# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMITTEE FOR A CONSTRUCTIVE TOMORROW, a nonprofit corporation, 1717 Pennsylvania Avenue, NW Washington, D.C. 20006 and <br><br> THE HEARTLAND INSTITUTE, a non-profit corporation, 3939 N. Wilke Rd. Arlington Heights, IL 60004-1275 and <br><br> CRAIG RUCKER, an individual, 1101 Old Charles Town Rd, Berryville, VA 22611 and <br><br> NATIONAL LEGAL AND POLICY CENTER, a non-profit corporation, 107 Park Washington Court Falls Church, VA 22046 and <br><br> PETER FLAHERTY, an individual, 2012 N. Westmoreland St. Arlington, VA 22213 <br><br>       Plaintiffs, <br><br>       v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street NW, Washington, DC 20240 and <br><br> DEB HAALAND, Secretary of the Interior, acting in her official capacity, 1849 C Street NW, Washington, DC 20240; and | Case No._____ |

UNITED STATES BUREAU OF OCEAN
ENERGY MANAGEMENT,
1849 C Street NW, Washington, DC 20240
and

ELIZABETH KLEIN, Director of United States
Bureau of Ocean Energy Management, acting in
her official capacity,
1849 C Street NW, Washington, DC 20240
and

GINA RAIMONDO, Secretary of Commerce,
acting in her official capacity,
1401 Constitution Avenue, NW
Washington, D.C., 20230
and

NATIONAL MARINE FISHERIES SERVICE,
1315 East-West Highway
Silver Spring, MD 20910
and

JANET COIT, Director of the National Marine
Fisheries Service,
1315 East-West Highway
Silver Spring, MD 20910

      Federal Defendants.


DOMINION ENERGY CORPORATION, a
publicly traded utility corporation,
120 Tredegar St.
Richmond, VA 23219-4306;

      Defendant and Real Party in Interest

# COMPLAINT

## For Declaratory and Injunctive Relief under the Endangered Species Act and Administrative Procedure Act

## NATURE OF THE ACTION

1.      This action seeks a court order to hold unlawful and set aside the Section 7

Biological Opinion (BiOp) issued by defendant National Marine Fisheries Service (NMFS) on

Sept. 18, 2023, pursuant to the Endangered Species Act (ESA) 16 U. S. C. 1540, for the

Commercial Virginia Offshore Wind project (CVOW), which was approved via Record of

Decision (ROD) by defendant Bureau of Ocean Energy Management (BOEM) on October 31,

2023 as well as all related permits, including the Letter of Authorization (LOA) issued on Feb. 5,

2024, to begin work on the CVOW. The CVOW will consist of 176 wind turbines to be

constructed approximately 25 miles off the coast of Virginia Beach, Virginia, and will be owned

by real party Dominion Energy Corporation (Dominion Energy). For the reasons set forth in this

Complaint, the BiOp constitutes an arbitrary and capricious action in violation of the ESA and

the Administrative Procedure Act (APA), 5 U.S.C. Sec. 706 (2).

2.      Specifically, the BiOp (i) failed to provide an adequate analysis of the cumulative,

jeopardy-producing effects of the CVOW project on the federally-listed and critically

endangered North Atlantic right whale (NARW); (ii) used an environmental baseline that failed

to account for previously-approved offshore wind (OSW) projects along the Atlantic coast, as

well as other existing sources of potential "take" of NARW; (iii) failed to consult, utilize, and

base its conclusions regarding "take" of and jeopardy to NARW on the best available scientific

and commercial information; and (iv) unlawfully segmented its analysis of jeopardy-producing

effects on NARW by analyzing only one OSW project at a time – in this case, the CVOW

project – and never seeking to examine the OSW projects for their combined and/or synergistic

impacts on the species.

3.      The United States government, led by defendant Bureau of Ocean Energy Management (BOEM), has embarked on a comprehensive and aggressive campaign to develop as many as 30 industrial-scale offshore wind (OSW) energy projects along the Atlantic coast, from Maine to North Carolina.

4.      Just days after his inauguration, President Biden confirmed his commitment to BOEM's OSW program by issuing Executive Order 14008, dated January 27, 2021, and titled "Tackling the Climate Crisis at Home and Abroad." Section 207 of the Executive Order expressly calls for a "doubling" of offshore wind energy production by 2030.

5.      In March 2021, the Departments of Interior, Energy, and Commerce responded to Executive Order 14008 by announcing a national goal to deploy 30 gigawatts of OSW by 2030.[1]

6.      As of September 2023, there were 30 renewable energy lease areas in the Atlantic Outer Continental Shelf (OCS).[2] All or most of these OSW lease areas overlap habitat of the federally-listed and endangered North Atlantic right whale (NARW).[3]

7.      As of the date of this Complaint, NMFS has issued BiOps for six (6) OSW projects along the Atlantic coast. Each of those BiOps includes an Incidental Take Statement (ITS) authorizing the OSW owner-operator to take a certain number of NARW through Level B noise harassment due to project-related pile driving. All told, the combined Level B take of NARW stands at 163 individuals. None of the BiOps or ITSs authorizes take of NARW by any means other than Level B noise harassment (e.g., vessel strikes). (See Map of Marine Mammals

---

[1]   www.doi.gov/news/interior-joins-government-wide-effort-advance-offshore-wind

[2]   Draft *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy*, October 2022, p. 3.

[3]   *Id.,* at p. 4.

Geographic Analysis Area, Fig. 3.15-1 to Final Environmental Impact Statement (EIS) for CVOW Project, attached to this Complaint as Exhibit 1.)

8.     As discussed below, the Atlantic coast OSW projects that BOEM is processing are part of a network of wind energy facilities that will generate electricity for consumers along the eastern seaboard. Correspondingly, this network of OSW projects will result in combined and/or synergistic impacts on a host of environmental resources, including federally-protected marine mammals such as the NARW.

9.     The wind energy areas (WEAs) that BOEM has selected for OSW development – including the WEA for CVOW – are located within and along the very migration corridors that NARWs use to travel from calving grounds in South Carolina to the zooplankton-rich foraging areas in New England and Canada. In short, BOEM's industrial-scale OSW program for the Atlantic coast puts human development on a collision course with the endangered NARW; and, historically, that situation has resulted in tragedy for the whale.

10.     Among the OSW projects planned and approved by BOEM is the CVOW facility to be constructed and operated by real party Dominion Energy.

11.     The CVOW project – during its construction, operation, and decommission phases – will adversely affect the federally-listed NARW, which uses the waters within and near the CVOW project area for migration, feeding, and other key life history events. CVOW will not only cause direct impacts to NARW individuals, of which there are only approximately 340 left in the world; the project will also contribute to the combined harm that the other planned and approved OSW projects, as well as other human activities in the Project's area of potential effect (APE), will inflict on these same 340 NARWs.

12.     In other words, the NARW individuals that migrate to and feed off the coast of Massachusetts, Rhode Island, and New Jersey are the same NARW individuals that migrate to and feed off the coast of Virginia. At every step along their migratory path, from Maine to North Carolina, these same NARWs will encounter not one or two OSW projects, but as many as 30. Each one of these OSW facilities will obstruct the NARWs' migration and expose it to threats such as vessel strikes, reduced food supplies (zooplankton), fishing gear entanglement, and dangerous noise impacts. To these impacts one must add potential take of NARW from other non-OSW sources. The combined effect of these impacts on each individual NARW will be devastating and likely push the species to or beyond the brink of extinction. The BiOp, however, does not analyze this potential outcome.

13.     Under Section 7 of the Endangered Species Act (ESA), BOEM was required to consult with NMFS regarding the CVOW project's potential to cause take of federally-listed species, such as the NARW. The consultation was supposed to generate a robust assessment of the project's impacts on these species from both a project-specific and cumulative perspective, using the best available scientific and commercial information. That assessment ultimately was set forth in a BiOp issued by NMFS.

14.     To comply with ESA section 7, the BiOp must analyze the CVOW project's potential to take listed species individuals and/or adversely modify their designated critical habitat. In addition, the BiOp must examine the extent to which the project, whether individually or cumulatively, could impede the species' recovery. The BiOp includes an Incidental Take Statement (ITS), specifying the number of NARW individuals the project may take without violating section 9 (or 10) of the ESA, and imposing reasonable and prudent measures to ensure that the amount of take does not exceed the limits set forth in the ITS.

15.     NMFS issued the BiOp for the CVOW project on September 18, 2023. The BiOp, however, was and remains legally deficient, as it failed to analyze the extent to which the CVOW project, when viewed in combination with previously-approved OSW projects along the Atlantic coast, will create impacts on NARWs, lead to take of NARW, and ultimately jeopardize the NARW. This is a critically important analysis in this instance, as many of NARW individuals will be adversely affected by every OSW project that BOEM has approved or plans to approve along the Atlantic coast. In failing to account for already-approved OSW projects, the BiOp used an incorrect baseline for assessing the CVOW project's contribution to anticipated combined impacts on NARW. These combined impacts include NARW "take" authorizations issued by NMFS for at least five (5) other OSW projects along the east coast.

16.     The BiOp failed to account for other federally-approved and non-federally-approved activities which, when combined with the impacts of the CVOW project, will produce additional impacts on NARW, potentially leading to take and jeopardy.

17.     The BiOp continues NMFS's and BOEM's unlawful policy of segmenting their analysis of the federal OSW program's impacts on and jeopardy to the NARW, so that the combined effects of the 30-plus Atlantic OSW projects on NARW are never evaluated, disclosed, or mitigated. This results in a gross underreporting of impacts on the NARW. Worse, it encourages institutional overconfidence at NMFS and BOEM that continued "take" of NARW through the OSW program will not jeopardize the survival of the species.

18.     The BiOp also failed to use the "best scientific and commercial information available" when assessing the CVOW project's noise impacts – during both construction and operation – on NARWs. Other defects in the BiOp include, but are not limited to, its reliance on unproven mitigation measures to prevent take of NARW and its failure to examine the extent to

which the project, during its operational phase, will alter water mixing patterns and disperse the dense aggregation of zooplankton (copepods) that NARWs need in order to feed efficiently.

19.     By *issuing* a legally-defective BiOp, NMFS and, by extension, the Secretary of the Department of Commerce, Gina Raimondo, violated the ESA. By *accepting* a legally-defective BiOp, BOEM and, by extension, the Secretary of the Interior, Deb Haaland, also violated the ESA.

20.     Through this lawsuit, the plaintiffs seek an order from the Court finding unlawful and  setting aside the BiOp issued by NMFS and accepted by BOEM, and ordering a halt to all work on the CVOW project until such time as NMFS prepares and issues a legally-compliant BiOp.

## JURISDICTION AND VENUE

21.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal questions), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 2201 (declaratory judgment), and 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701 through 706 (APA).

22.     For all claims brought under the ESA and the APA, Plaintiffs have exhausted all administrative remedies available to them. Specifically, Plaintiffs CFACT (of which Craig Rucker is president) and the Heartland Institute submitted a 60-day Notice of Intent to Sue, dated November 11, 2023, to the federal defendants in this action, identifying defects in the BiOp. A copy of the CFACT, *et al.* 60-day Notice of Intent to Sue is attached to this Complaint as Exhibit 2. Plaintiffs National Legal and Policy Center (NLPC) and Peter Flaherty submitted a 60-day Notice of Intent to Sue, dated March 7, 2024, to the federal defendants in this action, alleging defects in the BiOp. A copy of NLPC's 60-day Notice of Intent to Sue is attached to this

Complaint as Exhibit 3. Note that NLPC's 60-day Notice merely adopts and incorporates by reference the issues raised in CFACT's 60-day Notice of Intent to Sue.

23.     An actual, justiciable case or controversy exists between the parties within the meaning of Article III of the Constitution and 28 U.S.C. § 2201, because the defendants' issuance of the CVOW BiOp (including its Incidental Take Statement) and approval of the CVOW ROD and COP constitute final agency actions under the APA and the plaintiffs are aggrieved by that action, which this Court can remedy.

24.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants are federal agencies and officials whose offices are located in Washington, D.C.

