**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE FOR A CONSTRUCTIVE TOMORROW, a nonprofit corporation, 1717 Pennsylvania Avenue, NW Washington, DC 20006 and | |
| THE HEARTLAND INSTITUTE, a non-profit corporation, 3939 N. Wilke Rd. Arlington Heights, IL 60004-1275 and | |
| CRAIG RUCKER, an individual, 1101 Old Charles Town Rd, Berryville, VA 22611 and | Case No. 24-cv-00774 (LLA) Judge Loren L. AliKhan |
| NATIONAL LEGAL AND POLICY CENTER, a non-profit corporation, 107 Park Washington Court Falls Church, VA 22046 and | |
| PETER FLAHERTY, an individual, 2012 N. Westmoreland St. Arlington, VA 22213 | |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street NW, Washington, DC 20240 and | |
| DEB HAALAND, Secretary of the Interior, acting in her official capacity, 1849 C Street NW, Washington, DC 20240 and | |

UNITED STATES BUREAU OF OCEAN
ENERGY MANAGEMENT,
1849 C Street NW, Washington, DC 20240
and

ELIZABETH KLEIN, Director of United States
Bureau of Ocean Energy Management, acting in
her official capacity,
1849 C Street NW, Washington, DC 20240
and

GINA RAIMONDO, Secretary of Commerce,
acting in her official capacity,
1401 Constitution Avenue, NW
Washington, DC 20230
and

NATIONAL MARINE FISHERIES SERVICE,
1315 East-West Highway
Silver Spring, MD 20910
and

JANET COIT, Director of the National Marine
Fisheries Service,
1315 East-West Highway
Silver Spring, MD 20910

       Federal Defendants.


VIRGINIA ELECTRIC AND POWER
COMPANY d/b/a DOMINION ENERGY
VIRGINIA, a utility corporation,
120 Tredegar St.
Richmond, VA 23219-4306;

   Defendant and Real Party in Interest

# FIRST AMENDED COMPLAINT

**For Declaratory and Injunctive Relief under the Endangered Species Act, National
Environmental Policy Act, and Administrative Procedure Act**

## NATURE OF THE ACTION

1.     This action challenges the Coastal Virginia Offshore Wind Commercial (CVOW) project, which was approved via a Record of Decision (ROD) issued by defendant Bureau of Ocean Energy Management (BOEM) on October 31, 2023. As set forth below, federal defendant BOEM violated the National Environmental Policy Act (NEPA) and the Administrative Procedure Act (APA) when it approved the Final Environmental Impact Statement for the CVOW project and declared it legally adequate. In addition, federal defendant National Marine Fisheries Service (NMFS) violated section 7 of the Endangered Species Act (ESA) by issuing a Biological Opinion (BiOp), dated September 18, 2023, that constitutes an unlawful incremental step opinion under the Act and thus exposes federally-listed species, including the North Atlantic right whale (NARW) to project-related impacts that may jeopardize the survival of the species and impede its recovery. The unlawful approval of the defective BiOp results in a violation of the APA as well.

2.     The CVOW project will consist of 176 wind turbines to be constructed approximately 25 miles off the coast of Virginia Beach, Virginia, and will be owned and operated by real party Virginia Electric and Power Company d/b/a Dominion Energy Virginia (hereinafter, "Dominion"). The project is one of 30 planned for the Atlantic seaboard, all of which will be located within or very near the NARW habitat, including the whale's well-established migration route from Maine to Florida. The CVOW project, like the other industrial-scale wind farms to be constructed as part of the federal government's offshore wind development program, will involve *construction-related* activities, such as pile driving, that will adversely affect NARW, resulting in take of the species and pushing it closer to extinction. The

CVOW project, like its 29 counterparts, will also generate *operational* impacts that will further degrade the NARW's chance for survival. These impacts will occur for the 30-year life of the project. Sadly, given that the entire NARW population now consists of only 332 individuals, and given that the whale continues to decline in population due to human-caused threats, the CVOW project will likely outlive the NARW as a species unless the relevant federal authorities, including the defendants here, change course and begin to impose immediate and effective protections designed to ensure the continued existence of this iconic marine mammal.

3.     The United States government, led by BOEM, has embarked on a comprehensive and aggressive campaign to develop as many as 30 industrial-scale offshore wind (OSW) energy projects along the Atlantic coast, from Maine to North Carolina.

4.     Just days after his inauguration, President Biden confirmed his commitment to BOEM's OSW program by issuing Executive Order 14008, dated January 27, 2021, and titled "Tackling the Climate Crisis at Home and Abroad." Section 207 of the Executive Order expressly calls for a "doubling" of offshore wind energy production by 2030.

5.     In March 2021, the Departments of Interior, Energy, and Commerce responded to Executive Order 14008 by announcing a national goal to deploy 30 gigawatts of OSW by 2030.[1]

6.     As of September 2023, there were 30 renewable energy lease areas in the Atlantic Outer Continental Shelf (OCS).[2] All or most of these OSW lease areas overlap habitat of the federally-listed and endangered NARW.[3]

---

[1]     www.doi.gov/news/interior-joins-government-wide-effort-advance-offshore-wind

[2]     Draft *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy*, October 2022, p. 3.

[3]     *Id.,* at p. 4.

7.     As of the date of this Complaint, BOEM has issued ROD's for OSW projects. Those same projects were the subject of BiOps issued by NMFS and approved by BOEM. Each of those BiOps includes an Incidental Take Statement (ITS) authorizing the OSW owner-operator to take a certain number of NARW through Level B noise harassment due to project-related pile driving. All told, the combined Level B take of NARW stands at 163 individuals. None of the BiOps or ITSs authorizes take of NARW by any means other than Level B noise harassment (e.g., vessel strikes). (See Map of Marine Mammals Geographic Analysis Area, Fig. 3.15-1 to Final Environmental Impact Statement (EIS) for CVOW Project. In other words, neither the CVOW BiOp nor any other BiOp issued for an OSW project authorizes Level A "take" of NARW.

8.     In addition to the six OSW projects for which Final EISs have been approved, BOEM has prepared and released for public review Draft EISs for more than 10 OSW projects.

9.     As discussed below, the Atlantic coast OSW projects that BOEM is processing are part of a network of wind energy facilities that will generate electricity for consumers along the eastern seaboard. Correspondingly, this network of OSW projects will result in combined and/or synergistic impacts on a host of environmental resources, including federally-protected marine mammals such as the NARW.

10.     The wind energy areas (WEAs) that BOEM has selected for OSW development – including the WEA for CVOW – are located within and along the very migration corridors that NARWs use to travel from calving grounds in South Carolina to the zooplankton-rich foraging areas in New England and Canada. In short, BOEM's industrial-scale OSW program for the Atlantic coast puts human development on a collision course with the endangered NARW; and, historically, that situation has resulted in tragedy for the whale.

11.    The CVOW project – during its construction, operation, and decommission phases – will adversely affect NARW, which uses the waters within and near the CVOW project area for migration, feeding, and other key life history events. CVOW will not only cause direct impacts to NARW individuals, of which there are only approximately 332 left in the world; the project will also contribute to the combined harm that the other planned and approved OSW projects, as well as other human activities in the Project's area of potential effect (APE), will inflict on these same 332 NARWs.

12.    The NARW individuals that migrate to and feed off the coast of Massachusetts, Rhode Island, and New Jersey are the same NARW individuals that migrate to and feed off the coast of Virginia. At every step along their migratory path, from Maine to North Carolina, these same NARWs will encounter not one or two OSW projects, but as many as 30. Each one of these OSW facilities will obstruct the NARWs' migration and expose it to threats such as vessel strikes, reduced food supplies (zooplankton), fishing gear entanglement, and dangerous noise impacts. To these impacts one must add potential take of NARW from other non-OSW sources. The combined effect of these impacts on each individual NARW will be devastating and likely push the species to or beyond the brink of extinction. Neither the Final EIS nor the BiOp analyzes this potential outcome.

