# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMITTEE FOR A CONSTRUCTIVE TOMORROW, a nonprofit corporation; THE HEARTLAND INSTITUTE, a non-profit corporation; CRAIG RUCKER, an individual; NATIONAL LEGAL AND POLICY CENTER, a nonprofit foundation; and PETER FLAHERTY, an individual, | |
| Plaintiffs, | |
| v. | Case No. 24-cv-00774 (LLA) |
| UNITED STATES DEPARTMENT OF THE INTERIOR; DEB HAALAND, Secretary of the Interior, acting in her official capacity, UNITED STATES BUREAU OF OCEAN ENERGY MANAGEMENT; ELIZABETH KLEIN, Director of United States Bureau of Ocean Energy Management, acting in her official capacity; GINA RAIMONDO, Secretary of Commerce, acting in her official capacity; NATIONAL MARINE FISHERIES SERVICE; JANET COIT, Director of the National Marine Fisheries Service, | Hon. Loren L. AliKhan |
| Defendants. | |
| VIRGINIA ELECTRIC AND POWER COMPANY d/b/a DOMINION ENERGY VIRGINIA, a utility corporation, | |
| Real party in Interest. | |

**Hearing Requested**

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
FOR AN ADMINISTRATIVE STAY OR PRELIMINARY INJUNCTION**

**Table of Contents**

Table of Authorities ...................................................................................................... ii

Statement of Facts ......................................................................................................... 2

1.  The Federal Government Launches an Aggressive Program to Develop an Offshore Wind Program ................................................................................................................. 2

2.  Federal Agencies Quickly Complete Environmental Review and Approve Construction Plans for the Massive Dominion Wind Project ........................................................... 5

3.  The Highly Endangered North Atlantic Right Whale Will Be Directly Affected by the Dominion Wind Project .............................................................................................. 7

4.  Construction Is Set to Begin on May 1, 2024 ......................................................... 10

Procedural Background ................................................................................................ 10

Statutory Framework .................................................................................................. 11

Argument ................................................................................................................... 15

1.  Standard of Review .............................................................................................. 15

2.  CFACT Is Likely to Succeed Because the Biological Opinion Fails the ESA's Procedural Requirement that NMFS Analyze Cumulative Effects of This and Other Offshore Wind Projects on the Critically Endangered North Atlantic Right Whale ......................... 17

3.  Rucker, CFACT, and Its Members Will Suffer Irreparable Injury Without a Stay or Injunction ............................................................................................................. 22

4.  The Balance of Harms Tips Sharply in Favor of Rucker, CFACT, and Its Members ...... 24

5.  The Paramount Public Interest Lies in Protecting the Endangered Species of Whales that Inhabit the Dominion Wind Site ............................................................................ 26

Conclusion ................................................................................................................. 27

## Table of Authorities

### Cases

*Am. Rivers v. U.S. Army Corps of Engineers*, 271 F. Supp. 2d 230 (D.D.C. 2003) ............... 15, 16

*Ashkenazi v. Att'y Gen. of U.S.*, 246 F. Supp. 2d 1 (D.D.C. 2003) ............................................. 15

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ...................... 15

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988). .......................................................... 18, 19, 20

*Ctr. for Biological Diversity v. Env't Prot. Agency*, 56 F.4th 55 (D.C. Cir. 2022) ...................... 25

*Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2024 WL 1602457 (D.D.C. Apr. 12, 2024). ................................................................................................... 12, 14, 17, 18

*Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972 (D.C. Cir. 1985). ............................... 16, 17

*Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009) ..................................... 15, 16

*Defs. of Wildlife v. U.S. Env't Prot. Agency*, 420 F.3d 946 (9th Cir. 2005) ............................ 18, 19

*Green Tech. Grp., LLC v. United States*, 147 Fed. Cl. 231 (2020). ........................................... 26

*Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192 (D.D.C. 2010) .................................. 15

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582 (D.C. Cir. 2023) ... 18, 19

*Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305 (D.C. Cir. 1987). ............................................... 15

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007). ..................................... 17

*Nken v. Holder*, 556 U.S. 418 (2009) .......................................................................................... 15

*North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980) ................................................ 18

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011). .................................................................. 15

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978). ................................................... 12, 26, 27

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985). ................................................................... 20

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ................................................................ 15

*Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010). ....................................... 19, 20

### Statutes

16 U.S.C. § 1531(b). ..................................................................................................................... 12

16 U.S.C. § 1533. .......................................................................................................................... 17

16 U.S.C. § 1536. .......................................................................................................................... 27

16 U.S.C. § 1536(a)(2). ........................................................................................................... 13, 25

16 U.S.C. § 1536(a). ...................................................................................................................... 12

16 U.S.C. § 1536(d). ...................................................................................................................... 13

16 U.S.C. § 1536. .......................................................................................................................... 17

16 U.S.C. § 1540(a)(1). .................................................................................................................. 25

16 U.S.C. § 1540(b)(1) ................................................................................................................... 25

43 U.S.C. § 1332. ............................................................................................................................ 2

43 U.S.C. § 1337(p)(1)(C). .............................................................................................................. 2

5 U.S.C. § 702 ............................................................................................................................... 16

5 U.S.C. § 703 ............................................................................................................................... 16

5 U.S.C. § 704 ............................................................................................................................... 16

5 U.S.C. § 705 ............................................................................................................................... 16

5 U.S.C. § 706 ............................................................................................................................... 16

### Regulations

50 C.F.R. § 402.02. ....................................................................................................................... 14

50 C.F.R. § 402.14(a). ................................................................................................................... 13

50 C.F.R. § 402.14(g) .................................................................................................................... 13

50 C.F.R. § 402.14(g)(3) ........................................................................................................... 14

76 Fed. Reg. 64432 (Oct. 18, 2011) ........................................................................................... 2

89 Fed. Reg. 4370 (Jan. 23, 2024) ........................................................................................ 8, 27

Plaintiffs, the Committee for a Constructive Tomorrow, et al. (collectively "CFACT"), ask this Court for an administrative stay or preliminary injunction enjoining Defendants, the United States Department of Interior, et al. (collectively, the "Government") and Dominion Energy Virginia, from conducting any in-water work related to its offshore wind energy facility, the Coastal Virginia Offshore Wind Project (the "Dominion Wind Project"), while this action is pending. Defendants intend to commence in-water construction of the Dominion Wind Project on May 1, 2024. This work will potentially harm the federally endangered North Atlantic Right Whale, whose protection is at the heart of CFACT's legal challenge to Defendant's, National Marine Fisheries Service ("NMFS"), Biological Opinion issued for the Project.

