# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE FOR A CONSTRUCTIVE
TOMORROW, THE HEARTLAND
INSTITUTE, CRAIG RUCKER,
NATIONAL LEGAL AND POLICY
CENTER, and PETER FLAHERTY,

      Plaintiffs,

      v.                          Case No. 1:24-cv-00774-LLA

UNITED STATES DEPARTMENT
OF THE INTERIOR, DEB HAALAND,
UNITED STATES BUREAU OF
OCEAN ENERGY MANAGEMENT,
ELIZABETH KLEIN, GINA RAIMONDO,
NATIONAL MARINE FISHERIES
SERVICE, JANET COIT, and
DOMINION ENERGY CORPORATION,

      Defendants.

## FEDERAL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR AN ADMINISTRATIVE STAY OR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

INTRODUCTION..................................................................................................1

FACTUAL BACKGROUND ................................................................................3

LEGAL BACKGROUND.....................................................................................5

I. Outer Continental Shelf Lands Act ................................................................5

II. ESA ...................................................................................................................6

III. NEPA...............................................................................................................8

IV. APA..................................................................................................................9

STANDARD OF REVIEW ..................................................................................10

ARGUMENT ........................................................................................................12

I.  Plaintiffs are unlikely to succeed on the merits.............................................12

      A. Plaintiffs lack standing. ...........................................................................12

            1. None of the organizational Plaintiffs, their individual members, or the individually named Plaintiffs alleges the requisite injury-in-fact to establish standing. ........................................................................13

                a. Whale watching ........................................................................13

                b. Onshore project construction...................................................17

                c. Electric utility rates..................................................................18

            2. The organizational Plaintiffs fail to demonstrate that the interests at stake in this action are germane to their respective organizational purposes......................................................................20

      B. Plaintiffs are unlikely to succeed on the merits of their Count Two claims…………………………………………………...22

II. Plaintiffs have not shown they are likely to suffer irreparable harm............31

      A. Plaintiffs' delay is grounds in itself to deny their request. ...................33

      B. Plaintiffs fail to demonstrate that they will be irreparably harmed by the effects of noise on right whales.....................................................37

C. Plaintiffs fail to demonstrate that they will be irreparably harmed by the effects of increased vessel traffic in the region. .............................................40

D. Plaintiffs fail to demonstrate that they will be irreparably harmed by the presence of wind turbine foundations. ...........................................................42

E. Plaintiffs fail to demonstrate that they will be irreparably harmed by any alleged effects of the CVOW Project on the right whale population.............42

III. The balance of harms and public interest do not support Plaintiffs' request for preliminary injunctive relief. ...................................................................................................43

CONCLUSION ....................................................................................................................45

## TABLE OF AUHTORITIES

**Cases**                                                                     **Page(s)**

*Am. Fed'n of Gov't Emps. v. District of Columbia,*
  No. Civ.A 05-0472 (JDB), 2005 WL 1017877, *4 (D.D.C. May 2, 2005) ..................................17

*Am. Wildlands v. Kempthorne,*
  478 F. Supp. 2d 92,(D.D.C. 2007) ..........................................................................................10

*Allens Creek/Corbetts Glen Preservation Group, Inc. v. Caldera,*
  88 F. Supp. 2d 77 (W.D. N.Y. 2000) ................................................................................35, 36

*Allen v. Wright,*
  468 U.S. 737 (1984) .................................................................................................................15

*Amoco Prod. Co. v. Vill. of Gambell, Alaska,*
  480 U.S. 531 (1987) .................................................................................................................43

*B&D Land & Livestock Co. v. Connor,*
  534F. Supp. 2d 891 (N.D. Iowa 2008) .....................................................................................37

*\*Balt. Gas & Elec. Co v. Nat. Res. Def. Council, Inc.,*
  462 U.S. 87 (1983) .........................................................................................30, 38, 41, 42, 43

*\*Bennett v. Spear,*
  520 U.S. 154 (1997) ......................................................................................................8, 12, 41

*Bldg. Indus. Ass'n v. Norton,*
  247 F.3d 1241 (D.C. Cir. 2001) ...............................................................................................39

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
  419 U.S. 281 (1974) .................................................................................................................10

*Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson,*
  685 F.2d 678 (D.C. Cir. 1982) .................................................................................................31

*Califano v. Sanders,*
  430 U.S. 99 (1977) .....................................................................................................................9

*Camp v. Pitts,*
  411 U.S. 138 (1973) .................................................................................................................10

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) .................................................................................................31

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) .................................................................................................................10

*City of Las Vegas v. Lujan,*
  891 F.2d 927 (D.C. Cir. 1989) .................................................................................................39

*City of Tempe, Ariz. v. Fed. Aviation Admin.,*
  239 F. Supp. 2d 55 (D.D.C. 2003) ...........................................................................................34

iv

*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
  58 F.3d 738 (1995) ................................................................................................................ 11

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................................................... 12

*Coleman v. PACCAR, Inc.*,
  424 U.S. 1301 (1976) ............................................................................................................. 36

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988) ............................................................................................... 28

*Conservancy of Sw. Fla., Inc. v. Williams*,
  No. 13-14477-CIV-Martinez-Goodman, 2018 WL 11422990 (S.D. Fla. Dec. 21, 2018) ............ 31

*Consumer Fed'n of Am. v. FCC*,
  348 F.3d 1009 (D.C. Cir. 2003) ............................................................................................. 32

*Cuomo v. U.S. Nuclear Regulatory Commission*,
  772 F.2d 972 (D.C. Cir. 1985) ............................................................................................... 12

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
  563 F.3d 466 (D.C. Cir. 2009) ................................................................................................. 5

*Dall. Safari Club v. Bernhardt*,
  453 F. Supp. 3d 391 (D.D.C. 2020) ................................................................................. passim

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) .......................................................................................................... 16, 17

*Defs. of Wildlife v. U.S. Dep't. of Navy*,
  733 F.3d 1106 (11th Cir. 2013) .......................................................................................... 27, 33

*Env't Def. Fund, Inc. v. Costle*,
  657 F.2d 275 (D.C. Cir. 1981) ............................................................................................. 9, 10

*Ethyl Corp. v. EPA*,
  541 F.2d 1 (D.C. Cir. 1976) ................................................................................................... 31

*Fla. Audubon Soc'y v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) ................................................................................................. 19

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) .......................................................................................................... 10, 17

*Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ............................................................................................................... 32

*Fund for Animals v. Bureau of Land Mgmt.*,
  357 F. Supp. 2d 225 (D.D.C. 2004) ....................................................................................... 33

*Fund for Animals v. Frizzell*,
  530 F.2d 982 (D.C. Cir. 1975) ............................................................................................... 34

*Fund for Animals v. Norton,*
  281 F. Supp. 2d 209 (D.D.C. 2003) ............................................................33

*Gen. Elec. Co. v. EPA,*
  290 F.3d 377 (D.C. Cir. 2002) ..................................................................30

*Gordon v. Holder,*
  632 F.3d 772 (D.C. Cir. 2001) ..................................................................34

*Grocery Mfrs. Ass'n v. EPA,*
  693 F.3d 169 (D.C. Cir. 2012) ..................................................................19

*Hall v. Johnson,*
  599 F. Supp. 2d (D.D.C. 2009) .................................................................11

*Heartwood, Inc. v. U.S. Forest Serv.,*
  380 F.3d 428 (8th Cir. 2004) .....................................................................39

*Humane Soc'y of the U.S. v. Hodel,*
  840 F.2d 45 (D.C. Cir. 1988) ....................................................................22

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) .............................................................................21, 22

*Kinsella v. BOEM,*
  Case No. 23-CV-02915-FB-ST, 2023 WL 3571300 (E.D. N.Y. May 18, 2023) .....................18, 20

*\*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ........................................................................passim

*\*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) .......................................................................14, 15, 16

*Mahoney v. U.S. Dep't. of the Interior,*
  Case No. 22-CV_1305 (FB) (ST), 2023 WL 4564912 (E.D. N.Y. July 17, 2023) .....................17

*Me. Lobstermen's Ass'n v. NMFS,*
  70 F.4th 582 (D.C. Cir.) ...........................................................................30

*Marsh v. Or. Def. Res. Council,*
  490 U.S. 360 (1989) ...............................................................................30

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ...............................................................................10

*\*Melone v. Coit,*
  ---F.4th---, No. 23-1736, 2024 WL 1792762 (1st Cir. Apr. 25, 2024) ........................2, 27

*Mexichem Specialty Resins, Inc. v. EPA,*
  787 F.3d 544 (D.C. Cir. 2015) ..................................................................31

*Miccosukee Tribe of Indians v. United States,*
  566 F.3d 1257 (11th Cir. 2009) .................................................................25

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ...................................................................................12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ....................................................................................10

*Mountain States Legal Found. v. Glickman*,
   92 F.3d 1228 (D.C. Cir. 1996) ..............................................................16, 20

*Munaf v. Geren*,
   553 U.S. 674 (2008) ...................................................................................10

*Mylan Pharms. v. Shalala*,
   81 F. Supp. 2d 30 (D.D.C. 2000) ..............................................................34

*\*Nantucket Residents Against Turbines v. BOEM*,
   675 F. Supp. 3d 28 (D. Mass. 2023) .....................................................passim

*\*Nantucket Residents Against Turbines v. U.S. BOEM*,
   ---F.4th---, No. 23-1501, 2024 WL 1756024 (1st Cir. Apr. 24, 2024) ...............2, 24, 30

*\*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ....................................................................................passim

*Nat'l Parks Conservation Ass'n v. Hodel*,
   679 F. Supp. 49 (D.D.C. 1987) ..................................................................36

*Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*,
   Civ. No. 15-cv-01582 (APM), 2016 WL 420470 (D.D.C. Jan. 22, 2016)...............35

*Nat'l Wrestling Coaches Ass'n v. U.S. Dep't of Educ.*,
   366 F.3d 930 (D.C. Cir. 2004) ....................................................................19

*Neighbors of Cuddy Mountain v. Alexander*,
   303 F.3d 1059 (9th Cir. 2002)......................................................................31

*Newdow v. Bush*,
   355 F. Supp. 2d 265 (D.D.C. 2005) ............................................................34

*Nken v. Holder*,
   556 U.S. 418 (2009) ...........................................................................11, 43, 45

*\*North Slope Borough v. Andrus*,
   642 F.2d 589 (D.C. Cir. 1980) ...............................................................28, 29

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*,
   538 F. Supp. 2d 242 (D.D.C. 2008) ............................................................42

*Pyramid Lake Paiute Tribe of Indians v.*
   *U.S. Dep't of Navy*, 898 F.2d 1410 (9th Cir. 1990) .....................................45

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
   872 F.2d 75, 80 (4th Cir. 1989......................................................................34

vii

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*,
    415 F.3d 1078 (9th Cir. 2005)............................................................................22

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989).........................................................................................9

*\*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
    Case No. 1:22-cv-11091-IT, 2023 WL 3660689 (D. Mass. May 25, 2023)............35, 37

*\*SeafreezeShoreside, Inc. v. U.S. Dep't of the Interior*,
    *1:22-cv-11091-IT and 1:22-cv-11172-IT, 2023* WL 6691015 (D. Mass. Oct. 12, 2023)........20, 22

*Sec'y of the Interior v. California*,
    464 U.S. 312 (1984)..........................................................................................5

*Selkirk Conservation All. v. Forsgren*,
    336 F.3d 944 (9th Cir. 2003).........................................................................31, 41

*Sierra Club v. Morton*,
    405 U.S. 727 (1972).........................................................................................13

*Sierra Club v. U.S. Dep't of Interior*,
    990 F.3d 898 (5th Cir. 2021)............................................................................25

*Simon v. E. Ky. Welfare Rts. Org.*,
    426 U.S. 26 (1976)...........................................................................................19

*Tennessee Valley Authority v. Hill*,
    437 U.S. 153 (1978).........................................................................................45

*Thomas v. Peterson*,
    753 F.2d 754 (9th Cir. 1985)........................................................................27, 28

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*
    517 U.S. 544 (1996).........................................................................................22

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978)..........................................................................................9

*W. Watershed Project v. Bernhardt*,
    468 F. Supp. 3d 29 (D.D.C. 2020) ...................................................................35

*W. Watersheds Project v. Bureau of Land Mgmt.*,
    443 F. App'x 278 (9th Cir. 2011) .....................................................................44

*W. Watersheds Project v. Bureau of Land Mgmt.*,,
    774 F. Supp. 2d 1089 (D. Nev. 2011) ...............................................................44

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982).....................................................................................43, 45

*Wild Fish Conservancy v. Salazar*,
    628 F.3d 513 (9th Cir. 2010)............................................................................28

**Statutes**

*5 U.S.C. § 705 ...................................................................................................11, 12, 37

*5 U.S.C. § 706 ...........................................................................................................8, 9

*5 U.S.C. § 706(2)(A) .................................................................................................9, 31

16 U.S.C. § 1371(a)(5)(A) ..................................................................................................5

16 U.S.C. § 1532(13) ..........................................................................................................8

16 U.S.C. § 1532(15) ..........................................................................................................7

16 U.S.C. § 1532(19) ..........................................................................................................8

*16 U.S.C. § 1536(a)(2) ..................................................................................................7, 39

16 U.S.C. § 1536(b) .............................................................................................................7

16 U.S.C. § 1536(b)(4) ........................................................................................................8

16 U.S.C. § 1536(b)(4)(ii) ...................................................................................................8

