# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMITTEE FOR A CONSTRUCTIVE TOMORROW, et al., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 24-cv-00774 (LLA) ) |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al., | ) Hon. Loren L. AliKhan ) ) |
| Defendants. | ) ) ) |

## PLAINTIFFS' MEMORANDUM IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

Roger J. Marzulla
Nancie G. Marzulla
Marzulla Law, LLC
1150 Connecticut Ave., NW, Suite 1050
Washington, D.C. 20036
(202) 822-6760
nancie@marzulla.com
roger@marzulla.com
Bar No. 394907
Bar No. 400985

Paul D. Kamenar
1629 K. Street, N.W.
Suite 300
Washington, D.C. 20006
(301) 257-9435
paul.kamenar@gmail.com
Bar No. 914200

Attorneys for Plaintiffs

October 4, 2024

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iv

TABLE OF EXHIBITS ........................................................................................... vi

TABLE OF ABBREVIATIONS ............................................................................. vii

ISSUES PRESENTED FOR REVIEW ..................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 1

    1.    The Federal Government Launches an Aggressive, Coordinated Program to Construct Thousands of Offshore Wind Turbines in the Atlantic Ocean ................................................. 1

    2.    Federal Agencies Approve Massive Dominion Wind Project ........................................... 2

    3.    The North Atlantic Right Whale Is a Critically Endangered Species That Cannot Afford to Lose a Single Member ............................................................................. 6

    4.    NMFS Excluded from Its Biological Opinion Known Environmental Impacts of Turbine Failures ..................................................................................................... 7

STATUTORY AND REGULATORY BACKGROUND ........................................... 13

    1.    The Endangered Species Act ......................................................................... 13

    2.    NMFS' Regulations Regarding Cumulative Effects .......................................... 15

PROCEDURAL BACKGROUND ........................................................................... 15

SUMMARY OF ARGUMENT ............................................................................... 16

ARGUMENT ......................................................................................................... 21

    1.    Standard of Review ....................................................................................... 21

    2.    NMFS Violated the ESA by Excluding from Its Biological Opinion Known and Available Information Regarding the Cumulative Effects of Other Projects on the Highly Endangered Right Whale ........................................................................................... 22

        A.    NMFS Violated Section 7 of the Endangered Species Act by Failing to Ensure that the Dominion Wind Project Will Not Likely Jeopardize the Continued Existence of the Critically Endangered North Atlantic Right Whale ......................................... 25

        B.    NMFS and BOEM Had Information Available That Showed That When Aggregated, the Effects of all 30 Projects Would Affect the Right Whale's Likelihood of Survival ...... 26

        C.    NMFS' Regulatory Interpretation of Its Duties Under Section 7 Conflicts with the Plain Language of the ESA and the Court Should Not Defer to the Agency's Interpretation 29

    3.    Because BOEM Had Full Knowledge that the Cumulative Impacts of the Federal Offshore Wind Program Threaten the Viability of the Highly Endangered North Atlantic Right Whale, Its Approval of the Project Was Arbitrary, Capricious, an Abuse of Discretion, and Not In Accordance with the Requirements of the Endangered Species Act .................................. 32

    4.    Plaintiffs Have Standing to Bring Their Claims ............................................. 35

        A.    Plaintiffs Have Injury-in-Fact ................................................................ 36

            1.    Craig Rucker, Founder and President of CFACT ............................ 36

        2.    Peter Flaherty, Chairman of the National Legal and Policy Center ......................... 39

    B.    Plaintiffs Have Shown Causation ................................................................. 40

    C.    Redressability.................................................................................................. 41

CONCLUSION......................................................................................................................... 43

## TABLE OF AUTHORITIES

**Cases**

*Airport Neighbors All., Inc. v. United States*, 90 F.3d 426 (10th Cir. 1996) ............................... 42

*Bennett v. Spear*, 520 U.S. 154 (1997). ...................................................................................... 20

*Carpenters Indus. Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017). ............................................. 40

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). ......................................................................... 21

*Church of Scientology of California v. United States*, 506 U.S. 9 (1992) ................................. 42

*Columbia Basin Land Prot. Ass'n v. Schlesinger*, 643 F.2d 585 (9th Cir. 1981) ....................... 42

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) .......................................................... 18, 29, 30

*Ctr. for Biological Diversity v. E.P.A.*, 861 F.3d 174 (D.C. Cir. 2017). ..................................... 41

*Ctr. for Biological Diversity v. Env't Prot. Agency*, 56 F.4th 55 (D.C. Cir. 2022) ............... 25, 32

*Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2024 WL 1602457 (D.D.C. Apr. 12, 2024) ............................................................................................................................ 13, 22

*Defs. of Wildlife v. U.S. Env't Prot. Agency*, 420 F.3d 946 (9th Cir. 2005) ............................... 29

*Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172 (5th Cir. 2016). ......................................... 21

*Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir. 1992). .................................................. 21

*Hill v. Coggins*, 867 F.3d 499 (4th Cir. 2017) ........................................................................... 20

*Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221 (1986). ............................................ 20

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024). .................................... 17, 21, 29

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992). ................................................................... 36, 37

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582 (D.C. Cir. 2023) 21, 22, .............................................................................................................................................. 29

*Mayo v. Jarvis*, 177 F. Supp. 3d 91 (D.D.C. 2016) .................................................................... 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983). 21

*N. Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980) .................................................... 23

*Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045 (9th Cir. 2024). ........................................ 30

*Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359 (5th Cir. 1976). ................................................ 33

*Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028 (9th Cir. 2001). ................................................................................................................... 17, 18, 22

*Sierra Club v. National Marine Fisheries Service*, 2024 WL 3860211 (D. Md. Aug. 19, 2024). ......................................................................................................................................... 24, 34

*Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31 (D.C. Cir. 2015). .......................... 41

*Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260 (4th Cir. 2018) ...................... 34

*State of Ariz. v. Thomas*, 824 F.2d 745 (9th Cir. 1987). ............................................................ 21

*Stop H-3 Ass'n v. Dole*, 740 F.2d 1442 (9th Cir. 1984). ............................................................ 33

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978). ....................................... 13, 16, 25, 31

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985). .................................................................... 31

*United States v. Am. Trucking Ass'ns*, 310 U.S. 534 (1940). ..................................................... 21

*Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010). ................................. 29, 30, 31

*WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013) ............................................... 41

**Statutes**

16 U.S.C. § 1532(19). ................................................................................................................. 15

16 U.S.C. § 1533. ....................................................................................................................... 22

16 U.S.C. § 1536. .................................................................................................................. 17, 26

16 U.S.C. § 1536(a)(2). ............................................................................................. 14, 26, 33, 34

16 U.S.C. § 1536(a). ........................................................................................... 14
16 U.S.C. § 1536(b)(3)(A). ............................................................................ 14, 15
16 U.S.C. § 1536(d). ........................................................................................... 14
5 U.S.C. § 706(2)(A) ........................................................................................... 21

**Regulations**

30 C.F.R. § 585. ................................................................................................. 32
50 C.F.R. § 402.02 ................................................................................. 17, 28, 33
50 C.F.R. § 402.14(g)(8) ......................................................................... 14, 17, 25
50 C.F.R. § 402.14(g). ........................................................................................ 14
50 C.F.R. § 402.14(i). ......................................................................................... 15

**TABLE OF EXHIBITS**

**EXHIBIT NO.**                    **DESCRIPTION**

Ex. 1        Letter from Dr. Sean A. Hayes to Brian R. Hooker, Lead Biologist at the
             Bureau of Ocean Energy Management

Ex. 2        Declaration of Craig Rucker and the Committee for a Constructive
             Tomorrow

Ex. 3        Declaration of Peter Flaherty and the National Legal and Policy Center

## TABLE OF ABBREVIATIONS

| Abbreviation | Definition |
| --- | --- |
| APA | Administrative Procedure Act |
| BOEM | Bureau of Ocean Energy Management |
| BPA | Bisphenol A |
| CFACT | Citizens for a Constructive Tomorrow |
| COP | Construction and Operations Plan |
| CVOW | Coastal Virginia Offshore Wind |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FWS | United States Fish and Wildlife Service |
| ITS | Incidental Take Statement |
| NARW | North Atlantic Right Whale |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| OCS | Outer Continental Shelf |
| PET | Polyethylene Terephthalate |
| PFA | Perfluoroalkyl/Polyfluoroalkyl |
| PVC | Polyvinyl Chloride |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**ISSUES PRESENTED FOR REVIEW**

1.      Was the National Marine Fisheries Service's (NMFS) Biological Opinion for the Coastal

Virginia Offshore Wind Project (Dominion Wind Project) and its determination of No Jeopardy

arbitrary and capricious and, a clear error in judgment, in violation of the Administrative

Procedure Act (APA) because the agency disregarded all known and available information about

the aggregate impacts of the Dominion Wind Project and the other 29 planned offshore wind

projects on the North Atlantic Right Whale?

2.      Do NMFS' regulations, which allow the agency to ignore some cumulative impacts on

endangered species in its Section 7 analysis, fall short of NMFS' obligations under the plain

language of the Endangered Species Act (ESA)?

3.      Do Plaintiffs have standing under the Endangered Species Act to pursue their claims?

**FACTUAL BACKGROUND**

**1.      The Federal Government Launches an Aggressive, Coordinated Program to
         Construct Thousands of Offshore Wind Turbines in the Atlantic Ocean**

In March 2021, the administration identified a series of "bold actions" to "catalyze

offshore wind energy" development.[1] The Government announced its goal of deploying 30

gigawatts of offshore wind energy by 2030 and stated that it was taking "coordinated steps to

support rapid offshore wind deployment."[2] To meet the 2030 target, the administration

---

[1] Biden Administration, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.
[2] *Id.*

announced a plan to advance new lease sales and review "at least 16 Construction and Operations Plans (COPs) by 2025."[3]

As of today, 30 offshore wind projects are in various stages of development, all of which will be located in, along, or near the endangered North Atlantic Right Whale's migration path and habitat.[4] In its Final Environmental Impact Statement (EIS), the Bureau of Ocean Energy Management (BOEM) concluded that "[o]ver 3,287 structures . . . could be constructed in the geographic analysis area . . . for planned offshore wind projects[,]"[5] and that "[c]onsidering all of the [Impact Producing Factors] together, BOEM anticipates that the impacts from ongoing and planned actions, including Alternatives B and C, would result in overall *major* impacts on the [North Atlantic Right Whale]."[6]

## 2.      Federal Agencies Approve Massive Dominion Wind Project

In December 2020, Dominion Energy submitted a COP for the Dominion Wind Project,[7] and on September 18, 2023, NMFS issued a Biological Opinion, which concluded that the Dominion Wind Project, one of the largest offshore wind projects planned with 176 turbines, three offshore substations, and hundreds of miles of inter-array cables,[8] would not jeopardize any endangered species or their habitat. [9]

---

[3] *Id.*
[4] *See* Bureau of Ocean Energy Management, *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy* (Jan. 2024) at 5,
https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW_0.pdf (Strategy on the North Atlantic Right Whale).
[5] BOEMCVOW_438.
[6] BOEMCVOW_463 (emphasis added).
[7] BOEMCVOW_120988.
[8] BOEMCVOW_2162.
[9] *See* BOEMCVOW_18085; BOEMCVOW_18315.