## PARTIES

25.     Plaintiff COMMITTEE FOR A CONSTRUCTIVE TOMORROW (CFACT) is a 501(c)(3) non-profit corporation, based in Washington, D.C. Its mission is to educate the public about important political and environmental issues that can be addressed with practical solutions using the power of the private sector market. CFACT maintains a website cfact.org which describes its mission and current activities. Members of CFACT's Board of Advisors appear regularly in the media to discuss the adverse impacts of offshore wind power. These advisors include well-known media figures such as Marc Morano, Paul Driessen, H. Sterling Burnett, and Lord Christopher Moncton. CFACT is a sponsor of the "Save the Right Whale Coalition" which has submitted comments to BOEM and NMFS with respect to: (i) the BOEM's Draft Environmental Impact Statement (DEIS) for the CVOW project, (ii) Dominion Energy's application to NMFS for an Incidental Harassment Authorization, (iii) the Draft *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy*, and (iv) the BiOp issued by NMFS authorizing Dominion to take federally-listed species, including the NARW,

during construction, operation and decommissioning of the CVOW project. CFACT is a stockholder of Dominion. In addition, CFACT is a signatory to the 60-Day Notice of Intent to Sue letter challenging the legal adequacy of the BiOp, which was sent to the federal defendants on November 11, 2023, as required by the ESA, 16 U.S.C. § 1540(g)(2). Members of CFACT, including plaintiff Craig Rucker, enjoy whale-watching off the Atlantic coast where they might observe NARW. These members have concrete plans to go whale-watching in the future in areas where NARW are known to reside and/or migrate. Project-related impacts to the NARW will adversely affect CFACT members and degrade their ability to observe the species and enjoy the aesthetic experience of being in their presence.  Moreover, one or more members of CFACT live in Virginia Beach, VA where on-shore construction activities of the CVOW have begun which cause noise pollution and other disturbances to their well-being.[4]

26.     Plaintiff THE HEARTLAND INSTITUTE (Heartland) is a national, non-profit, 503(c)(3) public interest organization, based in Arlington Heights, Illinois. It was founded in 1984, and employs a staff of 24 with expertise in budget and tax issues, education policy, environmental protection, and energy policy. Its public relations staff conducts thousands of face-to-face meetings with state legislators every year. Heartland's communications in print, television, and radio have a combined circulation of 185 million viewers. Heartland has maintained a deep interest the CVOW and wind energy policy for many years. Like co-plaintiff CFACT, Heartland is a member of the Save the Whales Coalition and a signatory to the

---

[4] In a story dated March 4, 2024, Richmond, Virginia's local CBS news affiliate, WTVR, reported that residents of Virginia Beach are experiencing noise-related impacts from construction of CVOW's on-shore facilities.

https://www.wtvr.com/news/local-news/dominion-energy-wind-turbine-virginia-beach-march-4-2024

comments on the CVOW DEIS, the IHA issued by NMFS to Dominion Energy, and the Draft

Strategy on the NARW authored by BOEM and NOAA. In addition, like CFACT, Heartland was

a signatory on the 60-Day Notice of Intent to Sue letter submitted to NMFS on November 11,

2023, which identified defects in the BiOp issued for the CVOW project. Members of Heartland,

including Aaron Stover, enjoy whale-watching off the Atlantic coast where they might observe

NARW. These members, including Mr. Stover, have concrete plans to go whale-watching in the

future in areas where NARW are known to reside and/or migrate. For example, Mr. Stover has

contacted Rudee Tours in Virginia Beach, VA, to reserve a spot on a whale-watching boat this

coming December, when Rudee Tours resumes its whale-watching excursions. Project-related

impacts to the NARW will adversely affect Heartland members (including Mr. Stover) and

degrade their ability to observe the species and enjoy the aesthetic experience of being in their

presence.

27.      Plaintiff CRAIG RUCKER is a citizen of the United States and a resident of

Berryville, VA. Mr. Rucker is a Founder and President of CFACT. Mr. Rucker has spent a

considerable amount of his career involved with the protection of endangered animal species,

including the NARW. He has written numerous articles for CFACT, Real Clear Energy, the

Heartland Institute, and other national publications regarding the CVOW and the negative impact

which the CVOW, and all the related Atlantic Coast OSW projects, will inflict on the NARW.

These articles and activities also explain how the CVOW will cause an enormous and

unnecessary increase in electricity rates. Mr. Rucker has organized and participated in activities

which are designed to educate the public about the plight of the NARW, such as placing

billboards along main thoroughfares in Virginia with pictures of dead whales and the message

"Stop Wind Mills, Save Whales". In addition, Mr. Rucker organized and funded an airplane

which flew a trailing banner over New Jersey beaches on Memorial Day, 2023 with the message

"Stop Windmills, Save Whales". He has also participated in a boat expedition which drove 20

miles off Montauk Point, NY with the message "Save Whales, Stop Windmills". Mr. Rucker also

has appeared as a guest on television and radio shows commenting on the damage and

destruction the CVOW and other East Coast wind projects will cause for the NARW. Mr. Rucker

has made numerous trips on the coastal waters of the eastern United States for purposes of

whale-watching, and he intends to continue such trips in hopes of seeing one of these

magnificent marine mammals. To this end, Mr. Rucker has contacted Rudee Tours in Virginia

Beach, VA, to reserve a spot on a whale-watching boat this coming December, when Rudee

Tours resumes its whale-watching excursions. Should the CVOW project, alone or in concert

with other OSW projects planned and approved by BOEM, be constructed and made operational,

NARW will likely be harmed or may leave the coastal waters where Mr. Rucker might otherwise

observe them. Worse, the CVOW project, alone or in concert with other OSW projects planned

and approved by BOEM, may cause the NARW to become extinct, forever foreclosing Mr.

Rucker's desire to observe the species and enjoy the aesthetic experience of sharing the ocean

with it.

      28.     Plaintiff NATIONAL LEGAL AND POLICY CENTER (NLPC) is a nonprofit

503(c)(3) organization founded in 1991 that promotes ethics in government and opposes

unlawful government actions. NLPC is headquartered in Falls Church, Virginia. NLPC owns

59.7 shares of stock in Dominion Energy. As a shareholder, NLPC opposes Dominion Energy's

CVOW project on grounds that it will unlawfully endanger NARW and generate reputational

damage to Dominion, thereby adversely affecting NLPC. In particular, NLPC has challenged

Dominion Energy's use of its political influence to shape governmental policy in Virginia. In

addition, NLPC is being assessed a surcharge on its monthly electric bills from Dominion for this project, which would be eliminated if the project were halted. NLPC also has members and supporters who oppose endangerment to the NARWs by CVOW,

29. Plaintiff PETER FLAHERTY is an individual, currently employed as the Chairman of NLPC. He resides in Virginia. Mr. Flaherty opposes Dominion Energy's unlawful wind energy project because it will damage the environment, particularly the NARW. He is being assessed a surcharge on his residential monthly electric bills from Dominion for this project, which would be eliminated if the project were halted.

30. Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is an agency of the federal government, which is authorized to grant leases, easements, and/or rights-of-way on the Outer Continental Shelf for activities that produce or support production of energy from sources other than oil and gas, such as wind power.[5] The Department of the Interior is also the parent department which oversees defendant BOEM.

31. Defendant DEB HAALAND is the Secretary of the United States Department of the Interior and, among other things, is charged with overseeing the management of the nation's Outer Continental Shelf lands and oceans, including those affected by the OSW projects that will ultimately be developed along the Atlantic coast, such as CVOW. In this regard, Secretary Haaland oversees BOEM and is ultimately responsible for the decisions taken by BOEM. Further, Secretary Haaland is responsible for ensuring that all agencies within the Department of the Interior, including BOEM, comply with the ESA and the APA. In this action, Plaintiffs are suing Secretary Haaland in her official capacity as Secretary of the Interior.

---

[5]  43 U.S.C. § 1337(p)(1)(C).

32.     Defendant BOEM is an agency of the United States government within and under the jurisdiction of the Department of the Interior. BOEM's stated mission "is to manage development of U.S. Outer Continental Shelf energy and mineral resources in an environmentally and economically responsible way."[6] For purposes of this action, BOEM is the federal agency responsible for implementing the U.S. government's OSW energy program. More specifically, BOEM is the federal agency that approved the CVOW project, issued the ROD for the project, approved the CVOW COP, and accepted the analysis, terms, and conditions of the BiOp issued by NMFS on September 18, 2023. Here, BOEM has accepted a BiOp that (i) failed to address the cumulative, connected, and synergistic impacts of implementing the OSW projects slated for the Atlantic coast, including but not limited to the CVOW facility, and (ii) failed to consult and use the best available scientific and commercial information in its analyses. In doing so, BOEM violated the ESA.

33.     Defendant ELIZABETH KLEIN is the Director of BOEM. Director Klein oversees BOEM and is responsible for the decisions taken by BOEM. In this action, Plaintiffs are suing Director Klein in her official capacity as Director of BOEM.

34.     Defendant GINA RAIMONDO is the Secretary of the United States Department of Commerce and, among other things, is charged with overseeing commercial activities within the United States and abroad. Among the agencies under Secretary Raimondo's supervision is NMFS. Thus, Secretary Raimondo is responsible for ensuring that NMFS complies with the ESA. In this action, Plaintiffs are suing Secretary Raimondo in her official capacity as Secretary of Commerce.

---

[6]   U.S. Department of the Interior: Bureau of Ocean Energy Management, About Us (last visited Jan. 5, 2022), available at https://www.boem.gov/about-boem.

35.     Defendant NMFS is a government agency within the Department of Commerce. Among its duties is to assess federal actions, such as BOEM approval of the CVOW project, for their potential to adversely affect and take federal-listed marine species, including the NARW. In this case, NMFS prepared and issued the BiOp for the CVOW project.

36.     Defendant JANET COIT is the acting Director of NMFS and, as such, is primary responsible for ensuring that the Biological Opinions issued by NMFS comply with the legal requirements of the ESA. Ms. Coit oversaw the preparation and issuance of the BiOp for the CVOW project, which is the subject of this action. Plaintiffs are suing Ms. Coit in her official capacity.

37.     Defendant and real party in interest DOMINION ENERGY (Dominion) is an American energy company headquartered in Richmond, Virginia that supplies electricity in parts of Virginia, North Carolina, and South Carolina and supplies natural gas to parts of Utah, Idaho and Wyoming, West Virginia, Ohio, Pennsylvania, North Carolina, South Carolina, and Georgia. Dominion also has generation facilities in Indiana, Illinois, Connecticut, and Rhode Island. Dominion is the applicant, owner, and proposed operator of the CVOW project, as well as the recipient of the NARW "take" authorizations issued by the federal defendants.

## STATUTORY AND REGULATORY FRAMEWORK

### A.     The Administrative Procedure Act

38.     The Administrative Procedure Act (APA) is found at 5 U.S.C. §§ 551, et seq.

39.     The APA addresses agency actions such as issuance of policy statements, licenses, and permits. It also provides standards for judicial review if a person has been adversely affected or aggrieved by an agency action and empowers the courts to set aside and hold

unlawful such action  found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law  5 U.S.C. 706(2).

40.     When a substantive federal statute includes no citizen suit provision or statute of limitation, the APA is used to provide citizens access to federal courts when challenging actions by federal agencies.

## B.     The Endangered Species Act

41.     The ESA is found at 16 U.S.C. §§ 1531, et seq.

42.     The ESA was enacted, in part, to provide a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] a program for the conservation of such endangered species and threatened species . . . ."[7]

43.     Section 2(c) of the ESA establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act."[8] The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary."[9]

44.     Section 7(a)(1) of the ESA requires that all federal agencies "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species . . . ."[10] Section 7(a)(1) also directs NMFS (or, as the case

---

[7]    16 U.S.C. § 1531(b).
[8]    16 U.S.C. § 1531(c)(1).
[9]    16 U.S.C. § 1532(3).
[10]   16 U.S.C. § 1536(a)(1).

may be, the Fish and Wildlife Service) to review other programs administered by the Secretary and utilize such programs in furtherance of the purposes of the Act.[11]

45.    The ESA vests the Secretary of Commerce with primary responsibility for administering and enforcing that statute with respect to marine and anadromous species. The Secretary has delegated this responsibility to NMFS.[12] The National Oceanic Atmospheric Administration of the Department of Commerce, through the NMFS, is responsible for implementing the ESA with respect to marine and anadromous species. The United States Fish and Wildlife Service is responsible for implementing the ESA with respect to terrestrial and freshwater species.

46.    *Listing of Species.*  For purposes of marine species (including marine mammals, pelagic fish, anadromous fish, and coral), the Section 4 of the ESA requires the Secretary of the Commerce to issue regulations listing species as endangered or threatened based on the present or threatened destruction, modification, or curtailment of a species' habitat or range; overutilization for commercial, recreational, scientific, or educational purposes; disease or predation; the inadequacy of existing regulatory mechanisms; or other natural or manmade factors affecting the species' continued existence.  16 U.S.C. § 1533(a)(1).  An endangered species is one "in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(a).  A threatened species is one that will become endangered if current circumstances continue.  The ESA requires the Secretary to make listing decisions "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).  Only if officially listed does a species receive the full protection of the ESA.  The ultimate goal of the

---

[11]    16 U.S.C. § 1536(a)(1).
[12]    50 C.F.R. § 402.01(b).

ESA is to conserve and recover species so that they no longer require the protections of the Act. 16 U.S.C. §§ 1533(b), 1532(3). The Secretary has delegated the task of listing marine species under the ESA to NMFS. The NARW is a species listed pursuant to 16 U.S.C. § 1533(a)(1).

47.     *Critical Habitat.* Concurrently with listing a marine species as threatened or endangered, the Secretary of Commerce must also designate the species' "critical habitat". 16 U.S.C. § 1533(b)(2). "Critical habitat" is the area that provides the physical and biological features essential to the conservation of the species and which may require special protection or management. 16 U.S.C. § 1532(5)(A). The ESA requires the Secretary to make critical habitat designations and amendments "on the best scientific data available." 16 U.S.C. § 1533(b)(2). The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. § 1532(3). This definition of "conservation" is broader than mere survival; it also includes recovery of the species. *Id.* The Secretary has delegated the task of designating critical habitat for listed marine species to NMFS.

48.     *Duty to Conserve.* Federal agencies have an affirmative duty to promote the conservation and recovery of threatened and endangered species. Section 2(c) of the ESA provides that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of the Act." 16 U.S.C. § 1531(c)(1). Section 7(a) also establishes an

affirmative duty to conserve listed species. 16 U.S.C. § 1536(a)(1). The duty to conserve applies to the Secretary of the Interior, the Secretary of Commerce, BOEM, and NMFS.