13.    Under NEPA, BOEM was required to prepare an EIS that takes a "hard look" at the CVOW project's specific and cumulative impacts, both direct and indirect, on existing environmental resources, including but not limited to the NARW. It failed to do so. For example, the Final EIS does not adequately analyze the combined impacts of the 30 OSW projects on the NARW. Further, it assumes that unproven and facially insufficient mitigation measures will

protect NARW from significant impacts, including those that qualify as Level A "take" of the species.

14.     Under Section 7 of the ESA, BOEM was required to consult with NMFS regarding the CVOW project's potential to cause take of federally-listed species, such as the NARW. The consultation was supposed to generate a robust assessment of the project's impacts on these species from both a project-specific and cumulative perspective, using the best available scientific and commercial information. That assessment ultimately was set forth in a BiOp issued by NMFS.

15.     NMFS issued the BiOp for the CVOW project on September 18, 2023. The BiOp, however, was and remains legally deficient, as it failed to analyze the extent to which the CVOW project, when viewed in combination with previously-approved OSW projects along the Atlantic coast, will create impacts on NARWs, lead to take of NARW, and ultimately jeopardize the NARW. This is a critically important analysis in this instance, as many NARW individuals will be adversely affected by every OSW project that BOEM has approved or plans to approve along the Atlantic coast. Also, in failing to account for already-approved OSW projects, the BiOp used an incorrect baseline for assessing the CVOW project's contribution to anticipated combined impacts on NARW. These combined impacts include NARW "take" authorizations issued by NMFS for at least five (5) other OSW projects along the east coast.

16.     The BiOp continues NMFS's and BOEM's unlawful policy of segmenting their analysis of the federal OSW program's impacts on and jeopardy to the NARW, so that the combined effects of the 30-plus Atlantic OSW projects on NARW are never evaluated, disclosed, or mitigated. This results in a gross underreporting of impacts on the NARW. Instead, it issued an unlawful incremental step opinion, as defined in 50 CFR § 402.14(k), for an offshore

wind development program consisting of 30 federal lease areas and related approved and projected wind projects, and then rendered an opinion on only one of them – the CVOW. Such an incremental step analysis must specifically be authorized by "a statute that allows the agency to take incremental steps toward the completion of the action." The ESA contains no such authorization. In addition, the BiOp encourages institutional overconfidence at NMFS and BOEM that continued "take" of NARW through the OSW program will not jeopardize the survival of the species.

17.     The BiOp also failed to use the "best scientific and commercial information available" when assessing the CVOW project's noise impacts – during both construction and operation – on NARWs. Other defects in the BiOp include, but are not limited to, its reliance on unproven mitigation measures to prevent take of NARW and its failure to examine the extent to which the project, during its operational phase, will alter water mixing patterns and disperse the dense aggregation of zooplankton (copepods) that NARWs need in order to feed efficiently.

18.     By *issuing* a legally-defective BiOp, NMFS and, by extension, the Secretary of the Department of Commerce, Gina Raimondo, violated the ESA. By *accepting* a legally-defective BiOp, BOEM and, by extension, the Secretary of the Interior, Deb Haaland, also violated the ESA.

19.     Through this lawsuit, the plaintiffs seek an order from the Court declaring unlawful and setting aside the CVOW Final EIS and the CVOW BiOp.

## JURISDICTION AND VENUE

20.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal questions), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 2201 (declaratory judgment), and 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701 through 706 (APA).

21.     For all claims brought under NEPA, the ESA, and the APA, Plaintiffs have exhausted all administrative remedies available to them.

- *NEPA (and APA)*: On February 13, 2023, CFACT (of which Craig Rucker is president) and Heartland submitted to BOEM a 33-page comment letter identifying analytical defects in the Draft EIS for the CVOW project.

- *ESA*: On November 11, 2023, CFACT and Heartland submitted to NMFS and BOEM (among others) a 60-day Notice of Intent to Sue, identifying defects in the BiOp for the CVOW project. Plaintiffs National Legal and Policy Center (NLPC) and Peter Flaherty submitted a 60-day Notice of Intent to Sue, dated March 7, 2024, to the federal defendants in this action, alleging defects in the BiOp. Note that NLPC's 60-day Notice merely adopts and incorporates by reference the issues raised in CFACT's 60-day Notice of Intent to Sue.

22.     An actual, justiciable case or controversy exists between the parties within the meaning of Article III of the Constitution and 28 U.S.C. § 2201; the plaintiffs have been injured by the actions of the federal defendants and real party; and this Court can redress that injury by the relief sought in this action.

23.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because at five of the Defendants are federal agencies and officials whose offices are located in Washington, D.C.

## PARTIES

### PLAINTIFFS

24.     Plaintiff COMMITTEE FOR A CONSTRUCTIVE TOMORROW (CFACT) is a 501(c)(3) non-profit corporation, based in Washington, D.C. Its mission is to educate the public

about important political and environmental issues that can be addressed with practical solutions using the power of the private sector market. CFACT maintains a website cfact.org which describes its mission and current activities. Members of CFACT's Board of Advisors appear regularly in the media to discuss the adverse impacts of offshore wind power. These advisors include well-known media figures such as Marc Morano, Paul Driessen, H. Sterling Burnett, and Lord Christopher Moncton. CFACT is a sponsor of the "Save the Right Whale Coalition" which has submitted  comments to BOEM and NMFS with respect to: (i) the  BOEM's Draft Environmental Impact Statement (DEIS) for the CVOW project, (ii) Dominion Energy's application to NMFS for an Incidental Harassment Authorization, (iii) the Draft *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy*, and (iv) the BiOp issued by NMFS authorizing Dominion to take federally-listed species, including the NARW, during construction, operation and decommissioning of the CVOW project. CFACT is a stockholder of Dominion. In addition, CFACT is a signatory to the 60-Day Notice of Intent to Sue letter challenging the legal adequacy of the BiOp, which was sent to the federal defendants on November 11, 2023, as required by the ESA, 16 U.S.C. § 1540(g)(2). Members of CFACT, including plaintiff Craig Rucker, enjoy whale-watching off the Atlantic coast in areas known to support NARW for the purpose of seeing this rare species. These members have concrete plans to go whale-watching in the future in areas where NARW are known to reside and/or migrate. Project-related impacts to the NARW will adversely affect CFACT members and degrade their ability to observe the species and enjoy the aesthetic experience of being in their presence. Moreover, one or more members of CFACT live in Viginia Beach, VA where on-shore construction activities of the CVOW have begun which cause noise pollution and other

disturbances to their well-being.[4] These same members will be affected by the visual impacts of the CVOW project. In addition, some CFACT members are Dominion ratepayers and may be adversely affected by the project's potential to increase energy costs in Virginia.

25.     Plaintiff THE HEARTLAND INSTITUTE (Heartland) is a national, non-profit, 503(c)(3) public interest organization, based in Arlington Heights, Illinois. It was founded in 1984, and employs a staff of 24 with expertise in budget and tax issues, education policy, environmental protection, and energy policy. Its public relations staff conducts thousands of face-to-face meetings with state legislators every year. Heartland's communications in print, television, and radio have a combined circulation of 185 million viewers. Heartland has maintained a deep interest the CVOW and wind energy policy for many years. Like co-plaintiff CFACT, Heartland is a member of the Save the Whales Coalition and a signatory to the comments on the CVOW DEIS, the IHA issued by NMFS to Dominion Energy, and the Draft Strategy on the NARW authored by BOEM and NOAA. In addition, like CFACT, Heartland was a signatory on the 60-Day Notice of Intent to Sue letter submitted to NMFS on November 11, 2023, which identified defects in the BiOp issued for the CVOW project. Members of Heartland, including Aaron Stover, enjoy whale-watching off the Atlantic coast where they might observe NARW. These members, including Mr. Stover, have concrete plans to go whale-watching in the future in areas where NARW are known to reside and/or migrate. For example, Mr. Stover has contacted Rudee Tours in Virginia Beach, VA, to reserve a spot on a whale-watching boat this coming December, when Rudee Tours resumes its whale-watching excursions. Project-related

---

[4] In a story dated March 4, 2024, Richmond, Virginia's local CBS news affiliate, WTVR, reported that residents of Virginia Beach are experiencing noise-related impacts from construction of CVOW's on-shore facilities.

https://www.wtvr.com/news/local-news/dominion-energy-wind-turbine-virginia-beach-march-4-2024

impacts to the NARW will adversely affect Heartland members (including Mr. Stover) and degrade their ability to observe the species and enjoy the aesthetic experience of being in their presence. Moreover, one or more members of Heartland live in Viginia Beach, VA where on-shore construction activities of the CVOW have begun which cause noise pollution and other disturbances to their well-being.[5] These same members will be affected by the visual impacts of the CVOW project. In addition, some Heartland members are Dominion ratepayers and may be adversely affected by the project's potential to increase energy costs in Virginia.