The in-water construction work that Dominion intends to begin on May 1, 2024, including and especially pile driving for wind turbine foundations, will result in the unlawful "take" of North Atlantic Right Whales beyond the limits in the Incidental Take Statement attached to the Biological Opinion and jeopardize the survival and recovery of the highly endangered North Atlantic Right Whale species.

In addition, the Biological Opinion is defective because it fails to include legally required analyses, is internally inconsistent, and contains unsupported conclusions. Because of these serious deficiencies, the Biological Opinion underreports the specific and cumulative impacts of the Project on the North Atlantic Right Whales.

The requested injunction is necessary to ensure that Dominion's construction of the Project does not unlawfully injure the North Atlantic Right Whale while the claims in this lawsuit are under review by this Court.

CFACT meets all four criteria for an administrative stay or preliminary injunction: (1) CFACT is likely to prevail on the merits of its claim that the Project's Biological Opinion

violates the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA");

(2) without the requested stay or injunction, irreparable harm will come to the North Atlantic

Right Whale and, by extension, to CFACT's interests; (3) the balance of hardships tilts heavily

in favor of preventing harm to the highly endangered North Atlantic Right Whale, which the

parties agree is on the brink of extinction and can absorb no additional human-caused

perturbations; and (4) the requested injunction will benefit the public interest in preserving

valuable species from becoming extinct.

**Statement of Facts**

**1.    The Federal Government Launches an Aggressive Program to Develop an Offshore Wind Program**

In 2005, Congress amended the Outer Continental Shelf Lands Act ("OCSLA") to allow

the Minerals Management Service, an agency within the Department of the Interior, to grant

leases for offshore renewable energy projects, including such projects as the Dominion Wind

Project at issue here.[1] That amendment underscored that the language in the provisions "shall be

construed" so as to guarantee that "the right to navigation and fishing therein shall not be

affected."[2] Congress also stated that because the Outer Continental Shelf is a vital national,

public resource, and because exploration, development, and production of the minerals of the

Outer Continental Shelf will have "significant impacts on coastal and non-coastal areas of the

coastal States,"[3] all development within the reserve must be "subject to environmental

safeguards."[4]

---

[1] *See* 43 U.S.C. § 1337(p)(1)(C); 76 Fed. Reg. 64432, 64434, 64459 (Oct. 18, 2011).
[2] 43 U.S.C. § 1332.
[3] *Id.*
[4] *Id.*

In 2007, the Department of the Interior issued a "Programmatic Environmental Impact Statement for Alternative Energy Development and Production and Alternate Use of Facilities on the Outer Continental Shelf."[5] The Department's Programmatic Environmental Impact Statement, published before the granting of any leases and the planning of projects, "examine[d] the potential impacts of alternative energy and alternate use activities that could result from implementation" of OCSLA's new authority for "the establishment of [an] Alternative Energy and Alternative Use Program on the [Outer Continental Shelf] through rulemaking."[6] The agency analyzed wind, wave, and ocean current energy capture technologies, and the Environmental Impact Statement "examined the potential impacts of alternative energy and alternate use activities that could result from implementation of the new authority under the EPAct to issue leases, easements, and rights-of-way from initial site characterization through decommissioning."[7]

The Department intended that this Programmatic Environmental Impact Statement would provide a "baseline analysis that helps to satisfy the requirements of NEPA for offshore renewable energy leasing" because "many wind energy projects will have similar environmental impacts."[8] However, "[g]iven the rapidly evolving nature" of the industry, the Department of the Interior did not anticipate the numerous locations along the Atlantic seaboard where the projects would be proposed.[9]

---

[5] Bureau of Ocean Energy Management, *Programmatic Environmental Impact Statement for Alternative Energy Development and Production and Alternate Use of Facilities on the Outer Continental Shelf* (Oct. 2007), https://www.boem.gov/renewable-energy/guide-ocs-alternative-energy-final-programmatic-environmental-impact-statement-eis.
[6] *Id.*
[7] *Id.*
[8] *Id.* at ES-7.
[9] *Id.* at ES-1.

A few years later, the Interior Department revised its offshore wind energy leasing regulations to implement a "Smart from the Start" policy to "accelerate"[10] leasing on the Outer Continental Shelf and "speed offshore wind energy development off the Atlantic Coast."[11] Before the revisions, the issuance of a lease and approval of development had four phases: (1) planning and analysis, (2) lease issuance, (3) Site Assessment Plan approval, and (4) Construction and Operation Plan approval. The 2011 revisions merged the first three steps into one, leaving only one opportunity for public comment and removing any pre-bid opportunities for public comment on lease locations, on-site evaluations of environmental impacts, or reasonable uses before lease issuance. These new regulations allowed for most of the details of these projects—lease location, size, distance from land—to be determined before the release of the project information and before any notice and comment, depriving affected citizens of their limited opportunity to participate in the planning of projects that will have significant impacts on their lives and livelihoods, the economy, the marine environment and species, and the ecology of the Atlantic coast.

By 2019, the Bureau of Ocean Energy Management ("BOEM") had identified several Wind Energy Areas from Maine to South Carolina, opened bid processes, and awarded leases for more than two dozen projects.

In January 2021, President Biden issued Executive Order 14008 and reinstated an Obama-era presidential memorandum aimed at taking a "government-wide approach to the

---

[10] U.S. Dept. of Interior, Press Release: *Salazar Launches 'Smart from the Start Initiative to Speed Offshore Wind Energy Development off the Atlantic Coast* (Nov. 23, 2020), https://www.doi.gov/news/pressreleases/Salazar-Launches-Smart-from-the-Start-Initiative-to-Speed-Offshore-Wind-Energy-Development-off-the-Atlantic-Coast.
[11] *Id.*

climate crisis."[12] That Executive Order outlined an aggressive program to combat climate change

by, among other things, developing a clean energy supply.[13]

In March 2021, the administration identified a series of "bold actions" to "catalyze

offshore wind energy" development.[14] The White House stated its goal of deploying 30

gigawatts of offshore wind energy by 2030 and announced that it was taking "coordinated steps

to support rapid offshore wind deployment."[15] To meet the 2030 target, the administration

announced that it planned to advance new lease sales and complete review of "at least 16

Construction and Operations Plans (COPs) by 2025."[16]

As of today, 29 offshore wind projects are in various stages of development, all of which

will be located in, along, or very near the endangered North Atlantic Right Whale's migration

path and habitat.