16 U.S.C. § 1536(o)(2) ........................................................................................................8

16 U.S.C. § 1538(a)(1)(B) ...................................................................................................7

16 U.S.C. § 1540(a) .............................................................................................................8

16 U.S.C. § 1540(e)(6) .........................................................................................................8

16 U.S.C. § 1540(g)(1)(A) ...................................................................................................8

16 U.S.C. § 1540(g)(2)(A)(i) ...............................................................................................8

42 U.S.C. § 4321-4370h ......................................................................................................9

42 U.S.C. § 4332(C) ............................................................................................................9

42 U.S.C. § 4370m-6(b) ................................................................................................11, 44

43 U.S.C. § 1331(a) ........................................................................................................5, 18

43 U.S.C. § 1332(3) .......................................................................................................5, 36

43 U.S.C. § 1337(p) .............................................................................................................5

43 U.S.C. § 1337(p)(1) ..................................................................................................18, 44

43 U.S.C. § 1337(p)(1)(C) ..............................................................................................3, 6

43 U.S.C. § 1337(p)(4)(A-(L) ...........................................................................................36

43 U.S.C. § 1337(p)(8) ........................................................................................................6

**Rules**

Fed. R. Evid. 702 ................................................................................................................16

Fed. R. Civ. P. 65(c) ...........................................................................................................37

**Regulations**

30 C.F.R. Pt. 585 ..................................................................................................................6

30 C.F.R. § 585.200(a)(2) .....................................................................................................6

30 C.F.R. § 585.235(a)(2) .....................................................................................................6

30 C.F.R. § 585.600 ..............................................................................................................6

30 C.F.R. § 585.613(e) .........................................................................................................6

30 C.F.R. § 585.628(b) .........................................................................................................6

30 C.F.R. § 585.628(f) .......................................................................................................5, 6

30 C.F.R. § 585.634(b) .......................................................................................................29

30 C.F.R. § 585.701(a) .......................................................................................................29

40 C.F.R. § 1500-1508 .........................................................................................................9

40 C.F.R. § 1502.1 ................................................................................................................9

40 C.F.R. § 1502.3 ................................................................................................................9

40 C.F.R. § 1508.1(g)(3) ................................................................................................26, 28

50 C.F.R. § 222.101 ..............................................................................................................7

50 C.F.R. § 224.101(h) .........................................................................................................7

50 C.F.R. § 224.105 ............................................................................................................41

50 C.F.R. § 226.203 ..............................................................................................................7

*50 C.F.R. § 402 ..........................................................................................................passim

*50 C.F.R. § 402.02 .....................................................................................................passim

50 C.F.R. § 402.14 ................................................................................................................7

50 C.F.R. § 402.14(a) ............................................................................................................7

50 C.F.R. § 402.14(d) ............................................................................................................7

50 C.F.R. § 402.14(g)(7) .......................................................................................................8

50 C.F.R. § 402.14(h)(2) .......................................................................................................7

50 C.F.R. § 402.14(i)(1)(i-v) .................................................................................................8

50 C.F.R. § 402.14(i)(4) ......................................................................................................27

50 C.F.R. § 402.14(i)(5) ................................................................................................8

**Other Authorities**

51 Fed. Reg. 19926 (June 3, 1986) ..............................................................................25

74 Fed. Reg. 19638 (Apr. 29, 2009) ..............................................................................6

78 Fed. Reg. 44150 (July 23, 2013) ..............................................................................3

86 Fed. Reg. 35329 (July 2, 2021) ................................................................................4

87 Fed. Reg. 23453 (Apr. 20, 2022) ..............................................................................9

88 Fed. Reg. 67359 (Sept. 29, 2023) .............................................................................4

89 Fed. Reg. 4370 (Jan. 23, 2024) ................................................................................4

89 Fed. Reg. 35442 (May 1, 2024) ................................................................................9

## GLOSSARY

| | |
|---|---|
| **APA** | Administrative Procedure Act |
| **BiOp** | Biological Opinion |
| **BIWF** | Block Island Wind Farm |
| **BOEM** | U.S. Bureau of Ocean Energy Management |
| **CEQ** | Council on Environmental Quality |
| **CFACT** | Committee for a Constructive Tomorrow |
| **COP** | Construction and Operations Plan |
| **CVOW** | Coastal Virginia Offshore Wind |
| **DEV** | Dominion Energy Virginia |
| **ESA** | Endangered Species Act |
| **FEIS** | Final Environmental Impact Statement |
| **FWS** | U.S. Fish & Wildlife Service |
| **ITA** | Incidental Take Authorization |
| **ITS** | Incidental Take Statement |
| **JROD** | Joint Record of Decision |
| **LOA** | Letter of Authorization |
| **MMPA** | Marine Mammal Protection Act |
| **NARW** | North Atlantic right whale |
| **NEPA** | National Environmental Policy Act |
| **NLPC** | National Legal & Policy Center |
| **NMFS** | National Marine Fisheries Service |
| **NMFS/OPR** | NMFS Office of Protected Resources |
| **NOAA** | National Oceanic & Atmospheric Administration |
| **OCS** | Outer Continental Shelf |
| **OCSLA** | Outer Continental Shelf Lands Act |
| **PAM** | Passive Acoustic Monitoring |
| **PBR** | Potential Biological Removal |
| **PSOs** | Protected Species Observers |
| **RPM** | Reasonable and Prudent Measures |
| **T&Cs** | Terms & Conditions |
| **WEA** | Wind Energy Area |
| **WTGs** | Wind Turbine Generators |

**INTRODUCTION**

The Court should reject Plaintiffs' eleventh hour attempt to get preliminary injunctive relief to enjoin construction of the Coastal Virginia Offshore Wind Commercial Project ("CVOW Project" or "the Project"), an offshore wind energy project planned for Lease Area OCS-A 0483, an area on the Outer Continental Shelf ("OCS") approximately 27 miles east of Virginia Beach, VA. Offshore pile-driving construction conducted by co-Defendant Virginia Electric and Power Company, d/b/a Dominion Energy Virginia ("DEV") is currently scheduled to begin on or around May 4, 2024, after several years of extensive State and Federal environmental reviews. Plaintiffs' delay in seeking relief indicates a lack of irreparable harm, which is sufficient grounds on its own for denying their motion.

In addition to being untimely, Plaintiffs' motion fails to satisfy any of the requisite injunction elements. As a threshold issue, Plaintiffs lack the requisite injury-in-fact to establish standing to assert their claims. Plaintiffs fail to allege facts to support their conclusory assertions that they will be harmed by any of the agency actions challenged in this suit. Instead, Plaintiffs offer nothing more than vague and speculative statements about their alleged injuries resulting from various other ongoing and proposed wind development projects. For similar reasons, Plaintiffs have not shown, and cannot show, that they will be irreparably harmed if construction of the CVOW Project commences pursuant to the BOEM-approved Construction and Operations Plan ("COP").

Plaintiffs also fail to demonstrate any likelihood of success on the merits. In their Amended Complaint, Plaintiffs challenge a National Marine Fisheries Service ("NMFS") biological opinion ("BiOp"), which evaluated the effects of the Project on threatened and endangered species including the North Atlantic right whale ("NARW" or "right whale"). Plaintiffs allege that the Project will jeopardize the right whale in violation of the agencies' respective obligations pursuant to the

Endangered Species Act ("ESA").[1] The administrative record before the Court confirms that NMFS evaluated the best available scientific information concerning potential effects of the Project on the right whale, including impacts to its habitat, and reasonably concluded in its BiOp that the Project is not likely to jeopardize the continued existence of the right whale.

With respect to Plaintiffs' claims concerning "cumulative effects," NMFS properly considered the effects of the Project in relation to other offshore wind projects as part of the "environmental baseline" in accordance with the ESA regulations, 50 C.F.R. § 402.02. On substantially similar claims challenging the merits of a biological opinion for the Vineyard Wind project—another offshore wind project off the coast of Massachusetts—the U.S. Court of Appeals for the First Circuit recently held that "NMFS and BOEM followed the law in analyzing the right whale's current status and environmental baseline, the likely effects of the Vineyard Wind project on the right whale, and the efficacy of measures to mitigate those effects." *Nantucket Residents Against Turbines v. BOEM,* ---F.4th---, No. 23-1501, 2024 WL 1756024, *1 (1st Cir. Apr. 24, 2024) (*"Nantucket Residents"*); *see also Melone v. Coit,* ---F.4th---, No. 23-1736, 2024 WL 1792762 (1st Cir. Apr. 25, 2024) (rejecting claims pursuant to Marine Mammal Protection Act ("MMPA") in related case challenging the Vineyard Wind project). As in *Nantucket Residents,* Plaintiffs here fail to show that NMFS erred in its assessment of the potential effects of the CVOW Project in relation to other offshore wind projects.

Additionally, the balance of the hardships and public interest elements tip sharply in favor of the Defendants, especially given Plaintiffs' unjustifiable delay. Plaintiffs have not shown

---

[1] Plaintiffs also challenge the decision of the Bureau of Ocean Energy Management ("BOEM") to rely on the NMFS BiOp as part of its decision to approve the COP for the Project. In addition, Plaintiffs allege that BOEM's final environmental impact statement ("FEIS") violates the National Environmental Policy Act ("NEPA") for its alleged failure to adequately analyze potential impacts to right whales. These claims are not asserted in Plaintiffs' preliminary injunction motion.

that any concrete harm will occur to them during Project construction. On the other hand, the public interest will be served by construction of the Project, which will have the capacity to generate approximately 9.5 million megawatt-hours per year of renewable energy to power about 660,000 homes.

In short, Plaintiffs' own delay in filing their preliminary injunction motion just days before pile-driving construction was scheduled to begin and over *seven months* after NMFS issued its BiOp (on September 18, 2023) weighs strongly against their injunction request, and Plaintiffs also fail to satisfy their burden to demonstrate the preliminary injunction factors. For these reasons, as explained further below, the Court should deny Plaintiffs' motion for preliminary injunction.

## FACTUAL BACKGROUND

### The Project

The CVOW Project is an offshore wind energy project planned for Lease Area OCS-A 0483, an area on the Outer Continental Shelf approximately 27 miles east of Virginia Beach, VA. The Project will have the capacity to generate approximately 9.5 million megawatt-hours per year of renewable energy, enough to power about 660,000 homes.

### The Challenged Government Actions

BOEM began evaluating the potential for wind energy leasing and development off the shore of Virginia following enactment of the Energy Policy Act of 2005, Public Law No. 109-58, which granted the Secretary of the Interior the authority to issue leases, easements, or rights-of-way on the OCS for the purpose of renewable energy development. *See* 43 U.S.C. § 1337(p)(1)(C). On September 4, 2013, BOEM held a competitive lease sale auction for the Wind Energy Area ("WEA") covering approximately 112,799 acres offshore Virginia. 78 Fed. Reg. 44150 (July 23, 2013). DEV won the auction. *See* https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/VA/VA-Lease-OCS-A-0483_signed.pdf (last visited May 6, 2024).

In December 2020, DEV sought BOEM's approval of the Project's COP. *See* https://www.boem.gov/renewable-energy/state-activities/CVOW-C (last visited May 6, 2024). BOEM then initiated a review pursuant to NEPA. 86 Fed. Reg. 35329 (July 2, 2021), *available at* https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/86-FR-35329.pdf (last visited May 6, 2024). As part of that NEPA review, BOEM held numerous public hearings and received numerous submissions from the public, government agencies, and other stakeholders. 88 Fed. Reg. 67359 (Sept. 29, 2023) (notice of availability of Final EIS), *available at* https://www.federalregister.gov/documents/2023/09/29/2023-21337/notice-of-availability-of-a-final-environmental-impact-statement-for-the-proposed-coastal-virginia (last visited May 6, 2024).

The Project underwent an extensive, multi-year environmental review. BOEM's environmental review spanned three years, included six public meetings, and culminated in a three-volume FEIS. https://www.boem.gov/renewable-energy/state-activities/CVOW-C (last visited May 6, 2024).[2] The environmental review also included ESA consultation between BOEM and NMFS, which resulted in NMFS's publication of a 355-page BiOp on September 18, 2023, assessing potential effects of the Project on ESA-listed species, including the right whale.[3] NMFS separately evaluated and authorized the incidental harassment of right whales through an incidental take authorization ("ITA") issued pursuant to the Marine Mammal Protection Act ("MMPA"). 89 Fed. Reg. 4370 (Jan. 23, 2024), NOAA_000748, *available at* https://www.govinfo.gov/content/pkg/FR-

---

[2] The FEIS is available at https://www.boem.gov/renewable-energy/state-activities/coastal-virginia-offshore-wind-commercial-project-final (last visited May 6, 2024).

[3] The BiOp is available at https://www.boem.gov/sites/default/files/documents/renewable-energy/CVOW-C_Biological%20Opinion_NMFS.pdf (last visited May 6, 2024). Citations to specific pages within the BiOp refer to the Bates number for the Administrative Record produced by the National Oceanic and Atmospheric Administration ("NOAA") on behalf of Federal Defendants NMFS, Gina Raimondo, and Janet Coit (e.g., NOAA_000001, etc.), which corresponds to the pdf page number of the BiOp, rather than any other internal document numbering. The administrative record pertaining to actions of Federal Defendants United States Department of the Interior, Deb Haaland, BOEM, and Elizabeth Klein will be produced separately.