Every year, over 10 million visitors travel to Virginia Beach to enjoy the open ocean view, relax on the beach, and enjoy the nearby wildlife. From December to March, several species of whales, including the endangered North Atlantic Right Whale, migrate through and live in the waters off Virginia Beach. Once constructed, the Dominion Wind Project will consist of 176 turbines on 112,799 acres, approximately 27 miles off the coast of Virginia Beach, Virginia.[10]

Each turbine will require 2.86 acres of scour protection—boulders and concrete mattresses—around the foundation on the ocean floor,[11] and 229 miles of 660-kilovolt inter-array cables will be buried in the ocean floor. Each turbine will be installed using pile driving which requires a massive ship that hammers these foundations into the ocean floor.[12] The installation of turbines, inter-array cables, export cables, scour protection, and cable protection will permanently damage thousands of acres of the seafloor, destroying and disturbing habitats, fish, and protected species. Constructing this offshore power plant's components involves significant excavation of the seafloor over many miles and, sometimes, requires the use of explosive devices. The laying of scour and cable protection, as concrete mattresses (8 feet by 20 feet), rock bags, etc., along the export and inter-array cables further disrupts the seafloor and crushes the organisms on the seafloor.[13]

By narrowing the focus of its analysis, NMFS concluded that noise and behavioral disruption from the turbine construction would be at most temporary harassment of the Right Whales:

---

[10] *See* BOEMCVOW_28; *see also* BOEMCVOW_37; *see also* BOEMCVOW_120.
[11] *See* BOEMCVOW_18103.
[12] *See id.*
[13] *See* BOEMCVOW_168.

[T]he only adverse effects to [North Atlantic Right Whales] expected to result from the [Dominion Wind] project are temporary behavioral disturbance and/or temporary threshold shift in hearing from exposure to pile driving noise during installation of WTG and OSS foundations. We consider these adverse effects as harassment under the ESA. Up to 6 individual [North Atlantic Right Whales] a year, for a total of 12 individuals over two years . . . exposed to noise above the behavioral threshold from foundation pile driving noise. No mortality or permanent injury (auditory or other) is expected from exposure to any aspect of the proposed action during the construction, operations, or decommissioning phases of the project.[14]

NMFS' regulation allowed it to ignore the cumulative impacts of thousands of other wind turbines to be installed as part of the 29 other wind turbine projects planned for construction up and down the Atlantic coastline. NMFS also did not consider the effects of wind turbine structural failures—such as turbine or blade collapse—on the continued survival of the North Atlantic Right Whale that are occurring on wind turbines all over the world, including offshore of Nantucket, Massachusetts.[15]

Academics have long decried the gulf between the ESA's statutory requirements and the agencies' inconsistent and inadequate regulations:

While lawmakers envisioned these restrictions as "the institutionalization of . . . . caution," implementation of the statute has instead allowed a steady drumbeat of adverse impacts from federal actions that incrementally push protected species further toward the brink. The U.S. Fish and Wildlife Service (FWS) and National Marine Fisheries Service (NMFS), the two expert agencies responsible for assessing other federal agencies' compliance with section 7's prohibitions (collectively the Services), routinely sanction actions that negatively affect both listed species and the habitat designated as essential to their conservation—leaving species' recovery to an often unspecified, uncertain, and distant date in the future. On their face, the prohibitions in section 7(a)(2) appear to draw clear lines in the sand that prevent actions by federal agencies from driving threatened and endangered species closer to extinction and gradually diminishing habitat essential to these species' recovery. However, both regulators tasked with implementing the

---

[14] BOEMCVOW_18301.
[15] Northeast Ocean Data, *Energy and Infrastructure,* https://www.northeastoceandata.org/data-explorer/?energy-infrastructure|planning-areas (last accessed Apr. 26, 2024).

ESA have interpreted this part of the statute to allow for continued incremental declines of both listed species and their designated critical habitat.[16]

The statistics tell a story of agency neglect under the federal agency's narrowed interpretation of its responsibility under the ESA:

> An analysis covering more than seven years and ending in 2015 found that FWS issued only two biological opinions concluding that a federal project would jeopardize a listed species (out of over 88,000 formal and informal consultations); no opinion found destruction or adverse modification of critical habitat. A study evaluating biological opinions issued between 2005-2009 found a slightly higher incidence of FWS biological opinions finding jeopardy and destruction or adverse modification of critical habitat—2.4% and 0.6% of BiOps respectively.[17]

But, as required by the National Environmental Policy Act (NEPA), BOEM issued its Final EIS on September 29, 2023, which identified the cumulative impacts from other projects and numerous impacts on the environment, including impacts on the North Atlantic Right Whale, stating that that "[o]ver 3,287 structures . . . could be constructed in the geographic analysis area . . . for planned offshore wind projects[,]"[18] and that "[c]onsidering all of the [Impact Producing Factors] together, BOEM anticipates that the impacts from ongoing and planned actions, including Alternatives B and C, would result in overall *major* impacts on the [North Atlantic Right Whale]."[19] BOEM explained that it categorized those impacts as major "because serious injury or loss of an individual would result in population-level impacts that threaten the viability of the species."[20]

---

[16] Daniel J. Rohlf & Colin Reynolds, Daniel J. Rohlf & Colin Reynolds, *Restoring the Emergency Room: How to Fix Section 7(a)(2) of the Endangered Species Act*, 52 Envtl. L. 685, 686 (2022).

[17] *Id.*

[18] BOEMCVOW_438.

[19] BOEMCVOW_463 (emphasis added).

[20] *Id.*

Ignoring the cumulative impacts identified in the Final EIS and required under the plain language of the ESA, on October 30, 2023, BOEM and NMFS issued a Joint Record of Decision announcing the approval of the Construction and Operations Plan for the Dominion Wind Project.[21]

### 3. The North Atlantic Right Whale Is a Critically Endangered Species That Cannot Afford to Lose a Single Member

The North Atlantic Right Whale (Eubalaena glacialis) lives primarily in the western North Atlantic Ocean.[22] According to NMFS, while little is known about the Right Whale's habitat use of the mid-Atlantic, "recent acoustic data indicate near year round presence of at least some whales off the coasts of New Jersey, Virginia [where the Dominion Wind Project is located], and North Carolina."[23]

Few species are as imperiled as the North Atlantic Right Whale. According to NMFS, "none of the species recovery goals" have been met.[24] NMFS has therefore not even identified specific criteria for delisting the Right Whale in the species' recovery plan because conditions to support delisting are "too distant and hypothetical to realistically develop specific criteria."[25] NMFS stated in its Biological Opinion for the Dominion Wind Project that the whale's "resilience to future perturbations affecting health, reproduction, and survival is expected to be very low."[26]

According to BOEM in its Final EIS:

The total annual average observed human-caused mortality and serious injury for the [North Atlantic Right Whale] is 8.1 individuals per year, averaged over the

---

[21] *Id.*
[22] BOEMCVOW_18143.
[23] BOEMCVOW_18145 (citing Davis et al. 2017).
[24] BOEMCVOW_18147.
[25] BOEMCVOW_18154.
[26] BOEMCVOW_18148 (citing Hayes et al. 2018).

period between 2016 and 2020, though this likely represents an underestimate as not all mortalities are recorded (Hayes et al. 2023). Modeling using the 2015 to 2019 estimated annual means to account for undetected mortality and serious injury suggests the mortality rate could be as high as 31.2 animals per year (Hayes et al. 2023). Importantly, [North Atlantic Right Whale] mortalities exceed the species' calculated potential biological removal (0.7 individuals per year).[27]

BOEM concluded in its Final EIS that, when coupled with the species' low reproduction rate and small population size, "*all* human-caused mortalities have the potential to impact their population status."[28]

BOEM and NMFS also acknowledged the dire status of the North Atlantic Right Whale in their *Strategy on the North Atlantic Right Whale and Offshore Wind*:[29]

Due to the declining status of [North Atlantic Right Whales], the resilience of this population to stressors affecting their distribution, abundance, and reproductive potential is low. The species faces a high risk of extinction . . . [and] the loss of *even one* individual a year may reduce the likelihood of recovery and of the species' achieving optimum sustainable population.[30]

Yet, under the federal government's "coordinated" plan of constructing offshore wind turbine projects in the Atlantic Ocean, all wind turbines will be sited near or directly in the migratory path of the Right Whale.[31]

## 4.    NMFS Excluded from Its Biological Opinion Known Environmental Impacts of Turbine Failures

In its Biological Opinion for this Project, NMFS identified several activities that could adversely affect the continued survival of the Right Whale, including fishing entanglements and

---

[27] BOEMCVOW_417.

[28] BOEMCVOW_417 (emphasis added).

[29] *See* Strategy on the North Atlantic Right Whale *supra* note 4.

[30] *Id.* at 10 (emphasis added).

[31] *Id.*

vessel strikes.[32] NMFS also identified climate change as another potential issue affecting the survival of the species.[33]

But NMFS ignored known impacts from the structural failure of wind turbines and their blades that have occurred in other projects, impacts that will likely affect the continued survival of the Right Whale. That the massively large wind turbines built in the Atlantic Ocean are experiencing structural issues from lightning strikes, heavy wind and rain, bird strikes, and human error never seemed to cross the minds of the agencies reviewing the environmental impacts of the Project. Now the evidence continues to mount showing that wind turbines are experiencing significant and catastrophic structure problems, which the federal agencies did not mention even once in their environmental review of this Project. And any disaster or emergency response plan for clean-up was hidden from public view and comment.