49.    *Duty to Insure Survival and Recovery; Duty to Consult.* Section 7(a) mandates that all federal agencies "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species . . . determined . . . to be critical . . . ." 16 U.S.C. § 1536(a)(2). To fulfill this mandate, the acting agency must prepare a biological assessment to identify all endangered and threatened species likely to be affected by the action. U.S.C. § 1536(c)(1). Where, as here, the affected species are marine animals, the acting agency must consult with NMFS to determine the extent of the impact to the species in question and identify measures to minimize take.

50.    NMFS and the Fish and Wildlife Service follow a jointly prepared consultation handbook which states that a "may affect" determination is:

> [T]he appropriate conclusion when a proposed action may pose *any* effects on listed species or designated critical habitat. When the Federal agency proposing the action determines that a "may affect" situation exists, then they must either initiate formal consultation or seek written concurrence from the Services that the action 'is not likely to adversely affect' listed species.[13]

51.    A "may affect" determination triggering formal consultation is required when "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character"[14] occurs. Further, when determining whether any such effects may occur, NMFS (or the Fish and Wildlife Service) and the action agency must consider not only the direct effects of the action,

---

[13] *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act* at xiv (hereafter "Joint Consultation Handbook") (emphasis in original).
[14] 51 Fed. Reg. 19,926, 19,949 (June 3, 1986).

but also the "indirect effects", which are defined as those that are "caused by the proposed action and are later in time, but still are reasonably certain to occur."[15]

52.     Once an action agency makes a "may affect" determination, the agency may elect to enter informal consultation with either the NMFS or the Fish and Wildlife Service, depending on which Service has jurisdiction over the species in question. The action agency then must complete a Biological Assessment (BA) and make one of two determinations – a "not likely to adversely affect" (NLAA) determination or a "likely to adversely affect" (LAA) determination. If the action agency arrives at an LAA determination, then formal consultation is required. Joint Consultation Handbook at 2-6. If the relevant Service does not concur with the NLAA determination, or if the action agency elects to bypass the informal consultation process and initiate formal consultation, then the relevant Service works towards the completion of a BiOp for the proposed action. When engaging in Section 7 consultation, both NMFS and the "action agency" must "use the best scientific and commercial data available."[16]

53.     *Biological Opinion.*  Following consultation under Section 7(a)(2), NMFS must prepare a Biological Opinion (BiOp) that analyzes whether the proposed action is likely to jeopardize the continued existence of a listed marine species or destroy or adversely modify a marine species' designated critical habitat.  If the BiOp concludes the action has the potential to jeopardize the species or adversely modify its critical habitat, the BiOp must include an Incidental Take Statement (ITS) which specifies the impact of any incidental taking, provides reasonable and prudent measures to minimize such impacts, and sets forth terms and conditions that must be followed.  16 U.S.C. § 1536(b)(4).  Where an agency action may affect a listed

---

[15]   50 C.F.R. § 402.02.
[16]   16 U.S.C. § 1536(a)(2).

species, the absence of a valid BiOp means that the acting agency (here, BOEM) has not fulfilled its duty to insure through consultation with NMFS that its actions will neither jeopardize a listed species nor destroy or adversely modify the species' critical habitat.

54.     The BiOp must evaluate the "cumulative effects on the listed species." 50 CFR § 402.14(g)(3).  Cumulative effects include those of other federal actions, as well as those of "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 CFR § 402.02. Related to the requirement that BiOp's analyze cumulative effects, the ESA and its implementing regulations mandate that the BiOp's analytical baseline include environmental conditions resulting from approved federal actions, such as previously-approved OSW projects and any take authorizations issued along with them. 50 CFR § 402.02 [definition of "Environmental baseline"] This ensures that the BiOp fully considers the combined effects of the federal action under review *and* the impacts of previously-approved federal actions.

55.     The BiOp must use the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 CFR § 402.14(d).  In addition, the BiOp must consider all relevant evidence and factors, and articulate a rational connection between the facts and its conclusions.

56.     Although NMFS prepares and issues the BiOp, it is the action agency – here, BOEM – that must accept and implement the conditions set forth in the BiOp. Accordingly, the action agency is responsible for ensuring the BiOp is legally adequate.

57.     *Prohibition Against Unauthorized "Take"*.  Section 9 of the ESA and its implementing regulations prohibit any person from "taking" a threatened or endangered species. 16 U.S.C. § 1538(a)(1); 50 CFR § 17.31.  A "person" includes private entities, such as the applicant for the CVOW project, as well as local, state, and federal agencies.  16 U.S.C. §

1532(13).  The ESA defines "take" broadly to include harming, harassing, trapping, capturing, wounding, or killing a listed species either directly or by degrading its habitat to such an extent that it impairs or disrupts that species' essential behaviors.  16 U.S.C. § 1532(19).  However, there is an exception to the Section 9 prohibition on take.  A public agency or private party may take listed species if they secure an ITS from either the United States Fish and Wildlife Service (for take of terrestrial and freshwater species) or NMFS (for take of marine and anadromous species).  16 U.S.C. § 1536(b)(4).  So long as the permittee complies with the terms and conditions of the ITS, no take violation of Section 9 will occur.  16 U.S.C. § 1536(o)(2).

58.      *Citizen Suits.*  Section 11(g) of the ESA (16 U.S.C. § 1540(g)) – the so-called "citizen suit" provision – expressly authorizes citizens of the United States to sue members of the federal government and/or private citizens for violations of the Act, provided proper notice has been given to the defendant agency or individual. Plaintiffs here are invoking their rights under Section 11(g) to challenge (i) NMFS's issuance of the CVOW BiOP, and (ii) BOEM's acceptance of the BiOp and reliance on it when approving the CVOW ROD and COP. Plaintiffs have complied with all pre-suit requirements that apply under that provision of the Act.

## FACTUAL BACKGROUND

59.      On January 27, 2021, just two weeks after his Inauguration, President Biden issued Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad". This unusually detailed Order asserts that a "climate crisis" exists which "threatens our ability to live on Planet Earth" and requires a "whole of government" approach" to effectively resolve the "crisis". It specifically called for "a carbon-free electricity sector no later than 2035", and directed this mandate to all government agencies, including the Departments of Commerce, Interior, and Energy.

22

60.     The Departments of Interior, Commerce, and Energy established an inter-agency collaboration for the purpose of implementing the "Biden-Harris goal of developing 30 gigawatts of offshore wind by 2030". (See "Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy", Feb. 1, 2021.) These agencies have implemented an aggressive OSW leasing program which ultimately resulted in the establishment of nearly 30 separate offshore lease areas off the Atlantic coast, beginning in Massachusetts in the North and running down the east coast to South Carolina. (See Figure 3.15-1 Marine Mammals Geographic Area, Final Environmental Impact Statement for the CVOW, attached hereto as Exhibit 1.) One of the planned (and now approved) OSW projects is the CVOW facility.

61.     In 2021, Dominion Energy won the competitive bid for the CVOW project, which encompasses 112,799 acres located 25 miles off of Virginia Beach, Virginia. The project will consist of 176 14 MW wind turbines designed to produce 2,500 - 3,000 MWs of electricity annually.

62.     The National Environmental Protection Act (NEPA) requires every major federal action affecting the environment to issue an EIS which contains a "Purpose and Need" section explaining the reasons for taking the action. So far, there have been 12 Draft or Final EISs issued Atlantic coast OSW projects. Each of them, including the CVOW FEIS, cites Executive Order (EO) 14008 as the primary reason justifying the need for the project. Every application for an Incidental Harassment Authorization, including Dominion Energy's application for a 5-Year Letter of Authorization, cites Executive Order 14008 as the reason underlying its "Purpose and Need". Every Record of Decision (ROD), including the ROD for the CVOW, cites EO 14008 as grounds for its purpose and need. Therefore, it is clear that the CVOW is only one element of an

integrated plan to construct multiple wind energy facilities up and down the Atlantic Coast of the
U.S. in order to deploy 30 Gigawatts (30,000 MW) of offshore wind by 2030.

63.     The NARW is a federally-listed species under the ESA and one of the most
endangered large whales in the world, with approximately 340 individuals left in existence.
NARW migrate annually from the North Atlantic ocean, where it forages during the Summer
months, to the South Atlantic ocean, where it produces calves during the Winter months - a
distance of over 1,000 miles. This route carries the NARW through and/or near not only the
CVOW, but all other wind lease areas created by BOEM. See Map 3.15-1 "Marine Mammal
Geographic Analysis Area", Final Environmental Impact Analysis for the CVOW and BOEM
and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy, pp. 3-4.  Thus,
the same NARW individuals that must navigate through or around the BOEM-approved
Vineyard Wind OSW project in Massachusetts, must also navigate through or around the
BOEM-approved South Fork OSW project in Rhode Island, the BOEM-approved Revolution
Wind OSW project in Rhode Island/Connecticut, the BOEM-approved Empire Wind project in
New York, and the BOEM-approved Ocean Wind 1 OSW project in New Jersey, among others.
If and when the CVOW project begins construction, those same NARW individuals will have to
navigate around that facility as well. At each point, these OSW projects – and there are many
more in the BOEM-approval pipeline – will obstruct migration and feeding of NARW and
subject them to noise and increased threat of ship collisions and entanglement with fishing gear.

64.     In short, the same cohort of migratory NARW, numbering no more than 340
individual whales, will have to run the gauntlet of impacts, impediments, and physical threats
posed by the many OSW projects approved and/or planned for the Atlantic seaboard.
Unfortunately, however, neither NMFS nor BOEM has analyzed whether the combined and

synergistic impacts of so many OSW projects, when absorbed by such a limited number of individual whales, all of whom are entitled to the highest level of protection under the ESA, will result in "take" of such magnitude as to drive the species toward extinction or otherwise frustrate its recovery.

65.    In October 2022, BOEM and NOAA issued a draft document titled *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy* (the "NARW and OSW Strategy"), which admits that BOEM's Atlantic OSW program, when viewed in its entirety, has the potential to harm NARW and cause population scale impacts to the species. Key statements from the NARW and OSW Strategy include the following:

- "In March 2021, in response to Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, the Departments of Interior, Energy, and Commerce announced a national goal to deploy 30 gigawatts of OSW by 2030, while protecting biodiversity and promoting ocean co-use." (p. 1.)

- "BOEM and the National Oceanic and Atmospheric Administration's (NOAA's) National Marine Fisheries Service (NOAA Fisheries) recognize [OSW] development (from siting to decommissioning) must be undertaken responsibly including managing and mitigating the impacts to endangered species like the North Atlantic right whale. The NARW population is currently in decline, mainly due to vessel strikes and entanglement in fishing gear, necessitating precaution to ensure that OSW development is carried out in a way that minimizes the potential for adverse effects to the species and the ecosystems on which it depends." (p. 1.)

- "The agencies are working to understand the effects of OSW development on NARWs and their ecosystem, and to develop strategies to mitigate and monitor impacts to NARWs from OSW development."

- "BOEM and NOAA Fisheries initiated development of this shared draft *North Atlantic Right Whale and Offshore Wind Strategy* (hereinafter called "Strategy") to focus and integrate past, present, and future efforts related to NARW and OSW development. In response to Executive Order 14008, both agencies share a common vision *to protect and promote the recovery of North Atlantic right whales while responsibly developing offshore wind energy.* This vision reflects the combined legislative mandates of the two agencies and commitment to the Administration's goal of developing OSW while protecting biodiversity and promoting ocean co-use." (pp. 1-2.)

- "As of September 2022, there were 27 renewable energy lease areas in the Atlantic Outer Continental Shelf (OCS) and there are 42 megawatts of installed

OSW capacity. The OCS is the area of the continental shelf that begins at the edge of state marine boundaries (typically 3 nautical miles offshore except 9 miles for Texas and the west coast of Florida) and extends to 200 nautical miles, and more in some places." (p. 3.)

- "Additional lease sales are expected to be held in the Gulf of Maine and the Central Atlantic. In total, the area in existing leases and being considered for leasing in planning areas in the Atlantic OCS covers 22.237 million acres (about 8% of the Atlantic OCS). The OSW infrastructure currently proposed for installation by 2030 would be located on about 2.349 million acres, use fixed turbine technologies, and include 3,441 turbines and foundations and 9,874 miles of export and inter-array submarine cables." (p. 3.)

- "In addition, the Biden-Harris Administration has announced the goal of 15 gigawatts of floating OSW capacity by 2035. These metrics of development will change over time; but for purposes of this Strategy, the metrics demonstrate the large-scale nature of the development planned and underway." (p. 3.)

- "Due to the declining status of NARWs, the resilience of this population to stressors affecting their distribution, abundance, and reproductive potential is low. The species faces a high risk of extinction, and the population is small enough that the death of even some individuals can have a measurable effect on its population status, trend, and population dynamics. Further, the loss of even one individual a year may reduce the likelihood of recovery and the species achieving optimum sustainable population." (pp. 6-7.)

- ."NOAA Fisheries' *North Atlantic Right Whale Priority Action Plan for 2021-2025* identifies the need to improve our knowledge of factors that may limit NARW recovery, such as OSW development (NOAA Fisheries 2021)." (p. 7.)

- "NARWs engage in migration, foraging, socializing, reproductive, calving, and resting behaviors critical to their survival (Leiter et al. 2017; Muirhead et al. 2018; Quintana-Rizzo et al. 2021; Zoidis et al 2021). The overlap between OSW development (planned, leased, and permitted) and NARW habitat extends to corridors outside the immediate development sites, where vessel traffic between ports and offshore sites would further overlap with the distribution of NARW." (p. 7.)