26.     Plaintiff CRAIG RUCKER is a citizen of the United States and a resident of Berryville, VA. Mr. Rucker is a Founder and President of CFACT. Mr. Rucker has spent a considerable amount of his career involved with the protection of endangered animal species, including the NARW. He has written numerous articles for CFACT, Real Clear Energy, the Heartland Institute, and other national publications regarding the CVOW and the negative impact which the CVOW, and all the related Atlantic Coast OSW projects, will inflict on the NARW. These articles and activities also explain how the CVOW will cause an enormous and unnecessary increase in electricity rates. Mr. Rucker has organized and participated in activities which are designed to educate the public about the plight of the NARW, such as placing billboards along main thoroughfares in Virginia with pictures of dead whales and the message "Stop Windmills, Save Whales". In addition, Mr. Rucker organized and funded an airplane which flew a trailing banner over New Jersey beaches on Memorial Day, 2023 with the message "Stop Windmills, Save Whales". He has also participated in a boat expedition which drove 20 miles off Montauk Point, NY with the message "Save Whales, Stop Windmills". Mr. Rucker also

---

[5]   See note 4, *supra.*

has appeared as a guest on television and radio shows commenting on the damage and destruction the CVOW and other East Coast wind projects will cause for the NARW. Mr. Rucker has made numerous trips on the coastal waters of the eastern United States for purposes of whale-watching, and he intends to continue such trips to observe one of these magnificent marine mammals. To this end, Mr. Rucker has contacted Rudee Tours in Virginia Beach, VA, to reserve a spot on a whale-watching boat this coming December, when Rudee Tours resumes its whale-watching excursions. Should the CVOW project, alone or in concert with other OSW projects planned and approved by BOEM, be constructed and made operational, NARW will likely be harmed or may leave the coastal waters where Mr. Rucker might otherwise observe them. Worse, the CVOW project, alone or in concert with other OSW projects planned and approved by BOEM, may cause the NARW to become extinct, forever foreclosing Mr. Rucker's desire to observe the species and enjoy the aesthetic experience of sharing the ocean with it.

27.    Plaintiff NATIONAL LEGAL AND POLICY CENTER (NLPC) is a nonprofit 503(c)(3) organization founded in 1991 that promotes ethics in government and opposes unlawful government actions.  NLPC is headquartered in Falls Church, Virginia. NLPC owns 59.7 shares of stock in Dominion Energy. As a shareholder, NLPC opposes Dominion Energy's CVOW project on grounds that it will unlawfully endanger NARW and generate reputational damage to Dominion, thereby adversely affecting NLPC. In particular, NLPC has challenged Dominion Energy's use of its political influence to shape governmental policy in Virginia.  In addition, NLPC is being assessed a surcharge on its monthly electric bills from Dominion for this project, which would be eliminated if the project were halted.  NLPC also has members and supporters who oppose endangerment to the NARWs by CVOW,

28.     Plaintiff PETER FLAHERTY is an individual, currently employed as the Chairman of NLPC. He resides in Virginia. Mr. Flaherty opposes Dominion Energy's unlawful wind energy project because it will damage the environment, particularly the NARW. He is being assessed a surcharge on his residential monthly electric bills from Dominion for this project, which would be eliminated if the project were halted.

## DEFENDANTS

29.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is an agency of the federal government, which is authorized to grant leases, easements, and/or rights-of-way on the Outer Continental Shelf for activities that produce or support production of energy from sources other than oil and gas, such as wind power.[6] The Department of the Interior is also the parent department which oversees defendant BOEM.

30.     Defendant DEB HAALAND is the Secretary of the United States Department of the Interior and, among other things, is charged with overseeing the management of the nation's Outer Continental Shelf lands and oceans, including those affected by the OSW projects that will ultimately be developed along the Atlantic coast, such as CVOW. In this regard, Secretary Haaland oversees BOEM and is ultimately responsible for the decisions taken by BOEM. Further, Secretary Haaland is responsible for ensuring that all agencies within the Department of the Interior, including BOEM, comply with the ESA and the APA. In this action, Plaintiffs are suing Secretary Haaland in her official capacity as Secretary of the Interior.

31.     Defendant BOEM is an agency of the United States government within and under the jurisdiction of the Department of the Interior. BOEM's stated mission "is to manage development of U.S. Outer Continental Shelf energy and mineral resources in an

---

[6]     43 U.S.C. § 1337(p)(1)(C).

environmentally and economically responsible way."[7] For purposes of this action, BOEM is the

federal agency responsible for implementing the U.S. government's OSW energy program. More

specifically, BOEM is the federal agency that approved the CVOW project, issued the ROD for

the project, approved the CVOW COP, and accepted the analysis, terms, and conditions of the

BiOp issued by NMFS on September 18, 2023. Here, BOEM has accepted a BiOp that (i) failed

to address the cumulative, connected, and synergistic impacts of implementing the OSW projects

slated for the Atlantic coast, including but not limited to the CVOW facility, and (ii) failed to

consult and use the best available scientific and commercial information in its analyses. In doing

so, BOEM violated the ESA.

32.     Defendant ELIZABETH KLEIN is the Director of BOEM. Director Klein

oversees BOEM and is responsible for the decisions taken by BOEM. In this action, Plaintiffs

are suing Director Klein in her official capacity as Director of BOEM.

33.     Defendant GINA RAIMONDO is the Secretary of the United States Department

of Commerce and, among other things, is charged with overseeing commercial activities within

the United States and abroad.  Among the agencies under Secretary Raimondo's supervision is

NMFS.  Thus, Secretary Raimondo is responsible for ensuring that NMFS complies with the

ESA.  In this action, Plaintiffs are suing Secretary Raimondo in her official capacity as Secretary

of Commerce.

34.     Defendant NMFS is a government agency within the Department of Commerce.

Among its duties is to assess federal actions, such as BOEM approval of the CVOW project, for

---

[7]     U.S. Department of the Interior: Bureau of Ocean Energy Management, About Us (last
visited Jan. 5, 2022), available at https://www.boem.gov/about-boem.

their potential to adversely affect and take federal-listed marine species, including the NARW. In this case, NMFS prepared and issued the BiOp for the CVOW project.

35.     Defendant JANET COIT is the acting Director of NMFS and, as such, is primary responsible for ensuring that the Biological Opinions issued by NMFS comply with the legal requirements of the ESA. Ms. Coit oversaw the preparation and issuance of the BiOp for the CVOW project, which is the subject of this action. Plaintiffs are suing Ms. Coit in her official capacity.

36.     Defendant and real party in interest VIRGINIA ELECTRIC AND POWER COMPANY d/b/a DOMINION ENERGY VIRGINIA ("Dominion") is an American energy company headquartered in Richmond, Virginia that supplies electricity in parts of Virginia, North Carolina, and South Carolina and supplies natural gas to parts of Utah, Idaho and Wyoming, West Virginia, Ohio, Pennsylvania, North Carolina, South Carolina, and Georgia. Dominion also has generation facilities in Indiana, Illinois, Connecticut, and Rhode Island. Dominion is the applicant, owner, and proposed operator of the CVOW project, as well as the recipient of the NARW "take" authorizations issued by the federal defendants.

## STATUTORY AND REGULATORY FRAMEWORK

### A.     The Administrative Procedure Act

37.     The Administrative Procedure Act (APA) is found at 5 U.S.C. §§ 551, et seq.

38.     The APA addresses agency actions such as issuance of policy statements, licenses, and permits. It also provides standards for judicial review if a person has been adversely affected or aggrieved by an agency action and empowers the courts to set aside and hold unlawful such action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law  5 U.S.C. 706(2).