## 2.    Federal Agencies Quickly Complete Environmental Review and Approve Construction Plans for the Massive Dominion Wind Project

In December 2020, Dominion Energy submitted a Construction and Operations Plan for

the Project, which was most recently updated in 2023.[17] In the Construction and Operations Plan,

---

[12] Biden Administration, *Executive Order on Tackling the Climate Crisis at Home and Abroad* (Jan. 27, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/#:~:text=The%20Secretary%20of%20the%20Interior,of%20doubling%20offshore%20wind%20by.

[13] *Id.*

[14] Biden Administration, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

[15] *Id.*

[16] *Id.*

[17] Dominion Wind, *Construction and Operations Plan* (Sept. 8, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Public_Sec-1-3.pdf.

Dominion Wind asked BOEM to approve a project of up to 202 wind turbines (176 turbines preferred alternative), 300 miles of inter-array cables, up to nine high-voltage alternating-current export cables, and three offshore substations, in addition to onshore components.[18]

Following the submission of the Construction and Operations Plan in December 2022, BOEM published its Draft Environmental Impact Statement.[19] On August 31, 2023, the U.S. Fish and Wildlife Service issued a Biological Opinion for Endangered Species Act-listed species within its jurisdiction, making a no-jeopardy finding for endangered species.[20] On September 18, 2023, the National Marine Fisheries Service issued a Biological Opinion on the impacts of the Dominion Wind Project.[21] The Biological Opinion concluded that this Project, one of the largest offshore wind projects planned to date, would not jeopardize any endangered species or endangered species habitat.[22] The Service did not consider the cumulative impacts of the other wind turbine projects constructed, or soon to be constructed, up and down the Atlantic coastline.[23]

---

[18] *Id.* at 1-3.
[19] *See* Bureau of Ocean Energy Management, *Draft Environmental Impact Statement* (Dec. 2022), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/CVOW-C_DEIS_Volume%20I.pdf.
[20] Bureau of Ocean Energy Management, *Record of Decision* (Oct. 30, 2023) at 3, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/CVOW-C-ROD.pdf (Record of Decision).
[21] *See* National Marine and Fisheries Service, *Biological Opinion* (Sept. 18, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/CVOW-C_Biological%20Opinion_NMFS.pdf (Biological Opinion).
[22] *Id.* at 230.
[23] Northeast Ocean Data, *Energy and Infrastructure,* https://www.northeastoceandata.org/data-explorer/?energy-infrastructure|planning-areas (last accessed Apr. 26, 2024).

On September 29, 2023, BOEM published its Final Environmental Impact Statement and identified that the Project would include the installation of 176 turbines, three offshore substations, and hundreds of miles of inter-array cables.[24]

On October 30, 2023, the Bureau of Ocean Energy Management and the National Marine Fisheries Service issued a Joint Record of Decision, announcing the decision to approve the Construction and Operations Plan for the Dominion Wind Project.[25] BOEM issued its final approval letter authorizing construction on January 24, 2024. Two weeks later, NMFS issued Dominion Wind a Letter of Authorization under the MMPA, authorizing the take of marine mammals due to construction and operations for the Project. Under the terms of BOEM's approval, Dominion Wind plans to start construction on May 1, 2024.[26]

3.    **The Highly Endangered North Atlantic Right Whale Will Be Directly Affected by the Dominion Wind Project**

Few species are as imperiled as the North Atlantic Right Whale. The species is extremely close to extinction, easily susceptible to stress and chronic injuries from construction, vessel strikes, or entanglements, and has incredibly low reproductive rates.[27] The Defendants note just how dire the situation is in the recent *Strategy on the North Atlantic Right Whale and Offshore Wind*:[28]

> Due to the declining status of [North Atlantic Right Whales], the resilience of this population to stressors affecting their distribution, abundance, and reproductive potential is low. The species faces a high risk of extinction . . . [and] the loss of

---

[24] Record of Decision *supra* note 20.

[25] *Id.*

[26] First Amended Compl. (Apr. 16, 2024), ECF No. 11 at ¶ 80.

[27] Biological Opinion *supra* note 21 at 59.

[28] *See* Bureau of Ocean Energy Management, *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy* (Jan. 2024), https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW _0.pdf (Strategy on the North Atlantic Right Whale).

even one individual a year may reduce the likelihood of recovery and of the species' achieving optimum sustainable population.[29]

Since 2011, roughly 237 individual North Atlantic Right Whales have died, and BOEM estimates that 42% of the population is known to be in reduced health.[30]

North Atlantic Right Whales are experiencing an unusual mortality event,[31] and the population has dwindled to 338 individuals.[32] There are only about 70 breeding females capable of reproduction left.[33] The species has low genetic diversity and is not resilient.[34] Calving rates have slowed from one calf per female every three to four years to one calf per female every seven to ten years.[35]

Due to overharvesting in the 19th century, the North Atlantic Right Whale has been on the verge of extinction for more than a hundred years.[36] The Right Whale was among the first species to be listed as endangered.[37] Since then, none of the National Marine Fisheries Service's recovery goals have been achieved: "Despite . . . efforts to reduce the decline and promote recovery, progress toward right whale recovery has continued to regress."[38]

---

[29] *Id.* at 10.

[30] *Id.* at 8.

[31] *Id.* at 7.

[32] *See* Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the Coastal Virginia Offshore Wind Commercial Project Offshore of Virginia, 89 Fed. Reg. 4370, 4391 (Jan. 23, 2024).

[33] *Id.*

[34] Strategy on the North Atlantic Right Whale *supra* note 28 at 7.