2024-01-23/pdf/2024-00297.pdf (last visited May 6, 2024).[4] On October 30, 2023, based on the

FEIS, BOEM and NMFS issued a joint Record of Decision ("JROD") for the Project summarizing

the agencies' respective decisions including: BOEM's decision to approve the COP under

subsection 8(p) of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1337(p); and

NMFS's action to issue an ITA under Section 101(a)(5)(A) of the MMPA, 16 U.S.C. §

1371(a)(5)(A). https://www.boem.gov/sites/default/files/documents/renewable-energy/state-

activities/CVOW-C-ROD.pdf (last visited May 6, 2024). BOEM and NMFS's approval process for

the Project concluded on January 28, 2024, when BOEM issued final approval of the COP for the

Project, with applicable conditions including conditions to protect right whales, pursuant to BOEM

regulations, 30 C.F.R. § 585.628(f). *See*

https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/CVOW-

C%20COP%20Approval%20Letter%20OCS-A%200483%20.pdf (last visited May 6, 2024).

Offshore project construction is anticipated to begin in May 2024.

**LEGAL BACKGROUND**

**I.    Outer Continental Shelf Lands Act**

The Outer Continental Shelf consists of the submerged lands beneath the ocean, generally

from 3 to 200 miles seaward of the coastline. *Ctr. for Biological Diversity v. U.S. Dep't of Interior*,

563 F.3d 466, 472 (D.C. Cir. 2009); 43 U.S.C. § 1331(a). Under OCSLA, the United States holds

the Outer Continental Shelf as a "vital national resource reserve . . . for the public," which Congress

declared "should be made available for expeditious and orderly development, subject to

environmental safeguards[.]" *Id.* § 1332(3). Congress enacted OCSLA in 1953 to authorize oil and

gas leasing. *Sec'y of the Interior v. California*, 464 U.S. 312, 336 (1984). In 2005, Congress

---

[4] The Letter of Authorization ("LOA") effectuating the ITA is available at
https://www.fisheries.noaa.gov/action/incidental-take-authorization-dominion-energy-virginia-
construction-coastal-virginia (last visited May 6, 2024).

amended OCSLA to authorize the Secretary of the Interior to issue leases on the Outer Continental Shelf to "support production, transportation, storage, or transmission of energy from sources other than oil and gas[,]" including wind energy. 43 U.S.C. § 1337(p)(1)(C); *see also* Energy Policy Act of 2005 § 388, Pub. L. 109-58, 119 Stat. 594, 744-45 (2005).

The Secretary, in consultation with the U.S. Coast Guard and other relevant federal agencies, may grant a lease, easement, or right-of-way on the Outer Continental Shelf for the purpose of renewable energy production pursuant to subsection 8(p) of OCSLA, 43 U.S.C. § 1337(p)(1)(C). Pursuant to the authority granted by Congress, *see id.* § 1337(p)(8), BOEM has issued regulations governing the leasing process and management of offshore renewable energy projects. *See* 74 Fed. Reg. 19638 (Apr. 29, 2009); 30 C.F.R. Pt. 585. Under BOEM's renewable energy program, a lease does not authorize the development of a wind energy facility; instead, a lessee's right to "install and operate facilities" for the "production of energy from a renewable energy source[,]" is still "subject to obtaining the necessary approvals" from BOEM. *Id.* § 585.200(a)(2). After gathering the necessary data pursuant to 30 C.F.R. *Id.* § 585.235(a)(2), a lessee must prepare a proposal for the development of a wind energy facility on the Outer Continental Shelf and submit a COP. *Id.* §§ 585.600, 585.620-585.629. At this stage, BOEM must prepare "an appropriate NEPA analysis." *Id.* § 585.628(b). After reviewing the COP to ensure compliance with OCSLA and BOEM's regulations, BOEM may "approve, disapprove, or approve [the COP] with modifications[.]" *Id.* §§ 585.613(e), 585.628(f).

## II.    ESA

ESA Section 7(a)(2) provides that each federal agency must ensure that any action it authorizes, funds, or carries out is not likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical . . . ." 16 U.S.C.

§ 1536(a)(2).[5]  To achieve this objective, the ESA requires the action agency to consult with NMFS

or the U.S. Fish and Wildlife Service ("FWS") whenever a federal action "may affect" an

endangered or threatened species.  50 C.F.R. § 402.14(a).[6]

Section 7 and its implementing regulations set out detailed consultation procedures designed

to provide action agencies with expert advice to determine the biological impacts of their proposed

activities. 16 U.S.C. § 1536(b); 50 C.F.R. Pt. 402. "Formal consultation," which is described at

length at *id.* § 402.14, culminates in the issuance of a "biological opinion" by NMFS or FWS,

which advises the action agency whether jeopardy or adverse modification is likely to occur for any

listed species and, if so, whether "reasonable and prudent alternatives" exist to avoid jeopardy or

adverse modification. *Id.* § 402.14(h)(2). The ESA and its implementing regulations require NMFS

to utilize the "best scientific and commercial data available" in rendering its biological opinion. 16

U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

Section 9 of the ESA prohibits the "taking" of any endangered species, 16 U.S.C. §

1538(a)(1)(B), and the take prohibition can be extended to threatened species, *id.* § 1533(d). "Take"

as defined by the ESA means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or

---

[5] "Secretary" as used in the ESA means the Secretary of the Interior or the Secretary of Commerce, who in turn have delegated their responsibilities to the U.S. Fish & Wildlife Service ("FWS") and NMFS, respectively. *Id.* § 1532(15). In general, NMFS has authority over marine species, such as the right whale at issue here. 50 C.F.R. §§ 222.101, 224.101(h) (listed as endangered), 226.203 (designated critical habitat). To "jeopardize the continued existence" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.* § 402.02. "Destruction or adverse modification" of critical habitat is also defined. *Id.*

[6] With respect to this Project, NMFS acted in two roles: NMFS's Office of Protected Resources ("NMFS/OPR") acted as an action agency in issuing the ITA pursuant to the MMPA. NMFS/OPR also acted as the consulting agency in issuing the biological opinion under the ESA. Where, as here, more than one federal agency's action regarding a project "may affect" a listed species, each one must fulfill its obligation to consult, and a "lead action agency" is often identified. For this Project, BOEM was the lead action agency for purposes of ESA consultation with NMFS/OPR.

collect, or to attempt to engage in such conduct. *Id.* § 1532(19). The ESA's prohibition on taking

species applies to all "person[s]," including individuals, corporations, and federal or state agencies.

*Id.* § 1532(13). However, take incidental to federal actions that is "reasonably certain to occur" can

be exempted from liability as part of the consultation process in an incidental take statement ("ITS")

in the final biological opinion. *Id.* § 1536(b)(4); 50 C.F.R. § 402.14(g)(7).[7]

      Primary responsibility for enforcement and implementation of the ESA is entrusted to

officials of the federal government. *See, e.g.*, 16 U.S.C. § 1540(a), (b), (e)(6). The ESA also

contains a provision authorizing citizen suits "to enjoin any person, including the United States and

any other governmental instrumentality or agency . . . who is alleged to be in violation of any

provision of [the Act] or regulation issued under the authority thereof[.]" *Id*. § 1540(g)(1)(A).

However, a citizen suit under Section 1540(g)(1)(A) may not be commenced "prior to sixty days

after written notice of the violation has been given to the Secretary, and to any alleged violator of

any such provision or regulation[.]" *Id*. § 1540(g)(2)(A)(i).[8]

## III.    NEPA

      Plaintiffs' NEPA claim is not at issue in the present motion, but the NEPA process is

relevant for purposes of understanding the agencies' overall environmental review procedures.

---

[7] An ITS identifies the impact of such taking and specifies reasonable and prudent measures
("RPMs") "necessary or appropriate to minimize such impact" and terms and conditions to
implement those measures. 16 U.S.C. § 1536(b)(4)(ii); 50 C.F.R. § 402.14(i)(1)(i-v). Under Section
7(o) of the ESA, "any taking that is in compliance with the terms and conditions specified in [an
ITS] shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. §
1536(o)(2). "[N]o other authorization or permit under the Act is required." 50 C.F.R. § 402.14(i)(5).
[8] Plaintiffs' preliminary injunction motion invokes claims challenging the merits of the NMFS
BiOp, which arise solely under Count Two of Plaintiffs' Amended Complaint, ECF No. 11 ¶¶ 86-97
("Amended Complaint"). Such claims against NMFS are reviewed under the Administrative
Procedure Act ("APA"), 5 U.S.C. § 706, and are not considered as ESA citizen-suit claims
concerning alleged ESA "violations." *See Bennett v. Spear*, 520 U.S. 154, 171-73 (1997). As such,
Plaintiffs' Count Two claims, which comprise the basis of their preliminary injunction motion,
could have been brought immediately after the biological opinion was issued, without filing a 60-
days' notice letter pursuant to 16 U.S.C. § 1540(g)(2)(A)(i).

NEPA, 42 U.S.C. §§ 4321-4370h, requires federal agencies to examine the environmental effects of proposed federal actions and to inform the public about those effects. 42 U.S.C. § 4332(C). NEPA does not mandate particular substantive results, but instead prescribes a process to ensure that agencies are fully informed of the environmental consequences of their projects. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989); *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). Council on Environmental Quality ("CEQ") regulations guide NEPA implementation. *See* 40 C.F.R. §§ 1500-1508.[9] NEPA, and the applicable CEQ regulations, generally require an agency to prepare an environmental impact statement ("EIS") before proceeding with any action that the agency concludes will "significantly affect[]" the environment. 42 U.S.C. § 4332(C); 40 C.F.R. § 1502.3. An EIS must "provide [a] full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id*. § 1502.1.

## IV. APA

The Administrative Procedure Act, 5 U.S.C. § 706, provides the standard of review applicable to Plaintiffs' ESA-related claims against both NMFS and BOEM, respectively. A court may set aside final agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *Id.* § 706(2)(A). Review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid." *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citing*, inter alia, Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971), *abrogated on other grounds by Califano v.*

---

[9] The CEQ regulations have been the subject of several amendments over the past four years, including as recently as May 1, 2024. *See* 89 Fed. Reg. 35442 (May 1, 2024). The CVOW FEIS was prepared following the requirements of the regulations that became effective May 20, 2022, 87 Fed. Reg. 23453 (Apr. 20, 2022). *See* FEIS § 1 at p. 37.

*Sanders*, 430 U.S. 99 (1977)); *see also Am. Wildlands v. Kempthorne*, 478 F. Supp. 2d 92, 96 (D.D.C. 2007), *aff'd*, 530 F.3d 991 (D.C. Cir. 2008). A reviewing court is forbidden from "substituting its judgment for that of the agency." *Castle*, 657 F.2d at 283 (citing*, inter alia, Overton Park*, 401 U.S. at 416).[10]

A reviewing court may reverse an agency's decision under the "arbitrary and capricious" standard only "if the agency has relied on factors which Congress has not intended it to consider, [has] entirely failed to consider an important aspect of the problem, [or has] offered an explanation for [that] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).[11]

### STANDARD OF REVIEW

Injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Dall. Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 397 (D.D.C. 2020) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)). A court may only grant the extraordinary remedy "upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008) (citation omitted), and should do so sparingly, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

The standard for obtaining injunctive relief through either a temporary restraining order

---

[10] Rather, the APA standard "mandates judicial affirmance if a rational basis for the agency's decision is presented . . . even though [a court] might otherwise disagree[.]" *Id.* at 283 (citations omitted). An agency's treatment of the evidence need not be a "paragon of clarity[,]" as long as the reviewing court can discern a "rational basis" for the agency's treatment of the evidence. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 289-90 (1974).

[11] In addition to setting forth the standard of review, the APA also provides the applicable scope of review. The scope of judicial review of a final agency action is limited to "the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citation omitted). The "focal point for judicial review [of an agency decision] should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).

or a preliminary injunction is well established. *See Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("The same standard applies to both temporary restraining orders and to preliminary injunctions.") (citation omitted)). Specifically, a plaintiff must show that: (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Dall. Safari Club*, 453 F. Supp. 3d at 398 (quoting *Winter*, 555 U.S. at 20). "[I]f a court concludes that a movant has not demonstrated irreparable harm, it need not even consider the remaining factors." *Id.* (citing *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). Additionally, because the CVOW Project is a "covered project" under the FAST-41Act, *see* https://www.permits.performance.gov/permitting-project/fast-41-covered-projects/coastal-virginia-offshore-wind-commercial-project (last visited May 6, 2024), in weighing the equities, the Court must "(1) consider the potential effects on public health, safety, and the environment, and the potential for significant negative effects on jobs resulting from an order or injunction; and (2) not presume that the harms described in paragraph (1) are reparable." 42 U.S.C. § 4370m-6(b).

　　With respect to Plaintiffs' request for a stay, the APA permits a court reviewing agency action to "issue all necessary and appropriate process[es] to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" if it is "necessary to prevent irreparable injury[.]" 5 U.S.C. § 705. The standard for seeking such a stay is the same as the standard for seeking a preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 433-34 (2009). In considering a request to stay agency action under the APA, the reviewing court should bear in mind that the public is "generally entitled to the prompt execution" of an agency action "that the legislature has made final[,]" so a stay "is not a matter of right, even if irreparable injury might otherwise result to the [plaintiff.]" *Id.* at 427 (internal quotation marks and citation

omitted).