On July 13, 2024, a large portion of a 350-foot, 57-ton fiberglass, Polyvinyl chloride (PVC), and polyethylene terephthalate (PET) blade broke off a newly constructed turbine in the Vineyard Wind 1 Project, scattering thousands of shards across the ocean's surface. Over the next few days, additional pieces of the blade also fell into the ocean, adding to the mayhem. The Coast Guard sealed off the area from ship transit, and the developer of that project attempted to remove shards of the shattered blade from the ocean. These efforts were largely unsuccessful, and thousands of tons of debris washed ashore not only in Nantucket fifteen miles away—closing its beaches—but were also carried many miles away to wash up on Martha's Vineyard, Cape Cod, and the shores of Rhode Island and Long Island.[34]

---

[32] BOEMCVOW_18147; *see also* BOEMCVOW_463.
[33] BOEMCVOW_18154.
[34] Matt Schooley, *Vineyard Wind Shut Down After Turbine Failure Sends "Sharp Fiberglass Shards" Onto Nantucket Beaches* (July 17, 2024), https://www.cbsnews.com/boston/news/nantucket-beaches-closed-vineyard-wind/.

Vineyard Wind's blade failure is not an isolated incident. Recently, a blade on one of the turbines at the Dogger Bank wind project off the coast of England failed—the second blade failure at that facility in three months.[35] Globally, 0.54% of blades fail each year, with around 3,800 failures yearly.[36] In 2022, a blade—the height of an 11-story building weighing over four Toyota Camrys—flew off a turbine at the Bigelow Canyon project and landed in a nearby field, creating a four-foot-deep trench where it landed.[37] There are also repeated instances of turbines collapsing across the world. Turbines in Germany, Oklahoma, Wisconsin, Wales, and Colorado have all collapsed within the last several years,[38] several of which were caused by turbine fires and lightning strikes.

In January 2024, a turbine in a northern Colorado wind project caught fire and folded in half. Shortly after the collapse, the turbine's owners speculated that "a blade malfunctioned and struck the tower, causing the collapse much like the side of a soda can being poked."[39] In May 2024, a wind turbine in Chesapeake, Virginia, caught fire after being struck by lightning.[40] In

---

[35] *Second GE Vernova Turbine Blade Reportedly Fails at UK's Dogger Bank Wind Farm*, Offshore (Aug. 23, 2024), https://www.offshore-mag.com/renewable-energy/article/55135538/second-ge-vernova-turbine-blade-reportedly-fails-at-uks-dogger-bank-wind-farm.

[36] Leon Mishnaevsky, Jr., *Root Causes and Mechanisms of Failure of Wind Turbine Blades: Overview*, National Library of Medicine (Apr. 19, 2022) at 1, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9101399/pdf/materials-15-02959.pdf.

[37] Ted Sickinger, *Wind Bust*, The Oregonian (Aug. 27, 2022), https://projects.oregonlive.com/wind-farms/.

[38] Tim Newcomb, *Giant Wind Turbines Keep Mysteriously Falling Over. This Shouldn't Be Happening.*, Popular Mechanics (Jan. 23, 2023), https://www.popularmechanics.com/technology/infrastructure/a42622565/wind-turbines-falling-over/.

[39] Logan Smith, *Turbine at Colorado Wind Farm Collapses, Burns*, CBS News (Jan. 15, 2024), https://www.cbsnews.com/colorado/news/turbine-colorado-wind-farm-collapses-burns-invenergy-clearway-clean-energy-fire/.

[40] Patriceia Beckford, *Lightning Catches Wind Turbine on Fire at Brock Environmental Center*, 13 News Now (May 27, 2024), https://www.13newsnow.com/article/weather/brock-

Iowa, one landowner has had three turbines catch on fire after being struck by lightning in the last eighteen months.[41] After catching on fire, the turbine blades fell to the ground, littering adjacent land with debris, including turbine components.[42]

Turbine debris is hazardous for fish and marine mammals that will eventually consume the microplastic degradation products or come into contact with the chemicals and toxins.[43] Almost all of the blade debris consists of PVC and PET foam. Exposure to sunlight, wind, rain, and ocean water will degrade PVC foam, allowing it to contaminate the marine food chain with microplastics. As reported in the peer-reviewed journal "Materials," in January of this year, "PVC is considered the most environmentally damaging plastic and one of the most toxic substances for inhabitants of our planet."[44]

Likewise, PET in the marine environment is toxic to species ranging from copepods (the primary food source for the North Atlantic Right Whale) and sea bass to marine mammals.[45] The epoxy resins that impregnate the blades contain large quantities of Bisphenol A (BPA). BPA acts like a hormone in the body and can increase the risk of prostate, breast, and ovarian cancer in

---

environmental-center-wind-turbine-catches-fire-due-to-lightning/291-23d0907e-0746-4b48-ae94-68d89547859e.

[41] Jackson Valenti, *Wind Turbine Fire in Mechanicsville Could Cost Farmer Millions*, KCRG (Aug. 16, 2024), https://www.kcrg.com/2024/08/17/wind-turbine-fire-mechanicsville-could-cost-farmer-millions/.

[42] *Id.*

[43] *See* NOAA Fisheries, *Offshore Wind Energy: Protecting Marine Life,* https://www.fisheries.noaa.gov/topic/offshore-wind-energy/protecting-marine-life (last visited Oct. 1, 2024); *see also* NOAA Fisheries, *Ocean Pollution and Marine Debris* (Apr. 1, 2020), https://www.noaa.gov/education/resource-collections/ocean-coasts/ocean-pollution.

[44] Marcin H. Kudzin, *Risks Associated with the Presence of Polyvinyl Chloride in the Environment and Methods for Its Disposal and Utilization* (Dec. 28, 2023), https://www.mdpi.com/1996-1944/17/1/173.

[45] Subhankar Chatterjee and Shivika Sharma, *Microplastics In Our Oceans and Marine Health*, Field Actions Science Reports (2019), https://journals.openedition.org/factsreports/5257.

humans.[46] BPA can also cause weight gain,[47] influence development,[48] and alter the immune system.[49]

Up to 20% of the PVC foam contains toxic additives and resins released when the foam degrades. The material safety data sheet by Vineyard Wind on the composition of the blade lists a plethora of harmful substances, many of which are also considered cancer-causing, including styrene,[50] phthalates, formaldehyde,[51] benzene,[52] PFAs,[53] and butadiene.[54]

Because the threat of a blade or turbine failure is highly likely, these failures should have been evaluated and raised in the Government's environmental review documents for the Dominion Wind Project before BOEM or any other agency issued its approvals. Because BOEM and NMFS did not even address the possibility of blade and turbine failures, the public was never informed that this event could occur and had no real opportunity to comment on the

---

[46] Hui Gao et al., *Bisphenol A and Hormone-Associated Cancers: Current Progress and Perspectives* (Jan. 2015), https://journals.lww.com/md-journal/fulltext/2015/01010/bisphenol_a_and_hormone_associated_cancers_.6.aspx.

[47] Minh T. Do et al., *Urinary bisphenol A and obesity in adults: results from the Canadian Health Measures Survey* (Dec. 2017), https://pubmed.ncbi.nlm.nih.gov/29236378/.

[48] Mass.gov, *Protect Your Baby from BPA (Bisphenol A),* https://www.mass.gov/info-details/protect-your-baby-from-bpa-bisphenol-a (last visited Aug. 20, 2024).

[49] Thea Golden et al., *Immunomodulatory Role of EDCs in Disrupting Metabolic Health*, Endocrine Disruption and Human Health (Philippa D. Darbre, ed., 2d ed. 2022).

[50] National Toxicology Program, *15th Report on Carcinogens* (Dec. 21, 2021), https://www.ncbi.nlm.nih.gov/books/NBK590797/.

[51] National Cancer Institute, *Formaldehyde,* https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/formaldehyde (last visited Oct. 4, 2024).

[52] U.S. Centers for Disease Control and Prevention, *Facts About Benzene,* https://emergency.cdc.gov/agent/benzene/basics/facts.asp#:~:text=The%20Department%20of%20Health%20and,of%20the%20blood%2Dforming%20organs (last visited Oct. 4, 2024).

[53] National Cancer Institute, *PFAS Exposure and Risk of Cancer,* https://dceg.cancer.gov/research/what-we-study/pfas (last visited Oct. 4, 2024).

[54] Agency for Toxic Substances and Disease Registry, *ToxFAQs for 1,3-*Butadiene, https://wwwn.cdc.gov/TSP/ToxFAQs/ToxFAQsDetails.aspx?faqid=458&toxid=81 (last visited Oct. 4, 2024)

scenario. NMFS and BOEM should have analyzed this risk as it related to endangered species before approving this Project.

The number of published studies considering the effects of microplastic particles on aquatic organisms is considerable. In aquatic invertebrates, microplastics cause a decline in feeding behavior and fertility, slow down larval growth and development, increase oxygen consumption, and stimulate the production of reactive oxygen species. In fish, the microplastics may cause structural damage to the intestine, liver, gills, and brain, while affecting metabolic balance, behavior, and fertility; the degree of these harmful effects depends on the particle sizes and doses and the exposure parameters.[55]

A recent study determined that PET fibers are commonly found in marine mammals' tissues.[56] These microplastics can cause inflammation, tissue damage, fertility problems, endocrine disruption, and behavioral changes, diminishing the resiliency of marine species, including baleen whales.[57]

The Final EIS's analysis on the release of these toxins and debris from blade failures and Project equipment failures is nonexistent. NMFS' analysis in the Biological Opinion is also deficient. While there is a minimal discussion of marine debris and pollution, NMFS admits that its analysis is mostly speculative because "data on marine debris" in the action area "is largely

---

[55] Natalia Zolotova et al., *Harmful Effects of the Microplastic Pollution on Animal Health: A Literature Review,* National Library of Medicine (June 14, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9205308/.

[56] Greg B. Merrill et al., *Microplastics in Marine Mammal Blubber, Melon, & Other Tissues: Evidence of Translocation*, Environ Pollut. (Oct. 15, 2023), https://pubmed.ncbi.nlm.nih.gov/37541381/.

[57] Natalia Zolotova et al., *Harmful Effects of the Microplastic Pollution on Animal Health: A Literature Review* (June 14, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9205308/; Marine Mammals Management Toolkit, *Study: Microplastics Found in 2/3 Marine Mammals*, (Aug. 15, 2023), https://marine-mammals.info/study-microplastics-found-in-2-3-marine-mammals/.

lacking" and it is "difficult to draw conclusions as to the extent of the problem and its impacts on populations of ESA-listed species in the Atlantic Ocean."[58] There is also no discussion of the impacts of blade and turbine failure and how any debris from those components that fall into the ocean would impact endangered species.