- "Effects to NARWs could result from exposure to a single project and may be compounded by exposure to multiple projects. ***It is important to recognize that NARW migrating along the U.S. Atlantic Coast travel through or nearby every proposed OSW development.***" (p. 11 [Emphasis added].)

66.    On September 18, 2023, NMFS issued the BiOp for the CVOW project.

67.    The BiOp for the CVOW project identifies the "proposed action" for its analysis as the CVOW project itself, as defined in Dominion Energy's Construction and Operations Plan.

The COP describes the process for constructing 176 14-16 MW wind turbines and the associated

cables and infrastructure necessary to carry the generated electricity to shore. BiOp pp. 13-14.

68.     The BiOp concluded that while the CVOW project would result in limited "take"

of NARW, it would not jeopardize the species, adversely modify its critical habitat, or impede

the species recovery. The BiOp includes an ITS setting forth the number of NARW the CVOW

project is authorized to take and by what means.

69.     On October 31, 2023, BOEM issued a ROD approving the CVOW project and

adopting its Final EIS.

70.     On November 11,  2023, CFACT and Heartland, through counsel, submitted a 60-

Day Notice of Intent to Sue letter to BOEM and NMFS (among others) as required by the ESA.

This letter constitutes adequate notice to satisfy the requirements of the ESA and supports the

claims contained in this Complaint. Neither BOEM nor NMFS have responded to the letter. On

January 10, 2024, the 60-day "wait" period for bringing legal action against BOEM and NMFS

over the adequacy of the BiOp expired. Therefore, the district court may accept and adjudicate

this action.

71.     On January 24, 2024, BOEM approved the COP for the CVOW project, thereby

authorizing implementation of the project.

72.     On February 5, 2024, NMFS issued Dominion a Letter of Authorization, valid for

5 years, to begin work on the CVOW Project.

73.     On March 7, 2024, NLPC and Peter Flaherty, through counsel, submitted a 60-

Day Notice of Intent to Sue letter to BOEM and NMFS (among others) as required by  the ESA.

The letter expressly adopts and incorporates by reference CFACT's 60-day Notice of Intent to

Sue submitted previously to BOEM and NMFS. Note that the 60-Day Notice of Intent to Sue

submitted by NLPC and Mr. Flaherty contains no claims beyond those set forth in CFACT's 60-

Day Notice of Intent to Sue dated November 11, 2023.

### FIRST CAUSE OF ACTION:
### Violation of the ESA
### (Against NMFS for Issuing a Legally-Deficient BiOp)

74.     Plaintiffs hereby incorporate by this reference each paragraph and allegation set

forth above.

75.     Consultation under Section 7 of the ESA is required whenever a discretionary

agency action "may affect" any listed species or its critical habitat.

76.     The BiOp for the CVOW project concludes, "No mortality or permanent injury

(auditory or other) is expected from the proposed action during the construction, operations or

decommissioning phases of the project." (BiOp, p. 216.) The BiOp does, however, conclude that

the CVOW project will result in take of NARW through Level B (temporary) noise harassment

caused by pile driving.

77.     The CVOW BiOp only analyzed the CVOW area itself, and did not consider any

of the other 29 lease areas authorized for development by BOEM as part of its mission to fulfill

the mandate of Executive Order14008. In the BiOp, NMFS admits that it excluded from its

cumulative analysis all other ongoing and planned Atlantic coast OSW projects:

> We reviewed the list of cumulative impacts identified by BOEM in
> the CVOW-C DEI and determined that most (e.g. other future
> offshore wind development activities .......) do not meet the ESA
> definition of  cumulative effects because we expect that, if any of
> these activities were proposed in the action area, or were proposed
> elsewhere yet were to have future effects inside the action area,
> they would require at least one Federal authorization or permit, and
> would therefore be subject to ESA section 7 consultation
> requirements . . . . (BiOp p. 214.)

78.     The BiOp further explains the reason for its narrow approach by adding: "It is important to note that, because any future offshore wind project will require section 7 consultation, these future wind projects do not fit within the ESA definition of cumulative effects." BiOp p. 214.

79.     Thus, the BiOp's process for analyzing the CVOW project constitutes a textbook example of a segmented or piecemeal assessment, which artificially disconnects the project's impacts from those of other similar projects, thereby understating the impacts NARWs may incur during their annual thousand-mile migration path by examining only the harm it may suffer during a few miles of its migration.  The "future offshore wind projects" which BOEM ignores will create a gauntlet of noise, barriers, and potential ship strikes that will adversely affect the NARW and further jeopardize its survival.

80.     The BiOp also failed to adequately consider the CVOW project's impacts on NARW in combination with impacts from the other BOEM-approved OSW projects, each of which was granted an ITS authorizing take of NARW.

81.     In addition, the BiOp's analysis of all other federal and non-federally-approved projects and their contribution to existing and CVOW-related threats to NARW was inadequate and failed to provide sufficient data on which to make jeopardy determinations.

82.     As shown, the BiOp used an incorrect baseline for assessing the CVOW project's contribution to anticipated combined impacts on NARW. These combined impacts include (i) NARW "take" authorizations issued by NMFS for at least 5 other OSW projects, (ii) non-OSW federal activities for which take of NARW have been authorized, and (iii) non-federal activities that may cause impacts on NARW.

83.     By using an incorrect environmental baseline for the CVOW BiOp, NMFS

violated the ESA and issued a legally-defective BiOp. In short, due to the BiOp's piecemeal

analysis, "a listed species could be gradually destroyed so long as each path to its destruction is

sufficiently modest". (See also C.F.R.  Sec.402.14(k) - incremental step only allowed if

authorized by statute.)

84.     In their 60-day Notices of Intent to Sue, the plaintiff identified a host of defects in

the BiOp issued by NMFS, including, but not limited to the following:

- The BiOp Fails to Analyze the CVOW Project's Cumulative Impacts on NARW
  Individuals, Most of Which Will be Adversely Affected by Every Offshore Wind
  Project Currently Contemplated for the Atlantic Coast.

- The BiOp Fails to Use "Best Scientific Information Available" Because the
  Standards for Noise Tolerance of the NARW Were Based on Incomplete and
  Inaccurate Information

- The BiOp Fails to Analyze Cumulative Impacts on NARW from Multiple Level B
  Noise Take Authorizations.

- The BiOp Violates the ESA Because it Authorizes Loss of NARW in Excess of
  its Potential Biological Removal Rate.

- Presidential Order 14008 violates the APA, the MMPA, and the ESA by
  Removing the BOEM's Discretion to Adopt the No Action Alternative and to
  Exercise Its Duty to Properly Protect Endangered Species.

- The Proposed Mitigation Measures Will Not Adequately Protect NARW from
  Project-Related Vessel Strikes..

- Project Construction Activities, Including "Soft Start" Pile Driving, Will Force NARW Out of Their Preferred Habitat and Into Areas of Increased Threats – an Impact Not Studied in the BiOp.

- The BiOp Fails to Analyze Whether and to What Extent Project *Operations* Will Cause NARW to Abandon Favored Migration Routes and Feeding Areas.

- The BiOp Fails to Analyze Project's Potential to Alter Water Mixing Patterns and Dispersal of Zooplankton (Copepods).

- The BiOp's Analysis of Operational Noise Impacts Uses Unsubstantiated Assumptions Regarding Noise Propagation Loss Rates, Resulting in an Underreporting of Noise Impacts to NARW and Other Listed Species.

- The BiOp Fails to Acknowledge that the Individual NARWs Affected by the CVOW Project Are the Same NARWs that Will be Affected by Every Other Offshore Wind Project Along the Atlantic Coast.

- BiOp's Reliance on Passive Acoustic Monitoring is Misplaced.

85.     For the reasons set forth above and in the Plaintiffs' 60-Day Notices of Intent to Sue, the BiOp for the CVOW project is deficient as a matter of law. Accordingly, NMFS acted arbitrarily and capriciously when it issued the BiOp, resulting in an abuse of discretion and a violation of the ESA.

### SECOND CAUSE OF ACTION:
#### Violation of the ESA

### (Against BOEM for Accepting and Relying on a Defective BiOp)

86.     Plaintiffs hereby incorporate by this reference each paragraph and allegation set forth above.

31

87.     As the acting agency, BOEM has a duty to conserve listed species, including the NARW. As part of that duty, BOEM may not accept, rely on, or implement a defective BiOp, even if that BiOp was prepared by NMFS.

88.     As alleged above, the BiOp that NMFS issued for the CVOW project is legally-deficient and fails to meet the minimum legal standards established under Section 7 of the ESA. Thus, BOEM had a duty to reject the BiOp and demand further consultation so that a new or amended BiOp – one that was legally compliant – could be prepared.

89.     BOEM, however, did not reject the defective BiOp prepared by NMFS; nor did BOEM demand re-consultation. Instead, BOEM accepted the BiOp prepared by NMFS despite its analytical and legal deficiencies, and has relied on that defective BiOp for purposes of approving the ROD for the CVOW project. This is a violation of the ESA

90.     BOEM's actions vis-à-vis the BiOp were unlawful, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

### THIRD CAUSE OF ACTION:

**Violation of the APA**
**(Against NMFS and BOEM)**

91.     Plaintiffs hereby incorporate by this reference each paragraph and allegation set forth above.

92.     The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action with the meaning of a relevant statute, is entitled to judicial review thereof."[17] The reviewing court shall "hold unlawful and set

---

[17] 5 U.S.C. § 702.

aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."[18]

93.     An agency's action is arbitrary and capricious within the meaning of the APA if

> the agency has relied on factors which Congress has not intended it
> to consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter to
> the evidence before the agency, or is so implausible that it could not
> be ascribed to a difference in view or the product of agency
> expertise.[19]

94.     NMFS's issuance of the CVOW BiOp was arbitrary, capricious, and unlawful

because the BiOp failed to adequately address the proposed action's individual and cumulative

impacts on federally-listed species, including the North Atlantic Right Whale, and relied on

unproven, unsupported, and ineffective measures to protect such species from take and other

forms of harm. In addition, NMFS prepared the BiOp without consulting and using the best

available scientific and commercial data, a legal requirement of Section 7 of the ESA. For

example, the BiOp fails to examine and make use of data showing that Passive Acoustic

Monitoring (PAM) – which is a fundamental element of the project's strategy for

avoiding/mitigating impacts to NARW – has a very high "miss-rate" and should not be used for

ensuring that all NARW are detected before they enter the project's Level A ensonification zone.

The BiOp also fails to use the data provided by Dr. Robert Stern showing that the project's

operational noise will travel much further and attenuate at a slower rate than the BiOp assumes.

---

[18] 5 U.S.C. § 706(2)(A).

[19] *Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43 (1983).

95.     NMFS's issuance of the CVOW BiOp was arbitrary, capricious, and unlawful because the BiOp included an Incidental Take Statement that underreported and underestimated the number of individuals of each affected listed species that would be taken by the proposed action.  The Incidental Take Statement also failed to include a complete or effective set of reasonable and prudent measures that would minimize impacts, including taking, on the affected listed species.  16 U.S.C. § 1536(b)(4).

96.     BOEM's reliance on the defective BiOp was arbitrary, capricious, and an abuse of discretion because such reliance necessarily skewed BOEM's understanding of the impacts the CVOW project will have on the NARW.

97.     The actions of NMFS and BOEM have deprived plaintiffs of the procedural protections afforded them under the APA, and will irreparably harm plaintiffs' interests as they related to the NARW and environmental conditions off the coast of Virginia.

98.     Thus, this Court should reverse and set aside the BiOp and ITS, and all other project approvals that rely on them, and remand the matter to NMFS and BOEM for further consideration in accordance with the APA and the ESA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)     Enter an Order setting aside the CVOW BiOp and the ITS as unlawful and void, on grounds they were issued in violation of the ESA and APA;

(2)     Enter an Order setting aside all other federal approvals for the project that relied on the legal adequacy of the BiOp, including take or harassment authorizations issued pursuant to the Marine Mammal Protection Act.

34

(3)     Issue injunctive relief against Dominion prohibiting construction activities, both

onshore and offshore, at the CVOW project until such time as NMFS issues, and BOEM accepts,

a legally-compliant BiOp for the project.

(4)     Award Plaintiffs reasonable attorneys' fees and costs; and

(5)     Provide such other and further relief as the Court may deem just.