39.     When a substantive federal statute includes no citizen suit provision or statute of limitation, the APA is used to provide citizens access to federal courts when challenging actions by federal agencies.

**B.      The National Environmental Policy Act (NEPA)**

40.     The purpose of NEPA is to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.  NEPA's fundamental purposes are to guarantee that agencies take a "hard look" at the environmental consequences of their actions before such actions occur.  To conduct a "hard look" the agency in question must (1) carefully consider detailed information regarding the action's potentially significant environmental effects, and (2) make relevant information available to the public so that it may play a role in both the decision-making process and the implementation of the decision itself.  See, e.g., 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1.

41.     For any "major federal action" that "significantly affects" the "human environment," NEPA requires the federal agency in question (here, BOEM) to prepare a detailed EIS that analyzes and discloses the action's environmental consequences.  42 USC § 4332(c); *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989).  If the agency does not conduct this analytical "hard look" prior to the point of commitment, the agency deprives itself of the ability to "foster excellent action."  *See* 40 CFR § 1500.1(c); *Marsh v. Oregon Nat. Resources Council,* 490 U.S. 360, 371 (1989).

42.     Relatedly, NEPA requires that the EIS fully analyze all direct, indirect, and cumulative impacts of a proposed federal action or project.  40 CFR § 1502.16.  Direct effects include those "which are caused by the action and occur at the same time and place."  40 CFR § 1508.8(a).  Indirect effects include those "which are caused by the action and are later in time or

farther removed in distance, but are still reasonably foreseeable." 40 CFR § 1508(b). Indirect effects may also include growth inducing impacts and other effects that prompt changes in land use patterns, population density or growth rates, and related effects on air and water and other natural systems, including ecosystems. *Ibid.* Cumulative impacts include those which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over time. 40 CFR § 1508.7.

43.     The EIS must provide a complete and accurate discussion of the proposed project's foreseeable environmental impacts, including those that cannot be avoided. 5 USC § 706(2)(D); 40 CFR § 1502.22. However, when information is incomplete or unavailable, the EIS must "always make clear that such information is lacking." 40 CFR § 1502.22. And if the missing information can be feasibly obtained and is necessary for a "reasoned choice among alternatives," the agency must include the information in the EIS. *Ibid.* Where the cost of the data is too expensive to secure, the agency must still attempt to analyze the impacts in question. *Ibid.*

44.     The EIS must provide an accurate presentation of key facts and environmental impacts, as this is "necessary to ensure a well-informed and reasoned decision, both of which are procedural requirements under NEPA." *Natural Resources Defense Council v. U.S. Forest Serv.,* 421 F.3d 797, 812 (9th Cir. 2005). An EIS that is incomplete or provides misleading information can "impair[] the agency's consideration of the adverse environmental effects and . . . skew . . . the public's evaluation of the proposed agency action." *Id.,* at 811. For this reason, erroneous factual assumptions and misrepresentations of important facts can fatally undermine the information value of the EIS to the public and decision-makers. *Id.,* at 808.

45.     In addition, if the EIS identifies a significant effect, the EIS must propose and analyze "appropriate mitigation measures."  40 CFR § 1502.14; *Robertson v. Methow Valley Citizens Council*, 490 U.S. at 352-53 ["omission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA"].  Finally, the EIS must examine a reasonable range of alternatives to the proposed action, and focus on those that reduce the identified impacts of that action.  42 U.S.C. § 4332(2)(e); 40 CFR § 1502.1. So important is the alternatives analysis that the Council on Environmental Quality (CEQ) regulations describe it as the "heart" of the EIS.  40 CFR § 1502.14.  These same regulations require the agency to "[r]igorously explore and objectively evaluate all reasonable alternatives."  40 CFR § 1502.14(a).

**B.     The Endangered Species Act**

46.     The ESA (16 U.S.C. §§ 1531, *et seq.*) was enacted, in part, to provide a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] a program for the conservation of such endangered species and threatened species . . . ."[8]

47.     Section 2(c) of the ESA establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act."[9] The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to

---

8     16 U.S.C. § 1531(b).
9     16 U.S.C. § 1531(c)(1).

bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary."[10]

48.      Section 7(a)(1) of the ESA requires that all federal agencies "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species . . . ."[11] Section 7(a)(1) also directs NMFS (or, as the case may be, the Fish and Wildlife Service) to review other programs administered by the Secretary and utilize such programs in furtherance of the purposes of the Act.[12]

49.      The ESA vests the Secretary of Commerce with primary responsibility for administering and enforcing that statute with respect to marine and anadromous species. The Secretary has delegated this responsibility to NMFS.[13] The National Oceanic Atmospheric Administration of the Department of Commerce, through the NMFS, is responsible for implementing the ESA with respect to marine and anadromous species. The United States Fish and Wildlife Service is responsible for implementing the ESA with respect to terrestrial and freshwater species.

50.      *Listing of Species.*  For purposes of marine species (including marine mammals, pelagic fish, anadromous fish, and coral), the Section 4 of the ESA requires the Secretary of the Commerce to issue regulations listing species as endangered or threatened based on the present or threatened destruction, modification, or curtailment of a species' habitat or range; overutilization for commercial, recreational, scientific, or educational purposes; disease or predation; the inadequacy of existing regulatory mechanisms; or other natural or manmade

---

[10]   16 U.S.C. § 1532(3).
[11]   16 U.S.C. § 1536(a)(1).
[12]   16 U.S.C. § 1536(a)(1).
[13]   50 C.F.R. § 402.01(b).

factors affecting the species' continued existence.  16 U.S.C. § 1533(a)(1).  An endangered

species is one "in danger of extinction throughout all or a significant portion of its range."  16

U.S.C. § 1532(a).  A threatened species is one that will become endangered if current

circumstances continue.  The ESA requires the Secretary to make listing decisions "solely on the

basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).  Only if

officially listed does a species receive the full protection of the ESA.  The ultimate goal of the

ESA is to conserve and recover species so that they no longer require the protections of the Act.

16 U.S.C. §§ 1533(b), 1532(3).  The Secretary has delegated the task of listing marine species

under the ESA to NMFS. The NARW is a species listed pursuant to 16 U.S.C. § 1533(a)(1).

51.    *Critical Habitat.*  Concurrently with listing a marine species as threatened or

endangered, the Secretary of Commerce must also designate the species' "critical habitat".  16

U.S.C. § 1533(b)(2).  "Critical habitat" is the area that provides the physical and biological

features essential to the conservation of the species and which may require special protection or

management.  16 U.S.C. § 1532(5)(A).  The ESA requires the Secretary to make critical habitat

designations and amendments "on the best scientific data available."  16 U.S.C. § 1533(b)(2).

The ESA defines "conservation" to mean "the use of all methods and procedures which are

necessary to bring any endangered species or threatened species to the point at which the

measures provided pursuant to this Act are no longer necessary."  16 U.S.C. § 1532(3).  This

definition of "conservation" is broader than mere survival; it also includes recovery of the

species. *Id.*  The Secretary has delegated the task of designating critical habitat for listed marine

species to NMFS.

52.    *Duty to Conserve.*  Federal agencies have an affirmative duty to promote the

conservation and recovery of threatened and endangered species.  Section 2(c) of the ESA

provides that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of the Act."  16 U.S.C. § 1531(c)(1).  Section 7(a) also establishes an affirmative duty to conserve listed species.  16 U.S.C. § 1536(a)(1).  The duty to conserve applies to the Secretary of the Interior, the Secretary of Commerce, BOEM, and NMFS.

53.     *Duty to Insure Survival and Recovery; Duty to Consult.*  Section 7(a) mandates that all federal agencies "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species . . . determined . . . to be critical . . . ."  16 U.S.C. § 1536(a)(2).  To fulfill this mandate, the acting agency must prepare a biological assessment to identify all endangered and threatened species likely to be affected by the action.  U.S.C. § 1536(c)(1).  Where, as here, the affected species are marine animals, the acting agency must consult with NMFS to determine the extent of the impact to the species in question and identify measures to minimize take.