[35] *Id.*

[36] The North Atlantic Right Whale is a large baleen whale that naturally occurs in the western North *Atlantic* Ocean. The species is distinguished by a stocky body and a lack of a dorsal fin. *See* National Oceanic and Atmospheric Administration, *North Atlantic Right Whale,* https://www.fisheries.noaa.gov/species/north-atlantic-right-whale (last accessed Apr. 26, 2024).

[37] *See* National Oceanic and Atmospheric Administration, *North Atlantic Right Whale,* https://www.fisheries.noaa.gov/species/north-atlantic-right-whale (last accessed Apr. 26, 2024).

[38] Biological Opinion *supra* note 21 at 69.

The installation and construction of the Dominion Wind Project, combined with all the other wind turbine projects approved up and down the Atlantic coast, threaten the very existence of this species.



[39]

The North Atlantic Right Whale breeds in the waters offshore New England and then migrates annually along the Atlantic coast to the Bahamas to give birth, traversing many of the other areas where Defendants have approved or planned to approve offshore wind projects.[40] While generally a migratory species, some individuals become residents of preferred locations and do not migrate. Pregnant females give birth in shallow waters only a few miles offshore.[41] In

---

[39] World Wildlife Fund, *North Atlantic Right Whale*,
https://www.worldwildlife.org/species/north-atlantic-right-whale (last accessed Apr. 26, 2024).
[40] *See* BOEM and NOAA's Strategy on the North Atlantic Right Whale and Offshore Wind (Jan. 2024),
https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW_0.pdf.
[41] Biological Opinion *supra* note 21 at 59.

the springtime, the females who have given birth to a calf migrate back up the Atlantic coast and return to high-latitude foraging grounds.[42]

The Government's wind energy corridor and the Dominion Wind Project, which is developing at a blistering pace, will be situated directly in the migration path of the North Atlantic Right Whale. This means that each migrating North Atlantic Right Whale will have to navigate through all 30 offshore wind projects—and traverse through thousands of massive wind turbines—to maintain reproductive integrity and survive as a species.

**4.      Construction Is Set to Begin on May 1, 2024**

Dominion Wind intends to begin construction on May 1, 2024. Under the terms of the Biological Opinion, Dominion Wind is prohibited from starting any in-water pile driving activities until NMFS approves five mitigation plans, which are all intended to protect the North Atlantic Right Whale from the impacts of Project construction.

**Procedural Background**

On November 11, 2023, CFACT, along with Plaintiff the Heartland Institute, submitted to federal Defendants NMFS and BOEM (among others) a 60-Day Notice of Intent to Sue, challenging the Biological Opinion issued for Dominion Wind. Plaintiffs, Peter Flaherty and the National Legal and Policy Center submitted a similar 60-Day Letter on March 7, 2024. Like CFACT's comment letter on the Draft Environmental Impact Statement, the 60-Day Letter criticized the Biological Opinion for failing to assess the Dominion Wind Project's impacts on the North Atlantic Right Whale when viewed in combination with the other planned and approved offshore wind projects along the Atlantic Coast. The 60-Day Letter also identified other defects in the Biological Opinion, including unsupported reliance on Protected Species

---

[42] *Id.*

Observers and Passive Acoustic Monitoring to detect North Atlantic Right Whales and protect whales from being exposed to project-related construction noise and vessel strikes.

After waiting the required 60 days—to which CFACT heard nothing regarding the issues raised in the 60-Day Letter—CFACT filed its complaint challenging the Biological Opinion under the Administrative Procedure Act and the Endangered Species Act.[43]

Because the Biological Opinion and the Construction and Operations Plan indicate that Dominion Wind intends to commence in-water pile driving at the project site on May 1, 2024, counsel for CFACT held a telephone conference with counsel for Dominion Wind and Department of Justice attorneys representing the federal defendants. During that conference, counsel for CFACT informed opposing counsel that CFACT would move for a preliminary injunction unless Dominion agreed to delay its in-water construction work (e.g., pile driving). Dominion refused to consider any delay in moving forward with construction.

On April 15, 2024, counsel for CFACT notified counsel for Dominion and the federal Defendants that Plaintiffs planned to file this present motion for preliminary injunction and asked that they contact him with any further issues or questions regarding the proposed motion. Neither Dominion nor the federal Defendants responded with additional concerns or proposals, concluding the parties "meet and confer" obligations under Local Civil Rule 7(m). CFACT then filed the present motion on April 29, 2024.

**Statutory Framework**

The Endangered Species Act ("ESA") provides "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] a program

---

[43] Compl. (Mar. 18, 2024), ECF No. 1; *see also* First Amended Compl. (Apr. 16, 2024), ECF No. 11.

for the conservation of such endangered species and threatened species."[44] The Act requires all federal agencies to "conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes."[45] Congress's intent in enacting the Endangered Species Act "was to halt and reverse the trend toward species extinction, whatever the cost"[46]— even when doing so is inconvenient or counter to Government goals.

This Court has recognized the importance Congress placed on protecting those plants and animals whose survival is threatened by human activity, noting that the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."[47] With that legislation, Congress made a "conscious decision . . . to give endangered species priority over the 'primary missions' of federal agencies."[48] As noted by the Court, protecting endangered species, such as the North Atlantic Right Whale, is so important that it takes over the primary mission of federal agencies, including BOEM's mission to develop an industrial-scale offshore wind energy network.

Section 7 of the ESA requires that a government agency (BOEM) consult with the Secretary (authority delegated to NMFS) before taking any action that may jeopardize endangered species, such as the North Atlantic Right Whale:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, ensure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species. . . .[49]

---

[44] 16 U.S.C. § 1531(b).
[45] *Id.*
[46] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).
[47] *Ctr. for Biological Diversity v. Regan,* 2024 WL 1602457 (D.D.C. Apr. 12, 2024) (internal citations omitted).
[48] *Id.*
[49] 16 U.S.C. § 1536(a).