While the standards under Rule 65 and Section 705 are the same, Section 705 does not

provide Plaintiffs with the form of relief they seek here. Section 705 is intended to "*postpone* the

effective date of an agency action" or "preserve status." 5 U.S.C. § 705 (emphasis added). That

plain language indicates that a stay should be sought before the challenged action becomes

effective. But here, the NMFS BiOp was effective when issued, *see Bennett, supra*, 520 U.S. at 170

(biological opinions have "virtually determinative" effect with respect to actions of other Federal

agencies), and DEV has already commenced its operations and dispatched extensive equipment and

ships in preparation for offshore work in reliance on the NMFS BiOp that Plaintiffs challenge in

their motion.[12]

**ARGUMENT**

I.      **Plaintiffs are unlikely to succeed on the merits.**

        A.      **Plaintiffs lack standing.**

        As a threshold matter, Plaintiffs' claims are subject to dismissal because Plaintiffs lack

standing. To satisfy the standing requirements of Article III of the Constitution, a plaintiff must

establish an injury that is (i) "concrete, particularized, and actual or imminent"; (ii) "fairly traceable

to the challenged action"; and (iii) "redressable by a favorable ruling." *Clapper v. Amnesty Int'l*

*USA*, 568 U.S. 398, 409 (2013) (internal quotation marks and citation omitted). Where an alleged

injury has not yet occurred, it must be "*certainly impending*"; "allegations of *possible* future injury

are not sufficient." *Id.* (internal quotation marks and citation omitted). If any one of these essential

---

[12] In contrast to *Cuomo v. U.S. Nuclear Regulatory Commission,* 772 F.2d 972 (D.C. Cir. 1985), which Plaintiffs cite, *see* ECF No. 15-1 at 20, Plaintiffs here are not merely seeking to preserve the status quo by staying the effective date of an agency rule or action. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 166 (2010) (reversing stay of agency decision to deregulate genetically engineered crop). Instead, they seek to upend the status quo by halting ongoing construction of a project in reliance on a biological opinion issued over seven months ago.

elements is lacking, there is no "case or controversy" under Article III, and the case must be dismissed for lack of subject matter jurisdiction. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992). Moreover, "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 734-35, 740 n.16 (1972).

In support of standing in this case, Plaintiffs assert that members of the Committee for a Constructive Tomorrow ("CFACT"), the Heartland Institute ("Heartland"), and Plaintiff Craig Rucker plan to go whale watching and that unspecified "Project-related impacts" to the right whale will adversely affect their ability to observe the species. Amended Complaint" ¶¶ 24-26. In addition, Plaintiffs assert that CFACT members are "experiencing noise-related impacts" from on-shore Project construction. *Id.* at 11 n.4. Plaintiffs National Legal and Policy Center ("NLPC") and Plaintiff Peter Flaherty also assert generalized economic injuries based on surcharges on monthly electric bills that allegedly would be eliminated if the Project were halted. *Id.* ¶¶ 27-28. None of these alleged injuries are sufficient to demonstrate that organizational Plaintiffs or any of the individually named Plaintiffs have standing to bring this suit, much less that they will be irreparably harmed if they do not obtain their requested temporary injunctive relief.

> **1.      None of the organizational Plaintiffs, their individual members, or the individually named Plaintiffs alleges the requisite injury-in-fact to establish standing.**

None of the organizations, their members, or the individually named Plaintiffs alleges the requisite injury-in-fact to establish standing. Plaintiffs allege injuries with respect to: 1) aesthetic interests in whale watching; 2) annoyance from noise resulting from onshore project construction; and 3) economic harm resulting from electric bills. We will address these alleged injuries in turn.

> **a.      Whale watching**

Plaintiffs fail to allege facts showing that the individual members' or the individually named

Plaintiffs' asserted interests in observing right whales will be harmed as a result of the challenged agency actions involving approval of the Project. For example, Plaintiffs' Amended Complaint provides no information to substantiate bald assertions by CFACT member Craig Rucker or Heartland member Aaron Stover that the Project will degrade their ability to observe right whales. *See* Amended Complaint ¶¶ 24-25. In fact, pile driving is not authorized to occur during the month of December when Rucker and Stover allegedly plan to go whale-watching. *See* COP Approval Letter at p. 62, *available at* https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/CVOW-C-Conditions-COP-Approval-OCS-A-0483.pdf (last visited May 6, 2024) ("Foundation vibratory and pile-driving activities must not occur November 1 through April 30."). Plaintiffs' Amended Complaint also does not allege facts to support co-Plaintiff and CFACT member Craig Rucker's assertion that the Project may cause right whales to become extinct. *See* Amended Complaint ¶ 26. Rather, Plaintiffs' allegations concerning harm to right whales are premised on alleged impacts from *other* Federal agency actions that are not under review in this suit.[13]

To the extent that Mr. Rucker or other Plaintiffs allege injuries based on BOEM's approval of multiple other wind projects in addition to the CVOW Project, it is well-settled that a plaintiff lacks standing to challenge the implementation of an agency "program." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990). "Under the terms of the APA," instead, a plaintiff "must direct its attack against some particular 'agency action' that causes it harm." *Id.* at 891.[14] Moreover,

---

[13] For example, Plaintiffs assert that their whale-watching plans will be adversely affected because individual right whales must navigate through or around the CVOW Project in addition to *other* offshore wind projects that are currently in various phases of review and/or construction. *See* Amended Complaint ¶ 67. Plaintiffs assert that these projects collectively "will obstruct migration and feeding of NARW and subject them to noise and increased threat of ship collisions and entanglement with fishing gear." *Id.*

[14] The Supreme Court stated that, even if "rampant" violation of the law is occurring within the program, that in and of itself does not confer upon plaintiff the right to "seek *wholesale*

Plaintiffs' own assertions that their injuries result, in part, from the effects of other wind projects call into question whether such injuries could be redressed by an order of this Court with respect to the CVOW Project. *Allen v. Wright*, 468 U.S. 737, 759-60 (1984) ("[S]uits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations . . . [are], even when premised on allegations of several instances of violations of law, . . . rarely if ever appropriate for federal-court adjudication."). The Amended Complaint thus fails to allege facts to establish standing on behalf of any individual or organizational plaintiff on the basis of any alleged injury to their asserted interests in viewing right whales resulting from the specific agency actions at issue in this lawsuit.

The Declaration of Craig Rucker submitted in support of Plaintiffs' preliminary injunction motion, ECF No. 15-2, does not improve upon the conclusory allegations of harm presented in Plaintiffs' Amended Complaint. Mr. Rucker states that he intends to go whale watching in Virginia Beach in December, ECF No. 15-2 ¶ 5, but he does not allege that he intends to visit (or has ever visited) the offshore CVOW Project site. As discussed below, his claims of injury are but a variant of arguments that have been squarely rejected by the Supreme Court.

In *Lujan v. National Wildlife Federation*, 497 U.S. at 886-89, for instance, the Court held that standing was lacking where the plaintiff organization submitted affidavits, in response to the government's summary judgment motion, from two of its members who claimed injury based on use of federal lands "in the vicinity" of lands which were being opened for the staking of mining claims and oil and gas leasing.[15] Moreover, a general alleged interest in protecting right whales or

---

improvement of [the] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Id.*

[15] The Supreme Court held that these affidavits failed to establish injury-in-fact because they failed to provide specific facts linking those members' claims of injury to particular lands which were the subject of the government action. *Id.* at 889. The Supreme Court subsequently reiterated that it is insufficient for an environmental organization to allege that its members enjoy recreation "in the

the environment is insufficient for an ESA claim. *Lujan*, 504 U.S. at 563 (Plaintiffs must "submit affidavits or other evidence showing, through specific facts, not only that listed species were in fact being threatened by . . . [agency] activities . . . but also that one or more of respondents' members would thereby be 'directly' affected apart from their "'special interest' in th[e] subject.") (citation omitted). Plaintiffs must have a concrete interest that would be "directly affected" by the challenged action—something they fail to establish here. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1236–37 (D.C. Cir. 1996) ("In the absence of any reference to past (and anticipated future) enjoyment of the grizzly bear's presence, a mere expression of enjoyment of all things sylvan is inadequate to show a 'directly affected' interest with adequate specificity to survive dismissal on the pleadings, much less summary judgment.") (citation omitted).[16]

Mr. Rucker's standing declaration also fails to demonstrate that any purported interest in observing right whales will be affected, much less injured, as a result of the CVOW Project. Mr. Rucker does not purport to be an expert with respect to right whales. Nevertheless, in support of his assertion that the cumulative impacts of the CVOW Project in combination with other offshore wind projects will be "catastrophic" for right whales, Mr. Rucker cites a lay opinion article he authored for the CFACT website. ECF No. 15-2 ¶ 3. Such assertions should be afforded no weight, as they do not express any relevant opinion about the relative likelihood of harmful effects on marine mammals under the facts and circumstances here. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) (Under the Federal Rules of Evidence, "the trial judge

---

vicinity" of a challenged government action. *Lujan*, 504 U.S. at 565-66 (citing *Lujan*, 497 U.S. at 887-889) ("[A] plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it.").

[16] The *Lujan v. Defenders of Wildlife* Court further considered and rejected the plaintiffs' "ecosystem nexus" argument which proposed that a person who uses any part of an ecosystem could have standing even if the challenged government activity was located a great distance away. 504 U.S. at 565-66.

must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").[17] Moreover, the relevant facts underlying Mr. Rucker's assertions about alleged "catastrophic" effects on right whales are unsworn. *See Am. Fed'n of Gov't Emps. v. District of Columbia*, No. Civ.A 05-0472 (JDB), 2005 WL 1017877, *4 (D.D.C. May 2, 2005) ("At this early stage of the proceedings, the Court may rely on the sworn declarations in the record and other credible evidence in the record even though such evidence might not meet all of the formal requirements for admissibility at a trial."). There is simply no factual support for Mr. Rucker's assertion that the challenged CVOW Project may cause the right whales to "disappear[] forever." *See* ECF No. 15-2 ¶ 6. Indeed, that prospect is directly contradictory to the expert analysis the agencies conducted as part of their review.

### b.    Onshore project construction

To the extent that Plaintiff CFACT alleges that its members are injured by effects of onshore project construction including construction-related noise, *see id.* ¶ 9, the Federal Defendants' actions that gave rise to Plaintiffs' ESA-related claims in this action are far too attenuated from the onshore Project construction that allegedly disturbs CFACT members. The U.S. District Court for the Eastern District of New York recently dismissed claims challenging construction of an offshore wind energy project in New York based on alleged injuries to plaintiffs resulting from *onshore* construction. *Mahoney v. U.S. Dep't. of the Interior,* Case No. 22-CV_1305 (FB) (ST), 2023 WL 4564912, *5 (E.D. N.Y. July 17, 2023) ("Thus, Defendants' conduct is too attenuated from the location and manner of onshore trenching to be fairly traceable to Plaintiffs' alleged injuries."). The

---

[17] To the extent that Mr. Rucker's lay opinion article or other cited documents touch upon merits-related issues, it is unnecessary to reach the issue of whether they would be admissible pursuant to *Daubert*, because such documents are outside the NMFS administrative record and not subject to review in this case. "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co.*, 470 U.S. at 743-44 (citation omitted).

court reasoned that onshore project construction resulted from approvals by state and local agencies rather than the federal agencies that permitted the offshore portion of the project. *See id.* at *3-5; C*f. Kinsella v. BOEM,* Case No. 23-CV-02915-FB-ST, 2023 WL 3571300, *3 (E.D. N.Y. May 18, 2023) ("New York State agencies issued the permits for the onshore portion of the Project, not BOEM, and enjoinment of its authorization of the Project would not halt the onshore portion of the Project. . . ."). Based on the same reasoning, Plaintiff CFACT lacks standing here for claims against NMFS or BOEM based on alleged injuries resulting from onshore Project construction.[18]

### c.    Electric utility rates

To the extent Plaintiffs National Legal and Policy Center or Peter Flaherty allege that individuals are harmed from being assessed a surcharge on residential monthly electric bills, Plaintiffs fail to allege that the asserted economic injuries were caused by the challenged agency actions. The Declaration of Craig Rucker submitted in support of Plaintiffs' motion for preliminary injunction provides no support for the assertion that the CVOW Project will "affect the human environment, by dramatically increasing electricity rates for many homeowners and businesses destined to receive power from the Project." ECF No. 15-2 ¶ 8. Even assuming Plaintiffs could demonstrate that the CVOW Project will result in electric rate increases, Plaintiffs cannot show that such economic injury results from any of the challenged agency actions. In short, NMFS's ESA regulatory process, applied to BOEM and DEV as the action agency and applicant, is unrelated to any rate increase that DEV has applied to ratepayers under state law. NMFS has not and cannot

---

[18] BOEM has no authority to approve or regulate onshore activities. BOEM's authority is limited to regulating certain activities occurring offshore, specifically on the OCS. Through OCSLA, Congress granted the Secretary of the Interior (and the Secretary delegated to BOEM) regulatory jurisdiction over energy resources on the OCS. OCSLA defines the OCS as the submerged lands starting three miles from state coastlines and extending seaward. 43 U.S.C. §§ 1331(a), 1301(a)(2). *See also* 43 U.S.C. § 1337(p)(1) (providing that the Secretary of the Interior may grant a lease, easement, or right-of-way on the Outer Continental Shelf for specified activities). Likewise, as explained above, NMFS has authority over marine species, and does not regulate onshore activities.

regulate Plaintiffs' electric utility bills in any way.