**STATUTORY AND REGULATORY BACKGROUND**

**1.      The Endangered Species Act**

The Endangered Species Act (ESA) requires all federal agencies to "conserve endangered species and threatened species and [] utilize their authorities in furtherance of the purposes."[59] Congress's intent in enacting the ESA "was to halt and reverse the trend toward species extinction, whatever the cost"[60]—even when doing so is inconvenient or counter to Government goals.

The Supreme Court recognized the importance Congress placed on protecting those plants and animals whose survival is threatened by human activity, noting that the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."[61] With that legislation, Congress made a "conscious decision . . . to give endangered species priority over the 'primary missions' of federal agencies."[62] As noted by this Court, protecting endangered species, such as the North Atlantic Right Whale, is so important that it takes priority over the primary mission of federal agencies, including BOEM's mission to develop an industrial-scale offshore wind energy network.

---

[58] BOEMCVOW_18220.
[59] *Id.*
[60] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).
[61] *Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2024 WL 1602457 (D.D.C. Apr. 12, 2024) (internal citations omitted).
[62] *Id.*

Section 7 of the ESA requires that BOEM must consult with the National Marine

Fisheries Service, which has primary responsibility for marine species under the ESA, before

taking any action that may jeopardize an endangered species or its habitat:

> Each Federal agency shall, in consultation with and with the assistance of the
> Secretary, ensure that any action authorized, funded or carried out by such agency
> . . . is not likely to jeopardize the continued existence of any endangered or
> threatened species or result in the destruction or adverse modification of habitat of
> such species. . . .[63]

At the close of the Section 7 consultation, NMFS must present its findings and

conclusions in a biological opinion,[64] which must analyze and determine whether the proposed

action jeopardizes the species: "[T]he Secretary shall provide to the Federal agency and the

applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the

information on which the opinion is based, detailing how the agency action affects the species or

its critical habitat."[65]

When preparing a Biological Opinion, NMFS must "use the best scientific and

commercial data available"[66] and "[e]valuate the effects of the action and cumulative effects on

the listed species or critical habitat."[67] NMFS must ascertain whether the proposed action, in

conjunction with the environmental baseline and any cumulative effects, is likely to jeopardize

the species' continued existence or damage their critical habitats.[68] If NMFS concludes that the

action is likely to jeopardize a species or result in harm to its habitat, it must propose a

"reasonable and prudent alternative" to avoid those effects.[69] NMFS must also prepare an

---

[63] 16 U.S.C. § 1536(a).
[64] 16 U.S.C. § 1536(b)(3)(A).
[65] 16 U.S.C. § 1536(d).
[66] 50 C.F.R. § 402.14(g)(8); *see also* 16 U.S.C. § 1536(a)(2).
[67] *See* 16 U.S.C. § 1536(a)(2).
[68] 50 C.F.R. § 402.14(g).
[69] 16 U.S.C. § 1536(b)(3)(A).

incidental take statement that addresses whether the proposed action is likely to incidentally "take" members of a protected species, as defined by the ESA,[70] and specify the number of permissible takes.[71]

## 2.     NMFS' Regulations Regarding Cumulative Effects

NMFS' regulations explicitly exclude from its Section 7 analysis the cumulative impacts of a certain subset of known impacts from other offshore wind projects: "Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the ESA."[72]

In the Biological Opinion that NMFS prepared for this Project, NMFS admits that it did not consider the cumulative effects of the thousands of other planned wind turbines to be constructed in the Atlantic Ocean:

> We reviewed the list of cumulative impacts identified by BOEM in the [Dominion Wind Project Draft EIS] and determined that most (e.g. other future offshore wind development activities . . . ) do not meet the ESA definition of cumulative effects because we expect that, if any of these activities were proposed in the action area, or were proposed elsewhere yet were to have future effects inside the action area, they would require at least one Federal authorization or permit, and would therefore be subject to ESA section 7 consultation requirements . . . .[73]

## PROCEDURAL BACKGROUND

Although this ESA claim is brought under the APA, not under the Citizens' Suit Provision of the ESA, on November 11, 2023 and March 7, 2024, Plaintiffs, Citizens for a Constructive Tomorrow et al. (collectively CFACT) sent a 60-Day Notice of Intent to Sue to federal Defendants NMFS and BOEM, explaining the flaws with NMFS' Biological Opinion

---

[70] 16 U.S.C. § 1532(19).
[71] 50 C.F.R. § 402.14(i).
[72] BOEMCVOW_18299.
[73] *See id.*

issued for the Dominion Wind Project. On April 16, 2024, CFACT filed its amended complaint challenging the Biological Opinion under the APA, ESA, and NEPA.

On April 29, 2024, CFACT moved for an administrative stay or a preliminary injunction to stop the imminent construction of the Dominion Wind turbines.[74] On May 24, 2024, the Court found that Plaintiff, Craig Rucker, had standing but denied that motion on the merits and issued a scheduling order for cross-motions for summary judgment.[75]

**SUMMARY OF ARGUMENT**

In March 2021, the administration announced its plan of "bold actions" to catalyze offshore wind energy development, stating that it was taking "coordinated steps to support rapid offshore wind deployment."[76] In its zeal to rapidly develop renewable energy, however, the federal government has lost sight of its statutory obligations to protect and conserve endangered species—specifically, the North Atlantic Right Whale—that will be directly affected by the construction of thousands of wind turbines along its migration route up and down the Atlantic Coast.

The Supreme Court has held that the federal ESA confirms that Congress viewed the value of preserving endangered species as "incalculable" and that Congress intended for federal agencies to "halt and reverse the trend toward species extinction, whatever the cost."[77] Section 7 of the federal ESA imposes an explicit, affirmative duty on all federal agencies to ensure that their actions are not likely to jeopardize the continued existence of a species or destroy or

---

[74] Mot. for Stay (Apr. 29, 2024), ECF No. 15.

[75] Op. and Or. Denying Mot. for Stay (May 24, 2024), ECF No. 28.

[76] The White House, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

[77] *Tennessee Valley Auth.*, 437 U.S. at 184.

adversely modify its critical habitat, using "the best scientific and commercial data available."[78]

When BOEM excluded consideration of the jeopardizing effects of all the other offshore wind

projects already in the approval pipeline on the North Atlantic Right Whale, it failed to consider

all available scientific information—and so failed to comply with the ESA. Excluding the

jeopardizing effects of other planned governmental actions—here, approval of 29 other projects

in its "coordinated" plan to construct wind turbine projects up and down the Atlantic Ocean

coastline—violates this statutory requirement.

The NMFS' regulatory interpretation of Section 7 erroneously carves out and excludes

from the agency's Section 7 cumulative analysis most of the government's announced program

to develop 30 wind turbine projects on grounds that those projects have not yet received final

approval.[79] But this regulatory carve-out directly conflicts with the ESA, which commands

NMFS to use the best available science and data to evaluate the impacts of federal actions on an

endangered species. Under *Loper Bright Enterprises v. Raimondo*,[80] the agency's interpretation

of what the ESA requires is a question of law and is entitled to no deference by this Court:

> [C]ourts, not agencies, will decide "*all* relevant questions of law" arising on review
> of agency action, § 706 (emphasis added)—even those involving ambiguous
> laws—and set aside any such action inconsistent with the law as they interpret it.
> And it prescribes no deferential standard for courts to employ in answering those
> legal questions.[81]

The Ninth Circuit invalidated a biological opinion for failure to consider cumulative

effects in *Pacific Coast Federation of Fishermen's Ass'n v. National Marine Fisheries Service.*[82]

---

[78] *See* 16 U.S.C. § 1536; *see also* 50 C.F.R. § 402.14(g)(8).
[79] 50 C.F.R. § 402.02 (defining "cumulative effects").
[80] *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2261 (2024).
[81] *Id.* at 2261.
[82] *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028 (9th
Cir. 2001).

There plaintiffs challenged the adequacy of four biological opinions issued by NMFS, which concluded that 23 timber sales in the Umpqua River Basin in Oregon were not likely to jeopardize the continued existence of two species of cutthroat trout and coho salmon. The Ninth Circuit held that the biological opinions violated the "arbitrary and capricious" and "clear error in judgment" standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because they failed to consider the cumulative effect of the proposed timber sales.

Instructive here, too, are several other decisions issued by the Ninth Circuit, including one that invalidated a Biological Opinion for failure to consider all known effects of a future oil and gas leasing project, provide guidance for this Court in evaluating cumulative impacts under the ESA: "With the information available, the [federal agency] could also have identified potential conflicts between the protected species and post-leasing activities. . . . [I]t [is] critical that ESA review occur early in the process to avoid piecemeal chipping away of habitat."[83]

NMFS admits that its cumulative impacts analysis for its Biological Opinion was truncated and limited to impacts of the Dominion Wind Project only:

> "Cumulative effects" are those effects of future state or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation (50 C.F.R. § 402.02). Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the ESA. It is important to note that, while there may be some overlap, the ESA definition of cumulative effects is not equivalent to the definition of "cumulative impacts" as described in the CVOW-C DEIS. Under NEPA, "cumulative effects…are the impact on the environment resulting from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." While the effects of past and ongoing Federal projects for which consultation has been completed are evaluated in both the NEPA and ESA processes (Section 6.0 Environmental Baseline), reasonably foreseeable future actions by Federal

---

[83] *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988); *see also Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028 (9th Cir. 2001) (holding that NMFS biological opinion is arbitrary and capricious if it disregards the effects of individual projects as "localized" when they can have significant aggregate effects).

agencies must be considered (see 40 C.F.R. § 1508.7) in the NEPA process but not the ESA section 7 process.[84]

BOEM and NMFS also failed to consider the impacts of blade or turbine failures from this and other planned projects on the Right Whale.[85] The agencies knew when they approved the Dominion Wind Project that several blades in the Project and the 29 other offshore wind projects slated for approval will likely fail over the lifetime of the Project.[86] Yet this available information was ignored by both agencies in their environmental review of this Project. Both agencies had a statutory duty under the ESA to evaluate the impacts of the release of these microplastics and toxins on all endangered species in the area. Their failure to do so violated the ESA and was arbitrary and capricious and a clear error of judgment in violation of the APA.

These statutory violations do not tell the whole story of the agencies' failure to meet the environmental requirements for this Project. This year alone, two Right Whales have died. Most recently, on March 30, 2024, a deceased North Atlantic Right Whale was found floating, roughly 50 miles off the Virginia shore.[87] That these whale deaths may be attributable to non-Project actions is beside the point. BOEM found no jeopardy in its Final EIS for this Project based on its scientific determination that there would be only 0.7 Right Whale deaths per year.[88] But because there have already been two deaths this year, under BOEM's own jeopardy analysis, BOEM's

---

[84] BOEMCVOW_18299.