Dated: March 18, 2024                                    Respectfully submitted,


                                              */s/Paul D. Kamenar*
                                              Paul D. Kamenar
                                        1629 K Street, N.W., Suite 300
                                           Washington, D.C. 20006
                                              (202) 603-5397
                                          Paul.kamenar@gmail.com
                                            (D.C. Bar 914200)
                                            (Local Counsel)


                                              */s/David P. Hubbard*
                                              David P. Hubbard
                                        Gatzke Dillon & Ballance LLP
                                            2762 Gateway Road
                                            Carlsbad, CA 92009
                                              (760) 431-9501
                                           dhubbard@gdandb.com
                                           *Pro Hac Vice pending*
                                            (CA Bar No. 148660)


                                            *Counsel for Plaintiffs*

# EXHIBIT 1

Coastal Virginia Offshore Wind Commercial Project
Final Environmental Impact Statement

Section 3.15
Marine Mammals



**Figure 3.15-1     Marine Mammals Geographic Analysis Area**

# EXHIBIT 2

**G | D | B**   **Gatzke Dillon & Ballance LLP**
L A W Y E R S

November 11, 2023                                                    *By E-Mail*

National Marine Fisheries Service,
Office of Protected Resources
Attn: Kimberly Damon-Randall, Director
1315 East-West Highway, 13th Floor
Silver Spring, MD 20910
kimberly.damon-randall@noaa.gov

Bureau of Ocean Energy Management
1849 C Street, NW
Washington, D.C. 20240
jessica.stromberg@boem.gov

> Re:      *60-Day Notice of Intent to Sue Over Biological Opinion for the Construction,*
> *Operation, and Decommissioning of the Coastal Virginia Offshore Wind*
> *Commercial Project (Lease OCS-A-0483)—Issue Date September 18, 2023*

Dear Director Damon-Randall:

This firm represents the Committee for a Constructive Tomorrow (CFACT) and The Heartland
Institute ("Heartland") on matters relating to offshore wind energy development and its impacts
on the human and natural environment. We have reviewed the Biological Opinion ("BiOp") that
the National Marine Fisheries Service (NMFS) prepared for the construction, operation, and
decommissioning of the Coastal Virginia Offshore Wind (CVOW) project – also known as
"Dominion Wind". As explained below, the BiOp suffers from a host analytical defects that render
it unreliable and unusable as the basis for authorizing incidental take of listed species, most notably
the North Atlantic right whale (NARW). In short, the BiOp fails to meet the minimum
requirements imposed by the Endangered Species Act (ESA). By issuing it, NMFS has violated
the Act. By accepting it, the Bureau of Ocean Energy Management (BOEM) has likewise violated
the Act.

We provide this letter in hopes that NMFS and BOEM will rescind the current BiOp, correct the
deficiencies described below, and adjust the incidental take authorization to more accurately reflect
the CVOW's real impact on NARW and other listed species. Should NMFS and BOEM not take
these steps, CFACT and Heartland will wait the required 60 days and then file suit challenging the
legal adequacy of the BiOp.

**G | D | B   Gatzke Dillon & Ballance LLP**
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 2

1. <u>The BiOp Fails to Analyze the CVOW Project's Cumulative Impacts on NARWs, Most of Which Will be Adversely Affected by Every Offshore Wind Project Currently Contemplated for the Atlantic Coast.</u>

The CVOW BiOp constrains its analysis to the CVOW project and "project area". See BiOp p. 214. It does not assess or otherwise take into account the other offshore wind projects currently slated for development along the eastern seaboard of the United States. This results in a gross underreporting of impacts on individual NARWs and on the species as a whole. In their draft "North Atlantic Right Whale and Offshore Wind Strategy" (October 2022), BOEM and NOAA made the following statements about the potentially dangerous interface between offshore wind development and NARW critical life behaviors. The following quotations from the "strategy" are indicative:

- "NOAA Fisheries' *North Atlantic Right Whale Priority Action Plan for 2021-2025* identifies the need to improve our knowledge of factors that may limit NARW recovery, such as OSW development (NOAA Fisheries 2021). The plan identifies the need for a robust and comprehensive analysis of temporary and long-term direct and indirect impacts of OSW development from construction through decommissioning. (NARW and OSW Strategy, p. 7.)

- "Within the areas proposed for OSW development in the U.S., NARW engage in migration, foraging, socializing, reproductive, calving, and resting behaviors critical to their survival. The overlap between OSW development (planned, leased, permitted) and NARW habitat extends to corridors outside the immediate development sites, where vessel traffic between ports and offshore sites would further overlap with distribution of NARWs." (*Ibid.*)

- "Noise and ecosystem-level changes resulting from OSW development that may impact NARW are also likely to extend beyond the immediate OSW lease areas." (*Ibid.*)

- "Effects to NARWs could result from exposure to a single project and may be compounded by exposure to multiple projects. It is important to recognize that NARWs migrating along the U.S. Atlantic Coast travel through or nearby every proposed OSW development. (*Id.*, at p. 11.)

This last statement requires a closer examination, as it speaks to a fundamental flaw in the BiOp for the CVOW project. It is clear from the quoted language that NMFS and BOEM know that each migrating NARW individual (of which there are approximately 300 in existence) will pass through or near every approved or proposed OSW project now being processed by BOEM. It is also clear that NMFS and BOEM know that an individual NARW will receive impacts from each and every one of these OSW projects, resulting in cumulative and compound damage to the animal in

**G│D│B**   **Gatzke Dillon & Ballance LLP**
                L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 3

question. The BiOp, however, neither acknowledges this fact nor analyzes the compound impacts that are sure to result.

This piecemeal consideration of each individual wind project is invalid as a matter of law. *Wild Fish Conservancy v. Salazar,* 628 F. 3rd 513 (9th. Cir. 2010); *Strahan v. Roughead,* 910 F. Supp. 2d. 358 (D. Mass. 2012)*; Thomas v. Peterson,* 753 F.2d 754 (9th Cir. 1985). The CVOW project is an integral part of a larger enterprise which involves multiple leases for federal offshore property stretching from Massachusetts to Virgina. This is the "action" which should be analyzed by the federal agencies in determining the impact of the East Coast offshore wind program on endangered species, such as the NARW. This necessitates an assessment of the cumulative impact of all the industrial wind projects contained in the plan, during the proposal stage, with permitting and construction only beginning after a comprehensive EIS is completed is public notice. The only comprehensive EIS of the offshore wind program was published in Oct. 2007 (The   Final Programmatic Environmental Impact Statement), which explicitly stated that it was limited to current information and, for the future, only to "possible activities that may be initiated in the foreseeable future 5-7 Years (2007-2011)".  A BiOp issued in 2023, based on an outdated and inapposite EIS, is invalid as a matter of law, and injunctive relief is the proper remedy. An example of the case law:

"A listed species could be gradually destroyed, so long as each step on its path to destruction is sufficiently modest. This type of slow slide into oblivion is one of the very ills the ESA seeks to prevent". *Wild Fish Conservancy v. Salazar, supra,* 628 F.3d at p. 524.

   2.   The BiOp Fails to Use "Best Scientific Information Available" Because the Standards for Noise Tolerance of the NARW Were Based On Information that Was "Almost Non-Existent" at the Time.

BOEM has admitted that when the noise regulations for the NARW were promulgated, the noise parameters for baleen whales were "virtually unknown" and "almost non-existent." To rectify this admitted "knowledge gap," BOEM commissioned a complex program of additional investigation, as described in the "North Atlantic Right Whale and Offshore Wind Strategy", and one additional study co-funded with the US Navy, known as the "Auditory Weighting Function for Low-Frequency Whales" ( Feb. 2021).  The first document recommended numerous studies of baleen whale hearing capabilities, all of which are ongoing.  The second document – the Auditory Weighting Function for Low-Frequency Whales – consists of three studies which are ongoing and not due for completion until 2025. Because BOEM admitted that it based its regulations on outdated and incomplete data, without satisfying this "number one information need," the BiOp's conclusion that "[n]o mortality or permanent injury (auditory or other) is expected from exposure to any aspect of the proposed action" (p. 216) is arbitrary and capricious.

**G | D | B**   **Gatzke Dillon & Ballance LLP**
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 4

3. <u>The BiOp Fails to Analyze Cumulative Impact on NARW from Multiple Level B Noise Take Authorizations</u>

The developers of eleven offshore wind projects located off the coast of Massachusetts, New York, Connecticut, New Jersey, Maryland, Delaware, and Virginia all requested authorization to "take" NARWs and other marine mammals while performing site evaluation activities from April 2022 to November 2023. NMFS issued 163 "level B take" permits for the NARW to these developers. Level B take is defined as "the potential to disturb marine mammal stock by causing disruption of behavioral patterns, including migration, breathing, nursing, breeding, feeding or sheltering." The 163 Level B takes affects more than 50% of the entire estimated NARW population of 350 animals. In addition, the 163 takes does not take into account the Level B harassment authorizations for ***construction-related noise*** from the 20-plus offshore wind projects to be located up and down the Atlantic coast. In short, the BiOp fails to assess the cumulative load of these Level B takes on the affected NARWs, resulting in a violation of the ESA.

4. <u>The BiOp Violates the ESA Because it Authorizes Loss of NARW in Excess of its Potential Biological Removal Rate.</u>

The Potential Biological Removal Rate established by the NMFS - the number of human caused whale mortalities that can occur each year if the species is to survive - is objective, not subjective. That number is .07, which means there can be *zero human caused deaths per year.* For the CVOW project alone, NOAA anticipates eight human caused deaths per year for the next five years. (See Notice of Proposed Rulemaking, May 4, 2023, Ex. 7.) It is arbitrary and capricious for an agency to issue a regulation which claims to result in one outcome - zero deaths - while at the same time anticipating an opposite result - eight human caused dead whales per year. *American Rivers v. US Army Corps of Engineers,* 272 F.Supp.2d 230 (Dist. Ct. DC 2003) (BiOp is arbitrary and capricious where outcome predicted is not likely to occur).

5. <u>Presidential Order 14008 violates the APA, the MMPA, and the ESA by removing the BOEM's discretion to adopt the No Action Alternative and to exercise its duty to properly protect endangered species.</u>

Presidential Order 14008 requires that all federal agencies implement the programmatic East Coast offshore wind program. The MMPA and ESA, however, require federal agencies to protect endangered species. The federal agencies admit that they "do not know" what the impact of the industrialization of federal waters with thousands of offshore wind towers will be on the endangered North Atlantic Right Whale, but they authorize the program anyway because of the Presidential Order's directive, and then hide behind "mitigation" measures. See "Auditory Function." Thus, the BiOp violates the ESA mandate to "ensure" that the Virginia offshore wind program, and the related East Coast wind projects, will not result in the extinction of the North Atlantic Right Whale as a species, as required by ESA.

**G | D | B**  **Gatzke Dillon & Ballance LLP**
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 5

6. <u>The Proposed Mitigation Measures Will Not Adequately Protect NARW from Project-Related Vessel Strikes.</u>

The BiOp acknowledges that vessel strikes on NARW are a major cause of species mortality and a significant contributor to NARW population declines. The BiOp also acknowledges that the CVOW project will require hundreds of vessel trips, consisting of thousands of vessel miles, all through habitat used by NARW. These facts establish a clear potential for project-related vessel strikes on NARW and corresponding impacts to species survival and recovery.

To mitigate this impact, BOEM and Dominion have proposed two measures. First, they intend to staff project vessels with Protected Species Observers (PSOs), who would be trained to scan the ocean's surface looking for signs of NARW. If a PSO sees one, he or she is to report the sighting to the vessel captain who, presumably, will then take evasive action. The problem, however, is that PSOs – even under calm conditions – cannot detect NARW more than a few feet under the water's surface. During medium to high-swell conditions, the PSOs won't be able to consistently detect NARW when they come up to breathe or socialize. Because NARW spend most of their time underwater at depth, the PSOs will be largely unable to detect them. Consequently, PSOs provide little protection against vessel strikes.

The second proposed "vessel strike" mitigation measure is a 10 knot per hour speed limit for all project-related vessels. This speed limit, however, only applies for half the year (November through April). Vessels traveling to and from the project area during the remainder of the year (May through October) can travel as fast as they like. It is well established that when a vessel traveling in excess of 15 knots per hour collides with a whale, mortality is virtually 100 percent assured. The proposed mitigation measure does not address this issue and, in fact, would seem to place NARW in jeopardy of being struck and killed by project vessels. The BiOp, however, does not critically assess the vessel speed/whale collision issue; nor does it question why the 10 knot per hour speed applies only half the year. It accepts without discussion or analysis BOEM's assertion that NARW do not migrate through the project area between May and October. The evidence, however, is to the contrary. NARW *do* migrate through the project area during those months, though perhaps in smaller numbers. Given that the NARW has a potential biological removal (PBR) rate of less than 1.0 (i.e., 0.7, as noted above), even a single death due to vessel collision will push the species toward extinction.

Simply put, neither the PSOs nor the vessel speed limit, even when working in tandem, will be enough to protect NARW from potentially deadly collisions with project-related vessels. The BiOp's reliance on these measures to safeguard NARW is misplaced and without adequate scientific foundation.

**G|D|B**  **Gatzke Dillon & Ballance LLP**
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 6

7.  <u>Project Construction Activities, Including "Soft Start" Pile Driving, Will Force NARW
Out of Their Preferred Habitat and Into Areas of Increased Threats – an Impact Not Studied
in the BiOp.</u>

Dominion will begin each pile driving event with a "soft start" to encourage NARWs to leave the
project area and thereby escape harm from pile driving noise. The BiOp accepts this as an adequate
means of protecting NARW from noise-related damage (Level A and Level B). The BiOp,
however, fails to acknowledge, much less assess, the impacts of pushing NARW out of the project
area into waters with heavy vessel traffic and significant fishing activity. The proposed "soft start"
procedure will force NARW out of their preferred travel corridors and foraging zones into areas
where they could be struck by vessels and/or become entangled in fishing gear – the two most
prominent causes of NARW mortality and population declines. By ignoring this impact, NMFS
has issued BiOp that is fundamentally flawed and incomplete. Worse, NMFS has effectively
sanctioned construction activities that will drive NARW into areas where they will be exposed to
threats not studied or mitigated in the BiOp (or any other documents prepared by BOEM or NMFS).
Note, too, that the problem does not go away once pile driving transitions from "soft start" to full-
power hammering. To the contrary. Due to the intense noise it generates, full-power hammering
ensures that NARW will be forced to stay out of the pile driving zone for at least three hours per
pile drive event. And there is no guarantee the whales will come back soon or at all. This means
that the NARW will be displaced for considerable periods of time, in waters not of their choosing,
where threats to their physical wellbeing are significant and perhaps devastating. Again, the BiOp
fails to analyze this impact or impose measures to avoid it.