54.     NMFS and the Fish and Wildlife Service follow a jointly prepared consultation handbook which states that a "may affect" determination is:

> [T]he appropriate conclusion when a proposed action may pose ***any*** effects on listed species or designated critical habitat. When the Federal agency proposing the action determines that a "may affect" situation exists, then they must either initiate formal consultation or seek written concurrence from the Services that the action 'is not likely to adversely affect' listed species.[14]

---

[14]  *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act* at xiv (hereafter "Joint Consultation Handbook") (emphasis in original).

55.     A "may affect" determination triggering formal consultation is required when "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character"[15] occurs. Further, when determining whether any such effects may occur, NMFS (or the Fish and Wildlife Service) and the action agency must consider not only the direct effects of the action, but also the "indirect effects", which are defined as those that are "caused by the proposed action and are later in time, but still are reasonably certain to occur."[16]

56.     Once an action agency makes a "may affect" determination, the agency may elect to enter informal consultation with either the NMFS or the Fish and Wildlife Service, depending on which Service has jurisdiction over the species in question. The action agency then must complete a Biological Assessment (BA) and make one of two determinations – a "not likely to adversely affect" (NLAA) determination or a "likely to adversely affect" (LAA) determination. If the action agency arrives at an LAA determination, then formal consultation is required. Joint Consultation Handbook at 2-6. If the relevant Service does not concur with the NLAA determination, or if the action agency elects to bypass the informal consultation process and initiate formal consultation, then the relevant Service works towards the completion of a BiOp for the proposed action. When engaging in Section 7 consultation, both NMFS and the "action agency" must "use the best scientific and commercial data available."[17]

57.     *Biological Opinion.*  Following consultation under Section 7(a)(2), NMFS must prepare a Biological Opinion (BiOp) that analyzes whether the proposed action is likely to jeopardize the continued existence of a listed marine species or destroy or adversely modify a marine species' designated critical habitat.  If the BiOp concludes the action has the potential to

---

[15]   51 Fed. Reg. 19,926, 19,949 (June 3, 1986).
[16]   50 C.F.R. § 402.02.
[17]   16 U.S.C. § 1536(a)(2).

jeopardize the species or adversely modify its critical habitat, the BiOp must include an

Incidental Take Statement (ITS) which specifies the impact of any incidental taking, provides

reasonable and prudent measures to minimize such impacts, and sets forth terms and conditions

that must be followed.  16 U.S.C. § 1536(b)(4).  Where an agency action may affect a listed

species, the absence of a valid BiOp means that the acting agency (here, BOEM) has not fulfilled

its duty to insure through consultation with NMFS that its actions will neither jeopardize a listed

species nor destroy or adversely modify the species' critical habitat.

58.     The BiOp must evaluate the "cumulative effects on the listed species."  50 CFR §

402.14(g)(3).  Cumulative effects include those of other federal actions, as well as those of

"future State or private activities, not involving Federal activities, that are reasonably certain to

occur within the action area of the Federal action subject to consultation."  50 CFR § 402.02.

Related to the requirement that BiOps analyze cumulative effects, the ESA and its implementing

regulations mandate that the BiOp's analytical baseline include environmental conditions

resulting from approved federal actions, such as previously-approved OSW projects and any take

authorizations issued along with them. 50 CFR § 402.02 [definition of "Environmental

baseline"] This ensures that the BiOp fully considers the combined effects of the federal action

under review ***and*** the impacts of previously-approved federal actions.

59.     The BiOp must use the "best scientific and commercial data available."  16

U.S.C. § 1536(a)(2); 50 CFR § 402.14(d).  In addition, the BiOp must consider all relevant

evidence and factors, and articulate a rational connection between the facts and its conclusions.

60.     Although NMFS prepares and issues the BiOp, it is the action agency – here,

BOEM – that must accept and implement the conditions set forth in the BiOp. Accordingly, the

action agency is responsible for ensuring the BiOp is legally adequate.

61.     *Prohibition Against Unauthorized "Take".*  Section 9 of the ESA and its implementing regulations prohibit any person from "taking" a threatened or endangered species. 16 U.S.C. § 1538(a)(1); 50 CFR § 17.31.  A "person" includes private entities, such as the applicant for the CVOW project, as well as local, state, and federal agencies.  16 U.S.C. § 1532(13).  The ESA defines "take" broadly to include harming, harassing, trapping, capturing, wounding, or killing a listed species either directly or by degrading its habitat to such an extent that it impairs or disrupts that species' essential behaviors.  16 U.S.C. § 1532(19).  However, there is an exception to the Section 9 prohibition on take.  A public agency or private party may take listed species if they secure an ITS from either the United States Fish and Wildlife Service (for take of terrestrial and freshwater species) or NMFS (for take of marine and anadromous species).  16 U.S.C. § 1536(b)(4).  So long as the permittee complies with the terms and conditions of the ITS, no take violation of Section 9 will occur.  16 U.S.C. § 1536(o)(2).

62.     *Citizen Suits.*  Section 11(g) of the ESA (16 U.S.C. § 1540(g)) – the so-called "citizen suit" provision – expressly authorizes citizens of the United States to sue members of the federal government and/or private citizens for violations of the Act, provided proper notice has been given to the defendant agency or individual. Plaintiffs here are invoking their rights under Section 11(g) to challenge (i) NMFS's issuance of the CVOW BiOp, and (ii) BOEM's acceptance of the BiOp and reliance on it when approving the CVOW ROD and COP. Plaintiffs have complied with all pre-suit requirements that apply under that provision of the Act.

## FACTUAL BACKGROUND

63.     On January 27, 2021, just two weeks after his Inauguration, President Biden issued Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad". This unusually detailed Order asserts that a "climate crisis" exists which "threatens our ability to live

on Planet Earth" and requires a "whole of government" approach" to effectively resolve the "crisis". It specifically called for "a carbon-free electricity sector no later than 2035", and directed this mandate to all government agencies, including the Departments of Commerce, Interior, and Energy.

64.     The Departments of Interior, Commerce, and Energy established an inter-agency collaboration for the purpose of implementing the "Biden-Harris goal of developing 30 gigawatts of offshore wind by 2030". (See "Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy", Feb. 1, 2021.) These agencies have implemented an aggressive OSW leasing program which ultimately resulted in the establishment of nearly 30 separate offshore lease areas off the Atlantic coast, beginning in Massachusetts in the North and running down the east coast to South Carolina. (See Figure 3.15-1 Marine Mammals Geographic Area, Final Environmental Impact Statement for the CVOW.) One of the planned (and now approved) OSW projects is the CVOW facility.

65.     In 2021, Dominion Energy won the competitive bid for the CVOW project, which encompasses 112,799 acres located 25 miles off of Virginia Beach, Virginia. The project will consist of 176 14 MW wind turbines designed to produce 2,500 - 3,000 MWs of electricity annually.

66.     The National Environmental Protection Act (NEPA) requires every major federal action affecting the environment to issue an EIS which contains a "Purpose and Need" section explaining the reasons for taking the action. So far, there have been 12 Draft or Final EISs issued Atlantic coast OSW projects. Each of them, including the CVOW FEIS, cites Executive Order (EO) 14008 as the primary reason justifying the need for the project. Every application for an Incidental Harassment Authorization, including Dominion Energy's application for a 5-Year

Letter of Authorization, cites Executive Order 14008 as the reason underlying its "Purpose and Need". Every Record of Decision (ROD), including the ROD for the CVOW, cites EO 14008 as grounds for its purpose and need. Therefore, it is clear that the CVOW is only one element of an integrated plan to construct multiple wind energy facilities up and down the Atlantic Coast of the U.S. in order to deploy 30 Gigawatts (30,000 MW) of offshore wind by 2030.