The regulations promulgated to implement ESA Section 7 require that an action agency—here, BOEM and the U.S. Army Corps of Engineers—first must determine whether the action "may affect" an endangered or threatened species.[50] If so, the action agency must consult with the National Marine Fisheries Service, which has primary responsibility for marine species under the ESA.[51] The Section 7 consultation requires that when the National Marine Fisheries Service issues a Biological Opinion determining whether the proposed action jeopardizes the species: "[T]he Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat."[52]

When preparing a Biological Opinion, the consulting wildlife agency must "use the best scientific and commercial data available."[53] In addition, the consulting agency—NMFS—must:

(1) Review all relevant information provided by the [action] agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the [action] agency and the applicant.

(2) Evaluate the current status and environmental baseline of the listed species or critical habitat.

(3) Evaluate the effects of the action and cumulative effects on the listed species or critical habitat

(4) Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.[54]

---

[50] 50 C.F.R. § 402.14(a).

[51] *Id.*

[52] 16 U.S.C. § 1536(d).

[53] 50 C.F.R. § 402.14(g)(8); see also 16 U.S.C. § 1536(a)(2).

[54] *Center for Biological Diversity v. Regan*, 2024 WL 1602457 *6 (D.D.C. Apr. 12, 2024) (citing 50 C.F.R. § 402.14(g)).

13

As explained in *Center for Biological Diversity v. Regan*, "[e]stablishing the 'environmental baseline of the listed species or critical habitat' is a substantial undertaking."[55] The "environmental baseline" is the condition of the listed species without taking into account the impacts to that species caused by the proposed action or project.[56] The "baseline" includes the following:

> (a) The past and present impacts of all Federal, State, or private actions and other human activities in the action area;
>
> (b) The anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation;
>
> (c) The impact of State or private actions which are contemporaneous with the consultation in process.[57]

After establishing the "environmental baseline," the consulting wildlife agency must "[e]valuate the effects of the action and cumulative effects on the listed species."[58] The "effects of the action" include "all consequences to the listed species . . . that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action."[59] "Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action."[60]

---

[55] *Id.*
[56] 50 C.F.R. § 402.02.
[57] *Id.*
[58] 50 C.F.R. § 402.14(g)(3).
[59] 50 C.F.R. § 402.02.
[60] *Id.*

**Argument**

**1.      Standard of Review**

CFACT seeks either a preliminary injunction or, in the alternative, an administrative stay under 5 U.S.C. § 705. Under either, Plaintiffs bear "the burden of persuasion and must demonstrate, 'by a clear and convincing showing,' that the requested relief is warranted."[61]

This Court applies a four-part test to determine whether a preliminary injunction is warranted.[62] To secure a preliminary injunction pursuant to this test, the plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) that the plaintiff would suffer irreparable injury if the injunction is not granted; (3) that any injunction would not substantially injure other interested parties; and (4) the public interest would be served by the injunction.[63]

When assessing the plaintiff's offer of proof on these four factors, the D.C. Circuit performs a "sliding scale" assessment, where a strong showing on one factor will compensate for a weaker showing on another.[64] The *Davis*[65] court explained the sliding scale concept as follows:

> If the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor. For example, if the movant makes a very strong showing of irreparable harm and there is no substantial harm to the non-movant, then a correspondingly lower standard can be applied for likelihood of success. Alternatively, if substantial harm to the nonmovant is very high and the showing of irreparable harm to the movant very

---

[61] *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *see Nken v. Holder*, 556 U.S. 418, 433–434 (2009) ("The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.").

[62] *Ashkenazi v. Att'y Gen. of U.S.*, 246 F. Supp. 2d 1, 3 (D.D.C. 2003) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–312 (1982)); *see also Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305 (D.C. Cir. 1987).

[63] *Am. Rivers v. U.S. Army Corps of Engineers*, 271 F. Supp. 2d 230, 248–249 (D.D.C. 2003).

[64] *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011).

[65] *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009).

low, the movant must demonstrate a much greater likelihood of success. It is in this sense that all four factors must be balanced against each other.[66]

Although the D.C. Circuit continues to use the four-part test for preliminary injunctions, as set forth above, it recognizes that other courts have moved to a two-prong test when the plaintiff alleges violations of the Endangered Species Act.[67]

The Administrative Procedure Act[68] gives the Court broad power to postpone the effective date of an agency action to preserve the status quo or avoid irreparable injury: "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," courts reviewing agency action "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."[69]

The Court considers four factors to determine whether a stay is justified:

> The factors to be considered in determining whether a stay is warranted are: (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay.[70]

A stay may be granted if the plaintiff shows either a high likelihood of success or substantial irreparable injury:

> To justify the granting of a stay, a movant need not always establish a high probability of success on the merits. Probability of success is inversely proportional

---

[66] *Id.* at 1291–92.

[67] *American Rivers*, 271 F. Supp. 2d at 249 (citing 1st Circuit and 9th Circuit cases where two-prong test has been applied because "the balancing and public interest prongs have been answered by Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species.").

[68] 5 U.S.C. § 701-706.

[69] 5 U.S.C. § 705 (The reviewing court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.").

[70] *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).

to the degree of irreparable injury evidenced. A stay may be granted with either a high probability of success and some injury, or *vice versa.*[71]

**2.      CFACT Is Likely to Succeed Because the Biological Opinion Fails the ESA's Procedural Requirement that NMFS Analyze Cumulative Effects of This and Other Offshore Wind Projects on the Critically Endangered North Atlantic Right Whale**

The Endangered Species Act flatly prohibits federal agency actions that jeopardize the existence of a listed endangered species: "Each federal agency shall . . . insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species."[72] This provision, Section 7 of the ESA, "prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora."[73]

Relevant here, the ESA required NMFS to issue a Biological Opinion analyzing whether the Dominion Wind Project was likely to jeopardize the existence of the critically endangered North Atlantic Right Whale, using the "best scientific and commercial information available."[74] But instead of analyzing all of the best information available, NMFS intentionally chose to exclude from its analysis the effects that numerous other offshore wind projects along the Right Whale's annual migration path will have on the remaining 338 members of this nearly extinct whale species, invalidating its Biological Opinion and BOEM's authorization of the Project based on that incomplete Biological Opinion.[75]

Because the Biological Opinion explicitly states that it ignores and does not consider all of the effects of the agency's action on this severely endangered whale species, it is invalid as a

---

[71] *Id.*
[72] 16 U.S.C. § 1536.
[73] *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 652 (2007); *see Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2024 WL 1602457 (D.D.C. Apr. 12, 2024).
[74] 16 U.S.C. § 1533.
[75] *Ctr. for Biological Diversity*, 2024 WL 1602457.