Where, as here, a plaintiff's asserted injuries arise not from the government's regulation of the plaintiff itself, but from agency actions that govern third parties, it is "substantially more difficult" to establish standing. *Nat'l Wrestling Coaches Ass'n v. U.S. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting *Lujan*, 504 U.S. at 562); *see also Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 175 (D.C. Cir. 2012) (the fact that EPA actions did not directly impose regulatory restrictions or other burdens on petitioners made the task of establishing standing more difficult). That is because Article III requires that federal courts act "only to redress injury that fairly can be traced to the challenged action of the defendant, *and not injury that results from the independent action of some third party not before the court.*" *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976) (emphasis added); *see also Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996), *id.* at 669-71. In such cases, "the necessary elements of causation and redressability" both turn on third-party choices, increasing the plaintiff's burden to "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability . . . ." *Lujan*, 504 U.S. at 562.

Establishing the requisite chain of causation for Plaintiffs' electric rates theory requires speculation as to the effects of the challenged NMFS and BOEM agency actions on the decision of DEV to impose surcharges on Plaintiffs' electric bills. Plaintiffs' argument requires an assumption that an electric utility's billing practices are driven solely by permitting considerations, as opposed to other factors. As in *Simon,* this is a "purely speculative" exercise. 426 U.S. at 42-43. Plaintiffs fail to allege (let alone prove) the sufficiently direct, causal connection between the challenged action and the identified harm that Article III requires. *Lujan,* 504 U.S. at 562. For essentially the same reason, Plaintiffs cannot credibly assert that their alleged economic injuries will be redressed by an order from this Court with respect to Defendants' alleged ESA violations. *See id.* at 571

("[A]ny relief the District Court could have provided in this suit against the Secretary was not likely to produce that action."). The Court should reject Plaintiffs' claims concerning any alleged economic injuries because they "have not shown that they are the object of any action taken under the ESA consultation process, nor that they are the object of any other challenged agency action under the ESA connected to the Project." *Seafreeze Shoreside, Inc.*, 2023 WL 6691015, at *13; C*f. Kinsella, supra*, 2023 WL 3571300, at *3 ("This argument likewise fails at the preliminary injunction stage for its failure to show a likelihood of irreparable harm and its singular basis on monetary harm that could be remedied with standard damages."). Moreover, though NEPA is not at issue in the present motion, the alleged economic injuries asserted by Plaintiff NLPC and Peter Flaherty are outside the zone of interests protected by NEPA. *Mountain States Legal Found.*, 92 F.3d at 1235-36 (NEPA's zone of interests "do not include purely monetary interests").

In sum, neither Plaintiffs' Amended Complaint nor their preliminary injunction motion alleges any concrete injuries upon which the Plaintiff associations or individuals can properly base standing. Even if Plaintiffs' Amended Complaint is not subject to dismissal outright for lack of standing, the fact that Plaintiffs fail to allege, let alone substantiate, any concrete injuries indicates that they are unlikely to succeed on the merits and unlikely to suffer irreparable harm, such that no preliminary injunction should issue.

> **2.    The organizational Plaintiffs fail to demonstrate that the interests at stake in this action are germane to their respective organizational purposes.**

Even if one of the individual Plaintiffs could demonstrate standing, their alleged injuries are insufficient to establish standing on behalf of their associated organizations because the interests at stake in this action are not germane to the respective organizational purposes. Where, as here, an association sues on behalf of its members, the association must demonstrate that "its members would have standing to sue in their own right, *the interests at stake are germane to the*

*organization's purpose*, and neither the claim asserted nor the relief requested requires members' participation in the lawsuit." *Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009, 1011 (D.C. Cir. 2003) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)) (emphasis added). In order to sue in their own right, specific members are required to demonstrate an actual or imminent injury that is "concrete and particularized," not conjectural or hypothetical. *See Lujan*, 504 U.S. at 560. The organizational Plaintiffs here fail to demonstrate that the interests at stake in this action are germane to their respective organizational purposes.

Plaintiffs assert that CFACT is a non-profit corporation with a mission "to educate the public about important political and environmental issues that can be addressed with practical solutions using the power of the private sector market." Amended Complaint ¶ 24. Plaintiffs assert that Heartland has expertise in "environmental protection[.]" *Id.* ¶ 25. Plaintiffs assert that NLPC is a nonprofit organization "that promotes ethics in government and opposes unlawful government actions." *Id.* ¶ 27. Plaintiffs do not allege that CFACT, Heartland, or NLPC has any particular organizational purpose related to right whales, and none of these organizations appears to be suing in its own right. Instead, CFACT and Heartland are asserting ESA claims on behalf of individual members who allegedly seek to observe right whales. *See id.* ¶ 24 (CFACT member Craig Rucker allegedly plans to go whale watching in the future); *id.* ¶ 25 (Heartland member Aaron Stover allegedly plans to go whale watching in the future). NLPC does not identify any particular member who seeks to observe right whales but alleges that unnamed members and supporters "oppose endangerment to the NARWs by CVOW[.]" *Id.* ¶ 27

Assuming for sake of argument that any members would have standing to sue in their own right and that neither the claims asserted nor the relief requested in this suit require individual members' participation in the lawsuit, Plaintiffs have not shown that the asserted interests of individual members in observing right whales is germane to the organizational purposes of CFACT,

Heartland, or NLPC, respectively. Germaneness of the interests served by a lawsuit to the purpose of the organization is a requirement for standing based on membership that prevents "litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 57 (D.C. Cir. 1988). Plaintiffs' passing allegations regarding their organizational purposes involving "environmental issues[,]" *see id.* ¶¶ 24-25, are insufficient to establish that protection of right whales is "germane to the [plaintiffs'] purpose[,]" which is required to establish associational standing. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Ind.* 517 U.S. 544, 553 (1996) (quoting *Hunt*, 432 U.S. at 343); *see also Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078 (9th Cir. 2005) (organization lacked standing because purported environmental interest that it raised had no connection to trade and market interests organization was created to protect).

Here, as in one of the recent cases concerning the Vineyard Wind Project, the organizational Plaintiffs in the instant case have not demonstrated that any members' asserted interests in observing right whales are germane to their organizational purposes. *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior,* Case Nos. 1:22-cv-11091-IT and 1:22-cv-11172-IT, 2023 WL 6691015, *13 (D. Mass. Oct. 12, 2023) ("[Long Island Commercial Fishing Ass'n, Inc. ("LICFA")] has not demonstrated that the interests at stake–Aripotch's interests in observing right whales and marine life–are germane to LICFA's purpose of supporting fisheries management.") (citation omitted). Accordingly, neither CFACT, Heartland, nor NLPC has associational standing to assert any alleged injuries to aesthetic interests in whale watching as asserted by their individual members, including Craig Rucker or Aaron Stover.

**B.    Plaintiffs are unlikely to succeed on the merits of their Count Two claims.**

In support of their arguments concerning likelihood of success on the merits, Plaintiffs invoke certain arguments arising only under Count Two of their Amended Complaint. *See* ECF No. 15-1 at 21-26. Count Two of Plaintiffs' Amended Complaint asserts claims concerning the merits of the NMFS BiOp for the CVOW Project. Amended Complaint ¶¶ 86-97.

Even if Plaintiffs could demonstrate standing, Plaintiffs are unlikely to succeed on the merits of their Count Two claims because the record confirms that NMFS reasonably concluded, based on the best available science, that the CVOW Project is not likely to jeopardize right whales. NOAA_000231. In support of this determination, NMFS applied its expertise to conclude that temporary harassment in the form of temporary behavioral disturbance and/or temporary threshold shift[19] in hearing from exposure to pile-driving noise are the only adverse effects to right whales expected to result from the Project. NOAA_000217. NMFS determined, conservatively, that only up to six individual right whales a year, for a total of 12 individuals over the two years during which offshore pile driving would occur, could be subject to such harassment. *Id.* "No mortality or permanent injury (auditory or other) is expected from exposure to any aspect of the proposed action during the construction, operations, or decommissioning phases of the project." *Id.*

The NMFS BiOp specified reasonable and prudent measures and terms and conditions ("T&Cs") to avoid and minimize the potential take of right whales in the form of harassment that it determined was reasonably certain to occur as a result of pile-driving construction. NOAA_000233-247.[20] The U.S. District Court for the District of Massachusetts and the U.S. Court of Appeals for

---

[19] Temporary threshold shift is a temporary loss of hearing sensitivity at certain frequency ranges that recovers to pre-exposure levels over time. NOAA_000139.

[20] In short, pile-driving construction will only occur between May and October, which avoids the winter and spring seasons when right whales are more likely to be present. *Id.* Protected species observers ("PSOs") will visually monitor the construction area to detect right whales during pile driving. In addition, a real-time passive acoustic monitoring ("PAM") system will be used to supplement visual monitoring. *Id.* The PSOs and PAM will be used for pre-clearance monitoring and shutdown procedures to ensure that right whales are not present during pile-driving

the First Circuit recently upheld a biological opinion with similar terms and conditions for pile-driving construction of the Vineyard Wind offshore wind project. *Nantucket Residents Against Turbines v. BOEM*, 675 F. Supp. 3d 28, 43 (D. Mass. 2023) ("[N]umerous mitigation measures are designed not only to protect right whales from harassment, but also to protect other species."), *aff'd Nantucket Residents*, 2024 WL 1756024, at *12 ("And as discussed, the Residents have not demonstrated that the agency's proposed mitigation measures are inadequate, or that reliance on those measures was arbitrary and capricious.").

In support of their preliminary injunction motion, Plaintiffs focus almost exclusively on the incorrect assertion that NMFS failed to consider the cumulative effects of the CVOW Project on right whales in relation to other wind projects. *See* ECF No. 15-1 at 21-26. The record before the Court confirms that NMFS properly assessed the effects of other wind projects consistent with all requirements of the ESA and NEPA, respectively.

NMFS properly considered effects on listed species, including right whales, of other offshore wind projects under construction or completed as part of the "environmental baseline." NOAA_000215. The ESA consultation regulations define "environmental baseline" to include "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early Section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02. Consistent with this approach, NMFS properly considered information about the existing South Fork, Vineyard

construction. *Id.* If a right whale is present but was somehow not detected by PSOs or PAM, the mandatory use of a soft start with lower intensity sound will create an opportunity for the whale to move away from the source before more intense sound is emitted. *Id.* And, all pile-driving work must be mitigated by noise attenuation systems, such as two concentric bubble curtains used to muffle sound emitted from construction. *Id.* NMFS reasonably concluded that, taken together, these measures are expected to reduce the occurrence and intensity of noise exposure to right whales from pile-driving operations. NOAA_000217.

Wind, Ocean Wind 1, Revolution Wind, and Empire Wind projects as part of the "environmental baseline" for its analysis of the CVOW Project. NOAA_000215. As explained in the "Integration and Synthesis of Effects" section of the BiOp, NMFS added "the Effects of the Action (Section 7) with the Status of the Species (Section 5), the Environmental Baseline (Section 6), and the Cumulative Effects (Section 8), to formulate the agency's biological opinion as to whether the proposed action 'reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of an ESA-listed species in the wild by reducing its numbers, reproduction, or distribution. . . .'" NOAA_000216. Because no reductions in reproduction or overall number of right whales are expected, NMFS does not expect an appreciable reduction in the survival of right whales or a reduction in the likelihood of recovery of the species. NOAA_000217-18.

Plaintiffs incorrectly assert that the NMFS BiOp should have analyzed additional proposed or future offshore wind projects as part of its "cumulative effects" analysis. "Cumulative effects are those effects of future State or private activities, *not involving Federal activities*, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02 (emphasis added). Any future wind projects do not fit within the definition of "cumulative effects" because they will involve Federal activities requiring Section 7 consultation. NOAA_000215.[21] Consistent with this approach, "in each successive consultation, the effects on listed species of other offshore wind projects under construction or completed would be considered to the extent they influence the status of the species and environmental baseline in the action area

---

[21] *See also* 51 Fed. Reg. 19926, 19933 (June 3, 1986), *cited in Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1269 (11th Cir. 2009); *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 907 (5th Cir. 2021) ("The Annova project was also properly excluded from the cumulative effects analysis because, at the time of the opinion, the Annova project was a federal action subject to its own consultation.") (citation omitted).

25

for each consultation according to the best available scientific and commercial information." NOAA_000215.

Although the NMFS BiOp appropriately focused on the effects of the CVOW Project in relation to the environmental baseline pursuant to the ESA, NMFS and BOEM correctly considered the potential cumulative effects of future offshore wind development in their FEIS pursuant to NEPA. NEPA's cumulative effects analysis requires assessment of past, present, and reasonably foreseeable future actions regardless of who takes the actions, *see* 40 C.F.R. § 1508.1(g)(3), whereas, as described above, the ESA cumulative effects analysis is narrower. *See* 50 C.F.R. § 402.02. Therefore, consistent with the different statutory definitions, effects from foreseeable future OCS wind projects were appropriately not considered in the ESA analysis, while they were considered in the NEPA analysis.