[85] *See* BOEMCVOW_18085.

[86] *See* Leon Mishnaevsky, Jr., *Root Causes and Mechanisms of Failure of Wind Turbine Blades: Overview*, National Library of Medicine (Apr. 19, 2022) at 1, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9101399/pdf/materials-15-02959.pdf.

[87] NOAA Fisheries, *North Atlantic Right Whale Updates,* https://www.fisheries.noaa.gov/national/endangered-species-conservation/north-atlantic-right-whale-updates (last visited Sept. 26, 2024).

[88] *See* BOEMCVOW_417 (noting that the potential biological removal rate for the North Atlantic Right Whale is 0.7 individuals per year).

no-jeopardy analysis is invalid. To meet BOEM's standard, there cannot be another Right Whale death from any cause until 2028.

Plaintiffs have standing under NEPA and the ESA to pursue their claims.[89] This Court has found that at least one Plaintiff, Craig Rucker, has standing under the ESA and APA,[90] and, based on the same facts and injuries, this Court should find that Plaintiffs have standing. Plaintiffs, through their whale watching activities and aesthetic interest in the North Atlantic Right Whale, have shown cognizable injuries in fact.[91] The Plaintiffs have also shown causation, as this Court has found because "Mr. Rucker contends that NMFS's failure to consider cumulative effects resulted in a deficient Biological Opinion . . . leading to approval of a project that will hinder his ability to observe the Right Whale."[92] And Plaintiffs injuries are redressable because a favorable decision could lead to the change or relocation of the turbines, more mitigation measures, a supplemental EIS, and a supplemental Biological Opinion with an updated Incidental Take Statement.

---

[89] *See Mayo v. Jarvis*, 177 F. Supp. 3d 91, 129–30 (D.D.C. 2016); *see also Bennett v. Spear*, 520 U.S. 154, 176–77 (1997).
[90] Memo. Op. and Order Denying Mot. for Stay (May 24, 2024), ECF No. 28 at 8.
[91] *See, e.g., Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 n.4 (1986) (holding that plaintiffs established injury-in-fact sufficient for standing by alleging that the challenged agency actions would impair plaintiffs' whale watching); *Hill v. Coggins*, 867 F.3d 499, 505 (4th Cir. 2017) (holding that an "aesthetic interest in the observation of animals [is] a legally protected interest).
[92] Memo. Op. and Order Denying Mot. for Stay (May 24, 2024), ECF No. 28 at 7.

**ARGUMENT**

**1.     Standard of Review**

The party moving for summary judgment bears the initial burden of an entitlement to judgment.[93] Once that burden is met, the burden shifts to the non-moving party to identify specific record evidence and explain how it defeats the moving party's motion.[94]

Agency decisions under the ESA are governed by the APA, which requires that an agency action be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[95] This standard is designed to "ensure that the agency considered all of the relevant factors and that its decision contained no 'clear error of judgment.'"[96] Agency action should be overturned only when the agency has

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[97]

A biological opinion may also be invalid if it fails to use the best available scientific information as required by 16 U.S.C. § 1536(a)(2).[98]

Because "'the interpretation of the meaning of statutes" is "exclusively a judicial function,"[99] courts must overturn agency action where "the agency has misconceived the law."[100]

---

[93] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[94] *See Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 176 (5th Cir. 2016).
[95] 5 U.S.C. § 706(2)(A).
[96] *State of Ariz. v. Thomas*, 824 F.2d 745, 748 (9th Cir. 1987).
[97] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).
[98] *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir. 1992).
[99] *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2258 (2024) (quoting *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 544 (1940)).
[100] *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 597 (D.C. Cir. 2023) (internal citations and quotation omitted).

In determining the proper interpretation of the ESA, the court—not marine biologists—must determine the validity of the Biological Opinion by first ascertaining the proper meaning of the statutory language.[101]

**2.    NMFS Violated the ESA by Excluding from Its Biological Opinion Known and Available Information Regarding the Cumulative Effects of Other Projects on the Highly Endangered Right Whale**

The ESA required NMFS to determine if BOEM's approval of the Dominion Wind Project will jeopardize the Right Whale and, if so, to make recommendations in its Biological Opinion regarding how to avoid jeopardizing the whale species using the "best scientific and commercial data available."[102] But instead of analyzing all of the best information available, NMFS intentionally chose to exclude from its analysis the effects that the 29 other planned offshore wind projects along the Right Whale's annual migration path will have on the remaining members of this nearly extinct whale species, directly contrary to the ESA.[103] NMFS' Biological Opinion thus underestimates the jeopardy to the species caused by offshore wind development. NMFS' failure to consider this vitally important part of the problem makes the biological opinion arbitrary and capricious—just like NMFS' failure to consider the cumulative effects of multiple timber sales was:

> [T]he record contains no proof that the cumulative effect of site specific degradation was considered in reaching a no jeopardy opinion at the regional water-shed level. . . . [The agency's] disregard of projects with a relatively small area of impact but that carried a high risk of degradation when multiplied by many projects and continued over a long time period is the major flaw in NMFS study. . . . If in fact [the NMFS] disregards [the effects of individual projects] as "localized" when they can have significant aggregate effects, it acts arbitrarily and capriciously.[104]

---

[101] *Id.*
[102] 16 U.S.C. § 1533.
[103] *Ctr. for Biological Diversity*, 2024 WL 1602457 (D.D.C. Apr. 12, 2024).
[104] *Pac. Coast Fed'n of Fishermen's Ass'n, Inc.*, 265 F.3d at 1036.

In this case, NMFS ignored and did not analyze how other offshore wind projects now on the drawing board along the North Atlantic Right Whale's annual migration route will affect the species, taking the position that "other future offshore wind energy development activities,"[105] including the construction of thousands of giant turbines on millions of acres of ocean floor, could be ignored because "they would require at least one Federal authorization or permit and would, therefore require their own ESA section 7 consultation requirements."[106] But nothing in the ESA authorizes federal agencies to ignore known threats to endangered species just because the activity will require its own biological opinion in the future.[107]

The agencies knew that the Dominion Wind Project was only one small part of the much larger, coordinated offshore wind program swiftly gaining government approval, as the Biological Opinion reveals: "We presented information on the South Fork, Vineyard Wind, Ocean Wind 1, Revolution Wind, and Empire Wind projects in the Environmental Baseline of this Opinion for this reason."[108]

According to NMFS, it was not required to consider the cumulative impacts of all known and available information because, according to NMFS, these effects

> do not meet the ESA definition of cumulative effects because we expect that, if any of these activities were proposed in the action area, or were proposed elsewhere yet were to have future effects inside the action area, they would require at least one Federal authorization or permit and would, therefore, be subject to ESA section 7 consultation requirements.[109]

---

[105] BOEMCVOW_18299.
[106] *Id.*
[107] *See N. Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980) ("action" must be construed broadly).
[108] BOEMCVOW_18299.
[109] *Id.*

23

But for the Right Whale, the threat of extinction exists now, not sometime in the future. On similar grounds, the District Court of Maryland Recently invalidated the Biological Opinion for an offshore oil well regarding another species of endangered whale because NMFS' "unexplained failure to account for multiple effects of the action that the BiOp itself identifies as threats to the survival and recovery of the species, individually and in combination, renders the [reasonable and prudent alternative] invalid."[110]

Here, the North Atlantic Right Whale teeters on the brink of extinction. A report jointly prepared by BOEM and NMFS warns of the precarious status of the Right Whale, and that losing one individual may doom the species:

> Due to the declining status of [North Atlantic Right Whales], the resilience of this population to stressors affecting their distribution, abundance, and reproductive potential is low. The species faces a high risk of extinction, and the population size is small enough that the death of even very few individuals can have a measurable effect on its population status, trend, and dynamics. Furthermore, the loss of even one individual a year . . . may reduce the likelihood of species recovery and of their ability to achieve optimum sustainable population.[111]

Even though that same report acknowledged that the North Atlantic Right Whale's "range overlaps with the area proposed for [all east coast offshore wind] development[,]"[112] when it came time to publish the Biological Opinion, NMFS ignored its previous analysis in determining the impacts on the North Atlantic Right Whale.

---

[110] *Sierra Club v. National Marine Fisheries Service,* 2024 WL 3860211, at *28 (D. Md. Aug. 19, 2024).
[111] *See* Strategy on the North Atlantic Right Whale *supra* note 4 at 8.
[112] *Id.*

**A.    NMFS Violated Section 7 of the Endangered Species Act by Failing to Ensure that the Dominion Wind Project Will Not Likely Jeopardize the Continued Existence of the Critically Endangered North Atlantic Right Whale**

The Government's Atlantic wind energy corridor is developing at a blistering pace and will be situated directly in or near the migration path of the North Atlantic Right Whale. This means that each migrating North Atlantic Right Whale must navigate through all 30 offshore wind projects—and traverse thousands of massive wind turbines—to maintain reproductive integrity and survive as a species.

The ESA requires federal agencies to ensure "'that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat.'"[113] Failing to do so shirks its duties under the ESA, which commands "all federal agencies 'to [e]nsure that actions authorized, funded, or carried out by them do not jeopardize the continued existence' of an endangered species or 'result in the destruction or modification of habitat of such species . . . .' This language admits of no exception."[114]

The ESA required NMFS to issue a Biological Opinion analyzing whether the Dominion Wind Project was likely to jeopardize the existence of the critically endangered North Atlantic Right Whale, using the "best scientific and commercial data available."[115] But instead of analyzing the best information available, NMFS intentionally excluded from its analysis the effects that numerous other offshore wind projects along the Right Whale's annual migration path will have on the remaining 338 members of this nearly extinct whale species:

---

[113] *Ctr. for Biological Diversity v. Env't Prot. Agency*, 56 F.4th 55, 62 (D.C. Cir. 2022) (quoting 16 U.S.C. § 1536(a)(2)).
[114] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978) (quoting 16 U.S.C. § 1536).
[115] 50 C.F.R. § 402.14(g)(8); *see also* 16 U.S.C. § 1536(a)(2).

We reviewed the list of cumulative impacts identified by BOEM in the CVOW-C DEIS and determined that most (e.g., other future offshore wind development activities . . . ) do not meet the ESA definition of cumulative effects because we expect that, if any of these activities were proposed in the action area, or proposed elsewhere yet were to have future effects inside the action area, they would require at least one Federal authorization or permit and would, therefore, be subject to ESA section 7 consultation requirements . . . .[116]

As a result, NMFS issued an incomplete and invalid Biological Opinion that excluded crucial information from its cumulative effects analysis, and BOEM authorized the Project based on that incomplete Biological Opinion.