8.  <u>The BiOp Fails to Analyze Whether and to What Extent Project *Operations* Will Cause
NARW to Abandon Favored Migration Routes and Feeding Areas,</u>

Nearly the entire BiOp is focused on the *construction-related* impacts of the CVOW project; the
BiOp spends little time analyzing the project's *operational* impacts. At this time, there is no
scientific data showing that NARW (or any other species of whale) will continue to use migration
routes or feeding areas that intersect or otherwise overlap with operational offshore wind arrays.
The mere presence of hundreds of huge turbines, to say nothing of the noise they generate and the
hydrological and oceanographic changes they make to the environment, may cause many NARW
to avoid CVOW (and other offshore wind farms) even if it means abandoning their preferred travel
corridors and foraging areas. Again, any time whales are forced out of their preferred areas, they
are exposed to potential threats, including vessel collisions, fishing gear entanglement,
unnecessary expenditure of energy, and malnutrition. The BiOp does not address this potential
impact on individual NARW or on the species as a whole. And unlike construction-related impacts,
which are at least short in duration, the Project's operational impacts will be long-term, lasting
decades. The BiOp should analyze, but does not, the longitudinal effect Project operations will
have on the NARW.

**G | D | B**   **Gatzke Dillon & Ballance LLP**
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 7

9. **The BiOp Fails to Analyze Project's Potential to Alter Water Mixing Patterns and Dispersal of Zooplankton (Copepods).**

In a letter to BOEM's Lead Biologist (Brian Hooker), dated May 13, 2022, Sean Hayes, Ph.D., the Chief of Protected Species at NOAA (New England), stated that operational effects of offshore wind projects in New England could have population-scale impacts on NARW. Specifically, Dr. Hayes indicated that OSW-related oceanographic changes "may disrupt the distribution, abundance, and availability of typical right whale food (e.g., Dorrell et al 2022)," which in this context means zooplankton. Dr. Hayes then explained in detail how water mixing and stratification caused by wind turbine operations could make it difficult for NARWs to find and access the dense accumulations of zooplankton they need for survival:

> Right whales need dense aggregations of prey to make foraging energetically worthwhile, and disruptions to prey aggregations in the only known winter foraging area for right whales could have significant energetic and population consequences (Baumgartner and Mate 2003, 2005, van der Hoop et al 2019, Kenny et al 2020). Without dense aggregations of prey, right whales will search elsewhere for food, potentially at an energetic loss, given the likely increased metabolic travel costs and that alternative energetically beneficial foraging grounds may not exist during the winter. In addition, searching for new areas may place them in harm's way as occurred during their shift to Canadian waters sometime after 2010, resulting in 17 observed mortalities in 2017 and another 10 in 2019, and estimates of more than 200 total mortalities since (Davies & Brilliant 2019, Pace et al. 2021.)

> The presence of structures such as wind turbines are likely to result in both local and broader oceanographic effects, and may disrupt the dense aggregations and distribution of zooplankton prey through altering the strength of tidal currents and associated fronts, changes in stratification, primary production, the degree of mixing, and stratification in the water column (Chen et al. 2021, Johnson et al 2021, Christiansen et al 2022, Dorrell et al 2022). Modeling studies in this region have found changes in distribution patters of planktonic larvae under offshore wind build-out scenarios (Johnson et al. 2021, Chen et al. 2021), suggesting similar impacts could occur with right whale's zooplankton prey. The scale of impacts is difficult to predict and may vary from hundreds of meters for local individual turbine impacts (Schultze et al. 2020) to large-scale dipoles of surface elevation changes stretching hundreds of kilometers (Christiansen et al. 2022). Additionally, offshore

**G|D|B**  **Gatzke Dillon & Ballance LLP**
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 8

substations pose an unknown risk related to water withdrawals and
impingement/entrainment of zooplankton and other prey species.

(Sean Hayes, Ph.D., letter to Brian Hooker, May 13, 2022.)

Dr. Hayes' comments were focused on the NARW situation in New England, specifically the
offshore wind projects slated for the southern coast of Nantucket, MA. His concerns regarding the
long-term effects of offshore wind arrays on zooplankton abundance and density, however, apply
to any location where NARW feed, including the coastal waters of Virginia (i.e., the site of the
CVOW project). The BiOp makes passing reference to the potential oceanographic impacts of
CVOW project, but stops short of analyzing them in terms of their ability to impede NARW
nutritional and reproductive success. Worse, because the BiOp treats the issue in such an abstract
way, the proper urgency of the matter – which is evident throughout Dr. Hayes' letter – is not
conveyed or addressed. In fact, the BiOp utterly fails to heed the closing admonition from Dr.
Hayes: "[I]t is critical to assess the range of impacts/threats and stressors to protected species and
the degree to which they can be mitigated. This needs to include taking into consideration the
chronic state of right whales and the importance of productive foraging habitats to these species.
***These impacts should be thoroughly analyzed in any EIS or other environmental reviews
associated with offshore wind development.***" (Sean Hayes, Ph.D., letter to Brian Hooker, May 13,
2022, emphasis added.)

10. <u>The BiOp's Analysis of Operational Noise Impacts Uses Unsubstantiated Assumptions
Regarding Noise Propagation Loss Rates, Resulting in an Underreporting of Noise Impacts
to NARW and Other Listed Species.</u>

The BiOp's analysis of the Project's noise impacts – construction-related and operational – is
flawed because it assumes noise propagation loss factors that are much higher than those typically
applied to underwater sound sources. This problem was identified and brought to NOAA Fisheries'
attention by Robert Stern, Ph.D., a former chief administrator for the U.S. Department of Energy.
We refer specifically to Dr. Stern's letter of April 22, 2023, to Jolie Harrison, Chief of the Permits
and Conservation Division, Office of Protected Resources, at NMFS. Dr. Stern wrote the letter to
address impacts to NARW from site characterization studies proposed for offshore wind projects
in New York and New Jersey, but his concerns apply to any offshore wind project whose noise
impacts have been studied using incorrect/unsupported noise propagation loss factors. Dr. Stern's
specific complaint is set forth on pages 15-22 of his April 22, 2023, letter. In his discussion of the
topic, Dr. Stern shows that NMFS uses a 20 dB noise propagation loss factor when assessing
offshore wind projects, whereas it uses a 15 dB loss factor when assessing other sound sources in
coastal waters. This discrepancy is far from trivial. In fact, the 5 dB difference in noise propagation
loss, when converted to distances from the noise source, extends the Level B noise impact contours
for hundreds of meters underwater. For purposes of this 60-day Notice of Intent to Sue, we
incorporate by reference the arguments and data set forth in Dr. Stern's letter of April 22, 2023,
cited above.

**G | D | B**   **Gatzke Dillon & Ballance LLP**
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 9

11. <u>The BiOp Fails to Acknowledge that the Individual NARWs Affected by the CVOW Project Are the Same NARWs that Will be Affected by Every Other Offshore Wind Project Along the Atlantic Coast.</u>

BOEM made the strange decision to locate all of the Atlantic Coast wind energy areas (WEAs) in waters used by NARW for migration, foraging, reproduction, calving, socializing, and other life history behaviors. There are only 350 NARW individuals left. Of these, approximately 300 engage in yearly migrations up and down the Atlantic Coast. Once the various BOEM-approved offshore wind projects are operational, these 300 individual whales will be confronted with one offshore wind array after another, much the way salmon encounter multiple dams along the Columbia River and its tributaries. The combined impacts of these wind arrays on each individual NARW will be substantial. For example, once the full complement of offshore wind projects are constructed, a NARW migrating up and/or down the Atlantic Coast will experience Level B noise and/or be forced to use alternate travel routes 20 to 25 times during one migration period, resulting substantial disruption of life history behaviors and significant wastes of energy, all of which tend to reduce NARW nutritional health, reproductive success, and general survivability. Yet the BiOp fails to discuss or analyze this cumulative impact.

12. <u>BiOp's Reliance on Passive Acoustic Monitoring is Misplaced.</u>

The BiOp acknowledges that project-related pile driving would result in Level A "take" of at least one NARW. The BiOp, however, does ***not*** authorize any Level A "take" of NARW and Dominion has not requested such authorization. Instead, Dominion and BOEM have proposed – and NMFS has accepted – a plan to mitigate the Project's pile driving noise impacts to ensure no Level A "take" of NARW occurs. The key element of this mitigation plan is the use of passive acoustic monitoring (PAM) to detect whales when they swim into areas where pile driving is about to take place or is being conducted. The problem with this approach is that PAM can only detect whales that are actively vocalizing. Like many baleen whales, NARW are not especially vocal. They will go hours, sometimes days, without making a sound. Such whales cannot and will not be detected by PAM, which means they could easily enter the Level A "ensonified" zone and be exposed to damaging pile driving noise without anyone ever knowing it.

In addition, PAM has inherent limitations in terms of its ability to provide accurate and reliable data on marine mammal presence. A study published in August 2020, titled "PAMGuard Quality Assurance Module for Marine Mammal Detection Using Passive Acoustic Monitoring," explains how PAM systems have a high "miss rate".[1] For some applications, a high PAM miss rate may not result in mission-failure, but when it comes to protecting a critically endangered species like the

---

[1] The study was prepared CSA Ocean Sciences, Inc., with assistance from scientists at the University of St. Andrews (Scotland) and the Scripps Institution of Oceanography, University of California, San Diego. The primary author of the study is Mary Jo Barkaszi of CSA Ocean Sciences, Inc.

G | D | B    **Gatzke Dillon & Ballance LLP**
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 10

NARW, *any* miss rate is too high, especially when the BiOp has provided no authorization for Level A take of NARW. To comply with the BiOp and avoid violating the ESA, BOEM and Dominion must ensure than not one single NARW is exposed to Level A noise. Accordingly, Dominion's PAM system must bat 1000.00 every day, all day and never miss a whale. The data show, however, that PAM systems are not capable of such a task. And, by the way, the PSOs cannot make up for PAM's deficiencies, because the PSOs cannot detect NARW swimming under the water's surface. Thus, even when the PSOs and the PAM system are operating together, they will not be able to guarantee detection of any and all NARWs that may enter the pile driving zone and be exposed to Level A (or B) noise. The BiOp does not address the scientific data showing that PAM has significant limitations when it comes to detecting endangered whale species. Further, the BiOp does not demonstrate that its reliance on PAM for this purpose is founded on good science. Accordingly, the BiOp is deficient.

**Conclusion**

For the reasons set forth above, the BiOp for the CVOW project is defective as a matter of law. NMFS should not have issued it, and BOEM should not have accepted it. Both have operated in violation of the ESA. Therefore, we request that NMFS and BOEM withdraw the current BiOp and prepare a new one that corrects the deficiencies identified herein. Should NMFS and/or BOEM fail to do so, CFACT and the Heartland Institute will exercise its option to sue both agencies under ESA's citizen suit provision (16 U.S.C. § 1540(g).) Thank you for your consideration.

Very truly yours,

David P. Hubbard
of
Gatzke Dillon & Ballance LLP

DPH/rlf

cc:     Committee for a Constructive Tomorrow
        The Heartland Institute
        United States Secretary of the Interior
        United States Secretary of Commerce
        U.S. Army Corps of Engineers
        U.S. Coast Guard
        U.S. Environmental Protection Agency
        U.S. Bureau of Safety and Environmental Enforcement

# EXHIBIT 3



**NATIONAL LEGAL AND POLICY CENTER**

**Co-Founder**
*Ken Boehm 1949-2018*

**Board of Directors**
*Peter Flaherty, Chairman*
*Kurt Christensen, Vice-Chairman*
*Michael Falcone*
*Richard F. LaMountain*
*Martin Boehm*

**Since 1991**

March 7, 2024

Via Email
National Marine Fisheries Service,
Office of Protected Resources
Attn: Kimberly Damon-Randall, Director
1315 East-West Highway, 13th Floor
Silver Spring, MD 20910
kimberly.damon-randall@noaa.gov

Bureau of Ocean Energy Management
1849 C Street, NW
Washington, D.C. 20240
jessica.stromberg@boem.gov

   *Re:* *60-Day Notice of Intent to Sue Over Biological Opinion for the Construction,*
      *Operation, and Decommissioning of the Coastal Virginia Offshore Wind*
      *Commercial Project (Lease OCS-A-0483)—Issue Date September 18, 2023*

Dear Director Damon-Randall:

The undersigned represents the National Legal and Policy Center (NLPC) and NLPC's Chairman, Peter T. Flaherty, regarding Dominion Energy's proposed offshore wind energy development and its impacts on the human and natural environment. We have reviewed the Biological Opinion ("BiOp") that the National Marine Fisheries (NMFS) prepared for the construction, operation, and decommissioning of the Coastal Virginia Offshore Wind (CVOW) project – also known as "Dominion Wind". The BiOp and related authorizing documents were issued pursuant to the mandate contained in Executive Order 14008, which was issued by President Biden on January 27, 2021.