67.     The NARW is a federally-listed species under the ESA and one of the most endangered large whales in the world, with approximately 340 individuals left in existence. NARW migrate annually from the North Atlantic Ocean, where it forages during the summer months, to the South Atlantic Ocean, where it produces calves during the Winter months - a distance of over 1,000 miles. This route carries the NARW through and/or near not only the CVOW, but all other wind lease areas created by BOEM. See Map 3.15-1 "Marine Mammal Geographic Analysis Area", Final Environmental Impact Analysis for the CVOW and BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy, pp. 3-4.  Thus, the same NARW individuals that must navigate through or around the BOEM-approved Vineyard Wind OSW project in Massachusetts, must also navigate through or around the BOEM-approved South Fork OSW project in Rhode Island, the BOEM-approved Revolution Wind OSW project in Rhode Island/Connecticut, the BOEM-approved Empire Wind project in New York, and the BOEM-approved Ocean Wind 1 OSW project in New Jersey, among others. If and when the CVOW project begins construction, those same NARW individuals will have to navigate around that facility as well. At each point, these OSW projects – and there are many more in the BOEM-approval pipeline – will obstruct migration and feeding of NARW and subject them to noise and increased threat of ship collisions and entanglement with fishing gear.

68.     In short, the same cohort of migratory NARW, numbering no more than 340 individual whales, will have to run the gauntlet of impacts, impediments, and physical threats posed by the many OSW projects approved and/or planned for the Atlantic seaboard. Unfortunately, however, neither NMFS nor BOEM has analyzed whether the combined and synergistic impacts of so many OSW projects, when absorbed by such a limited number of individual whales, all of whom are entitled to the highest level of protection under the ESA, will result in "take" of such magnitude as to drive the species toward extinction or otherwise frustrate its recovery.

69.     In October 2022, BOEM and NOAA issued a draft document titled *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy* (the "NARW and OSW Strategy"), which admits that BOEM's Atlantic OSW program, when viewed in its entirety, has the potential to harm NARW and cause population scale impacts to the species. Key statements from the NARW and OSW Strategy include the following:

- "In March 2021, in response to Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, the Departments of Interior, Energy, and Commerce announced a national goal to deploy 30 gigawatts of OSW by 2030, while protecting biodiversity and promoting ocean co-use." (p. 1.)

- "BOEM and the National Oceanic and Atmospheric Administration's (NOAA's) National Marine Fisheries Service (NOAA Fisheries) recognize [OSW] development (from siting to decommissioning) must be undertaken responsibly including managing and mitigating the impacts to endangered species like the North Atlantic right whale. The NARW population is currently in decline, mainly due to vessel strikes and entanglement in fishing gear, necessitating precaution to ensure that OSW development is carried out in a way that minimizes the potential for adverse effects to the species and the ecosystems on which it depends." (p. 1.)

- "The agencies are working to understand the effects of OSW development on NARWs and their ecosystem, and to develop strategies to mitigate and monitor impacts to NARWs from OSW development."

- "BOEM and NOAA Fisheries initiated development of this shared draft *North Atlantic Right Whale and Offshore Wind Strategy* (hereinafter called "Strategy") to focus and integrate past, present, and future efforts related to NARW and OSW

development. In response to Executive Order 14008, both agencies share a common vision *to protect and promote the recovery of North Atlantic right whales while responsibly developing offshore wind energy.* This vision reflects the combined legislative mandates of the two agencies and commitment to the Administration's goal of developing OSW while protecting biodiversity and promoting ocean co-use." (pp. 1-2.)

- "As of September 2022, there were 27 renewable energy lease areas in the Atlantic Outer Continental Shelf (OCS) and there are 42 megawatts of installed OSW capacity. The OCS is the area of the continental shelf that begins at the edge of state marine boundaries (typically 3 nautical miles offshore except 9 miles for Texas and the west coast of Florida) and extends to 200 nautical miles, and more in some places." (p. 3.)

- "Additional lease sales are expected to be held in the Gulf of Maine and the Central Atlantic. In total, the area in existing leases and being considered for leasing in planning areas in the Atlantic OCS covers 22.237 million acres (about 8% of the Atlantic OCS). The OSW infrastructure currently proposed for installation by 2030 would be located on about 2.349 million acres, use fixed turbine technologies, and include 3,441 turbines and foundations and 9,874 miles of export and inter-array submarine cables." (p. 3.)

- "In addition, the Biden-Harris Administration has announced the goal of 15 gigawatts of floating OSW capacity by 2035. These metrics of development will change over time; but for purposes of this Strategy, the metrics demonstrate the large-scale nature of the development planned and underway." (p. 3.)

- "Due to the declining status of NARWs, the resilience of this population to stressors affecting their distribution, abundance, and reproductive potential is low. The species faces a high risk of extinction, and the population is small enough that the death of even some individuals can have a measurable effect on its population status, trend, and population dynamics. Further, the loss of even one individual a year may reduce the likelihood of recovery and the species achieving optimum sustainable population." (pp. 6-7.)

- "NOAA Fisheries' *North Atlantic Right Whale Priority Action Plan for 2021-2025* identifies the need to improve our knowledge of factors that may limit NARW recovery, such as OSW development (NOAA Fisheries 2021)." (p. 7.)

- "NARWs engage in migration, foraging, socializing, reproductive, calving, and resting behaviors critical to their survival (Leiter et al. 2017; Muirhead et al. 2018; Quintana-Rizzo et al. 2021; Zoidis et al 2021). The overlap between OSW development (planned, leased, and permitted) and NARW habitat extends to corridors outside the immediate development sites, where vessel traffic between ports and offshore sites would further overlap with the distribution of NARW." (p. 7.)

- "Effects to NARWs could result from exposure to a single project and may be compounded by exposure to multiple projects. ***It is important to recognize that***

> *NARW migrating along the U.S. Atlantic Coast travel through or nearby every proposed OSW development.*" (p. 11 [Emphasis added].)

70.     On December 12, 2022, BOEM released for public review the Draft EIS for the CVOW project. The Draft EIS purported to disclose and analyze the direct, indirect, and cumulative impacts of the project, including those with the potential to affect the NARW.

71.     On February 13, 2023, CFACT and Heartland submitted to BOEM an extensive comment letter identifying defects in the Draft EIS, including (but not limited to) the following:

- The EIS fails to include key analytical reports and instead refers the reader to technical studies attached to non-NEPA documents.

- The EIS fails to include an adequate analysis of the project's construction-related noise impacts on marine mammals, including the NARW.

- The EIS fails to include an adequate analysis of the project's operational noise impacts on marine mammals, including the NARW.

- The EIS fails to include an adequate analysis of the project's cumulative impacts on the NARW. That is, the EIS does not assess the project's impacts on NARW in combination with related impacts from all other sources, including the other proposed and approved offshore wind projects that are located in or near NARW habitat.

- The EIS fails to include sufficient information on the number, type, size, and speed of project vessels, plus non-project vessels, that will be operating in the project area where they could come in contact with NARW.

- The EIS fails to provide an accurate and adequate accounting of the number of NARW within the project area, which includes all transit corridors for vessels traveling between the wind development area and supply ports.

- The EIS provides insufficient information on the current and anticipated use of the areas near the project site by non-project vessels. As a result, the EIS cannot adequately assess the threats posed to NARW by project-related noise, which is expected to force NARW out of the project "ensonification" zone into areas where they may come into contact with vessels and fishing gear.

- In its assessment of piling driving noise, the EIS uses a noise dispersion/attenuation model that deviates substantially from industry standard.

- The EIS relies on unproven and facially insufficient mitigation measures, such as Protected Species Observers (PSOs) and Passive Acoustic Monitoring (PAM), to prevent impacts on NARW.

- The EIS fails to adequately assess the project's potential to alter water currents and stratification, which can disperse zooplankton making it difficult for NARW to forage efficiently.

- The EIS fails to adequately assess the threat posed by project-related vessels, many of which are not subject to speed limits requiring them to travel no more than 10 knots per hour.

- The EIS fails to adequately disclose and analyze the full complement of project-related air quality impacts.

- The EIS relies on data that have been redacted from technical appendices and thus hidden from public view and scrutiny.

This First Amended Complaint incorporates the entire CFACT/Heartland comment letter by this reference.