matter of law. In cases like this, where the issue is the proper interpretation of the Endangered Species Act rather than the facts supporting the agency action, the Courts—not marine biologists—must determine the validity of the Biological Opinion by first ascertaining the proper meaning of the statutory language.[76] Where the opinion's flaws "are legal in nature," discerning the flaw "'requires no technical or scientific expertise.'"[77]

The Dominion Wind Biological Opinion states that NMFS ignored and did not analyze how other offshore wind projects now on the drawing board along the North Atlantic Right Whale's annual migration route will affect the species, taking the position that "other future offshore wind energy development activities," including construction of thousands of giant turbines on millions of acres of ocean bed, could be ignored because "they would require at least one Federal authorization or permit and would, therefore, be subject to the ESA section 7 consultation requirements."[78] But nothing in the ESA authorizes federal agencies to ignore known threats to endangered species just because the activity will require its own biological opinion in the future.[79]

Directly on point is *Conner v. Burford*,[80] in which the Ninth Circuit rejected this same argument, invalidating the Biological Opinion for a federal oil and gas lease even though each well location would later be subject to a post-lease Section 7 consultation and its own biological opinion: "Although we recognize that the precise location and extent of future oil and gas activities were unknown at the time, extensive information about the behavior and habitat of the

---

[76] *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582 (D.C. Cir. 2023).
[77] *Ctr. for Biological Diversity*, 2024 WL 1602457 (quoting *Defs. of Wildlife v. U.S. Env't Prot. Agency*, 420 F.3d 946, 976 (9th Cir. 2005)).
[78] Biological Opinion *supra* note 21 at 214.
[79] *See North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980) ("action" must be construed broadly).
[80] *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988).

species in the areas covered by the leases was available."[81] In that case, the court agreed with the appellees that asserting

> incomplete information about post-leasing activities does not excuse the failure to comply with the statutory requirement of a comprehensive biological opinion using the best information available. 16 U.S.C. § 1536(a)(2). With the post-leasing and biological information that was available, the FWS could have determined whether post-leasing activities in particular areas were fundamentally incompatible with the continued existence of the species.[82]

The *Conner* court flatly rejected the Government's rationale—resurrected in this Biological Opinion—that cumulative effects of future projects could be ignored:

> With the information available, the FWS could also have identified potential conflicts between the protected species and post-leasing activities due to the cumulative impact of oil and gas activities. For example, species like the grizzly and the gray wolf require large home ranges making it critical that ESA review occur early in the process to avoid piecemeal chipping away of habitat.[83]

The Court of Appeals for the District of Columbia has just recently ruled that, in cases which involve the proper interpretation of the Endangered Species Act, it is the Courts—not NMFS and its marine biologists—who must determine the proper meaning of the statute.[84] And, in *Wild Fish Conservancy v. Salazar*,[85] the court affirmed the principle enunciated in the recent *Lobstermen's*[86] case—that legal or procedural violations of ESA do not require subject-matter expertise: "Where the opinion's flaws are 'legal in nature,' however, '[d]iscerning them requires no technical or scientific expertise[.]'"[87]

---

[81] *Id.* at 1454.
[82] *Id.*
[83] *Id.*
[84] *Maine Lobstermen's Association*, 70 F.4th 582.
[85] *Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010).
[86] *Maine Lobstermen's Association*, 70 F.4th 582.
[87] *Wild Fish Conservancy*, 628 F.3d at 532 (quoting *Defenders of Wildlife*, 420 F.3d at 976).

Moreover, "[g]iven a substantial procedural violation of the ESA in connection with a federal project, the remedy must be an injunction of the project pending compliance with the ESA."[88] That is because

> [t]he ESA's procedural requirements call for a systematic determination of the effects of a federal project on endangered species. If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result. The latter, of course, is impermissible.[89]

The case law is clear that carving related actions into separate pieces for the purpose of evaluating environmental harm is equally unlawful under NEPA, just as it is under the Endangered Species Act. In *Thomas v. Peterson*,[90] the Court held that not requiring a comprehensive, cumulative review of related actions "would permit dividing a project into multiple 'actions' each of which individually has an insignificant environmental impact but which collectively have a substantial impact."[91] Such an approach "might result, for example, in the 'piecemeal chipping away of habitat' for endangered species."[92]

Here, too, the Government had plenty of information available to identify conflicts between offshore wind development and the North Atlantic Right Whale. In October 2022, BOEM and NMFS authored and sent for comment a draft *North Atlantic Right Whale and Offshore Wind Strategy*, in which they recognize this development (from siting to decommissioning) must be undertaken responsibly, including managing and mitigating the impacts on endangered species like the North Atlantic right whale and that the agencies must

---

[88] *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985).
[89] *Id.*
[90] *Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985).
[91] *Id.* at 758.
[92] *Wild Fish Conservancy*, 628 F.3d at 522 (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)

take precautions to ensure that Offshore Wind development "is carried out in a way that avoids or minimizes the potential for introducing adverse effects to the species and ecosystems on which it depends."[93] BOEM and NMFS published the final Strategy in January 2024.[94]

The Strategy identifies "30 renewable energy lease areas in the Atlantic Outer Continental Shelf"[95] and that the North Atlantic Right whale, "whose range overlaps with the area proposed for [Offshore Wind] development, is one of the most endangered large whales in the world."[96] The agencies state that "[t]he activities associated with [Offshore Wind] development would introduce or further contribute to existing stressors in the environment that affect [North Atlantic Right Whales]."[97] These stressors include "exposure to noise and/or pressure (particularly from construction activities),"[98] resulting in hearing impairment, masking of [North Atlantic Right Whale] vocal communication, physiological impacts (e.g., stress), and/or behavioral disturbance, as well as mortality and injury."[99] Caution in authorizing offshore wind projects is necessary because

> Due to the declining status of [North Atlantic Right Whales], the resilience of this population to stressors affecting their distribution, abundance, and reproductive potential is low. The species faces a high risk of extinction, and the population size is small enough that the death of even some individuals can have a measurable effect on its population status, trend, and population dynamics. Further, the loss of even one individual a year may reduce the likelihood of recovery and of the species' achieving optimum sustainable population.[100]

---

[93] *See* Strategy on the North Atlantic Right Whale *supra* note 28 at 1.
[94] *See generally* Strategy on the North Atlantic Right Whale *supra* note 28.
[95] *Id.* at 5.
[96] *Id.* at 5.
[97] *Id.* at 12.
[98] *Id.*
[99] *Id.*
[100] *Id.* at 8.