While not directly at issue here, the NEPA cumulative effects analysis in the FEIS here was proper and comprehensive, taking into account the past, present, and reasonably foreseeable future impacts of climate change and past and future offshore wind projects, as well as much larger industries than offshore wind, including fishing and marine transportation. FEIS § 1.6 at p. 42. Consistent with the appropriate scope of analysis pursuant to NEPA, NMFS and BOEM correctly considered the potential cumulative effects of wind development including the selected "Alternative B" on right whales in Section 3.15 of the FEIS. FEIS § 3.15 at pp. 410-464.[22]

---

[22] The FEIS's "No Action Alternative," which assumes a scenario in which no construction of the subject project occurs, found that impacts to right whales from all unrelated past, present, and reasonably foreseeable future actions are major "due to the current stock status for which serious injury or loss of an individual from vessel strike or entanglement, and the continued stressor of climate change reducing the health and resilience of the population, would result in population-level impacts that threaten the viability of the species." FEIS § 3.15.3.3 at p. 445. The FEIS properly concludes, however, that the CVOW Project's incremental impact on right whales is *minor*, because individuals are not expected to abandon their migratory behavior but may modify their behavior in ways that do not rise to population-level impacts due to mitigation and monitoring measures. FEIS § 3.15-51 at p. 460.

The BiOp's conclusion that no mortality or permanent injury is expected to result from any aspect of the CVOW Project, NOAA_000217, is consistent with the FEIS's conclusion that the CVOW Project's incremental impact on right whales is minor. As explained above, NMFS reasonably came to this conclusion in part because of the extensive mitigation and monitoring measures that BOEM has adopted as conditions of COP approval. NOAA_000217. Nor is any mortality or permanent injury authorized pursuant to the MMPA. Any such take involving mortality or permanent injury would be unauthorized and would result in immediate reinitiation of the Section 7 consultation. 50 C.F.R. § 402.14(i)(4) ("If during the course of the action the amount or extent of incidental taking . . . is exceeded, the Federal agency must reinitiate consultation immediately."); *see also Defs. of Wildlife v. U.S. Dep't. of Navy,* 733 F.3d 1106, 1124 (11th Cir. 2013) (no authorized take is a reinitiation trigger set to its strictest setting).

NMFS also assessed cumulative effects on right whales in the context of the MMPA incidental take authorization. In *Melone v. Coit, supra*, the U.S. Court of Appeals for the First Circuit noted that NMFS had evaluated the direct, indirect, and cumulative effects of the Vineyard Wind Project as part of its "negligible impact" analysis, which analyzes the species' density, distribution, population size, growth rate, and other relevant stressors. 2024 WL 1792762, at *8. NMFS addressed cumulative impacts on right whales in the incidental take authorization for the CVOW Project in response to Comment 28. *See* 89 Fed. Reg. at 4384-85.

None of the cases cited by Plaintiffs supports their assertion that NMFS's consideration of other offshore wind Projects resulted in an unlawful "incremental step" biological opinion. *See* Amended Complaint ¶¶ 1, 16, 91. Plaintiffs' citation to *Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir. 1985), does not support their ESA claims here. *See* ECF No. 15-1 at 24. In that case, the U.S. Forest Service had failed to complete a "biological assessment" to determine whether ESA consultation was necessary. *Thomas,* 753 F.2d at 763. Here, by contrast, BOEM submitted a

biological assessment (NOAA_000359, *available at*

https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/CVOW-C-

NMFS-BA.pdf (last visited May 6, 2024)), and NMFS properly concluded ESA consultation when

it provided its biological opinion, NOAA_000001. The *Thomas* court's statements about

"cumulative actions," "cumulative environmental effects," and "cumulative impacts" were related

to NEPA claims in that case and did not pertain to the Court's ESA-related holding. *See Thomas*,

753 F.2d at 759-61. Moreover, as noted above, the FEIS in this case considered potential

cumulative effects on right whales in a manner consistent with the applicable scope of analysis

prescribed by the NEPA regulations, 40 C.F.R. § 1508.1(g)(3).[23]

Plaintiffs' reliance on *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988), is also misplaced.

ECF No. 15-1 at 22-23. *Conner* involved a sale of oil and gas leases on 1,300,000 acres of national

forest land in Montana. The leases lacked a "no surface occupancy" stipulation, meaning that the

federal government did not reserve the right to prohibit surface-disturbing activities upon further

environmental reviews. 848 F.2d at 1444. Because the biological opinions addressed only the

"incremental-step" of leasing and not the subsequent phases of oil and gas production, the court

ruled that the biological opinions violated the ESA. *Id.* at 1453. The facts here are more like *North*

*Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980), a case construing agency actions under

OCSLA.

---

[23] *Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010), cited by Plaintiffs, is also inapposite. *See* ECF No. 15-1 at 23-24. In *Wild Fish Conservancy*, the facts did not support NMFS's conclusion that operational changes at the fish hatchery at issue in that case would improve in a "small" way the contribution of a local population of threatened bull trout to the survival of the species. *See* 628 F.3d at 520, 528. To the contrary, NMFS itself had determined that the operation of the fish hatchery at issue in that case would "'at least reduce, and in some years preclude' migratory bull trout spawning[.]" *Id.* at 527. Thus, in *Wild Fish Conservancy*, "the bottom line of the Service's findings [was] that as a result of the [challenged] action, the local bull trout population will continue to decline." *Id.* at 528. Here, by contrast, NMFS concluded that the Project will not result in any reductions in reproduction or the overall number of right whales. NOAA_000217.

In *North Slope Borough,* the plaintiffs challenged the adequacy of ESA analysis associated with lease sales for oil and gas development. *Id.* at 609. The court concluded that environmental review procedures under OCSLA provided "checks and balances" to ensure that environmental effects could be fully assessed at later stages. *Id.* Under OCSLA, any lease entered into by the Secretary of the Interior requiring future approval of plans contained as an implied term a condition that the Secretary will not violate the ESA. *Id.* The *North Slope* court reasoned that, under the OCSLA procedures, "it becomes clear that the Secretary of Interior retains strict control of an [O]uter [C]ontinental [S]helf project for its duration, from lease sale to depleted, run-dry well. And, as information and experience is collected, the Secretary is in better shape to respond sensitively to environmental needs and wisely to oil-strikes." *Id.* As in *North Slope Borough*, here there are "checks and balances." BOEM may periodically review the activities conducted under an approved COP pursuant to 30 C.F.R. § 585.634(b) and therefore retains discretion to ensure ESA compliance through further consultations with NMFS, if necessary. *See also* 30 C.F.R. § 585.701(a). Moreover, BOEM's condition of approval of the COP incorporate the terms and conditions and reasonable and prudent measures of a future biological opinion that might result from such consultation. *See* COP Approval Letter, *supra*, at pp. 2-4, condition 1.4.

The Court should also reject Plaintiffs' arguments about any alleged failure to consider the effects of other offshore wind projects based on the reasoning in the recent Vineyard Wind case. *Nantucket Residents*, 675 F. Supp. 3d at 63 ("Because Plaintiffs do not offer any new arguments regarding the 'synergistic' impacts, Plaintiffs' challenges to the 2021 BiOp and Final EIS's consideration of cumulative impacts fail for the reasons previously discussed."). NMFS performed the requisite analysis of Project effects, appropriately incorporating cumulative effects—including those of other offshore wind projects—into the environmental baseline. Given the copious and stringent measures the agencies are imposing to protect the right whale by avoiding exposure of

29

right whales to Project construction and minimizing the risks of any exposures, NMFS reasonably

concluded the CVOW Project will not jeopardize the species. *See* NOAA_000231. [24]

     In affirming the district court's decision in *Nantucket Residents*, the First Circuit recently

rejected arguments that NMFS failed to account for potential effects of additional wind power

development as described in a publication authored by Quintano-Rizzo:

> Also, the Quintana-Rizzo study did not suggest that right whale survival was
> incompatible with wind energy development. Instead, it urged policymakers to
> implement comprehensive monitoring and mitigation plans. That is what NMFS did
> here. And as discussed, the Residents have not demonstrated that the agency's
> proposed mitigation measures are inadequate, or that reliance on those measures was
> arbitrary and capricious.

*Nantucket Residents,* 2024 WL 1756024, at *12.

     Contrary to Plaintiffs' assertion that the NMFS BiOp is not owed deference[25], reviewing

courts are at their "most deferential" when, as here, the agency is "making predictions, within its

area of special expertise, at the frontiers of science." *Balt. Gas & Elec. Co v. Nat. Res. Def. Council*,

*Inc.,* 462 U.S. 87, 103 (1983); *see also Marsh v. Or. Def. Res. Council*, 490 U.S. 360, 377 (1989).

---

[24] Plaintiffs correctly note that BOEM and NOAA recently published a joint guidance document
titled North Atlantic Right Whale and Offshore Wind Strategy ("Strategy"), *available at*
https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW_0.
pdf. *See* ECF No. 15-1 at 24-25. The final Strategy document post-dates the NMFS BiOp in this
case and is not part of the NOAA Administrative Record. *See* ECF No. 10-1 (certified list of
contents of the administrative record). At any rate, the Strategy expressly does not modify the
agencies' responsibilities pursuant to Federal statutes and regulations such as those governing the
NMFS BiOp at issue in this case. Strategy at 7. Thus, the Strategy does not impose any "binding
obligations" on the agencies that might otherwise inform the Court's review of the NMFS BiOp in
this case. *Gen. Elec. Co. v. EPA,* 290 F.3d 377, 383 (D.C. Cir. 2002).
[25] Plaintiffs incorrectly suggest that NMFS is owed no deference with respect to its determinations
concerning the appropriate scope of the BiOp's cumulative effects analysis because this claim
involves the interpretation of the ESA itself. ECF No.15-1 at 23 (citing *Me. Lobstermen's Ass'n v.
NMFS,* 70 F.4th 582 (D.C. Cir. 2023)). The *Me. Lobstermen's* court determined that NMFS was not
owed deference in that case because the agency had erred in applying a "precautionary principle"
that the Court concluded resulted in overestimating the effects of lobster fishing on the right whale
population. *Id.* at 598. Plaintiffs cite no corresponding legal error here.

As the D.C. Circuit has noted, the court "must look at the decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc). Thus, the Court should defer to the NMFS BiOp's "no jeopardy" conclusion in accordance with D.C. Circuit precedent applying the "arbitrary and capricious" standard of review in accordance with the APA, 5 U.S.C. § 706(2)(A). *E.g.*, *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 686 (D.C. Cir. 1982) ("We conclude therefore that the appropriate standard of review under the ESA is the arbitrary and capricious standard provided by the APA.").[26]

In sum, Plaintiffs are unlikely to prevail on the merits of any of their claims concerning the NMFS BiOp, including Plaintiffs' arguments that NMFS unlawfully limited its analysis only to potential effects of the CVOW Project itself.

## II.    Plaintiffs have not shown they are likely to suffer irreparable harm.

To constitute "irreparable harm," the injury alleged must be "both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief[.]" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal quotation marks and citation omitted). The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The Supreme Court has likewise made clear that this standard is a rigorous

---

[26] *See also Conservancy of Sw. Fla., Inc. v. Williams,* No. 13-14477-CIV-Martinez-Goodman, 2018 WL 11422990, at *16 (S.D. Fla. Dec. 21, 2018) (Assessment of cumulative effects "is an area clearly within the technical expertise of the agency to which this Court should defer."); *Cf. Selkirk Conservation All. v. Forsgren,* 336 F.3d 944, 959 (9th Cir. 2003) (Under NEPA, courts "defer to an agency's determination of the scope of its cumulative effects review.") (*quoting Neighbors of Cuddy Mountain, v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002)).

test, and that an injunction may be granted on nothing less than a showing of likely irreparable harm to the movant. *Winter*, 555 U.S. at 20, 22. Furthermore, harm to the environment, standing alone, cannot constitute irreparable harm for purposes of injunctive relief. It must be *the movant* that is likely to suffer irreparable harm. *Id.* at 20 (requiring plaintiff to establish "that *he* is likely to suffer irreparable harm") (emphasis added)); *accord Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 181 (2000) (to demonstrate standing, a plaintiff must show that the harm "is not injury to the environment but injury to the plaintiff"). Where, as here, a moving party does not demonstrate irreparable harm, the court "need not even consider the remaining factors." *Dall. Safari Club*, 453 F. Supp. 3d at 398.

As an initial matter, Plaintiffs provide no excuse for their months-long delay in filing suit or moving for a preliminary injunction in this case. A delay of this magnitude demonstrates Plaintiffs lack irreparable harm and thus provides a basis, standing alone, for denying Plaintiffs' motion. *Dallas Safari Club v. Bernhardt*, 453 F.Supp.3d 391, 403 (D.D.C. 2020).

Moreover, Plaintiffs provide only vague speculation about possible generalized harm resulting from Project construction and operation, but those arguments fall far short of meeting the required showing under the D.C. Circuit's and the Supreme Court's precedent. As explained in detail above with respect to the Article III standing analysis, Plaintiffs' arguments concerning alleged harm to their planned whale-watching activities are not based on any effects to right whales that would occur absent an injunction over the next several weeks or months while the Court considers the merits of Plaintiffs' claims. Likewise, Plaintiffs cannot credibly assert that alleged harm resulting from ongoing *onshore* Project construction, *see* ECF No. 15-2 ¶ 9, will occur absent an injunction of *offshore* Project construction.