### B.    NMFS and BOEM Had Information Available That Showed That When Aggregated, the Effects of all 30 Projects Would Affect the Right Whale's Likelihood of Survival

In October 2022, BOEM and NMFS issued a draft document entitled the *North Atlantic Right Whale and Offshore Wind Strategy*, in which the agencies admit that, when viewed in its entirety, BOEM's Atlantic Offshore Wind Turbine program has the potential to harm North Atlantic Right Whale and cause population-scale impacts to the species. Key statements about the scope of BOEM's offshore wind program from the October 2022 strategy include:

- "As of September 2022, there were 27 renewable energy lease areas in the Atlantic Outer Continental Shelf (OCS) and there are 42 megawatts of installed OSW capacity."[117]

- "Additional lease sales are expected to be held in the Gulf of Maine and the Central Atlantic. In total, the area in existing leases and being considered for leasing in planning areas in the Atlantic OCS covers 22.237 million acres (about 8% of the Atlantic OCS). The OSW infrastructure currently proposed for installation by 2030 would be located on about 2.349 million acres, use fixed turbine technologies, and include 3,441 turbines and foundations and 9,874 miles of export and inter-array submarine cables."[118]

---

[116] BOEMCVOW_18299.

[117] National Marine Fisheries Service and Bureau of Ocean Energy Management, *Draft North Atlantic Right Whale and Offshore Wind Strategy* (Oct. 2022) at 3, https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_DRAFT_NARW_OSW_Strategy.pdf.

[118] *Id*.

In January 2024, BOEM and NMFS published the final Strategy, which identifies "30 renewable energy lease areas in the Atlantic Outer Continental Shelf"[119] and notes that the North Atlantic Right Whale has a "range [that] overlaps with the area proposed for [offshore wind] development. . . ."[120] The agencies acknowledge that "[t]he activities associated with [offshore wind] development would introduce or further contribute to existing stressors in the environment that affect [North Atlantic Right Whales]."[121] These stressors include "exposure to noise and/or pressure (particularly from construction activities),"[122] resulting in "hearing impairment, masking of [North Atlantic Right Whale] vocal communication, physiological impacts (e.g., stress), and/or behavioral disturbance, as well as mortality and injury. . . ."[123]

The Strategy also notes that the Right Whale faces a "high risk of extinction" and that its population is small enough that "the loss of even one individual a year" reduces the likelihood of recovery and the species' achieving an optimum sustainable population.[124]

And, unlike NMFS' Biological Opinion for the Project, in the Strategy NMFS concedes that the negative impacts of the planned, multiple projects will be compounded:

> Effects to [North Atlantic Right Whales] could result from stressors generated from a single project; there is potential for these effects to be compounded by exposure to multiple projects. [North Atlantic Right Whale] migrating along the U.S. Atlantic Coast have the potential to travel near or through many currently proposed OSW developments along the Atlantic Coast.[125]

---

[119] *See* Strategy on the North Atlantic Right Whale *supra* note 4 at 5.
[120] *Id.*
[121] *Id.* at 12.
[122] *Id.*
[123] *Id.*
[124] *Id.* at 6-7.
[125] *Id.* at 13.

By ignoring the cumulative effects of offshore wind projects along the East Coast that are now awaiting final approval, NMFS puts the species at risk. As NMFS biologist, Dr. Sean Hayes, wrote in a May 2022 letter to BOEM:

- "Right whales are one of the most endangered marine mammals with fewer than 350 animals remaining in the population (Pettis et al. 2022), down from a high of 478 in 2011 and over 400 as recently as 2017 (Hayes et al. 2021)."[126]

- "Additional noise vessel traffic, and habitat modifications due to offshore wind development will likely cause added stress that could result in additional population consequences to a species that is already experiencing rapid decline (30% in the last 10 years)."[127]

- "The presence of structures such as wind turbines are likely to result in both local and broader oceanographic effects, and may disrupt the dense aggregations and distribution of zooplankton prey through altering the strength of tidal currents and associated fronts, changes in stratification, primary production, the degree of mixing, and stratification in the water column (Chen et al. 2021, Johnson et al 2021, Christiansen et al 2022, Dorrell et al 2022)."[128]

- "Maintenance and operational impacts would be for a duration of thirty or more years."[129]

- "As offshore wind energy projects in southern New England progress in development, in particular around Nantucket Shoals, it is critical to assess the range of impacts/threats and stressors to protected species and the degree to which they can be mitigated. This needs to include taking into consideration the chronic state of right whales and the importance of productive foraging habitats to these species. These impacts should be thoroughly analyzed in any EIS or other environmental reviews associated with offshore wind development."[130]

---

[126] Ex. 1, Letter from Dr. Sean A. Hayes to Brian R. Hooker, Lead Biologist at the Bureau of Ocean Energy Management (May 13, 2022).
[127] *Id.* at 1
[128] *Id.* at 2.
[129] *Id.*
[130] *Id.*

**C.     NMFS' Regulatory Interpretation of Its Duties Under Section 7 Conflicts with the Plain Language of the ESA and the Court Should Not Defer to the Agency's Interpretation**

NMFS has erroneously adopted a regulatory interpretation of Section 7 that allows it to carve out or exclude from its Section 7 cumulative analysis a subset of the government's coordinated plan to develop wind turbine projects solely because those projects have not yet undergone Section 7 consultation.[131]

But this Court owes no deference to that erroneous interpretation of the ESA, particularly where, as here, that interpretation runs counter to the mandatory requirements of the ESA. As the Supreme Court recently held in *Loper Bright*,[132] Courts—not NMFS officials or marine biologists—must determine the validity of the agency's Biological Opinion within the plain language of the ESA and not the agency's own regulations:

> [C]ourts, not agencies, will decide "*all* relevant questions of law" arising on review of agency action, § 706 (emphasis added)—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it. And it prescribes no deferential standard for courts to employ in answering those legal questions.[133]

The D.C. Circuit also recently ruled that the Courts—not NMFS and its marine biologists—must determine the proper meaning of the ESA in cases involving the proper interpretation of the statute.[134] In *Wild Fish Conservancy v. Salazar*,[135] the Ninth Circuit adopted the same principle—that legal or procedural violations of ESA do not require subject-matter

---

[131] 50 C.F.R. § 402.02.
[132] *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).
[133] *Id.* at 2261.
[134] *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582 (D.C. Cir. 2023).
[135] *Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010).

expertise: "Where the opinion's flaws are 'legal in nature,' however, '[d]iscerning them requires no technical or scientific expertise[.]'"[136]

In another Ninth Circuit case, *Conner v. Burford*,[137] the Ninth Circuit invalidated a Biological Opinion for a federal oil and gas lease because it failed to consider the environmental impacts of planned oil-and-gas-well locations—even though each well location would later be subject to a post-lease Section 7 consultation and its own biological opinion, stating: "Although we recognize that the precise location and extent of future oil and gas activities were unknown at the time, extensive information about the behavior and habitat of the species in the areas covered by the leases was available."[138]

In that case, the court explained that

incomplete information about post-leasing activities does not excuse the failure to comply with the statutory requirement of a comprehensive biological opinion using the best information available. 16 U.S.C. § 1536(a)(2). With the post-leasing and biological information that was available, the FWS could have determined whether post-leasing activities in particular areas were fundamentally incompatible with the continued existence of the species.[139]

The *Conner* court flatly rejected the government's rationale—relied on in this Biological Opinion—that cumulative effects of future projects could be ignored:

With the information available, the FWS could also have identified potential conflicts between the protected species and post-leasing activities due to the cumulative impact of oil and gas activities. For example, species like the grizzly and the gray wolf require large home ranges making it critical that ESA review occur early in the process to avoid piecemeal chipping away of habitat.[140]

---

[136] *Id.* at 532 (quoting *Defs. of Wildlife v. U.S. Env't Prot. Agency*, 420 F.3d 946, 976 (9th Cir. 2005)).
[137] *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988).
[138] *Id.* at 1454.
[139] *Id.*; *see also Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1069–70 (9th Cir. 2024) (holding that agency must make a meaningful determination of a project's impacts by looking beyond the immediate project).
[140] *Id.*

As the Ninth Circuit explained in another case, *Wild Fish Conservancy v. Salazar*,[141]

*Conner* rejected biological opinions addressing only the first, preliminary stage in a multistage project. The case involved the federal government's issuance of more than 700 leases for oil and gas exploration in two national forests. Before the leases were issued, the Service prepared a biological opinion for each forest. Concluding that there was "insufficient information available to render a comprehensive biological opinion beyond the initial lease phase," [] the Service considered the effects only of the leases themselves, not of the oil and gas activity to follow on the leased land. [] Instead of comprehensive biological opinions at the leasing stage, the Service included in the leases stipulations requiring additional environmental consultation prior to any "surface-disturbing activities." []

\* \* \*

We held that the limited scope of the biological opinions violated the ESA. The Service's obligation, we said, was "to analyze the effect of the *entire* agency action." [] Because "[p]umping oil and not leasing tracts is the aim of congressional mineral leasing policy," the agency action necessarily encompassed "not only leasing but leasing and all post-leasing activities through production and abandonment." [] The Service's proposal to conduct "incremental-step consultation" was an inadequate alternative. That approach might result, for example, in the "piecemeal chipping away of habitat" for endangered species. [] The Service was thus "required to prepare, at the leasing stage, a comprehensive biological opinion" considering "all phases of the agency action." [] Because it had not done so, the biological opinions were invalid.[142]

In *Thomas v. Peterson*,[143] the Ninth Circuit also explained that the substantive

requirements of the ESA require more strict enforcement of its procedural requirements

compared to NEPA:

We acknowledge that the ESA's substantive provisions distinguish it from NEPA, but the distinction acts the other way. If anything, the strict substantive provisions of the ESA justify more stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions. The ESA's procedural requirements call for a systematic determination of the effects of a federal project on endangered species. If a project is allowed to proceed without substantial compliance with those procedural

---

[141] *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 521–22 (9th Cir. 2010).
[142] *Id.*
[143] *Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985).

requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result. The latter, of course, is impermissible.[144]

3.    **Because BOEM Had Full Knowledge that the Cumulative Impacts of the Federal Offshore Wind Program Threaten the Viability of the Highly Endangered North Atlantic Right Whale, Its Approval of the Project Was Arbitrary, Capricious, an Abuse of Discretion, and Not In Accordance with the Requirements of the Endangered Species Act**

BOEM, like NMFS, is required under the ESA to ensure "'that any action authorized, funded, or carried out by [BOEM] . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat.'"[145] Although BOEM may rely on the analysis of a valid Biological Opinion issued by NMFS to satisfy its duties under the ESA, if that analysis fails to satisfy the requirements of the ESA, BOEM is not excused from ESA compliance. Yet, BOEM approved the project without a complete analysis of the cumulative effects on the North Atlantic Right Whale in violation of the ESA.