The BiOp suffers from a host of analytical defects that render it unreliable and unusable as the basis for authorizing incidental take of listed species, most notably the North Atlantic right whale (NARW). In short, the BiOp fails to meet the minimum requirements imposed by the Endangered Species Act (ESA). By issuing it, NMFS has violated the Act. By accepting it, the Bureau of Ocean Energy Management (BOEM) has likewise violated the Act.

For the reasons set forth in the 60-day Notice of Intent to Sue filed by the Committee for a Constructive Tomorrow (CFACT) and The Heartland Institute ("Heartland") on November 11, 2023, which we hereby adopt and incorporate herein (see attached), the BiOp for the CVOW

*107 Park Washington Court • Falls Church, VA • 22046*
*703-237-1970 • 703-237-2090 fax • www.nlpc.org*

project is deficient as a matter of law. NMFS should not have issued it, and BOEM should not have accepted it. Both have operated in violation of the ESA.

Therefore, we request that NMFS and BOEM withdraw the current BiOp and prepare a new one that corrects the defects identified herein. Should NMFS and/or BOEM fail to do so, NLPC and Peter T. Flaherty will exercise their option to sue both agencies under ESA's citizen suit provision (16 U.S.C. § 1540(g).

Respectfully submitted,

Paul Kamenar, Esq.
1629 K Street, N.W.
Suite 300
Washington, D.C. 20006
301-257-9435
Paul.kamenar@gmail.com
Counsel to NLPC and Peter T. Flaherty

Encl: 60 day Notice Letter of Intent to Sue by CFACT and Heartland Institute

**G | D | B**  **Gatzke Dillon & Ballance LLP**
L A W Y E R S

November 11, 2023                                                    *By E-Mail*

National Marine Fisheries Service,
Office of Protected Resources
Attn: Kimberly Damon-Randall, Director
1315 East-West Highway, 13th Floor
Silver Spring, MD 20910
kimberly.damon-randall@noaa.gov

Bureau of Ocean Energy Management
1849 C Street, NW
Washington, D.C. 20240
jessica.stromberg@boem.gov

> Re:   *60-Day Notice of Intent to Sue Over Biological Opinion for the Construction,
> Operation, and Decommissioning of the Coastal Virginia Offshore Wind
> Commercial Project (Lease OCS-A-0483)—Issue Date September 18, 2023*

Dear Director Damon-Randall:

This firm represents the Committee for a Constructive Tomorrow (CFACT) and The Heartland
Institute ("Heartland") on matters relating to offshore wind energy development and its impacts
on the human and natural environment. We have reviewed the Biological Opinion ("BiOp") that
the National Marine Fisheries Service (NMFS) prepared for the construction, operation, and
decommissioning of the Coastal Virginia Offshore Wind (CVOW) project – also known as
"Dominion Wind". As explained below, the BiOp suffers from a host analytical defects that render
it unreliable and unusable as the basis for authorizing incidental take of listed species, most notably
the North Atlantic right whale (NARW). In short, the BiOp fails to meet the minimum
requirements imposed by the Endangered Species Act (ESA). By issuing it, NMFS has violated
the Act. By accepting it, the Bureau of Ocean Energy Management (BOEM) has likewise violated
the Act.

We provide this letter in hopes that NMFS and BOEM will rescind the current BiOp, correct the
deficiencies described below, and adjust the incidental take authorization to more accurately reflect
the CVOW's real impact on NARW and other listed species. Should NMFS and BOEM not take
these steps, CFACT and Heartland will wait the required 60 days and then file suit challenging the
legal adequacy of the BiOp.

G | D | B   **Gatzke Dillon & Ballance LLP**
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 2

1. The BiOp Fails to Analyze the CVOW Project's Cumulative Impacts on NARWs, Most of Which Will be Adversely Affected by Every Offshore Wind Project Currently Contemplated for the Atlantic Coast.

The CVOW BiOp constrains its analysis to the CVOW project and "project area". See BiOp p. 214. It does not assess or otherwise take into account the other offshore wind projects currently slated for development along the eastern seaboard of the United States. This results in a gross underreporting of impacts on individual NARWs and on the species as a whole. In their draft "North Atlantic Right Whale and Offshore Wind Strategy" (October 2022), BOEM and NOAA made the following statements about the potentially dangerous interface between offshore wind development and NARW critical life behaviors. The following quotations from the "strategy" are indicative:

- "NOAA Fisheries' *North Atlantic Right Whale Priority Action Plan for 2021-2025* identifies the need to improve our knowledge of factors that may limit NARW recovery, such as OSW development (NOAA Fisheries 2021). The plan identifies the need for a robust and comprehensive analysis of temporary and long-term direct and indirect impacts of OSW development from construction through decommissioning. (NARW and OSW Strategy, p. 7.)

- "Within the areas proposed for OSW development in the U.S., NARW engage in migration, foraging, socializing, reproductive, calving, and resting behaviors critical to their survival. The overlap between OSW development (planned, leased, permitted) and NARW habitat extends to corridors outside the immediate development sites, where vessel traffic between ports and offshore sites would further overlap with distribution of NARWs." (*Ibid.*)

- "Noise and ecosystem-level changes resulting from OSW development that may impact NARW are also likely to extend beyond the immediate OSW lease areas." (*Ibid.*)

- "Effects to NARWs could result from exposure to a single project and may be compounded by exposure to multiple projects. It is important to recognize that NARWs migrating along the U.S. Atlantic Coast travel through or nearby every proposed OSW development. (*Id.,* at p. 11.)

This last statement requires a closer examination, as it speaks to a fundamental flaw in the BiOp for the CVOW project. It is clear from the quoted language that NMFS and BOEM know that each migrating NARW individual (of which there are approximately 300 in existence) will pass through or near every approved or proposed OSW project now being processed by BOEM. It is also clear that NMFS and BOEM know that an individual NARW will receive impacts from each and every one of these OSW projects, resulting in cumulative and compound damage to the animal in

**G | D | B**  Gatzke Dillon & Ballance LLP
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 3

question. The BiOp, however, neither acknowledges this fact nor analyzes the compound impacts that are sure to result.

This piecemeal consideration of each individual wind project is invalid as a matter of law. *Wild Fish Conservancy v. Salazar,* 628 F. 3rd 513 (9th. Cir. 2010); *Strahan v. Roughead,* 910 F. Supp. 2d. 358 (D. Mass. 2012); *Thomas v. Peterson,* 753 F.2d 754 (9th Cir. 1985). The CVOW project is an integral part of a larger enterprise which involves multiple leases for federal offshore property stretching from Massachusetts to Virgina. This is the "action" which should be analyzed by the federal agencies in determining the impact of the East Coast offshore wind program on endangered species, such as the NARW. This necessitates an assessment of the cumulative impact of all the industrial wind projects contained in the plan, during the proposal stage, with permitting and construction only beginning after a comprehensive EIS is completed is public notice. The only comprehensive EIS of the offshore wind program was published in Oct. 2007 (The Final Programmatic Environmental Impact Statement), which explicitly stated that it was limited to current information and, for the future, only to "possible activities that may be initiated in the foreseeable future 5-7 Years (2007-2011)". A BiOp issued in 2023, based on an outdated and inapposite EIS, is invalid as a matter of law, and injunctive relief is the proper remedy. An example of the case law:

"A listed species could be gradually destroyed, so long as each step on its path to destruction is sufficiently modest. This type of slow slide into oblivion is one of the very ills the ESA seeks to prevent". *Wild Fish Conservancy v. Salazar, supra,* 628 F.3d at p. 524.

2. The BiOp Fails to Use "Best Scientific Information Available" Because the Standards for Noise Tolerance of the NARW Were Based On Information that Was "Almost Non-Existent" at the Time.

BOEM has admitted that when the noise regulations for the NARW were promulgated, the noise parameters for baleen whales were "virtually unknown" and "almost non-existent." To rectify this admitted "knowledge gap," BOEM commissioned a complex program of additional  investigation, as described in the "North Atlantic Right Whale and Offshore Wind Strategy", and one additional study co-funded with the US Navy, known as the "Auditory Weighting Function for Low-Frequency Whales" ( Feb. 2021).  The first document recommended numerous studies of baleen whale hearing capabilities, all of which are ongoing. The second document – the Auditory Weighting Function for Low-Frequency Whales – consists of three studies which are ongoing and not due for completion until 2025. Because BOEM admitted that it based its regulations on outdated and incomplete data, without satisfying this "number one information need," the BiOp's conclusion that "[n]o mortality or permanent injury (auditory or other) is expected from exposure to any aspect of the proposed action" (p. 216) is arbitrary and capricious.

**G | D | B   Gatzke Dillon & Ballance LLP**
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 4

3.  <u>The BiOp Fails to Analyze Cumulative Impact on NARW from Multiple Level B Noise Take Authorizations</u>

The developers of eleven offshore wind projects located off the coast of Massachusetts, New York, Connecticut, New Jersey, Maryland, Delaware, and Virginia all requested authorization to "take" NARWs and other marine mammals while performing site evaluation activities from April 2022 to November 2023. NMFS issued 163 "level B take" permits for the NARW to these developers. Level B take is defined as "the potential to disturb marine mammal stock by causing disruption of behavioral patterns, including migration, breathing, nursing, breeding, feeding or sheltering." The 163 Level B takes affects more than 50% of the entire estimated NARW population of 350 animals. In addition, the 163 takes does not take into account the Level B harassment authorizations for ***construction-related noise*** from the 20-plus offshore wind projects to be located up and down the Atlantic coast. In short, the BiOp fails to assess the cumulative load of these Level B takes on the affected NARWs, resulting in a violation of the ESA.

4.  <u>The BiOp Violates the ESA Because it Authorizes Loss of NARW in Excess of its Potential Biological Removal Rate.</u>

The Potential Biological Removal Rate established by the NMFS - the number of human caused whale mortalities that can occur each year if the species is to survive - is objective, not subjective. That number is .07, which means there can be *zero human caused deaths per year*. For the CVOW project alone, NOAA anticipates eight human caused deaths per year for the next five years. (See Notice of Proposed Rulemaking, May 4, 2023, Ex. 7.) It is arbitrary and capricious for an agency to issue a regulation which claims to result in one outcome - zero deaths - while at the same time anticipating an opposite result - eight human caused dead whales per year. *American Rivers v. US Army Corps of Engineers,* 272 F.Supp.2d 230 (Dist. Ct. DC 2003) (BiOp is arbitrary and capricious where outcome predicted is not likely to occur).

5.  <u>Presidential Order 14008 violates the APA, the MMPA, and the ESA by removing the BOEM's discretion to adopt the No Action Alternative and to exercise its duty to properly protect endangered species.</u>

Presidential Order 14008 requires that all federal agencies implement the programmatic East Coast offshore wind program. The MMPA and ESA, however, require federal agencies to protect endangered species. The federal agencies admit that they "do not know" what the impact of the industrialization of federal waters with thousands of offshore wind towers will be on the endangered North Atlantic Right Whale, but they authorize the program anyway because of the Presidential Order's directive, and then hide behind "mitigation" measures. See "Auditory Function." Thus, the BiOp violates the ESA mandate to "ensure" that the Virginia offshore wind program, and the related East Coast wind projects, will not result in the extinction of the North Atlantic Right Whale as a species, as required by ESA.

**G | D | B**   Gatzke Dillon & Ballance LLP
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 5

6. <u>The Proposed Mitigation Measures Will Not Adequately Protect NARW from Project-Related Vessel Strikes.</u>

The BiOp acknowledges that vessel strikes on NARW are a major cause of species mortality and a significant contributor to NARW population declines. The BiOp also acknowledges that the CVOW project will require hundreds of vessel trips, consisting of thousands of vessel miles, all through habitat used by NARW. These facts establish a clear potential for project-related vessel strikes on NARW and corresponding impacts to species survival and recovery.

To mitigate this impact, BOEM and Dominion have proposed two measures. First, they intend to staff project vessels with Protected Species Observers (PSOs), who would be trained to scan the ocean's surface looking for signs of NARW. If a PSO sees one, he or she is to report the sighting to the vessel captain who, presumably, will then take evasive action. The problem, however, is that PSOs – even under calm conditions – cannot detect NARW more than a few feet under the water's surface. During medium to high-swell conditions, the PSOs won't be able to consistently detect NARW when they come up to breathe or socialize. Because NARW spend most of their time underwater at depth, the PSOs will be largely unable to detect them. Consequently, PSOs provide little protection against vessel strikes.

The second proposed "vessel strike" mitigation measure is a 10 knot per hour speed limit for all project-related vessels. This speed limit, however, only applies for half the year (November through April). Vessels traveling to and from the project area during the remainder of the year (May through October) can travel as fast as they like. It is well established that when a vessel traveling in excess of 15 knots per hour collides with a whale, mortality is virtually 100 percent assured. The proposed mitigation measure does not address this issue and, in fact, would seem to place NARW in jeopardy of being struck and killed by project vessels. The BiOp, however, does not critically assess the vessel speed/whale collision issue; nor does it question why the 10 knot per hour speed applies only half the year. It accepts without discussion or analysis BOEM's assertion that NARW do not migrate through the project area between May and October. The evidence, however, is to the contrary. NARW *do* migrate through the project area during those months, though perhaps in smaller numbers. Given that the NARW has a potential biological removal (PBR) rate of less than 1.0 (i.e., 0.7, as noted above), even a single death due to vessel collision will push the species toward extinction.