72.     On September 18, 2023, NMFS issued the BiOp for the CVOW project. The BiOp requires that BOEM and/or Dominion submit to NMFS five mitigation plans at least 180 days prior to commencement of in-water pile driving. The BiOp also prohibits Dominion from conducting any in-water pile driving until NMFS approves each of the five mitigation plans.

73.     The BiOp for the CVOW project identifies the "proposed action" for its analysis as the CVOW project itself, as defined in Dominion Energy's Construction and Operations Plan. The COP describes the process for constructing 176 14-16 MW wind turbines and the associated cables and infrastructure necessary to carry the generated electricity to shore. BiOp pp. 13-14.

74.     The BiOp concluded that while the CVOW project would result in limited "take" of NARW, it would not jeopardize the species, adversely modify its critical habitat, or impede the species recovery. The BiOp includes an ITS setting forth the number of NARW the CVOW project is authorized to take and by what means.

75.     On October 31, 2023, BOEM issued a ROD approving the CVOW project and adopting its Final EIS.

76.     On November 11, 2023, CFACT and Heartland, through counsel, submitted a 60-Day Notice of Intent to Sue letter to BOEM and NMFS (among others) as required by the ESA. This letter constitutes adequate notice to satisfy the requirements of the ESA and supports the claims contained in this Complaint. Neither BOEM nor NMFS have responded to the letter. On January 10, 2024, the 60-day "wait" period for bringing legal action against BOEM and NMFS

over the adequacy of the BiOp expired. Therefore, the district court may accept and adjudicate this action.

77.     On January 24, 2024, BOEM approved the COP for the CVOW project, thereby authorizing implementation of the project.

78.     On February 5, 2024, NMFS issued Dominion a Letter of Authorization, valid for 5 years, to begin work on the CVOW Project.

79.     On March 7, 2024, NLPC and Peter Flaherty, through counsel, submitted a 60-Day Notice of Intent to Sue letter to BOEM and NMFS (among others) as required by the ESA. The letter expressly adopts and incorporates by reference CFACT's 60-day Notice of Intent to Sue submitted previously to BOEM and NMFS. Note that the 60-Day Notice of Intent to Sue submitted by NLPC and Mr. Flaherty contains no claims beyond those set forth in CFACT's 60-Day Notice of Intent to Sue dated November 11, 2023.

80.     On April 3, 2024, and again on April 10, 2024, counsel for Dominion represented to counsel for plaintiffs that Dominion intends to begin in-water pile driving on May 1, 2024, as contemplated in the BiOp and COP. On April 11, 2024, counsel for Dominion notified counsel for CFACT that the five mitigation plans required for the project have been submitted to NMFS but only the Vessel Strike Avoidance plan had received "conditional" concurrence; the other four are still under review. Dominion has not indicated any intention to abandon the May 1 start date for pile driving, despite having not received final NMFS approval of its five mitigation plans, all of which are intended to reduce impacts on NARW during pile driving.

## FIRST CAUSE OF ACTION
## Violation of NEPA
## (Against BOEM for Adopting a Legally-Deficient EIS)

81.     Plaintiffs hereby incorporate by this reference each paragraph and allegation set forth above.

82.     BOEM has violated NEPA and its implementing regulations by issuing a ROD for the CVOW project and by approving the Final EIS for the Project, despite the Final EIS's procedural and substantive defects. 42 U.S.C. § 4331, *et seq*; 40 CFR § 1500, *et seq*.  The Final EIS, and the ROD that formalized its approval, are arbitrary and capricious and otherwise not in accordance with the law in violation of 5 U.S.C. § 706.

83.     An EIS must provide a detailed statement of: (1) the environmental impacts of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitment of resources that would be involved in the action should it be implemented.  42 U.S.C. § 4332(C).  An EIS must "inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 CFR § 1502.1.  NEPA also requires federal agencies, such as BOEM, to analyze the direct, indirect, and cumulative impacts of the proposed action and to take a hard look at those impacts.  40 CFR §§ 1508.7, 1508.8.  In addition, NEPA requires federal agencies to consider mitigation measures to minimize the environmental impacts of a proposed action.  40 CFR § 1502.14 (alternatives and mitigation measures); 40 CFR § 1502.16 (environmental consequences and mitigation measures).

84.     The ROD and Final EIS that BOEM prepared and approved for the CVOW project failed to comply with each of these NEPA requirements.  The Final EIS does not analyze an adequate range of alternatives; nor does it adequately analyze the Project's impacts on the human and natural environment, as discussed in Plaintiffs' comment letters to BOEM and as set forth in this First Amended Complaint.  The Final EIS also fails to consider mitigation measures capable of reducing the action's impacts on human and natural resources and relies on outdated, inaccurate, incomplete, and inadequate information when assessing the impacts of the proposed action.

85.     For each of the reasons set forth above, BOEM's adoption of the ROD and Final EIS for the CVOW Project was arbitrary, capricious, and not in accordance with law as required by NEPA, its implementing regulations, and the APA.

## SECOND CAUSE OF ACTION:
### Violation of the ESA
### (Against NMFS for Issuing a Legally-Deficient BiOp)

86.     Plaintiffs hereby incorporate by this reference each paragraph and allegation set forth above.

87.      Consultation under Section 7 of the ESA is required whenever a discretionary agency action "may affect" any listed species or its critical habitat.

88.     The BiOp for the CVOW project concludes, "No mortality or permanent injury (auditory or other) is expected from the proposed action during the construction, operations or decommissioning phases of the project." (BiOp, p. 216.) The BiOp does, however, conclude that the CVOW project will result in take of NARW through Level B (temporary) noise harassment caused by pile driving.

89.     The CVOW BiOp only analyzed the CVOW area itself, and did not consider any of the other 29 lease areas authorized for development by BOEM as part of its mission to fulfill the mandate of Executive Order14008. In the BiOp, NMFS admits that it excluded from its cumulative analysis all other ongoing and planned Atlantic coast OSW projects:

> We reviewed the list of cumulative impacts identified by BOEM in the CVOW-C DEI and determined that most (e.g. other future offshore wind development activities .......) do not meet the ESA definition of  cumulative effects because we expect that, if any of these activities were proposed in the action area, or were proposed elsewhere yet were to have future effects inside the action area, they would require at least one Federal authorization or permit, and would therefore be subject to ESA section 7 consultation requirements . . . . (BiOp p. 214.)

90.     The BiOp further explains the reason for its narrow approach by adding: "It is important to note that, because any future offshore wind project will require section 7 consultation, these future wind projects do not fit within the ESA definition of cumulative effects." BiOp p. 214.

91.     Thus, the BiOp's process for analyzing the CVOW project constitutes a textbook example of a segmented or piecemeal assessment – an unlawful incremental step opinion under 50 CFR § 402.14(k), which mischaracterizes the "action" to be only the CVOW itself, and not the entire 30 lease project developed in accordance with E.O. 14008, which is the "entire action" referenced in 50 CFR § 402.14(k). This approach artificially disconnects the project's impacts from those of other similar projects, thereby understating the impacts NARWs may incur during their annual thousand-mile migration path by examining only the harm it may suffer during a few miles of its migration.  An incremental step opinion is allowed only when "the action is authorized by a statute that allows the agency to take incremental steps toward the completion of the action." The ESA contains no such authorization.

92.     The BiOp also failed to adequately consider the CVOW project's impacts on NARW in combination with impacts from the other BOEM-approved OSW projects, each of which was granted an ITS authorizing take of NARW.

93.     In addition, the BiOp's analysis of all other federal and non-federally-approved projects and their contribution to existing and CVOW-related threats to NARW was inadequate and failed to provide sufficient data on which to make jeopardy determinations.

94.     As shown, the BiOp used an incorrect baseline for assessing the CVOW project's contribution to anticipated combined impacts on NARW. These combined impacts include (i) NARW "take" authorizations issued by NMFS for at least 5 other OSW projects, (ii) non-OSW federal activities for which take of NARW have been authorized, and (iii) non-federal activities that may cause impacts on NARW.