Yet, despite offshore wind's threat to the North Atlantic Right Whale species, NMFS intentionally excluded from its Biological Opinion the effects of the 23 other offshore wind projects that are planned for the Outer Continental Shelf. Sunrise Wind and New England Wind—like Vineyard Wind, South Fork Wind, Ocean Wind 1, Revolution Wind, and Empire Wind—have all of their environmental permitting and review complete. Yet, NMFS failed to analyze the Projects' impacts. SouthCoast Wind, Atlantic Shores South, and Maryland Offshore Wind are awaiting comments on their Draft Environmental Impact Statements, and the agencies have signaled that those Projects will be approved.

All of these projects fall along the migration path of the North Atlantic Right Whale, as recognized by BOEM and NOAA in their Joint Strategy to protect the right whales: North Atlantic Right Whales "migrating along the U.S. Atlantic Coast have the potential to travel near or through many currently proposed OSW developments along the Atlantic Coast."[101] Offshore wind projects, many of which were not even considered by NMFS in its Section 7 Consultation, "occur in areas that are important for [North Atlantic Right Whale] vital functions."[102] Without considering the cumulative effects of all of the currently planned offshore wind projects, NMFS failed to use the best available information on whether Dominion Wind, together with the other components of the offshore wind program, will jeopardize this magnificent species as it stands on the brink of extinction.

**3.     Rucker, CFACT, and Its Members Will Suffer Irreparable Injury Without a Stay or Injunction**

Craig Rucker, CFACT, and its members not only show a high likelihood of success on their Endangered Species Act claim, but they also show irreparable harm if the ongoing seabed

---

[101] *Id.* at 14.
[102] *Id.*

construction and the intended May 1, 2024 start of pile driving are not stayed. NMFS itself

described how offshore wind projects like Dominion Wind jeopardize North Atlantic Right

Whale populations in a 2021 report titled, *Right Whale Use of Southern New England Wind*

*Energy Areas Increasing*:

> Construction and operation of hundreds of wind turbines is likely to introduce increased ocean noise, vessel traffic and possibly habitat alteration. All of these factors have the potential to affect right whales.

> Increased vessel traffic in the region will bring with it a greater risk of vessel strikes, one of the leading causes of serious injury and death of right whales.

> Increased noise from wind turbine construction and operations and vessels could also directly impact important whale behaviors and interfere with the detection of critical acoustic cues. These types of impacts may also be associated with physiological stress and could affect the whales' use of the region.

> The presence of wind turbine foundations may impact oceanographic and atmospheric conditions including potential changes in ocean stratification. This might alter the formation of plankton aggregations and thus foraging opportunities for right whales.[103]

Injury to the North Atlantic Right Whale is an injury to Mr. Rucker, CFACT, the

organization he founded, and its members. Rucker has long held a strong and abiding interest in

observing, studying, analyzing, and protecting whale species—particularly the North Atlantic

Right Whale.[104] He has written and spoken extensively on the subject of whale protection,

participated in rallies and demonstrations to protect the whales, and booked a whale-watching

trip to observe the whales in the very area offshore Virginia where the giant turbines are to be

constructed.[105] If, as Rucker believes, the cumulative effects of multiple offshore wind projects

---

[103] NOAA Fisheries, *Right Whale Use of Southern New England Wind Energy Areas Increasing* (July 29, 2021), https://www.fisheries.noaa.gov/feature-story/right-whale-use-southern-new-england-wind-energy-areas-increasing.
[104] *See* Ex. 1, Decl. of Craig Rucker (Apr. 26, 2024) ¶ 1–3.
[105] *Id.* ¶ 4–5.

all along the North Atlantic Right Whale's migration path accelerates the downward plunge of this already highly endangered species, there will be fewer—or maybe no more—North Atlantic Right Whales for him to study, observe, and admire.[106]

> As the Biological Opinion states, the species is in steep decline:

> The [North Atlantic Right Whale] population continues to decline. From 1990 to 2011, right whale abundance increased by approximately 2.8% per year; however, since 2011 the population has been in decline (Pace et al. 2017). The draft 2023 SAR reports an overall abundance decline between 2011 and 2020 of 29.7% (Hayes et al.).[107]

Once pile-driving activities start, as planned for May 1, the harm caused by the removal of boulders, the laying of cable and scour protection, and the pile-driving to install monopiles and cables cannot easily be reversed and may never be undone. The harm to the species, Mr. Rucker, and CFACT will be irreversible and irreparable.

## 4.    The Balance of Harms Tips Sharply in Favor of Rucker, CFACT, and Its Members

Because starting construction without a valid Biological Opinion violates the Endangered Species Act, a stay or preliminary injunction would do no more than require that Defendants conform their conduct to the law. On the other hand, construction will hasten the decline of the North Atlantic Right Whale and impose immeasurable harm on the whales, Rucker, CFACT, and its members—not to mention the environment. By ignoring the cumulative effects of offshore wind projects in the southern New England area now awaiting final approval, NMFS puts the species at risk. As NMFS biologist, Dr. Sean Hayes, wrote in an opinion letter to BOEM:

- "Right whales are one of the most endangered marine mammals with fewer than 350 animals remaining in the population (Pettis et al. 2022), down from a high of 478 in 2011 and over 400 as recently as 2017 (Hayes et al. 2021)."[108]

---

[106] *Id.* ¶ 6–7.
[107] Biological Opinion *supra* note 21 at 62.
[108] Ex. 2, Opinion from Dr. Sean A. Hayes to Brian R. Hooker, Lead Biologist at the Bureau of Ocean Energy Management (May 13, 2022).