Plaintiffs have offered no evidence that continued Project construction off the coast of Virginia during the authorized May-October pile-driving season when right whales are less likely to

be present will have any impact on Plaintiffs' ability to go whale watching in December, when Plaintiffs intend to observe right whales. *See* ECF No. 15-2 ¶ 5. Mr. Rucker does not even allege that his planned whale-watching trip will go to the Project Lease Area. *See Lujan,* 504 U.S. at 565-66. Moreover, construction and operation of the CVOW Project itself is not anticipated or authorized to result in the mortality or permanent injury of any right whales. NOAA_000232. Therefore, an injunction is unnecessary to preserve the status quo with respect to any alleged harm to right whales.[27]

Plaintiffs' citation to a 2021 online publication concerning the presence of right whales offshore of Southern New England, *see* ECF No. 15-1 at 27, does not support their assertion that right whales will be harmed by Project construction off the coast of Virginia. However, to the extent the cited publication raises concerns about potential effects of offshore wind development generally, we will address Plaintiffs' concerns in turn.[28]

### A.      Plaintiffs' delay is grounds in itself to deny their request.

---

[27] *Cf. Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003) (Plaintiffs met their burden of establishing the existence of substantial irreparable harm to their interests absent the grant of injunctive relief where challenged agency action involved the immediate, intentional killing of 525 mute swans.); *Fund for Animals v. Bureau of Land Mgmt.*, 357 F. Supp. 2d 225, 230 (D.D.C. 2004) ("[O]nce the gather was completed and the wild horses were either sold or destroyed there was nothing a court thereafter could do to reestablish the preexisting status quo.").

[28] Plaintiffs raise similar concerns in reference to an opinion letter by a NMFS biologist, Dr. Sean Hayes, ECF No. 15-3. *See* ECF No. 15-1 at 28-29. With all due respect to Dr. Hayes, he was not part of the decision-making process here, and his comments pertaining to the potential effects of southern New England offshore wind energy projects on the Nantucket Shoals habitat area are not relevant to the Project at issue here, which is sited off the Virginia coast. *See* ECF No. 15-3 at 2-3. Indeed, the Project at issue in this case is sited hundreds of miles away from any core congregating areas for the right whale such as foraging or calving grounds. *See* NOAA_000060-61; s*ee also Defs. of Wildlife,* 733 F.3d at 1110 ("Because the area offshore Georgia and Florida is the [right whales'] only known calving ground, regulations have been adopted in adjacent waters to protect right whales from threats of fishing gear entanglement and ship collisions."). Moreover, statements of agency staff during an interim step in the decision-making process are not the proper focus for a reviewing court, which instead must focus on the agency's explanation presented in its final decision. *See, e.g., Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658-59 (2007) ("[F]ederal courts ordinarily are empowered to review only an agency's final action," as opposed to "various statements made by the involved agencies' regional offices.").

This Court should deny Plaintiffs' motion based solely on their unjustified delay in commencing this suit and filing their motion for preliminary injunction after onshore and offshore construction have already been progressing for months. The biological opinion that forms the basis of Plaintiffs' claims against NMFS and BOEM was issued on September 18, 2023. Plaintiffs could have brought an APA action against NMFS at that time. *See Bennett, supra*. Instead, Plaintiffs waited *six* months to commence this action on March 18, 2024. Plaintiffs waited another month to file their motion for preliminary injunctive relief on April 29, 2024. Meanwhile, Plaintiffs and all parties were on notice concerning the sequence and schedule for Project construction as described in the COP. *See* Table 1.1-2 (Indicative Construction Schedule), *available at* https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Public_Sec-1-3.pdf (last visited May 6, 2024). Onshore construction and offshore Project construction is already progressing ahead of the planned 2024 monopile installation season. *See* Mariner Update-2/4/24 – February Update, *available at* https://coastalvawind.com/partnerships/supporting-fisheries/february.aspx (last visited May 6, 2024). Plaintiffs' seven-month delay in filing their preliminary injunction motion undercuts their allegation of irreparable harm. *Gordon v. Holder,* 632 F.3d 772, 775 (D.C. Cir. 2011) ("[D]elay indicates a lack of irreparable harm.") (citing *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel,* 872 F.2d 75, 80 (4th Cir. 1989)).[29]

---

[29] *See also Mylan Pharms.v. Shalala,* 81 F. Supp. 2d 30, 43 (D.D.C. 2000) (two-month delay favored denial of preliminary injunction). "The D.C. Circuit has held that a delay of forty-four days before bringing action for injunctive relief was 'inexcusable,' and 'bolstered' the 'conclusion that an injunction should not issue,' particularly where the party seeking an injunction had knowledge of the pending nature of the alleged irreparable harm." *Dall. Safari Club,* 453 F. Supp. 3d at 403 (*quoting Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975)); *see also Newdow v. Bush,* 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm.") (citations omitted); *City of Tempe, Ariz. v. Fed. Aviation Admin.*, 239 F. Supp. 2d 55, 65 n.13 (D.D.C. 2003) ("Although the Center Runway Project began in July 2002, and plaintiffs filed their complaint on October 16, 2002, they did not apply for a preliminary injunction until December 16, 2002—three weeks before the scheduled start of the Phase II runway closure.");

The Massachusetts District Court denied a motion for preliminary injunction on construction of the Vineyard Wind Project citing Plaintiffs' delay in seeking injunctive relief until shortly after pile-driving construction had begun. *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, Case No. 1:22-cv-11091-IT, 2023 WL 3660689, at *5 (D. Mass. May 25, 2023) ("Plaintiffs did not file their Motion for a Stay [Doc. No. 115] until May 10, 2023, despite knowing for months that installation of the monopiles would commence in May 2023 and that installation of cables and scour protection had already commenced.") (citation omitted). The court noted that the construction schedule for the Vineyard Wind Project had been publicly available on BOEM's website since shortly after plaintiffs had filed their complaint in that case. *See id.* The Court concluded that "Plaintiffs' substantial delay in seeking preliminary relief is fatal to their claim of irreparable harm." *Id.* at *4*. Here, as in *Seafreeze*, the Project construction schedule has been available for months and Plaintiffs' request for preliminary injunctive relief should be deemed untimely because Plaintiffs' delay in filing their motion until the eve of commencement of pile-driving construction indicates a lack of irreparable harm.

The reasoning set forth in *Allens Creek/Corbetts Glen Preservation Group, Inc. v. Caldera*, 88 F. Supp. 2d 77, 84 (W.D. N.Y. 2000), *aff'd*, 2 F. App'x. 162 (2nd Cir. 2001), is also relevant to Plaintiffs' request for preliminary injunctive relief in this case. In holding that the federal defendants (in addition to the permittee) were prejudiced by delay in bringing the lawsuit, the *Allens Creek* court noted that "[t]he integrity of the permit process and the value of Corps review and approval is substantially undermined if challenges may be mounted indefinitely, as plaintiffs seek to

---

*Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*, Civ. No. 15-cv-01582 (APM), 2016 WL 420470, at *12 (D.D.C. Jan. 22, 2016) ("Plaintiff's delay in filing this lawsuit therefore weighs against it in the court's balance of equities."); *W. Watershed Project v. Bernhardt*, 468 F. Supp. 3d 29, 50 (D.D.C. 2020) ("These unexplained delays in seeking emergency relief undermine their contention that they will be irreparably harmed absent an injunction.") (citations omitted).

do here." *Id.* at 85; *see also Nat'l Parks & Conservation Ass'n v. Hodel,* 679 F. Supp. 49, 54 (D.D.C. 1987) ("A number of actions have been taken by defendants which plaintiffs might have been successful at preventing before the fact had plaintiffs brought this suit in a timely manner.").

Here, as in *Allens Creek*, granting Plaintiffs' request for preliminary injunctive relief after significant onshore and offshore construction have already occurred would undermine the respective permitting processes of the Federal Defendant agencies. There is a strong public interest in the certainty and reliability of Federal Defendants' approvals. Where, as here, an offshore energy developer has complied with agency rules and satisfied federal statutory requirements to the agencies' satisfaction, the developer should be able to rely on its permits, as it may need to make business and financial decisions in furtherance of completing the authorized activity. OCSLA recognizes that interest. *See* 43 U.S.C. § 1332(3) ("[T]he [O]uter Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs[.]"). The requested injunction will also impede BOEM from carrying out its responsibility to ensure that authorized activities are carried out in a manner accomplishing the enumerated goals of OCSLA (including safety, protection of the environment, and conservation of natural resources). *Id.* § 1337(p)(4)(A)-(L).

Thus, independent of any expense and prejudice to the permittee, the Court should find that Plaintiffs' untimely request for preliminary injunctive relief prejudices the interests of Federal Defendants. This governmental interest is not easily quantifiable or protected through the issuance of an injunction bond and alone supports the denial of a preliminary injunction. *Coleman v. PACCAR, Inc.,* 424 U.S. 1301, 1307 (1976) ("Thus, even if the stay ordered by the Court of Appeals is ultimately dissolved and the Secretary's decision upheld on the merits, the goals of the

36

federal motor vehicle safety program will have been dealt a serious setback."). At minimum, although the United States will not bear the costs of delay in the same manner as the Project proponent, DEV, any injunction should be conditioned on Plaintiffs posting a substantial bond pursuant to Federal Rule of Civil Procedure 65(c).[30]

### B. Plaintiffs fail to demonstrate that they will be irreparably harmed by the effects of noise on right whales.

Plaintiffs incorrectly assert irreparable harm because "[i]ncreased noise from wind turbine construction and operations and vessels could also directly impact important whale behaviors and interfere with the detection of critical acoustic cues." ECF No. 15-1 at 27. As noted above, the relevant inquiry is not whether right whales will allegedly be injured but, rather, whether Plaintiffs themselves will suffer irreparable harm. *Winter*, 555 U.S. at 20. Plaintiffs fail to demonstrate that they themselves or right whales will suffer any injury.

With respect to pile-driving construction noise, the CVOW Project is subject to terms and conditions effectuating a suite of avoidance and mitigation measures analyzed in the NMFS BiOp, as described in further detail above. Based on this suite of avoidance measures and the resulting low number of right whales that may be harassed as a result of pile driving, NMFS reasonably concluded that the Project will not result in any reductions in reproduction or the overall number of right whales. NOAA_000217. Furthermore, NMFS determined that short-term behavioral responses from exposure to pile-driving noise are not anticipated to have any lingering consequences to the fitness of individual right whales. NOAA_000217. NMFS further determined that, because no consequences are anticipated to right whale population growth rates, the proposed action will not

---

[30] Plaintiffs may not use Section 705 as a shield to avoid posting a bond. *See, e.g.*, *B&D Land & Livestock Co. v. Connor*, 534 F. Supp. 2d 891, 911-12 (N.D. Iowa 2008) (issuing injunction and a stay under Section 705 and imposing bond); *Seafreeze Shoreside, Inc.,* 2023 WL 3660689, at *8 ("In Plaintiffs' scenario, the court would ignore [the wind project proponent's] economic losses altogether and provide no protection despite the preliminary nature of the relief sought. Equity is not so one-sided.").

appreciably reduce the likelihood of recovery in the wild for right whales. *Id.* Based on these considerations, NMFS determined that the proposed action is not expected "directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of an ESA-listed species in the wild by reducing its numbers, reproduction, or distribution." *See* NOAA_000216; 50 C.F.R. § 402.02 (definition of "jeopardize the continued existence of"). Therefore, NMFS reasonably concluded that the CVOW Project is not likely to jeopardize the continued existence of the right whale or any other species. NOAA_000231. The Court should defer to NMFS's scientific determinations concerning effects of Project construction noise on whales. *Balt. Gas,* 462 U.S. at 103.

Plaintiffs' arguments with respect to potential effects of operational noise on right whales similarly lack merit. For example, Plaintiffs assert that NMFS failed to use the "[b]est [s]cientific [i]nformation [a]vailable" about the noise tolerance of right whales. Amended Complaint ¶ 96. Contrary to Plaintiffs' assertions, the NMFS BiOp considers the best available information on the potential effects of operational noise, including information based on monitoring of existing wind farms in Europe, which indicates that noise levels resulting from older-generation wind turbine generators ("WTGs") usually remain indistinguishable from background noise within a short distance from the source. NOAA_000158. NMFS cited two studies, Thomsen et al. (2006b) and Tougaard et al. (2020), for the proposition that operational noise levels are likely lower than those ambient levels already present in active shipping lanes. *Id.*[31]

---

[31] NMFS also considered available modeling information to predict underwater operational noise levels associated with newer 10-megawatt turbines. *Id.* at 159. NMFS cited findings from hydroacoustic monitoring of operational noise from the Block Island Wind Farm ("BIWF"), which utilizes direct-drive technology similar to the WTGs planned for the CVOW Project. *Id.* (citing Elliott et al. (2019)). NMFS observed that "in areas with consistent vessel traffic, such as the CVOW-C lease area, operational noise may not be detectable above ambient noise and, therefore, would be unlikely to result in any behavioral response by any whale, sea turtle, or sturgeon." *Id.* Taken together, this information supports NMFS's conclusion that "effects of operational noise are likely to be insignificant for ESA-listed whale species." NOAA_000161.

Notwithstanding the BiOp's consideration of studies involving the noise effects of other wind projects, Plaintiffs suggest that there remains a "knowledge gap" concerning the effect of sound on right whales. Complaint, ECF No. 1 at 54. Contrary to Plaintiffs' suggestion that development of wind farms must await further studies involving operational noise generated by the latest turbine designs, the ESA's requirement to utilize the "best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), does not require NMFS to conduct independent studies or await new data.[32] Plaintiffs have not identified any other "better" information that NMFS failed to consider. As in *Nantucket Residents*, the Court should conclude that the NMFS BiOp is supported by the best scientific and commercial data available. 675 F. Supp. 3d at 59 ("Accordingly, Plaintiffs have not shown that NMFS and BOEM violated the ESA by failing to rely on the 'best scientific and commercial data available' during the consultation process.").