As the final decisionmaker for all 30 Atlantic Coast offshore wind projects,[146] BOEM bears the ultimate statutory responsibility to ensure that its programs and projects do not push the Right Whale over the brink of extinction. Yet that is exactly what it has done—as BOEM's own Environmental Impact Statement confirms:

> Based on the [North Atlantic Right Whale's] current status, impacts on NARWs resulting from all [Impact Producing Factors] combined from ongoing and planned actions, including Alternatives B and C, are expected to be *major* because serious injury or loss of an individual would result in population-level impacts that threaten the viability of the species.[147]

---

[144] *Id.* at 764 (citing *Tennessee Valley Authority*, 437 U.S. 153).
[145] *Ctr. for Biological Diversity v. Env't Prot. Agency*, 56 F.4th 55, 62 (D.C. Cir. 2022) (quoting 16 U.S.C. § 1536(a)(2)).
[146] *See generally* 30 C.F.R. § 585.
[147] BOEMCVOW_463 (emphasis in original).

BOEM admits that the ocean area where the Dominion Wind Project will be built is considered a biologically important area for the North Atlantic Right Whale:

> [North Atlantic Right Whales] have the potential to occur in the Project area year-round. The offshore waters of Virginia, including waters within the Project area, are used as a migration corridor for [the North Atlantic Right Whale] and are considered a Biologically Important Area (BIA2) for migration between their Northwest Atlantic feeding grounds and their calving grounds off the Southeast United States (LaBrecque et al. 2015).[148]

Separate from and in addition to its duty to consult with NMFS in approving the Project, BOEM had the statutory duty under the ESA "to decide whether it has taken all possible action to [e]nsure that [the Dominion Wind Project] is not likely to jeopardize the continued existence of the [Right Whale]."[149] Under the ESA, BOEM (like all other federal agencies) was required to ensure that its actions were "not likely to jeopardize the continued existence of any [listed species]."[150] Actions governed by this ESA requirement include "the granting of licenses, contracts, leases, easements, rights-of-way, permits . . . or actions directly or indirectly causing modifications to the land, water, or air"[151] or "result in the destruction or adverse modification of [critical habitat]."[152] BOEM's Record of Decision approving the Dominion Wind Project is an action governed by this ESA provision. So, regardless of the sufficiency of the Biological Opinion prepared by NMFS, BOEM's approval of the Project is arbitrary, capricious, and contrary to law because, as BOEM itself states, the cumulative effect of the 30 Atlantic Coast

---

[148] BOEMCVOW_417.
[149] *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1460 (9th Cir. 1984) (citing *Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359, 371 (5th Cir. 1976)).
[150] 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.02.
[151] 50 C.F.R. § 402.02.
[152] 16 U.S.C. § 1536(a)(2).

offshore wind projects it has approved or is likely to approve in the future does threaten at least

one Right Whale death a year—exceeding the .7 per year figure that jeopardizes the species.[153]

And, as BOEM itself concluded in a July 2023 study evaluating the effects of offshore-

wind development and the North Atlantic Right Whale, that an agency's mitigation plan includes

actions to protect the species, does not mean that the actions will necessarily be effective:

7.2    Effectiveness of Mitigation Measures

Broadly speaking, once implemented, conservation measures are not often
evaluated for their effectiveness in achieving intended goals (e.g., Selig and Bruno
2010). Likewise, scant information exists on attempts to assess the effectiveness of
measures designed and implemented to reduce the impacts of OSW activities on
marine mammals.
                                        ***
Given the species' vulnerable status, it is critical that action be taken from the start
to prevent noise impacts which could further stress the species and impair its
recovery.[154]

Here, NMFS issued an Incidental Take Statement that allows for the "take" of .7 Right

Whales per year.[155] Further, NMFS concluded that even one death of a Right Whale would be

catastrophic on the survivability of the species.[156] Because neither NMFS nor BOEM considered

the effectiveness of their proposed mitigation measures on protecting the Right Whale, much less

considered the impact of turbine failures on the Right Whale, their approvals of the Project with

incomplete and inadequate environmental analysis was arbitrary and capricious and contrary to

the Endangered Species Act. As a federal district court judge in Maryland recently explained:

"'The amount of take set by the ITS creates a trigger that, when reached, results in an

---

[153] *See* BOEMCVOW_417 (noting that the potential biological removal rate for the North
Atlantic Right Whale is 0.7 individuals per year).
[154] Bureau of Ocean Energy Management, *Offshore Wind Energy Development and North Atlantic
Right Whales* (July 2023), https://espis.boem.gov/Final%20Reports/BOEM_2023-051.pdf.
[155] BOEMCVOW_417.
[156] *See* Strategy on the North Atlantic Right Whale *supra* note 4 at 7.

unacceptable level of incidental take.' . . . When that trigger is pulled, the agencies must reinitiate consultation immediately."[157]

Unlike the ESA regulations that NMFS relied on to ignore the cumulative effects of all the other planned offshore wind projects along the Right Whale's Atlantic coast migration route, NEPA regulations required BOEM to analyze those cumulative impacts. In its Environmental Impact Statement, BOEM concluded that "[o]ver 3,287 structures . . . could be constructed in the geographic analysis area . . . for planned offshore wind projects[,]"[158] and that "[c]onsidering all of the [Impact Producing Factors] together, BOEM anticipates that the impacts from ongoing and planned actions, including Alternatives B and C, would result in overall *major* impacts on the [North Atlantic Right Whale]."[159] BOEM explained that it categorized those impacts as major "because serious injury or loss of an individual would result in population-level impacts that threaten the viability of the species."[160]

But the ESA forbids an agency—including BOEM—from authorizing actions that, in BOEM's own words, "threaten the viability of the species."[161] Because BOEM's Record of Decision does exactly that—threatens the viability of the species—its Record of Decision violates the ESA—and should be set aside under the APA.

**4.    Plaintiffs Have Standing to Bring Their Claims**

In its May 24, 2024 Order the Court concluded that "Plaintiffs have shown a substantial likelihood that at least one plaintiff, Mr. Rucker, has standing to seek a preliminary

---

[157] *Sierra Club v. National Marine Fisheries Service,* 2024 WL 3860211, at *33 (D. Md. Aug. 19, 2024) (quoting *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 269 (4th Cir. 2018)).
[158] BOEMCVOW_438.
[159] BOEMCVOW_463.
[160] *Id.*
[161] *Id.*

injunction[.]"[162] And, because "[t]he court 'need only find one party with standing' in order to

proceed,"[163] Rucker's standing provided the Court the necessary jurisdiction to decide CFACT's

Motion for Preliminary Injunction or Stay (which the Court denied on the merits).[164] Using the

same facts and analysis, the Court should reach the same conclusion at this summary judgment

stage— that Rucker has standing to bring this motion, which provides the Court jurisdiction to

decide the case.

While the standard at this stage has risen from "substantial likelihood" (the preliminary

injunction standard) to the summary judgment standard of "no triable issue of fact,"[165] the same

undisputed facts presented in Rucker's original declaration[166] also support his standing under the

Rule 56 summary judgment standard. CFACT further presents the Court with additional

evidence of the standing of Rucker and the other Plaintiffs to leave no doubt that the Court has

jurisdiction to decide this case.

### A.    Plaintiffs Have Injury-in-Fact

#### 1.    Craig Rucker, Founder and President of CFACT

Plaintiff, Craig Rucker, is the founder and President of CFACT and has spent

considerable time in his career "working to protect the most environmentally sensitive and

endangered species on the planet, including the North Atlantic Right Whale."[167] Rucker has

authored numerous reports on the threat of offshore wind to the continued viability of the North

Atlantic Right Whale. He has also made several whale-watching trips in the past, where he has

---

[162] Memo. Op. and Order Denying Mot. for Stay (May 24, 2024), ECF No. 28 at 8.
[163] *Id.* at 6 (quoting *Americans for Safe Access v. Drug Enf't Admin.*, 706 F.3d 438, 443 (D.C. Cir. 2013)).
[164] *See id.*
[165] *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).
[166] Decl. of C. Rucker (Apr. 29, 2024), ECF No. 15-2.
[167] Ex. 2, Decl. of C. Rucker and CFACT ⁋ 3.

had the opportunity to observe Right Whales firsthand. Rucker has also booked a trip to observe

Right Whales directly within the project area, which is scheduled for this December.[168] Rucker is

deeply concerned that the Dominion Wind project, as well as the scores of other offshore

projects planned along the East Coast, poses a substantial threat to the continued survival of the

species, which could "forever foreclos[e his] ability to enjoy seeing these whales."[169]

As the Court has found, Rucker has shown injury-in-fact because he "has an abiding interest

in the Right Whale, he has concrete plans to observe the Right Whale in the near future, and he

believes that the Project will interfere with these plans."[170] And "the desire to use or observe an

animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose

of standing."[171]

For similar reasons of aesthetics and animal protection, CFACT, the nonprofit

organization Rucker heads, also has shown injury-in-fact. Specifically, Rucker, in his declaration,

has amply shown that CFACT has an aesthetic interest in observing and studying the North

Atlantic Right Whale and that protecting the critically endangered Right Whale is germane to

CFACT's mission and furthers their active stewardship program that seeks to protect animals,

empower entrepreneurs, and promote a healthy environment.[172]

"CFACT is a sponsor of the 'Save Right Whales Coalition' which has submitted

comments to BOEM and NMFS regarding: (i) BOEM's Draft Environmental Impact Statement

(DEIS) for the [Dominion Wind] project, (ii) Dominion Energy's application to NMFS for an

Incidental Harassment Authorization, (iii) the Draft *BOEM and NOAA Fisheries North Atlantic*

---

[168] *Id.* ¶ 4–5.
[169] *Id.* ¶ 6.
[170] Memo. Op. and Order Denying Mot. for Stay (May 24, 2024), ECF No. 28 at 6.
[171] *Lujan*, 504 U.S. at 562–63.
[172] *See* Ex. 2 ¶ 2–3.