Simply put, neither the PSOs nor the vessel speed limit, even when working in tandem, will be enough to protect NARW from potentially deadly collisions with project-related vessels. The BiOp's reliance on these measures to safeguard NARW is misplaced and without adequate scientific foundation.

G | D | B   **Gatzke Dillon & Ballance LLP**
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 6

7.  <u>Project Construction Activities, Including "Soft Start" Pile Driving, Will Force NARW Out of Their Preferred Habitat and Into Areas of Increased Threats – an Impact Not Studied in the BiOp.</u>

Dominion will begin each pile driving event with a "soft start" to encourage NARWs to leave the project area and thereby escape harm from pile driving noise. The BiOp accepts this as an adequate means of protecting NARW from noise-related damage (Level A and Level B). The BiOp, however, fails to acknowledge, much less assess, the impacts of pushing NARW out of the project area into waters with heavy vessel traffic and significant fishing activity. The proposed "soft start" procedure will force NARW out of their preferred travel corridors and foraging zones into areas where they could be struck by vessels and/or become entangled in fishing gear – the two most prominent causes of NARW mortality and population declines. By ignoring this impact, NMFS has issued BiOp that is fundamentally flawed and incomplete. Worse, NMFS has effectively sanctioned construction activities that will drive NARW into areas where they will be exposed to threats not studied or mitigated in the BiOp (or any other documents prepared by BOEM or NMFS). Note, too, that the problem does not go away once pile driving transitions from "soft start" to full-power hammering. To the contrary. Due to the intense noise it generates, full-power hammering ensures that NARW will be forced to stay out of the pile driving zone for at least three hours per pile drive event. And there is no guarantee the whales will come back soon or at all. This means that the NARW will be displaced for considerable periods of time, in waters not of their choosing, where threats to their physical wellbeing are significant and perhaps devastating. Again, the BiOp fails to analyze this impact or impose measures to avoid it.

8.  <u>The BiOp Fails to Analyze Whether and to What Extent Project *Operations* Will Cause NARW to Abandon Favored Migration Routes and Feeding Areas.</u>

Nearly the entire BiOp is focused on the *construction-related* impacts of the CVOW project; the BiOp spends little time analyzing the project's *operational* impacts. At this time, there is no scientific data showing that NARW (or any other species of whale) will continue to use migration routes or feeding areas that intersect or otherwise overlap with operational offshore wind arrays. The mere presence of hundreds of huge turbines, to say nothing of the noise they generate and the hydrological and oceanographic changes they make to the environment, may cause many NARW to avoid CVOW (and other offshore wind farms) even if it means abandoning their preferred travel corridors and foraging areas. Again, any time whales are forced out of their preferred areas, they are exposed to potential threats, including vessel collisions, fishing gear entanglement, unnecessary expenditure of energy, and malnutrition. The BiOp does not address this potential impact on individual NARW or on the species as a whole. And unlike construction-related impacts, which are at least short in duration, the Project's operational impacts will be long-term, lasting decades. The BiOp should analyze, but does not, the longitudinal effect Project operations will have on the NARW.

**G|D|B**  **Gatzke Dillon & Ballance LLP**
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 7

9. The BiOp Fails to Analyze Project's Potential to Alter Water Mixing Patterns and Dispersal of Zooplankton (Copepods).

In a letter to BOEM's Lead Biologist (Brian Hooker), dated May 13, 2022, Sean Hayes, Ph.D., the Chief of Protected Species at NOAA (New England), stated that operational effects of offshore wind projects in New England could have population-scale impacts on NARW. Specifically, Dr. Hayes indicated that OSW-related oceanographic changes "may disrupt the distribution, abundance, and availability of typical right whale food (e.g., Dorrell et al 2022)," which in this context means zooplankton. Dr. Hayes then explained in detail how water mixing and stratification caused by wind turbine operations could make it difficult for NARWs to find and access the dense accumulations of zooplankton they need for survival:

> Right whales need dense aggregations of prey to make foraging energetically worthwhile, and disruptions to prey aggregations in the only known winter foraging area for right whales could have significant energetic and population consequences (Baumgartner and Mate 2003, 2005, van der Hoop et al 2019, Kenny et al 2020). Without dense aggregations of prey, right whales will search elsewhere for food, potentially at an energetic loss, given the likely increased metabolic travel costs and that alternative energetically beneficial foraging grounds may not exist during the winter. In addition, searching for new areas may place them in harm's way as occurred during their shift to Canadian waters sometime after 2010, resulting in 17 observed mortalities in 2017 and another 10 in 2019, and estimates of more than 200 total mortalities since (Davies & Brilliant 2019, Pace et al. 2021.)

> The presence of structures such as wind turbines are likely to result in both local and broader oceanographic effects, and may disrupt the dense aggregations and distribution of zooplankton prey through altering the strength of tidal currents and associated fronts, changes in stratification, primary production, the degree of mixing, and stratification in the water column (Chen et al. 2021, Johnson et al 2021, Christiansen et al 2022, Dorrell et al 2022). Modeling studies in this region have found changes in distribution patters of planktonic larvae under offshore wind build-out scenarios (Johnson et al. 2021, Chen et al. 2021), suggesting similar impacts could occur with right whale's zooplankton prey. The scale of impacts is difficult to predict and may vary from hundreds of meters for local individual turbine impacts (Schultze et al. 2020) to large-scale dipoles of surface elevation changes stretching hundreds of kilometers (Christiansen et al. 2022). Additionally, offshore

**G | D | B**   Gatzke Dillon & Ballance LLP
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 8

substations pose an unknown risk related to water withdrawals and
impingement/entrainment of zooplankton and other prey species.

(Sean Hayes, Ph.D., letter to Brian Hooker, May 13, 2022.)

Dr. Hayes' comments were focused on the NARW situation in New England, specifically the
offshore wind projects slated for the southern coast of Nantucket, MA. His concerns regarding the
long-term effects of offshore wind arrays on zooplankton abundance and density, however, apply
to any location where NARW feed, including the coastal waters of Virginia (i.e., the site of the
CVOW project). The BiOp makes passing reference to the potential oceanographic impacts of
CVOW project, but stops short of analyzing them in terms of their ability to impede NARW
nutritional and reproductive success. Worse, because the BiOp treats the issue in such an abstract
way, the proper urgency of the matter – which is evident throughout Dr. Hayes' letter – is not
conveyed or addressed. In fact, the BiOp utterly fails to heed the closing admonition from Dr.
Hayes: "[I]t is critical to assess the range of impacts/threats and stressors to protected species and
the degree to which they can be mitigated. This needs to include taking into consideration the
chronic state of right whales and the importance of productive foraging habitats to these species.
*These impacts should be thoroughly analyzed in any EIS or other environmental reviews*
*associated with offshore wind development.*" (Sean Hayes, Ph.D., letter to Brian Hooker, May 13,
2022, emphasis added.)

10. <u>The BiOp's Analysis of Operational Noise Impacts Uses Unsubstantiated Assumptions</u>
    <u>Regarding Noise Propagation Loss Rates, Resulting in an Underreporting of Noise Impacts</u>
    <u>to NARW and Other Listed Species.</u>

The BiOp's analysis of the Project's noise impacts – construction-related and operational – is
flawed because it assumes noise propagation loss factors that are much higher than those typically
applied to underwater sound sources. This problem was identified and brought to NOAA Fisheries'
attention by Robert Stern, Ph.D., a former chief administrator for the U.S. Department of Energy.
We refer specifically to Dr. Stern's letter of April 22, 2023, to Jolie Harrison, Chief of the Permits
and Conservation Division, Office of Protected Resources, at NMFS. Dr. Stern wrote the letter to
address impacts to NARW from site characterization studies proposed for offshore wind projects
in New York and New Jersey, but his concerns apply to any offshore wind project whose noise
impacts have been studied using incorrect/unsupported noise propagation loss factors. Dr. Stern's
specific complaint is set forth on pages 15-22 of his April 22, 2023, letter. In his discussion of the
topic, Dr. Stern shows that NMFS uses a 20 dB noise propagation loss factor when assessing
offshore wind projects, whereas it uses a 15 dB loss factor when assessing other sound sources in
coastal waters. This discrepancy is far from trivial. In fact, the 5 dB difference in noise propagation
loss, when converted to distances from the noise source, extends the Level B noise impact contours
for hundreds of meters underwater. For purposes of this 60-day Notice of Intent to Sue, we
incorporate by reference the arguments and data set forth in Dr. Stern's letter of April 22, 2023,
cited above.

**G | D | B**   Gatzke Dillon & Ballance LLP
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 9

11. <u>The BiOp Fails to Acknowledge that the Individual NARWs Affected by the CVOW Project Are the Same NARWs that Will be Affected by Every Other Offshore Wind Project Along the Atlantic Coast.</u>

BOEM made the strange decision to locate all of the Atlantic Coast wind energy areas (WEAs) in waters used by NARW for migration, foraging, reproduction, calving, socializing, and other life history behaviors. There are only 350 NARW individuals left. Of these, approximately 300 engage in yearly migrations up and down the Atlantic Coast. Once the various BOEM-approved offshore wind projects are operational, these 300 individual whales will be confronted with one offshore wind array after another, much the way salmon encounter multiple dams along the Columbia River and its tributaries. The combined impacts of these wind arrays on each individual NARW will be substantial. For example, once the full complement of offshore wind projects are constructed, a NARW migrating up and/or down the Atlantic Coast will experience Level B noise and/or be forced to use alternate travel routes 20 to 25 times during one migration period, resulting substantial disruption of life history behaviors and significant wastes of energy, all of which tend to reduce NARW nutritional health, reproductive success, and general survivability. Yet the BiOp fails to discuss or analyze this cumulative impact.

12. <u>BiOp's Reliance on Passive Acoustic Monitoring is Misplaced.</u>

The BiOp acknowledges that project-related pile driving would result in Level A "take" of at least one NARW. The BiOp, however, does ***not*** authorize any Level A "take" of NARW and Dominion has not requested such authorization. Instead, Dominion and BOEM have proposed – and NMFS has accepted – a plan to mitigate the Project's pile driving noise impacts to ensure no Level A "take" of NARW occurs. The key element of this mitigation plan is the use of passive acoustic monitoring (PAM) to detect whales when they swim into areas where pile driving is about to take place or is being conducted. The problem with this approach is that PAM can only detect whales that are actively vocalizing. Like many baleen whales, NARW are not especially vocal. They will go hours, sometimes days, without making a sound. Such whales cannot and will not be detected by PAM, which means they could easily enter the Level A "ensonified" zone and be exposed to damaging pile driving noise without anyone ever knowing it.

In addition, PAM has inherent limitations in terms of its ability to provide accurate and reliable data on marine mammal presence. A study published in August 2020, titled "PAMGuard Quality Assurance Module for Marine Mammal Detection Using Passive Acoustic Monitoring," explains how PAM systems have a high "miss rate".[1] For some applications, a high PAM miss rate may not result in mission-failure, but when it comes to protecting a critically endangered species like the

---

[1] The study was prepared CSA Ocean Sciences, Inc., with assistance from scientists at the University of St. Andrews (Scotland) and the Scripps Institution of Oceanography, University of California, San Diego. The primary author of the study is Mary Jo Barkaszi of CSA Ocean Sciences, Inc.

**G | D | B**   **Gatzke Dillon & Ballance LLP**
L A W Y E R S

National Marine Fisheries Service
November 10, 2023
Page 10

NARW, *any* miss rate is too high, especially when the BiOp has provided no authorization for Level A take of NARW. To comply with the BiOp and avoid violating the ESA, BOEM and Dominion must ensure than not one single NARW is exposed to Level A noise. Accordingly, Dominion's PAM system must bat 1000.00 every day, all day and never miss a whale. The data show, however, that PAM systems are not capable of such a task. And, by the way, the PSOs cannot make up for PAM's deficiencies, because the PSOs cannot detect NARW swimming under the water's surface. Thus, even when the PSOs and the PAM system are operating together, they will not be able to guarantee detection of any and all NARWs that may enter the pile driving zone and be exposed to Level A (or B) noise. The BiOp does not address the scientific data showing that PAM has significant limitations when it comes to detecting endangered whale species. Further, the BiOp does not demonstrate that its reliance on PAM for this purpose is founded on good science. Accordingly, the BiOp is deficient.

**Conclusion**

For the reasons set forth above, the BiOp for the CVOW project is defective as a matter of law. NMFS should not have issued it, and BOEM should not have accepted it. Both have operated in violation of the ESA. Therefore, we request that NMFS and BOEM withdraw the current BiOp and prepare a new one that corrects the deficiencies identified herein. Should NMFS and/or BOEM fail to do so, CFACT and the Heartland Institute will exercise its option to sue both agencies under ESA's citizen suit provision (16 U.S.C. § 1540(g).) Thank you for your consideration.

Very truly yours,

David P. Hubbard
of
Gatzke Dillon & Ballance LLP

DPH/rlf

cc:     Committee for a Constructive Tomorrow
        The Heartland Institute
        United States Secretary of the Interior
        United States Secretary of Commerce
        U.S. Army Corps of Engineers
        U.S. Coast Guard
        U.S. Environmental Protection Agency
        U.S. Bureau of Safety and Environmental Enforcement