95.     By using an incorrect environmental baseline for the CVOW BiOp, NMFS violated the ESA and issued a legally-defective BiOp. In short, due to the BiOp's piecemeal analysis, "a listed species could be gradually destroyed so long as each path to its destruction is sufficiently modest". (See also C.F.R.  Sec.402.14(k) - incremental step only allowed if authorized by statute.)

96.     In their 60-day Notices of Intent to Sue, the plaintiff identified a host of defects in the BiOp issued by NMFS, including, but not limited to the following:

- The BiOp Fails to Analyze the CVOW Project's Cumulative Impacts on NARW Individuals, Most of Which Will be Adversely Affected by Every Offshore Wind Project Currently Contemplated for the Atlantic Coast.

- The BiOp Fails to Use "Best Scientific Information Available" Because the Standards for Noise Tolerance of the NARW Were Based on Incomplete and Inaccurate Information

- The BiOp Fails to Analyze Cumulative Impacts on NARW from Multiple Level B Noise Take Authorizations.

- The BiOp Violates the ESA Because it Authorizes Loss of NARW in Excess of its Potential Biological Removal Rate.

- Presidential Order 14008 violates the APA, the MMPA, and the ESA by Removing the BOEM's Discretion to Adopt the No Action Alternative and to Exercise Its Duty to Properly Protect Endangered Species.

- The Proposed Mitigation Measures Will Not Adequately Protect NARW from Project-Related Vessel Strikes.

- Project Construction Activities, Including "Soft Start" Pile Driving, Will Force NARW Out of Their Preferred Habitat and Into Areas of Increased Threats – an Impact Not Studied in the BiOp.

- The BiOp Fails to Analyze Whether and to What Extent Project *Operations* Will Cause NARW to Abandon Favored Migration Routes and Feeding Areas.

- The BiOp Fails to Analyze Project's Potential to Alter Water Mixing Patterns and Dispersal of Zooplankton (Copepods).

- The BiOp's Analysis of Operational Noise Impacts Uses Unsubstantiated Assumptions Regarding Noise Propagation Loss Rates, Resulting in an Underreporting of Noise Impacts to NARW and Other Listed Species.

- The BiOp Fails to Acknowledge that the Individual NARWs Affected by the CVOW Project Are the Same NARWs that Will be Affected by Every Other Offshore Wind Project Along the Atlantic Coast.

- BiOp's Reliance on Passive Acoustic Monitoring is Misplaced.

97.     For the reasons set forth above and in the Plaintiffs' 60-Day Notices of Intent to Sue, the BiOp for the CVOW project is deficient as a matter of law. Accordingly, NMFS acted arbitrarily and capriciously when it issued the BiOp, resulting in an abuse of discretion and a violation of the ESA.

**THIRD CAUSE OF ACTION:**
**Violation of the ESA**
**(Against BOEM for Accepting and Relying on a Defective BiOp)**

98.     Plaintiffs hereby incorporate by this reference each paragraph and allegation set forth above.

99.     As the acting agency, BOEM has a duty to conserve listed species, including the NARW. As part of that duty, BOEM may not accept, rely on, or implement a defective BiOp, even if that BiOp was prepared by NMFS.

100.     As alleged above, the BiOp that NMFS issued for the CVOW project is legally-deficient and fails to meet the minimum legal standards established under Section 7 of the ESA. Thus, BOEM had a duty to reject the BiOp and demand further consultation so that a new or amended BiOp – one that was legally compliant – could be prepared.

101.     BOEM, however, did not reject the defective BiOp prepared by NMFS; nor did BOEM demand re-consultation. Instead, BOEM accepted the BiOp prepared by NMFS despite its analytical and legal deficiencies, and has relied on that defective BiOp for purposes of approving the ROD for the CVOW project. This is a violation of the ESA

102.    BOEM's actions vis-à-vis the BiOp were unlawful, arbitrary, capricious, an abuse

of discretion, and otherwise not in accordance with law.

**FOURTH CAUSE OF ACTION:**
**Violation of the APA**
**(Against NMFS and BOEM)**

103.    Plaintiffs hereby incorporate by this reference each paragraph and allegation set

forth above.

104.    The APA provides that "[a] person suffering legal wrong because of agency

action, or adversely affected or aggrieved by agency action with the meaning of a relevant

statute, is entitled to judicial review thereof."[18] The reviewing court shall "hold unlawful and set

aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."[19]

105.    An agency's action is arbitrary and capricious within the meaning of the APA if

> the agency has relied on factors which Congress has not intended it
> to consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter to
> the evidence before the agency, or is so implausible that it could not
> be ascribed to a difference in view or the product of agency
> expertise.[20]

106.    NMFS's issuance of the CVOW BiOp was arbitrary, capricious, and unlawful

because the BiOp failed to adequately address the proposed action's individual and cumulative

impacts on federally-listed species, including the North Atlantic Right Whale, and relied on

unproven, unsupported, and ineffective measures to protect such species from take and other

---

[18] 5 U.S.C. § 702.

[19] 5 U.S.C. § 706(2)(A).

[20] *Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43 (1983).

forms of harm. In addition, NMFS prepared the BiOp without consulting and using the best available scientific and commercial data, a legal requirement of Section 7 of the ESA. For example, the BiOp fails to examine and make use of data showing that Passive Acoustic Monitoring (PAM) – which is a fundamental element of the project's strategy for avoiding/mitigating impacts to NARW – has a very high "miss-rate" and should not be used for ensuring that all NARW are detected before they enter the project's Level A ensonification zone. The BiOp also fails to use the data provided by Dr. Robert Stern showing that the project's operational noise will travel much further and attenuate at a slower rate than the BiOp assumes.

107.    NMFS's issuance of the CVOW BiOp was arbitrary, capricious, and unlawful because the BiOp included an Incidental Take Statement that underreported and underestimated the number of individuals of each affected listed species that would be taken by the proposed action.  The Incidental Take Statement also failed to include a complete or effective set of reasonable and prudent measures that would minimize impacts, including taking, on the affected listed species.  16 U.S.C. § 1536(b)(4).

108.    BOEM's reliance on the defective BiOp was arbitrary, capricious, and an abuse of discretion because such reliance necessarily skewed BOEM's understanding of the impacts the CVOW project will have on the NARW.

109.    The actions of NMFS and BOEM have deprived plaintiffs of the procedural protections afforded them under the APA, and will irreparably harm plaintiffs' interests as they related to the NARW and environmental conditions off the coast of Virginia.

110.    Thus, this Court should reverse and set aside the BiOp and ITS, and all other project approvals that rely on them, and remand the matter to NMFS and BOEM for further consideration in accordance with the APA and the ESA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)     Enter an Order declaring that the CVOW Final EIS and ROD was unlawful and void, on grounds they were approved in violation of NEPA and the APA;

(2)     Enter an Order setting aside the CVOW BiOp and the ITS as unlawful and void, on grounds they were issued in violation of the ESA and the APA;

(3)     Enter an Order setting aside all other federal approvals for the project that relied on the legal adequacy of the BiOp, including take or harassment authorizations issued pursuant to the Marine Mammal Protection Act.

(4)     Issue injunctive relief against Dominion prohibiting construction activities, both onshore and offshore, at the CVOW project until such time as NMFS issues, and BOEM accepts, a legally-compliant BiOp for the project.

(5)     Award Plaintiffs reasonable attorneys' fees and costs; and

(6)     Provide such other and further relief as the Court may deem just.


Dated: April 16, 2024                                    Respectfully submitted,


                                                         */s/Paul D. Kamenar*
                                                         Paul D. Kamenar
                                                   1629 K Street, N.W., Suite 300
                                                       Washington, D.C. 20006
                                                            (202) 603-5397
                                                       Paul.kamenar@gmail.com
                                                         (D.C. Bar 914200)
                                                          (Local Counsel)

/s/David P. Hubbard
David P. Hubbard
Gatzke Dillon & Ballance LLP
2762 Gateway Road
Carlsbad, CA 92009
(760) 431-9501
dhubbard@gdandb.com
*Pro Hac Vice*
(CA Bar No. 148660)

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing First Amended Complaint was served on all counsel of record via ECF system on April 16, 2024

*Paul D. Kamenar*