- "Additional noise vessel traffic, and habitat modifications due to offshore wind development will likely cause added stress that could result in additional population consequences to a species that is already experiencing rapid decline (30% in the last 10 years)."[109]

- "The presence of structures such as wind turbines are likely to result in both local and broader oceanographic effects, and may disrupt the dense aggregations and distribution of zooplankton prey through altering the strength of tidal currents and associated fronts, changes in stratification, primary production, the degree of mixing, and stratification in the water column (Chen et al. 2021, Johnson et al 2021, Christiansen et al 2022, Dorrell et al 2022)."[110]

- "Maintenance and operational impacts would be for a duration of thirty or more years."[111]

- "As offshore wind energy projects in southern New England progress in development, in particular around Nantucket Shoals, it is critical to assess the range of impacts/threats and stressors to protected species and the degree to which they can be mitigated. This needs to include taking into consideration the chronic state of right whales and the importance of productive foraging habitats to these species. These impacts should be thoroughly analyzed in any EIS or other environmental reviews associated with offshore wind development."[112]

The ESA requires federal agencies to ensure "'that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat.'"[113] Under the ESA, it is unlawful to take a protected species without a valid biological opinion and corresponding incidental take statement.[114]

---

[109] *Id.* at 1

[110] *Id.* at 2.

[111] *Id.*

[112] *Id.*

[113] *Ctr. for Biological Diversity v. Env't Prot. Agency*, 56 F.4th 55, 62 (D.C. Cir. 2022) (quoting 16 U.S.C. § 1536(a)(2)).

[114] *See* 16 U.S.C. § 1540(a)(1) ("Any person who knowingly violates . . . any provision of this chapter, or any provision of any permit . . . may be assessed a civil penalty by the Secretary of not more than $25,000 for each violation. . . ."); *see also* 16 U.S.C. § 1540(b)(1) ("[a]ny person who knowingly violates any provision of this chapter, of any permit or certificate issued hereunder . . . shall, upon conviction, be fined not more than $50,000 or imprisoned for not more than one year, or both.").

The Government cannot credibly argue that it will be harmed by having to comply with environmental laws. Requiring an agency to do its statutorily required duty "is not a hardship, but an obligation."[115]

Likewise, Dominion Energy has an interest in making sure environmental laws are complied with before conducting a federally approved activity that may result in the unlawful take/harassment of an endangered species without a valid Biological Opinion. Mere financial loss can be remedied; the extinction of a species cannot.

**5.    The Paramount Public Interest Lies in Protecting the Endangered Species of Whales that Inhabit the Dominion Wind Site**

The Government admits that "U.S. offshore wind projects would by themselves probably have a limited impact on global emissions and climate change."[116]

The public interest, as expressed by Congress in the Endangered Species Act, gives first priority to the protection of endangered species: Section 7 "reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species."[117] In the landmark case of *Tennessee Valley Authority v. Hill*,[118] the Supreme Court rejected the argument that the interest in completing a nearly finished $100 million publicly financed dam overrode the public interest in protecting an endangered, minnow-like species that the dam would exterminate:

---

[115] *See Green Tech. Grp., LLC v. United States*, 147 Fed. Cl. 231, 246 (2020) (bid protest case granting injunction where the harm in "requiring the government to continue purchasing the services from the incumbent for the interim does not outweigh the irreparable harm to an offeror arising from an agency's own failure to comply with the law in awarding the contract.").

[116] Bureau of Ocean Energy Management, *Final Environmental Impact Statement* (Sept. 23, 2023) at 3.4-7, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/_CVOW-C_FEIS_Volume_I_FEIS.pdf.

[117] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).

[118] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978).

> The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute. All persons, including federal agencies, are specifically instructed not to "take" endangered species . . . . Agencies in particular are directed by §§ 2(c) and 3(2) of the Act to "use . . . *all methods* and procedures which are necessary" to preserve endangered species.[119]

So, while the public may have a legitimate interest in advancing the governmental offshore wind program, that interest takes a backseat to the protection of species identified as endangered or threatened by governmental actions. And Dominion Wind's interests in time and money invested, and its profits to be made from this project, while important economic considerations, do not outweigh the significant public interest considerations in species preservation. There are, for example, only 338 remaining right whales in existence.[120]

In a contest between a public policy project and endangered species protection, the endangered species wins: "[I]t is clear Congress foresaw that § 7 would, on occasion, require agencies to alter ongoing projects in order to fulfill the goals of the Act."[121] The ESA commands that agencies assure that their actions do not jeopardize an endangered species:

> One would be hard-pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies to ensure "that actions authorized, funded, or carried out by them do not jeopardize the continued existence" of an endangered species or "result in the destruction or modification of habitat of such species . . . ." This language admits of no exception.[122]

**Conclusion**

The Dominion Wind Project's construction should be stayed or enjoined until there is a new, valid Biological Opinion that includes analysis of the cumulative effects of other offshore

---

[119] *Id.* at 184–185 (internal citations omitted).
[120] 89 Fed. Reg. 4370, 4391 (Jan. 23, 2024).
[121] *Tennessee Valley Authority*, 437 U.S. at 186.
[122] *Id.* at 173 (quoting 16 U.S.C. § 1536).

wind projects on the highly endangered North Atlantic Right Whale. Because CFACT has shown that there is a likelihood of success on the merits of the ESA claim, that the balance of harms weighs in CFACT's favor, and that there is a substantial public interest in protecting these desperately endangered species, this Court should grant CFACT's Motion to Stay or Enjoin Dominion Wind's pile-driving construction scheduled to begin May 1, 2024.

Dated: April 29, 2024                                    Respectfully submitted,

                                                        s/ Roger J. Marzulla
                                                        Roger J. Marzulla
                                                        Nancie G. Marzulla
                                                        Marzulla Law, LLC
                                                        1150 Connecticut Ave., NW
                                                        Suite 1050
                                                        Washington, D.C. 20036
                                                        (202) 822-6760
                                                        roger@marzulla.com
                                                        nancie@marzulla.com
                                                        Bar No. 394907
                                                        Bar No. 400985

                                                        Paul D. Kamenar
                                                        1629 K. Street, N.W.
                                                        Suite 300
                                                        Washington, D.C. 20006
                                                        (301) 257-9435
                                                        paul.kamenar@gmail.com
                                                        Bar No. 914200

                                                        Counsel for Plaintiffs