Likewise, Plaintiffs offer no support for their speculation that Project operations will cause right whales to abandon favored migration routes and feeding areas or otherwise affect the whales' use of the region. *See* Amended Complaint ¶ 96; ECF No. 15-1 at 27. Under the best available science standard, it is not enough to rely "on speculation or surmise[.]" *Bldg. Indus. Ass'n v. Norton*, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001). Contrary to Plaintiffs' speculation, the NMFS BiOp concludes, based on available information about past wind projects, that "effects of operational noise are likely to be insignificant for ESA-listed whale species." NOAA_000161. NMFS also cited available information about past wind projects in support of its determination that

---

[32] *E.g., Heartwood, Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 436 (8th Cir. 2004) ("The requirement that agencies use the 'best scientific and commercial data available,' . . . does not require an agency to conduct new studies when evidence is available upon which a determination can be made. . . . All that is required of the agencies is to seek out and consider all existing scientific evidence relevant to the decision at hand.") (citations omitted). Rather, the requirement "merely prohibits the Secretary from disregarding available scientific evidence that is in some way better than the evidence [s]he relies on. Even if the available scientific and commercial data were quite inconclusive, [s]he may— indeed must—still rely on it at that stage." *City of Las Vegas v. Lujan*, 891 F.2d 927, 933 (D.C. Cir. 1989).

"effects of structure presence to ESA-listed whales and sea turtles would be insignificant." NOAA_000165. For the same reasons that NMFS determined operational effects of the CVOW Project to be insignificant, there is no evidence that operational effects of multiple wind projects will result in adverse effects on right whales. *See Nantucket Residents*, 675 F. Supp. 3d at 62 ("Because Plaintiffs do not offer any new arguments regarding the 'synergistic' impacts, Plaintiffs' challenges to the 2021 BiOp and Final EIS's consideration of cumulative impacts fail for the reasons previously discussed."). The record before the Court confirms that NMFS appropriately considered the best available science with respect to potential effects of Project operations including operational noise.

**C.    Plaintiffs fail to demonstrate that they will be irreparably harmed by the effects of increased vessel traffic in the region.**

Next, Plaintiffs mistakenly suggest that NMFS failed to account for the possibility that the CVOW Project may result in right whale vessel strikes. ECF No. 15-1 at 27; *see also* Amended Complaint ¶ 96. Plaintiffs again fail to demonstrate that they themselves will suffer any irreparable harm, *see Winter*, 555 U.S. at 20, but Plaintiffs also fail to demonstrate that any right whales will be injured as a result of Project-related vessel traffic.

Contrary to Plaintiffs' suggestion, the BiOp requires implementation of a comprehensive Vessel Strike Avoidance Plan. That plan includes "mitigation and monitoring measures for listed species, vessel speeds and transit protocols from all planned ports, vessel-based observer protocols for transiting vessels, communication and reporting plans, proposed alternative monitoring equipment to maintain vessel strike avoidance zones in varying weather conditions, darkness, sea states, and in consideration of the use of artificial lighting[.]" NOAA_000245. In addition, the MMPA incidental take authorization includes complementary requirements to implement various vessel strike avoidance measures. *See* 89 Fed. Reg. at 4371; NOAA_000748. Considering these avoidance measures, NMFS appropriately concluded that the potential for vessel strike is so low as

to be "discountable." 89 Fed. Reg. at 4389. Because no right whale vessel strikes are anticipated, it was unnecessary for NMFS to provide take coverage for vessel strikes pursuant to the ESA. NMFS nevertheless considered the potential for vessel strikes on whales as part of the "environmental baseline" and "effects of the action" sections in the biological opinion. NOAA_000132-133 and NOAA_000203-205. "Based on the best available information on the risk factors associated with vessel strikes of large whales (e.g., vessel speed), and the measures required to reduce risk," NMFS reasonably determined "vessel strike of ESA-listed whales to be extremely unlikely to occur and, therefore, discountable." NOAA_000205. The Court should defer to NMFS's determination about the utility of the selected mitigation measures including vessel strike avoidance, which is amply supported by the record. *See Balt. Gas,* 462 U.S. at 103; *Cf. Selkirk Conservation All.,* 336 F.3d at 955-56 (FWS properly relied upon mitigation in conservation agreement in arriving at a "no jeopardy" conclusion). Federal Defendants note that NMFS is also addressing the risk of vessel strikes in the fishing and marine transportation industries through various stringent measures including those imposed through Section 7 consultations and the MMPA fishery authorization process as well as the right whale Vessel Speed Rule, 50 C.F.R. § 224.105, which applies highly protective measures to avoid vessel strikes across the entire Eastern Seaboard. *See also* 87 Fed. Reg. 46,921 (October 1, 2022) (proposed revisions to Vessel Speed Rule).

Plaintiffs cite no scientific information in support of their assertion in their Amended Complaint that "[s]oft [s]tart" pile driving will force right whales into areas of increased threats. *See* Amended Complaint ¶ 96. In response to similar claims asserted by the plaintiffs in *Nantucket Residents*, the Massachusetts District Court observed that plaintiffs in that case similarly had not "offered any evidence to support their speculative argument that right whales will flee *into* vessel traffic." 675 F. Supp. 3d at 60; *see also id.* at 62 ("Plaintiffs' argument regarding the risk of entanglement stemming from soft-start procedures is speculative."). The court concluded that

because NMFS had considered the issue of vessel strikes and relied on available data, it was entitled

to deference, even if available data was not conclusive. *Id.* at 60 (citing *Pac. Shores Subdivision*

*Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 538 F. Supp. 2d 242, 250 (D.D.C. 2008)). Here, too,

the Court should conclude that NMFS has sufficiently analyzed the risk of vessel strikes on right

whales resulting from Project construction, including "soft start" procedures, and properly found no

long-term harm to the species. Consequently, Plaintiffs have fallen far short of meeting their burden

to show irreparable harm to their interest in the right whales.

> ### D.   Plaintiffs fail to demonstrate that they will be irreparably harmed by the presence of wind turbine foundations.

Plaintiffs' preliminary injunction motion also fails to provide any support for suggesting that

they will be irreparably harmed by the presence of wind turbine foundations associated with the

CVOW Project. ECF No. 15-1 at 27. Contrary to Plaintiffs' allegations in the Amended Complaint

paragraph 96, and their preliminary injunction motion, ECF No. 15-1 at 27, the NMFS BiOp

considered potential Project effects including the presence of wind turbine foundations on water

mixing patterns and dispersal of zooplankton (copepods). NMFS determined that, given the large

distances between the Project area and foraging habitat, the Project will not affect any of the

physical or oceanographic conditions that serve to aggregate copepods in designated critical habitat.

NOAA_000053. In accordance with the reasoning in *Balt. Gas*, 462 U.S. at 103, the Court should

defer to NMFS's scientific determination that Project effects on right whale critical habitat would

be insignificant and not likely to adversely affect such habitat. NOAA_000053.

> ### E.   Plaintiffs fail to demonstrate that they will be irreparably harmed by any alleged effects of the CVOW Project on the right whale population.

Finally, there is no support for Plaintiffs' assertion that they will be irreparably harmed

because "there will be fewer—or maybe no more—North Atlantic Right Whales for [Mr. Rucker] to

study, observe, and admire." ECF No. 15-1 at 28. As explained in the NMFS incidental take

authorization, the CVOW Project is not expected to result in the mortality of any right whales. *See* 89 Fed. Reg. at 4380; NOAA_000757. Thus, Plaintiffs' arguments about irreparable harm to right whales are based almost entirely on alleged, long-term effects of construction and operation of multiple commercial wind projects that are not subject to the Court's jurisdiction. As explained in further detail above, Federal Defendants considered potential effects of the CVOW Project together with effects of other offshore wind projects to the extent required pursuant to the ESA and NEPA, respectively. NMFS's scientific determinations with respect to the lack of anticipated population effects on right whales is owed deference. *Balt. Gas*, 462 U.S. at 103. Even if Plaintiffs could demonstrate some legal error with respect to Federal Defendants' consideration of "cumulative effects" (which they have not), Plaintiffs do not allege that such cumulative effects will result in any irreparable harm to Plaintiffs' own interests (or, for that matter, to right whales) in the near-term that might arguably support their claim for preliminary injunctive relief. Therefore, the requested injunction to preserve the status quo is legally unavailable because Plaintiffs have not made the requisite showing of injury. *Dall. Safari Club*, 453 F. Supp. 3d at 398.

### III. The balance of harms and public interest do not support Plaintiffs' request for preliminary injunctive relief.

The third and fourth factors of the preliminary injunction test—balancing the equities and the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. In considering the balance of the equities between the parties, traditionally a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, Alaska,* 480 U.S. 531, 542 (1987)). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citation omitted). "[W]here an injunction is asked [for] which will adversely affect a public interest . . . the court may in the

43

public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Id*. at 312-13 (citation omitted).

In addition to the reasons explained above, the Court should deny Plaintiffs' motion because allowing the Project to proceed is in the public interest. In Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad[,]" the government recognized that "[t]he United States and the world face a profound climate crisis." Exec. Order 14008, 86 Fed. Reg. 7619 (Jan. 27, 2021). As one part of the federal government's response to that crisis, Executive Order 14008 announced an objective to increase renewable energy production on the Outer Continental Shelf "with the goal of doubling offshore wind by 2030 while ensuring robust protection for our lands, waters, and biodiversity and creating good jobs." *Id.* § 207. Congress, too, has taken steps to encourage renewable energy development, including by enacting the Energy Policy Act of 2005, which expressly authorized the Secretary of the Interior to approve renewable energy projects on the Outer Continental Shelf. *See* 43 U.S.C. § 1337(p)(1). In doing so, "Congress has articulated the public policy that our nation should incorporate clean energy as a necessary part of America's future and it is essential to securing our nation's energy independence and decreasing green house emissions." *W. Watersheds Project v. Bureau of Land Mgmt.,* 774 F. Supp. 2d 1089, 1103 (D. Nev. 2011), *aff'd*, 443 F. App'x 278 (9th Cir. 2011) (citing the Energy Policy Act of 2005).

The Project furthers these important public interests. With the capacity to generate approximately 9.5 million megawatt-hours per year of electricity, the Project would supply enough renewable, virtually emissions-free energy to power about 660,000 homes. By the same token, enjoining the Project would undermine the public interest and "harm federal renewable energy goals." *Id.* (holding that balance of equities disfavored enjoining agency's authorizations of wind energy facility). In accordance with the Fast 41 Act, 42 U.S.C. § 4370m-6(b), the Court should also weigh the potential loss of jobs that may result from granting Plaintiffs' requested injunctive relief.

Federal Defendants defer to DEV to further explain the potential adverse effects that may result from even a temporary halt to Project activities.

Plaintiffs' reliance on *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978) ("*TVA*"), for their argument that the balance of the equities tips in their favor is misplaced. *See* ECF No. 15-1 at 30. In *TVA*, the Supreme Court found that a federal dam project should be enjoined because, after engaging in ESA Section 7 consultation, the consulting agency "determined that operation of the dam would eradicate an endangered species[.]" *TVA,* 437 U.S. at 156; *see also Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy,* 898 F.2d 1410, 1418 (9th Cir. 1990) ("In *TVA*, it was indisputable that the challenged agency action, 'would result in total destruction of the snail darter's habitat.' Here, the FWS predicts no such grave danger.") (citation omitted)). In such circumstances as in *TVA*, the Supreme Court has held that where "[r]efusal to enjoin the action would have ignored the explicit provisions of the [ESA]" by allowing the elimination of an endangered species, only an injunction would vindicate the objectives of the ESA. *Weinberger*, 456 U.S. at 314 (citation omitted). By contrast, here, Section 7 consultation led NMFS to determine that the CVOW Project will not jeopardize any ESA-listed species. NOAA_000231. Plaintiffs' ESA claims do not override other public interest considerations based on the reasoning in *TVA*.

In sum, preliminarily enjoining the Project threatens more harm to the combined interests of the government and public, *see Nken*, 556 U.S. at 435, than Plaintiffs have shown that they will suffer absent an injunction. Plaintiffs have not carried their burden to show that the balance of equities favors an injunction and the Court should deny Plaintiffs' motion.

## CONCLUSION

For the foregoing reasons, Plaintiffs fail to meet their heavy burden to demonstrate irreparable harm, a likelihood of success on the merits, or that the balance of the harms or public interest favors Plaintiffs. Therefore, the Court should deny Plaintiffs' Motion.

Date:  May 6, 2024

*Of Counsel:*

Stephen R. Vorkoeper
Lori R. Monroe
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240

Brandon Sousa
Attorney-Advisor
National Oceanic and Atmospheric
Administration
Office of General Counsel, Fisheries and
Protected Resources Section
1315 East-West Highway
Silver Spring, MD 20910
(240) 621-1302
brandon.sousa@noaa.gov

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

*/s/ Mark Arthur Brown*
MARK ARTHUR BROWN
D.C. Bar No. 470050
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0204
Fax: (202) 305-0275
E-mail: mark.brown@usdoj.gov

*Counsel for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

*/s/ Mark Arthur Brown*
Mark Arthur Brown

46