*Right Whale and Offshore Wind Strategy*, and (iv) the Biological Opinion issued by NMFS

authorizing Dominion to take federally listed species, including the North Atlantic Right Whale,

during construction, operation, and decommissioning of the Dominion Wind Project. CFACT is

also a signatory to the 60-Day Notice of Intent to Sue letter challenging the legal adequacy of the

Biological Opinion, which was sent to the federal defendants on November 11, 2023, as required

by the Endangered Species Act, 16 U.S.C. § 1540(g)(2)."[173]

CFACT members have authored numerous reports and articles documenting threats to the

Right Whale from offshore construction activities.[174] The organization's mission is to enhance

the fruitfulness of the earth and all of its inhabitants through four main strategies:

1. **Prospering Lives**. CFACT works to help people find better ways to provide for food, water, energy and other essential human services.

2. **Promoting Progress**. CFACT advocates the use of safe, affordable technologies and the pursuit of economic policies that reduce pollution and waste and maximize the use of resources.

3. **Protecting the Earth**. CFACT helps protect the earth through wise stewardship of the land and its wildlife.

4. **Providing Education**. CFACT educates various sectors of the public about important facts and practical solutions regarding environmental concerns.[175]

In addition, "[t]o further its mission, CFACT started its Stewardship in Action program in

2003 to "showcase that the organization doesn't just talk the talk – but also walks the walk in

---

[173] *Id.* ⁋ 2.

[174] *Id.* ⁋ 3 (citing Peter Murphy, *Are Whales the Latest Casualties of the Climate Change Industry?* (Mar. 18, 2023), https://save-whales-stop-windmills.org/are-whales-the-latest-casualties-of-the-climate-change-industry/; Collister Johnson, *As Whales Wash Up, Feds Push "Green" Energy on Inadequate Knowledge* (Mar. 14, 2023), https://save-whales-stop-windmills.org/as-whales-wash-up-feds-push-green-energy-on-inadequate-knowledge/.)

[175] Committee for a Constructive Tomorrow, *Our Mission,* https://www.cfact.org/about/ (last visited Oct. 4, 2024).

making an impact in people's lives."[176] "Through CFACT's ever-growing 'Stewardship in Action' program, entrepreneurs are empowered, animals are protected, reliable clean drinking water is provided, the environment is made cleaner, and so much more."[177]

"Since starting this program, CFACT has walked the walk. In Africa, for example, CFACT has untaken a project to protect the ranchers, their cattle, and the wild lions.[178] To protect the cattle, CFACT "installs lights on the perimeter of cattle grazing land."[179]

CFACT's efforts to protect the environment have been publicly praised:

> CFACT has been termed "invaluable" by the *Arizona Republic*, it has been lauded for its "effort to bring sound science to the environmental debate" by a former president of the National Academy of Sciences, and has been praised by a respected *Boston Herald* columnist for "a record of supplying absolutely solid information.[180]

### 2. Peter Flaherty, Chairman of the National Legal and Policy Center

Plaintiffs, National Legal and Policy Center, and its Chairman, Peter Flaherty, have and will continue to suffer concrete injuries-in-fact resulting from the Government's approvals and authorizations of the Dominion Wind Project. These injuries support their standing under the Endangered Species Act and the Administrative Procedures Act.

Plaintiffs, National Legal and Policy Center (the Center), a nonprofit 503(c)(3) organization that promotes sound government and corporate decision-making and opposes

---

[176] CFACT Ed, *Uganda Pig Farmer Grateful for CFACT's Empowerment Efforts* (Nov. 23, 2023), https://www.cfact.org/2023/11/23/uganda-pig-farmer-grateful-for-cfacts-empowerment-efforts/.
[177] Committee for a Constructive Tomorrow, *Stewardship in Action*, https://www.cfact.org/stewardship-in-action/ (last visited Oct. 4, 2024).
[178] Greg Neff, *CFACT Works to Protect People, Livestock, and Wildlife in Africa* (May 1, 2024), https://www.cfact.org/2024/05/01/cfact-works-to-protect-people-livestock-and-wildlife-in-africa/.
[179] *Id.*
[180] Committee for a Constructive Tomorrow, *Our Mission,* https://www.cfact.org/about/ (last visited Oct. 4, 2024).

unlawful government actions.[181] The Center is headquartered in Falls Church, Virginia, and is being assessed a specific surcharge of $3.74 on its monthly electric bills from Dominion Energy for this project, entitled "OSW Off-Shore Wind," which would be eliminated if the project were halted.[182]

Peter Flaherty is the Chairman of National and he is also being assessed a surcharge of $2.53 on his residential monthly electric bills from Dominion Energy for this project, "OSW Off-Shore Wind," which would be eliminated if the Court were to grant this motion.[183]

These surcharges imposed for the sole purpose of proving funding for the Dominion Wind Project constitute injury-in-fact under the ESA and the APA. As the Supreme Court held, "economic harm to a business clearly constitutes an injury-in-fact"[184] under the ESA. The Court explained that, although species conservation is the goal of the ESA, "we think it readily apparent that another objective (if not indeed the primary one) is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives."[185]

## B.    Plaintiffs Have Shown Causation

The Court's analysis and ruling that Rucker had shown causation sufficient to bring the preliminary injunction is law of the case for this summary judgment motion, as neither the facts nor the law have changed. As the Court stated:

> [C]ausation in the context of a procedural injury requires a showing of two causal links: "one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of

---

[181] *See* Ex. 3, Decl. of Peter Flaherty and the National Legal and Policy Center ¶ 1.
[182] *See* Dominion Energy Bill for the National Legal and Policy Center, attached to Ex. 3 as Attachment 2.
[183] *See* Dominion Energy Bill for P. Flaherty, attached to Ex. 3 as Attachment 1.
[184] *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017).
[185] *Id.* at 176–77.

[that procedural requirement] and one connecting that substantive decision to the plaintiffs particularized injury."[186]

Unlike tort cases, standing in an APA challenge does not require proof of a complete chain of causation.[187] "A plaintiff need not show but-for causation but must show that 'the procedural step was connected to the substantive result' and that there is a 'substantial probability' that the procedural mistake will create an adverse effect."[188]

As the Court found here: "Both links are present here: Mr. Rucker contends that NMFS' failure to consider cumulative effects resulted in a deficient Biological Opinion . . . leading to approval of a project that will hinder his ability to observe the Right Whale."[189] Plaintiffs make those same sworn statements here[190] and that satisfies the causation element of standing.

## C.    Redressability

As this Court has correctly noted, "[w]here, as here, plaintiffs are alleging a 'procedural injury' in the form of a deficient Biological Opinion, 'the redressability and imminence requirements' are 'relax[ed].'"[191] Here, Plaintiffs have also shown that their injuries will be redressable by an appropriate court order, invalidating as arbitrary and capricious the Government's approvals and authorizations for construction of the Dominion Wind Project.

---

[186] Memo. Op. and Order Denying Mot. for Stay (May 24, 2024) ECF No. 28 at 7 (quoting *Ctr. for Biological Diversity v. Env't Prot. Agency*, 861 F.3d 174, 184 (D.C. Cir. 2017) (quoting *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 668 (D.C. Cir. 1996))).

[187] *See Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 593 (D.C. Cir. 2023).

[188] ECF No. 28 at 7 (quoting *Ctr. for Biological Diversity v. E.P.A.*, 861 F.3d 174, 184 (D.C. Cir. 2017)).

[189] *See* ECF No. 28 at 7.

[190] *See* Ex. 2 ¶ 6–7.

[191] Memo. Op. and Or. Denying Mot. for Stay (May 24, 2024), ECF No. 28 at 6 (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)).

That the Company has begun the construction process does not render CFACT's injuries unredressable. The D.C. Circuit has held that courts have the power to redress injuries, even after a project has been constructed. In *Sierra Club v. Army Corps of Engineers*,[192] for example, environmental groups challenged the actions of federal agencies that allowed the construction of an oil pipeline and raised NEPA and Clean Water Act claims. By the time the case made it to the D.C. Circuit, the pipeline's construction was complete. The court nevertheless found that "an order wholly or partly enjoining operation . . . would provide some degree of 'effectual relief.'"[193] That is because, if the court holds "that the agencies' NEPA analysis was inadequate or their decisions otherwise arbitrary and capricious, [the agencies] 'would have to correct the decision-making process.'"[194] If the NEPA analysis was legally deficient or inadequate, the court "'could order that the [pipeline] be closed or impose restrictions on its use' . . . 'until [the agencies] complied with NEPA.'"[195]

Plaintiffs' injuries from the Government's approvals of this Project are redressable because a favorable decision could lead to the change or relocation of the turbines, more mitigation measures, the preparation of a supplemental EIS that responds to greater public input, and a supplemental Biological Opinion with an updated Incidental Take Statement, and amendments to the Construction and Operations Plan and Terms of Condition of Approval. An order requiring the Government to reconsider its decision, considering (this time) the best available information on the cumulative impacts of all planned and coordinated offshore wind

---

[192] *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31 (D.C. Cir. 2015).
[193] *Id.* at 43 (quoting *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992)).
[194] *Id.* (quoting *Columbia Basin Land Prot. Ass'n v. Schlesinger*, 643 F.2d 585, 591 n.1 (9th Cir. 1981)).
[195] *Id.* (quoting *Airport Neighbors All., Inc. v. United States*, 90 F.3d 426, 429 (10th Cir. 1996)).

development on the continued viability of the North Atlantic Right Whale. One or more of these results would also further ensure the protection of this critically endangered species.

**CONCLUSION**

CFACT asks this Court to hold that the CFACT Plaintiffs have standing to bring their claims and to grant this motion for summary judgment, holding that BOEM's issuance of the Construction and Operations Plan, based on an unlawful Biological Opinion, and approval of the Dominion Wind Project, because of NMFS' and BOEM's failures to consider all known and available information about the cumulative impacts of the 29 other planned wind turbine projects on the highly endangered North Atlantic Right Whale, was arbitrary and capricious and unlawful in violation of the Endangered Species Act and the Administrative Procedure Act.


Dated: October 4, 2024                           Respectfully submitted,

                                                 /s/Roger J. Marzulla
                                                 Roger J. Marzulla
                                                 Nancie G. Marzulla
                                                 Marzulla Law, LLC
                                                 1150 Connecticut Ave., NW, Suite 1050
                                                 Washington, D.C. 20036
                                                 (202) 822-6760
                                                 nancie@marzulla.com
                                                 roger@marzulla.com
                                                 Bar No. 394907
                                                 Bar No. 400985

                                                 Paul D. Kamenar
                                                 1629 K. Street, N.W.
                                                 Suite 300
                                                 Washington, D.C. 20006
                                                 (301) 257-9435
                                                 paul.kamenar@gmail.com
                                                 Bar No. 914200

                                                 Counsel for Plaintiffs