**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE FOR A CONSTRUCTIVE
TOMORROW, THE HEARTLAND
INSTITUTE, CRAIG RUCKER,
NATIONAL LEGAL AND POLICY
CENTER, and PETER FLAHERTY,

      Plaintiffs,

      v.                                Case No. 1:24-cv-00774-LLA

UNITED STATES DEPARTMENT
OF THE INTERIOR, DEB HAALAND,
UNITED STATES BUREAU OF
OCEAN ENERGY MANAGEMENT,
ELIZABETH KLEIN, GINA RAIMONDO,
NATIONAL MARINE FISHERIES
SERVICE, JANET COIT, and
DOMINION ENERGY CORPORATION,

      Defendants.

**FEDERAL DEFENDANTS' COMBINED MEMORANDUM**
**IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**
**AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION...........................................................................................................1

FACTUAL BACKGROUND ........................................................................................2

LEGAL BACKGROUND.............................................................................................4

    I.    Outer Continental Shelf Lands Act .................................................................4

    II.   ESA ..................................................................................................................6

STANDARD OF REVIEW ...........................................................................................7

ARGUMENT .................................................................................................................8

    I.    The Court Should Strike Plaintiffs' Repeated References to Extra-Record
         Documents and Information.............................................................................8

         A.   Plaintiffs' documents concerning turbine blade failure, marine debris, and
             toxicology are untimely and improper. .........................................11

         B.   Hayes letter........................................................................................12

         C.   North Atlantic Right Whale Offshore Wind Strategy ....................13

    II.   Plaintiffs Lack Standing to Bring Their Claims...........................................15

    III.  NMFS Reasonably Concluded, Based on the Best Available Science, that the
         CVOW Project Is Not Likely To Jeopardize Right Whales.........................17

         A.   No injury, serious injury, or mortality of any ESA-listed whales is expected to
             occur as a result of the CVOW Project. .......................................177

         B.   NMFS properly considered the effects of the CVOW Project in relation to other
             offshore wind projects as part of the environmental baseline. .....................22

         C.   NMFS's analysis of cumulative effects of the offshore wind projects on the
             NARW is consistent with the ESA and supported by the record..............311

    IV.  BOEM Reasonably Relied on the NMFS BiOp.............................................39

    V.   Plaintiffs Have Waived Their NEPA claim. .................................................400

VI.    Plaintiffs Are Not Entitled to Any Remedy, but Certainly Not the Requested
Remedies. ..................................................................................................................41

CONCLUSION ...................................................................................................................43

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Am. Wildlands v. Kempthorne*,
   478 F. Supp. 2d 92 (D.D.C. 2007) ................................................................. 8

*Am. Wildlands v. Kempthorne*,
   530 F.3d 991 (D.C. Cir. 2008) .................................................................... 10

*Amfac Resorts, LLC v. Dep't of Interior*,
   282 F.3d 818 (D.C. Cir 2002) .................................................................... 34

*Appalachian Power Co. v. EPA*,
   251 F.3d 1026 (D.C. Cir. 2001) ................................................................. 11

*\*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
   515 U.S. 687 (1995) ................................................................................... 35

*Balt. Gas & Elec. Co v. Nat. Res. Def. Council, Inc.*,
   462 U.S. 87 (1983) ..................................................................................... 38

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................... 17

*Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*,
   685 F.2d 678 (D.C. Cir. 1982) .................................................................... 38

*\*Camp v. Pitts*,
   411 U.S. 138 (1973) .......................................................................... 8, 9, 27

*Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*,
   667 F. Supp. 2d 111 (D.D.C. 2009) ............................................................. 9

*Chemical Mfrs. Ass'n v. EPA*,
   870 F.2d 177 (5th Cir. 1989) ...................................................................... 42

*\*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ................................................................................. 7, 8

*City of Dania Beach v. FAA*,
   628 F.3d 581 (D.C. Cir. 2010) .................................................................... 10

*\*City of Tacoma, Washington v. F.E.R.C.*,
   460 F.3d 53 (D.C. Cir. 2006) ...................................................................... 39

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................... 15

*Conner v. Burford,*
    848 F.2d 1441 (9th Cir. 1988) ............................................................................... 30

*Conservancy of Sw. Fla., Inc. v. Williams,*
    No. 13-14477-CIV-Martinez-Goodman, 2018 WL 11422990 (S.D. Fla. Dec. 21, 2018) ............ 38

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    144 S. Ct. 2440 (2024) ...................................................................................... 34

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
    563 F.3d 466 (D.C. Cir. 2009) ........................................................................... 4, 5

*Ctr. for Biological Diversity v.U.S. Dep't of the Interior,*
    No. 3:24-cv-04651-JST (N.D. Cal. 2024) ................................................................ 33

*Ctr. for Biological Diversity v. Haaland,*
    No. 19-cv-05206 (N.D. Cal. Nov. 16, 2022) ........................................................... 32

*Defs. of Wildlife v. Norton,*
    No. 99–927, 2003 WL 24122459 (D.D.C. Jan. 7, 2003) ............................................. 25

*Defs. of Wildlife v. U.S. Dep't of Navy,*
    733 F.3d 1106 (11th Cir. 2013) ...................................................................... 12, 27

*Earth Island Institute v. U.S. Forest Serv.,*
    87 F.4th 1054 (9th Cir. 2023) ........................................................................... 33

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) ....................................................................................... 42

*EMILY's List v. Fed. Election Comm'n,*
    569 F. Supp. 2d 18 (D.D.C. 2008) ...................................................................... 40

*Env't Def. Fund, Inc. v. Costle,*
    657 F.2d 275 (D.C. Cir. 1981) ......................................................................... 7, 8

*Ethyl Corp. v. EPA,*
    541 F.2d 1 (D.C. Cir. 1976) ............................................................................. 38

*Fed. Power Comm'n v. Idaho Power Co.,*
    344 U.S. 17 (1952) ........................................................................................ 41

*Fertilizer Inst. v. EPA,*
    935 F.2d 1303 (D.C. Cir. 1991) ........................................................................ 42

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ................................................................................ 8, 9, 41

v

*Forest Res. Coal. v. Vilsack*,
  100 F.Supp.3d 21 (D.D.C. 2015) .................................................................16

*Fund for Animals v. Hall*,
  448 F.Supp.2d 127 (D.D.C. 2006) ...............................................................25

*Gen. Elec. Co. v. EPA*,
  290 F.3d 377 (D.C. Cir. 2002) .....................................................................14

*Healy v. Sea Gull Specialty Co.*,
  237 U.S. 479 (1915) .....................................................................................33

*Hill Dermaceuticals, Inc. v. Food & Drug Admin.*,
  709 F.3d 44 (D.C. Cir. 2013) .......................................................................11

*Hudson v. Am. Fed'n of Gov. Employees*,
  630 F. Supp. 3d 214 (D.D.C. 2022) .............................................................33

*Int'l United Mine Workers v. Fed. Mine Safety & Health Admin.*,
  920 F.2d 960 (D.C. Cir. 1990) .....................................................................42

*Kisor v. Wilkie*,
  139 S.Ct. 2400 (2019) ..................................................................................37

*Loper Bright Enterprises v. Raimondo*,
  144 S.Ct. 2244 (2024) ............................................................................36, 39

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................................15, 16

*Maine Lobstermen's Association v. NMFS*,
  70 F.4th 582 (D.C. Cir. 2023) .....................................................................37

*Marinette Marine v. Coast Guard*,
  973 F. Supp. 1 (D.D.C. 1997) ......................................................................40

*Marsh v. Or. Def. Res. Council*,
  490 U.S. 360 (1989) .....................................................................................38

*Mayo v. Jarvis*,
  177 F.Supp.3d 91 (D.D.C. 2016) .................................................................25

*McKinney v. U.S. Postal Serv.*,
  75 F. Supp. 3d 266 (D.D.C. 2014) ...............................................................33

*Melone v. Coit*,
  No. 1:22-cv-10921-IT, 2023 WL 5002764 (D. Mass. Aug. 4, 2023) ...........28

vi

*Melone v. Coit,
    100 F.4th 21 (1st Cir. 2024) ................................................................... 20, 28

Merrell Dow Pharms. v. Thompson,
    478 U.S. 804 (1986) ....................................................................................... 33

*Miccosukee Tribe of Indians v. United States,
    566 F.3d 1257 (11th Cir. 2009) .................................................................... 24

Monsanto Co. v. Geertson Seed Farms,
    561 U.S. 139 (2010) ....................................................................................... 42

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) ........................................................................................... 8

*Nantucket Residents Against Turbines v. BOEM,
    100 F.4th 1 (1st Cir. Apr. 24, 2024) ....................................................... 19, 23

Nantucket Residents Against Turbines v. BOEM,
    675 F. Supp. 3d 28 (D. Mass. 2023) ............................................................. 19

Nat'l Ass'n of Home Builders v. Defs. of Wildlife,
    551 U.S. 644 (2007) ....................................................................................... 13

Nat'l Hydropower Ass'n v. Fish & Wildlife Serv.,
    No. 24-2285-CRC (D.D.C. 2024) .................................................................. 33

Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs,
    170 F.Supp.3d 6 (D.D.C. 2016) .................................................................... 15

Neighbors of Cuddy Mountain, v. Alexander,
    303 F.3d 1059 (9th Cir. 2002) ...................................................................... 38

NLRB v. Food Store Emps. Union,
    417 U.S. 1 (1974) .......................................................................................... 41

North Slope Borough v. Andrus,
    642 F.2d 589 (D.C. Cir. 1980) ...................................................................... 31

Oceana, Inc. v. Evans,
    384 F. Supp. 2d 203 (D.D.C. 2005) .............................................................. 26

Oceana, Inc. v. Pritzker,
    24 F. Supp. 3d 49 (D.D.C. 2014) ............................................................. 40, 41

Pac. Coast Federation of Fishermen's Associations, Inc. v. NMFS,
    265 F.3d 1028 (9th Cir. 2001) ...................................................................... 30

*Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*,
  448 F. Supp. 2d 1 (D.D.C. 2006) ..................................................................................10

*Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*,
  898 F.2d 1410 (9th Cir.1990)......................................................................................39

*Reno v. Flores*,
  507 U.S. 292 (1993) ....................................................................................................34

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014).......................................................................................36

*Seafreeze Shoreside Inc. v. United States Department of the Interior and Responsible Offshore
  Development Alliance v. United States Department of the Interior*,
  Nos. 1:22-cv-11091-IT & 1:22-cv-11172IT, 2023 WL 6691015 (D. Mass. Oct. 12, 2023) .........28

*Sec'y of the Interior v. California*,
  464 U.S. 312 (1984) ......................................................................................................5

*Selkirk Conservation All. v. Forsgren*,
  336 F.3d 944 (9th Cir. 2003)........................................................................................38

*Sierra Club v. U.S. Dep't of Interior*,
  990 F.3d 898 (5th Cir. 2021)........................................................................................24

*Sims v. Apfel*,
  530 U.S. 103 (2000) ....................................................................................................11

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ..............................................................................................16, 17

*Taylor v. Mills*,
  892 F. Supp. 2d 124 (D.D.C. 2012) ............................................................................33

*Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*,
  940 F.2d 685 (D.C. Cir. 1991) ....................................................................................10

*The Fair v. Kohler Die & Specialty Co.*,
  228 U.S. 22 (1913) ......................................................................................................33

*Thomas v. Peterson*,
  753 F.2d 754 (9th Cir. 1985)........................................................................................29

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978) ....................................................................................................41

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
  435 F.3d 989 (9th Cir. 2006)..................................................................................33

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ....................................................................................42, 43

*Wild Fish Conservancy v. Salazar*,
  628 F.3d 513 (9th Cir. 2010)...................................................................29, 30

*WildEarth Guardians v. Salazar*,
  670 F. Supp. 2d 1 (D.D.C. 2009) .............................................................9

**Statutes**

5 U.S.C. §§ 701 to 706 .................................................................................9

*5 U.S.C. § 706 ......................................................................................7, 9, 14

5 U.S.C. § 706(2) ......................................................................................41

*5 U.S.C. § 706(2)(A) ..............................................................................37, 38

16 U.S.C. § 1362(20) ...............................................................................20

16 U.S.C. § 1371(a)(5) .............................................................................28

16 U.S.C. § 1371(a)(5)(A) ........................................................................4

16 U.S.C. § 1386(a)(6) .............................................................................20

16 U.S.C. § 1387(f)(2) ..............................................................................20

16 U.S.C. § 1531 .......................................................................................9

16 U.S.C. § 1532(13) ................................................................................7

16 U.S.C. § 1532(15) ................................................................................6

16 U.S.C. § 1532(19) ................................................................................7

16 U.S.C. § 1533(d) .................................................................................7

16 U.S.C. § 1536 .....................................................................................22

*16 U.S.C. § 1536(a)(2)....................................................................passim

16 U.S.C. § 1536(a)(3) ...............................................................................................32, 36

16 U.S.C. § 1536(b) ..............................................................................................................6

16 U.S.C. § 1536(b)(1) ..................................................................................................35, 36

16 U.S.C. § 1536(b)(3)(A) ................................................................................................35

16 U.S.C. § 1536(b)(4) ..................................................................................................7, 17

16 U.S.C. § 1536(b)(4)(ii) ...................................................................................................7

16 U.S.C. § 1536(o)(2) .........................................................................................................7

16 U.S.C. § 1538(a)(1)(B) ...................................................................................................7

28 U.S.C. § 2401(a) .............................................................................................................34

42 U.S.C. § 4331 ...................................................................................................................9

43 U.S.C. § 1331(a) ..............................................................................................................5

43 U.S.C. § 1332(3) ..............................................................................................................5

43 U.S.C. § 1337(p) ..........................................................................................................4, 5

43 U.S.C. § 1337(p)(1)(C) ................................................................................................2, 5

43 U.S.C. § 1337(p)(8) .........................................................................................................5

**Regulations**

30 C.F.R. Pt. 585 .................................................................................................................5

30 C.F.R. § 585.200(a)(2) ...................................................................................................5

30 C.F.R. § 585.600 ............................................................................................................5

30 C.F.R. §§ 585.620-585.629 ..........................................................................................5

30 C.F.R. § 585.628(f) ......................................................................................................4, 5

30 C.F.R. § 585.701(a) .......................................................................................................31

50 C.F.R. § 222.101 .............................................................................................................6

50 C.F.R. § 222.101(h) ............................................................................................6

50 C.F.R. § 226.203 ................................................................................................6

50 C.F.R. Pt. 402 ...............................................................................................6, 32

*50 C.F.R. § 402.02 ......................................................................................passim

50 C.F.R. § 402.05 ................................................................................................22

50 C.F.R. § 402.14 ...........................................................................................6, 35

50 C.F.R. § 402.14(a) .............................................................................................6

50 C.F.R. § 402.14(d) .............................................................................................7

50 C.F.R. § 402.14(g)(7) ........................................................................................7

50 C.F.R. § 402.14(h)(2) ........................................................................................7

50 C.F.R. § 402.14(i)(1)(i-iv) ................................................................................7

50 C.F.R. § 402.14(i)(5) ....................................................................................7, 27


**Federal Register**

*51 Fed. Reg. 19926 (June 3, 1986) ..............................................24, 32, 33, 35

74 Fed. Reg. 19638 (Apr. 29, 2009).......................................................................5

84 Fed. Reg. 4976  (Aug. 27, 2019)......................................................................33

86 Fed. Reg. 35329 (July 2, 2021) .........................................................................2

89 Fed. Reg. 24268 (Apr. 5, 2024).......................................................................34

89 Fed. Reg. 42602 (May 15, 2024) ......................................................................5

89 Fed. Reg. 77972 (Sept. 24, 2024).....................................................................21

89 Fed. Reg. 4370 (Jan. 23, 2024) ................................................................3, 28


**Other Authorities**

Pub. L. No. 109-58, 119 Stat. 594 (2005) ..........................................................2, 5

## **GLOSSARY**

| | |
|---|---|
| **APA** | Administrative Procedure Act |
| **BiOp** | Biological Opinion |
| **BOEM** | U.S. Bureau of Ocean Energy Management |
| **COP** | Construction and Operations Plan |
| **CVOW** | Coastal Virginia Offshore Wind |
| **DEV** | Dominion Energy Virginia |
| **EIS** | Environmental Impact Statement |
| **ESA** | Endangered Species Act |
| **FEIS** | Final Environmental Impact Statement |
| **FWS** | U.S. Fish & Wildlife Service |
| **ITA** | Incidental Take Authorization |
| **ITS** | Incidental Take Statement |
| **MMPA** | Marine Mammal Protection Act |
| **NARW** | North Atlantic right whale |
| **NEPA** | National Environmental Policy Act |
| **NMFS** | National Marine Fisheries Service |
| **NMFS/OPR** | NMFS Office of Protected Resources |
| **NOAA** | National Oceanic & Atmospheric Administration |
| **OCS** | Outer Continental Shelf |
| **OCSLA** | Outer Continental Shelf Lands Act |
| **PAM** | Passive Acoustic Monitoring |
| **PBR** | Potential Biological Removal |
| **PSOs** | Protected Species Observers |
| **RPM** | Reasonable and Prudent Measures |

**INTRODUCTION**

The Coastal Virginia Offshore Wind Commercial Project ("CVOW Project" or "the Project") is an offshore wind energy project currently under development approximately twenty-seven miles east of Virginia Beach, Virginia. Offshore pile-driving construction conducted by co-Defendant Virginia Electric and Power Company, d/b/a Dominion Energy Virginia ("DEV"), began in May 2024 after several years of extensive State and Federal environmental reviews.

In their First Amended Complaint, ECF No. 11, Plaintiffs challenge the National Marine Fisheries Service's ("NMFS") biological opinion ("BiOp") evaluating the effects of the Project on threatened and endangered species including the North Atlantic right whale ("NARW" or "right whale"). Plaintiffs also challenge the Bureau of Ocean Energy Management's ("BOEM") reliance on the NMFS BiOp in approving the Construction and Operations Plan ("COP") for the Project. In support of their motion for summary judgment, Plaintiffs allege the Project will jeopardize the right whale in violation of the agencies' respective obligations pursuant to the Endangered Species Act ("ESA"). Contrary to Plaintiffs' arguments, NMFS evaluated the best available scientific information concerning potential effects of the Project on the right whale, including impacts to its habitat, and reasonably concluded that the Project is not likely to jeopardize the species' continued existence. BOEM reasonably relied on NMFS's expert determinations. Finally, while Plaintiffs' First Amended Complaint alleges that BOEM failed to comply with the National Environmental Policy Act ("NEPA"), Plaintiffs waived that claim by failing to raise it in their motion for summary judgment. For these reasons, as demonstrated further herein, the Court should grant Federal Defendants' cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment.

**FACTUAL BACKGROUND**

The CVOW Project is an offshore wind energy project on Lease Area OCS-A 0483, an area on the Outer Continental Shelf ("OCS") approximately twenty-seven miles east of Virginia Beach, VA. The Project will have the capacity to generate approximately 2,500 to 3,000 megawatt-hours of renewable energy, enough to power about 660,000 homes. BOEMCVOW_2139.[1]

BOEM began evaluating the potential for wind energy leasing and development off the shore of Virginia following enactment of the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005), which granted the Secretary of the Interior the authority to issue leases, easements, or rights-of-way on the OCS for the purpose of renewable energy development. *See* 43 U.S.C. § 1337(p)(1)(C). Through a competitive leasing process, DEV was awarded a commercial Renewable Energy Lease covering approximately 112,799 acres off the shore of Virginia. *See* BOEMCVOW_ 21; BOEMCVOW_143.

In December 2020, DEV sought BOEM's approval of the Project's COP. *See* BOEMCVOW_27378 (Executive Summary and Table of Contents). BOEM then initiated a review pursuant to NEPA. 86 Fed. Reg. 35329 (July 2, 2021), BOEMCVOW_4692. As part of that NEPA review, BOEM held numerous public hearings and received numerous submissions from the public, government agencies, and other stakeholders. BOEMCVOW_24563. NMFS became a cooperating agency in the preparation of an Environmental Impact Statement ("EIS") pursuant to NEPA. *See* BOEMCVOW_699 (list of cooperating agencies).

The extensive, multi-year environmental review process for the Project included ESA consultation between BOEM and NMFS, which resulted in NMFS's publication of a 355-page

---

[1] Citations to the Administrative Records produced by the National Oceanic and Atmospheric Administration ("NOAA") (e.g., NOAA_000001, etc.) and BOEM (e.g., BOEMCVOW_1, etc.), respectively, correspond to the applicable Bates number, rather than any other internal document numbering.

BiOp on September 18, 2023. The BiOp assessed potential effects of the Project on ESA-listed species, including the right whale. NOAA_000001. As explained in further detail below, NMFS considered the effects of the CVOW Project in relation to the following previously authorized offshore wind projects: South Fork, Vineyard Wind, Ocean Wind 1, Revolution Wind, and Empire Wind. NOAA_000215. The BiOp describes all aspects of Project construction and operation— including the installation of scour protection—and determined that most aspects of the CVOW Project are not likely to adversely affect ESA-listed species or designated critical habitat. NOAA_000141-91.[2] NMFS concluded the CVOW Project is not likely to jeopardize right whales. NOAA_000231. NMFS separately evaluated and authorized the incidental harassment of right whales through an incidental take authorization ("ITA") issued pursuant to the Marine Mammal Protection Act ("MMPA"). 89 Fed. Reg. 4370 (Jan. 23, 2024); NOAA_000748. *See also* BOEMCVOW_5990 (Letter of Authorization effectuating the ITA).[3]

BOEM's environmental review of the Project spanned three years, included six public meetings, and culminated in a three-volume Final Environmental Impact Statement ("FEIS"). BOEMCVOW_1 (Volume 1); BOEMCVOW_688 (Volume 2); BOEMCVOW_1505 (Volume 3). The EIS analyzed a wide variety of reasonably foreseeable or potential impacts to marine species, coastal habitats, recreation and tourism, and cultural resources, among other things. The analysis in

---

[2] Plaintiffs' allegations concerning scour protection and cables, *see* ECF No. 36-1 at 10, have nothing to do with any alleged effects of the CVOW Project on right whales. Indeed, Plaintiffs' First Amended Complaint does not include any claims referencing the sufficiency of Defendants' analysis of potential project effects of scour protection and cables on right whales. *See generally* ECF No. 11.

[3] On August 30, 2024, DEV requested a modification to their MMPA Letter of Authorization that would allow for nighttime pile driving. NMFS considers such a change a trigger for reinitiation of ESA consultation pursuant to 50 C.F.R. § 402.16(a)(3) and intends to conduct a Section 7 consultation with the NMFS Office of Protected Resources, Permits and Conservation Division limited specifically to the impacts of any potential nighttime pile driving. No final agency action subject to review has yet been issued, and no changes to the existing BiOp under review here, or the related MMPA authorization, have been made.

the EIS included an analysis of cumulative effects. BOEMCVOW_42; *see also*, *e.g.*,

BOEMCVOW_423-45 (analyzing the cumulative effects of the no-action alternative on marine

mammals, including the NARW). The EIS analyzed in detail a "no action" alternative and four

action alternatives, including one action alternative with three sub-choices. BOEMCVOW_44-46;

*see also* BOEMCVOW_66-72 (discussing alternatives not carried forward for detailed

consideration). It also considered potential mitigation measures, such as measures intended to

address marine debris. BOEMCVOW_1116; *see also*, *e.g.*, BOEMCVOW_465-92 (discussing

mitigation measures "recommended for inclusion in the Preferred Alternative");

BOEMCVOW_1087-244 (Appendix H).

On October 30, 2023, as informed by the BiOp and FEIS, BOEM and NMFS issued a joint

Record of Decision ("ROD") for the Project summarizing the agencies' respective decisions

including: BOEM's decision to approve the COP under subsection 8(p) of the Outer Continental

Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1337(p); and NMFS's decision to issue an ITA under

Section 101(a)(5)(A) of the MMPA, 16 U.S.C. § 1371(a)(5)(A). BOEMCVOW_2131. BOEM's and

NMFS's approval processes for the Project concluded on January 28, 2024, when, pursuant to its

regulations, BOEM issued final approval of the COP for the Project, with applicable conditions

including conditions to protect right whales, 30 C.F.R. § 585.628(f). *See* BOEMCVOW_2310.

Plaintiffs commenced this action on March 18, 2024. The Court denied Plaintiffs' motion

for preliminary injunctive relief on May 24, 2024, ECF No. 28. Offshore Project construction is

ongoing.

## LEGAL BACKGROUND

### I.    Outer Continental Shelf Lands Act

The OCS consists of the submerged lands beneath the ocean, generally from 3 to 200 miles

seaward of the coastline. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466,

472 (D.C. Cir. 2009); 43 U.S.C. § 1331(a). Under OCSLA, the United States holds the OCS as a "vital national resource reserve . . . for the public," which Congress declared "should be made available for expeditious and orderly development, subject to environmental safeguards[.]" 43 U.S.C. § 1332(3). Congress enacted OCSLA in 1953 to authorize oil and gas leasing. *Sec'y of the Interior v. California*, 464 U.S. 312, 336 (1984). In 2005, Congress amended OCSLA to authorize the Secretary of the Interior to issue leases on the OCS to "support production, transportation, storage, or transmission of energy from sources other than oil and gas[,]" including wind energy. 43 U.S.C. § 1337(p)(1)(C); *see also* Energy Policy Act of 2005, Pub. L. No. 109-58, § 388, 119 Stat. 594, 744-45 (2005).

The Secretary of the Interior, in consultation with the U.S. Coast Guard and other relevant federal agencies, may grant a lease, easement, or right-of-way on the OCS for the purpose of renewable energy production pursuant to subsection 8(p) of OCSLA, 43 U.S.C. § 1337(p)(1)(C). Pursuant to the authority granted by Congress, *see id.* § 1337(p)(8), BOEM has issued regulations governing the leasing process and management of offshore renewable energy projects. *See* 74 Fed. Reg. 19638 (Apr. 29, 2009); 30 C.F.R. Pt. 585.[4] Under BOEM's renewable energy program, a lease does not authorize the development of a wind energy facility; instead, a lessee's right to "install and operate facilities" for the "production of energy from a renewable energy source[,]" is "subject to obtaining the necessary approvals" from BOEM. *Id.* § 585.200(a)(2). After gathering the necessary data pursuant to 30 C.F.R. § 585.626(b), a lessee must prepare a proposal for the development of a wind energy facility on the OCS and submit a COP. *Id.* §§ 585.600, 585.620-585.629. After reviewing the COP to ensure compliance with OCSLA and BOEM's regulations, BOEM may "approve, disapprove, or approve [the] COP with conditions." *Id.* § 585.628(f).

---

[4] BOEM recently published updates to the Part 585 regulations that became effective in July of this year. 89 Fed. Reg. 42602 (May 15, 2024). The CVOW ROD and COP approval preceded this rulemaking, and BOEM applied the rules as they existed before that rulemaking went into effect.

## II.    ESA

ESA Section 7(a)(2) requires each federal agency to consult with the Secretary to ensure that any action it authorizes, funds, or carries out is not likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical . . . ."  16 U.S.C. § 1536(a)(2).[5] To "jeopardize the continued existence" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.* § 402.02. "Destruction or adverse modification" of critical habitat is also defined as the "direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.* To achieve the § 7(a)(2) objective, the ESA regulations state that the action agency shall consult with NMFS or FWS whenever the agency determines that a federal action "may affect" listed species or critical habitat.  50 C.F.R. § 402.14(a).[6]

ESA Section 7 and its implementing regulations set out detailed consultation procedures designed to provide action agencies with expert advice to determine the biological impacts of their proposed activities. 16 U.S.C. § 1536(b); 50 C.F.R. Pt. 402. "Formal consultation," which is described at length at 50 C.F.R. § 402.14, culminates in the issuance of a BiOp by NMFS or FWS,

---

[5] "Secretary" as used in the ESA means the Secretary of the Interior or the Secretary of Commerce, who in turn have delegated their responsibilities to the FWS and NMFS, respectively. 16 U.S.C. § 1532(15). In general, NMFS has authority over marine species, such as the right whale at issue here. 50 C.F.R. §§ 222.101, 224.101(h) (listed as endangered), 226.203 (designated critical habitat).
[6] With respect to this Project, NMFS acted in two roles: NMFS's Office of Protected Resources ("NMFS/OPR") acted as an action agency in issuing the ITA pursuant to the MMPA. NMFS/OPR also acted as the consulting agency in issuing the BiOp under the ESA. Where, as here, more than one federal agency's action regarding a project "may affect" a listed species, each one must fulfill its obligation to consult, and a "lead action agency" is often identified. For this Project, BOEM was the lead action agency for purposes of ESA consultation with NMFS/OPR.

which advises the action agency whether jeopardy of a listed species or adverse modification of critical habitat is likely to occur and, if so, whether "reasonable and prudent alternatives" exist to avoid jeopardy or adverse modification. *Id.* § 402.14(h)(2). The ESA and its implementing regulations require each Federal agency to use the "best scientific and commercial data available" in fulfilling these requirements. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

Section 9 of the ESA prohibits the "taking" of any endangered species, 16 U.S.C. § 1538(a)(1)(B), and the take prohibition can be extended to threatened species, *id.* § 1533(d). "Take" as defined by the ESA, means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct. *Id.* § 1532(19). The ESA's prohibition on taking species applies to all "person[s]," including individuals, corporations, and federal or state agencies. *Id.* § 1532(13). However, a take incidental to federal actions that is "reasonably certain to occur" can be exempted from liability as part of the consultation process in an incidental take statement ("ITS") provided with the final BiOp. *Id.* § 1536(b)(4); 50 C.F.R. § 402.14(g)(7).[7]

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA"), 5 U.S.C. § 706, provides the standard of review applicable to Plaintiffs' ESA-related claims against both NMFS and BOEM, respectively. A court may set aside final agency action if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *Id.* § 706(2)(A). Review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid." *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citing, *inter alia, Citizens to Pres.*

---

[7] An ITS identifies the impact of such taking and specifies reasonable and prudent measures ("RPMs") "necessary or appropriate to minimize such impact" and terms and conditions to implement those measures. 16 U.S.C. § 1536(b)(4)(ii); 50 C.F.R. § 402.14(i)(1)(i-v). Under Section 7(o) of the ESA, "any taking that is in compliance with the terms and conditions specified in [an ITS] shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2). "[N]o other authorization or permit under the Act is required." 50 C.F.R. § 402.14(i)(5).

*Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971)); *see also Am. Wildlands v. Kempthorne*, 478

F. Supp. 2d 92, 96 (D.D.C. 2007), *aff'd*, 530 F.3d 991 (D.C. Cir. 2008). A reviewing court may not

"substitute[e] its judgment for that of the agency." *Castle*, 657 F.2d at 283 (citing*, inter alia,*

*Overton Park*, 401 U.S. at 416). A reviewing court may reverse an agency's decision under the

"arbitrary and capricious" standard only

> if the agency has relied on factors which Congress has not intended it to consider,
> [has] entirely failed to consider an important aspect of the problem, [or has] offered
> an explanation for [that] decision that runs counter to the evidence before the agency,
> or is so implausible that it could not be ascribed to a difference in view or the
> product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In addition to setting forth the standard of review, the APA also provides the applicable

scope of review. The scope of judicial review of a final agency action is limited to "the record the

agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744

(1985) (citation omitted). The "focal point for judicial review [of an agency decision] should be the

administrative record already in existence, not some new record made initially in the reviewing

court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).

**ARGUMENT**

**I.    The Court Should Strike Plaintiffs' Repeated References to Extra-Record Documents and Information.**

As a threshold matter, we note that Plaintiffs' summary judgment memorandum includes

extensive citation to documents outside the administrative records produced by NMFS and BOEM,

respectively. Not counting Plaintiffs' standing-related declarations, Plaintiffs' memorandum

includes approximately fifty-eight citations to a total of thirty-eight discrete extra-record

documents. Plaintiffs' reliance upon these extra-record documents is both untimely and improper.

It is well-settled that the appropriate scope of the Court's review in APA cases, such as the

instant case, is limited to the agency's administrative record. "The task of the reviewing court is to

apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co.*, 470 U.S. at 743-44; *see also Camp v. Pitts,* 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). A court should generally consider neither more nor less than what was before the agency at the time it made its decision. *Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 667 F. Supp. 2d 111, 114 (D.D.C. 2009). A party may seek to supplement the record with "extra-judicial evidence that was not initially before the agency but [which] the party believes should nonetheless be included in the administrative record." *WildEarth Guardians v. Salazar*, 670 F. Supp. 2d 1, 5 n.4 (D.D.C. 2009). Supplementation, however, is the exception, not the rule. *Id.*

In submitting the proposed briefing schedule for this case, the parties agreed that this is an APA case. ECF No. 23 ("The parties agree that this case is an action for review of final agency actions based on an administrative record arising under the [ESA], 16 U.S.C. §§ 1531, *et seq.*, [NEPA], 42 U.S.C. §§ 4331, *et seq.*, and the [APA], 5 U.S.C. §§ 701 to 706 regarding the [Project]"). *Id.* at 1. Plaintiffs specifically agreed that their claims should be resolved based on the administrative record. *Id.* at 1-2 ("The Parties agree that Plaintiffs' claims should be resolved through motions for summary judgment based on the administrative record.").

The Court set September 6, 2024, as the deadline for the parties to confer and, if necessary, file any motions regarding the administrative record. ECF No. 27. This was the deadline the parties jointly proposed. ECF No. 23. Plaintiffs did not confer with the other parties regarding any alleged deficiencies in the scope of the administrative records or move for an order from the Court authorizing supplementation of the certified administrative records of NOAA and/or BOEM. The time for Plaintiffs to request supplementation of the administrative record has passed, and their attempt to now rely on extra-record documents in their motion for summary judgment is improper.

9

Even if Plaintiffs' citation to and reliance on over three dozen discrete documents outside the agencies' certified administrative records were not precluded by the parties' agreed scheduling order, there is no appropriate basis for Plaintiffs to supplement the administrative record, whether by citing extra-record documents posted on the internet or by attaching such documents as exhibits to their brief. Absent clear evidence to the contrary, an agency is entitled to a strong presumption of regularity that it properly designated the administrative record. *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006). Accordingly, in this Circuit, courts do not allow parties to supplement the record "unless they can demonstrate unusual circumstances justifying a departure from this general rule." *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.,* 940 F.2d 685, 698 (D.C. Cir. 1991); *accord Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008). These circumstances include: "(1) if the agency 'deliberately or negligently excluded documents that may have been adverse to its decision,' (2) if background information was needed 'to determine whether the agency considered all the relevant factors,' or (3) if the 'agency failed to explain administrative action so as to frustrate judicial review.'" *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting *Am. Wildlands*, 530 F.3d at 1002)).

The party seeking to supplement the administrative record must "demonstrate unusual circumstances," *Texas Rural Legal Aid,* 940 F.2d at 698, which means *that* party bears the burden of overcoming the presumption of regularity and presenting the Court with its arguments about why one of the exceptions applies. Here, Plaintiffs make no such showing at the outset. To the extent that any discussion of the substance of Plaintiffs' extra-record documents is warranted, a brief review of these documents confirms that Plaintiffs have failed to demonstrate the required "unusual circumstances" for the Court to consider them in support of Plaintiffs' summary judgment motion.

A.    **Plaintiffs' documents concerning turbine blade failure, marine debris, and toxicology are untimely and improper.**

Plaintiffs devote several pages of their background section to a discussion of turbine blade failures at the Vineyard Wind project site and at a European location, both of which occurred after the agencies approved this project and Plaintiffs commenced this lawsuit. *See* ECF No. 36-1 at 14-19. Information about the recent offshore wind turbine blade failures, *see id.* at 15-16, n.34-35 is post-decisional, and thus should be disregarded by the Court. *Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 47 (D.C. Cir. 2013). Plaintiffs' additional extra-record information concerning turbine blade failures, marine debris, and toxicology is also improper. *See* ECF No. 36-1 at 16-19, n.36-57 & 26 n.86.

Although Plaintiffs suggest NMFS and/or BOEM did not adequately consider the potential effects of marine debris resulting from such failures as part of their respective agency actions, *see id.* at 26, Plaintiffs did not assert such claims in their First Amended Complaint, ECF No. 11. To the extent Plaintiffs reference generalized concerns about potential ecological effects of debris on the marine environment, such concerns clearly go beyond Plaintiffs' claims in this case, which are limited to claims concerning potential effects of the CVOW Project on right whales. Moreover, Plaintiffs did not submit comments regarding such concerns during the EIS process. *See* BOEMCVOW_124998 (CFACT Comment Letter). It is a bedrock rule of administrative law that courts may not review arguments not raised during an agency proceeding. *Sims v. Apfel*, 530 U.S. 103, 112 (2000) (O'Connor, J., concurring) ("In most cases, an issue not presented to an administrative decisionmaker cannot be argued for the first time in federal court. On this underlying principle of administrative law, the Court is unanimous."); *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) (It is "black-letter administrative law" that a court cannot consider an issue unless it was raised by a party in comments to the agency "made with sufficient specificity reasonably to alert the agency."). The Court should strike Plaintiffs' citations to extra-record

11

documents concerning turbine blade failure, marine debris, and toxicology. In any event, as discussed *infra* at p. 21, the record here refutes Plaintiffs' arguments that right whales will be harmed by marine debris in the event of blade failure.

    **B.**    **Hayes letter**

In addition to Plaintiffs' frequent citations to various websites containing extra-record information, Plaintiffs have attached the extra-record letter of NMFS biologist Dr. Sean Hayes as an exhibit in support of their assertion that NMFS failed to adequately consider the cumulative effects of other wind projects on right whales. ECF No. 36-1 at 35 (citing Plaintiffs' Exhibit 1). As with Plaintiffs' citations to other extra-record documents, their proffer of the Hayes letter as an exhibit is both untimely and improper. Again, Plaintiffs did not confer with the other parties or obtain an order from the Court authorizing supplementation of the certified administrative records in accordance with the parties' agreed Scheduling Order, ECF No. 27, or otherwise. The Scheduling Order included a deadline of September 6, 2024, for the parties to confer over any disputes regarding the administrative records and, if necessary, to file any motions regarding the administrative record.

Even if the Hayes letter were part of the administrative record, it does not support Plaintiffs' merits arguments. Dr. Hayes was not part of the decision-making process here, and his comments pertaining to the potential effects of southern New England offshore wind energy projects on the Nantucket Shoals habitat area are not relevant to the Project at issue here, which is sited off the Virginia coast. Indeed, the Project at issue in this case is sited hundreds of miles away from any core congregating areas for the right whale, such as foraging or calving grounds. *See* NOAA_000060-61; s*ee also Defs. of Wildlife v. U.S. Dep't. of Navy*, 733 F.3d 1106, 1110 (11th Cir. 2013) ("Because the area offshore Georgia and Florida is the [right whales'] only known calving ground, regulations have been adopted in adjacent waters to protect right whales from threats of

fishing gear entanglement and ship collisions."). Unlike Dr. Hayes' correspondence, NMFS scientists here had the specific proposed action and relevant best available science including the environmental baseline to consider in their formal Section 7 consultation.[8] After a full consideration of that information performed under the ESA and its implementing regulations, NMFS came to a "no jeopardy" determination, and imposed significant mitigation and monitoring measures specific to this Project.

Moreover, even if the Hayes letter was a part of the decision-making process here, statements of agency staff during an interim step in such a process are not the proper focus for a reviewing court, which instead must focus on the agency's explanation presented in its final decision. *See, e.g.*, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658-59 (2007) ("[F]ederal courts ordinarily are empowered to review only an agency's *final* action," as opposed to "various statements made by the involved agencies' regional offices."). For all these reasons, the Court should strike Plaintiffs' citations to the extra-record Hayes letter.

**C.    North Atlantic Right Whale Offshore Wind Strategy**

The Court should also strike Plaintiffs' repeated references, *see* ECF No. 36-1 at 9 n. 4, 14, 31, 33-34, 41, and 45, to draft and final versions of the North Atlantic Right Whale and Offshore Wind Strategy ("Strategy"). As with the Hayes letter, Plaintiffs did not previously confer with Defendants or file a motion seeking to supplement the administrative records with the Strategy

---

[8] Specifically, NMFS took into account wind turbine generator operational noise and determined it was not likely to adversely impact listed species. NOAA_000138. NMFS also considered construction, operation, and decommissioning of other existing offshore wind projects (including those in southern New England) that had undergone Section 7 consultation and determined the lease areas and the geographic areas that may be affected by their project operations are outside of the CVOW-C project area. NOAA_000137. NMFS also determined the geographic extent of noise during construction of these projects will not extend into the CVOW-C lease area. *Id.*

document. At any rate, the Strategy document expressly does not modify the agencies' responsibilities pursuant to Federal statutes and regulations such as those governing the NMFS BiOp at issue in this case. Strategy at p. 7. Thus, the Strategy does not impose any "binding obligations" on the agencies that might otherwise inform the Court's review of the NMFS BiOp in this case. *Gen. Elec. Co. v. EPA,* 290 F.3d 377, 383 (D.C. Cir. 2002).

Moreover, the Strategy, issued January 25, 2024, also substantially post-dates the NMFS BiOp in this case, which was issued September 18, 2023. Even if it would be appropriate to consider the nonbinding Strategy in a specific consultation, the Strategy was not available to NMFS when it issued the BiOp. We note, however, that the Strategy confirms that BOEM and NMFS are working together to achieve the shared goal to "understand the impacts to NARW from project-level and cumulative effects from multiple Projects. . . ." Strategy at p. 20 (Goal 2). In addition, the Strategy's three general goals of appropriate mitigation, research and monitoring, and collaboration between the agencies (Strategy at p. 1) are supported by the many mitigation and monitoring measures in the BiOp, as described below, and the interagency collaboration inherent in the ESA Section 7 consultation process. Plaintiffs' citations to broad statements from the Strategy about the status of the species and the anticipated impacts of offshore wind development fail to undermine NMFS's reasoned analysis in the BiOp and NMFS's conclusion that the CVOW Project is not likely to jeopardize right whales, as discussed in detail below. NOAA_000231.

In sum, Plaintiffs' repeated citations to extra-record documents are contrary to both the parties' agreed scheduling order and the applicable scope of APA review. The Court should strike Plaintiffs' citations to the Strategy, the Hayes letter and other extra-record documents, in accordance with the applicable scope of review pursuant to the APA, 5 U.S.C. § 706.

**II. Plaintiffs Lack Standing to Bring Their Claims.**

To establish Article III standing, a plaintiff must demonstrate an injury that is (i) "concrete, particularized, and actual or imminent"; (ii) "fairly traceable to the challenged action"; and (iii) "redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). The Court previously concluded that at least one Plaintiff, Mr. Rucker, had standing to seek a preliminary injunction or administrative stay. ECF No. 28 at 8. However, Plaintiffs, as the parties seeking to invoke federal jurisdiction, bear the burden of establishing the elements of standing at each successive stage of the litigation. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the summary judgment stage, satisfying that burden requires proving specific facts via affidavits or other means. *Id.*

Plaintiffs' declarations of Craig Rucker, ECF No. 36-4, and Peter Flaherty, ECF No. 36-5, do not materially improve upon declarations submitted in support of their preliminary injunction motion and do not demonstrate any non-speculative injury to establish standing for purposes of their summary judgment motion. In short, the Rucker Declaration, ECF No. 36-4, does not establish that he intends to visit (or has ever visited) the offshore CVOW Project site or that his ability to view right whales will be affected by offshore project construction activities which, in any event, will not be occurring at the time of his planned whale-watching trip because of the applicable terms and conditions of the CVOW Project, *see* NOAA_000233-47. "Logically, in order for a plaintiff's desire to view an animal species to be directly affected by the agency action, such viewing must take place at the area affected by the challenged activity." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs,* 170 F.Supp.3d 6,12 (D.D.C. 2016) (citing *Lujan*, 504 U.S. at 565-66). Moreover, a general alleged interest in protecting right whales or the environment is insufficient for an ESA claim. *Lujan,* 504 U.S. at 563 (Plaintiffs must "submit affidavits or other evidence showing, through specific facts, not only that listed species were in fact being threatened by . . . [agency] activities . . .

15

but also that one or more of respondents' members would thereby be 'directly' affected apart from their "'special interest' in th[e] subject.") (citation omitted). The Rucker Declaration does not provide the requisite non-speculative information for Plaintiffs to establish standing based on any alleged interests in viewing right whales.

Likewise, the Flaherty Declaration, ECF No. 36-5, fails to demonstrate a sufficiently direct, causal connection between the challenged action and the alleged economic harm that Article III requires. *Lujan,* 504 U.S. at 562. Even assuming Plaintiffs could demonstrate that the CVOW Project will result in electric rate increases, the ESA-related agency actions challenged in this case are themselves unrelated to any rate increase that DEV has applied to ratepayers under state law. Plaintiffs are challenging only Federal agency actions in this litigation. Neither NMFS nor BOEM has authority to set or alter any electric utility rates, and Plaintiffs' challenges to any such rates must be brought in relation to the state utility process, not here.

As to supposed procedural harm, the First Amended Complaint offers only a bare allegation that "[t]he actions of NMFS and BOEM have deprived plaintiffs of the procedural protections afforded them under the APA, and will irreparably harm plaintiffs' interests as they relate to the NARW and environmental conditions off the coast of Virginia." ECF No. 11 ¶ 109. The Rucker Declaration references the "combined adverse impacts of the Dominion Wind Project with other wind projects," ECF No. 36-4 ¶ 6, but does not establish that Defendants' actions with respect to the CVOW Project specifically will hinder Plaintiffs' ability to observe right whales. Plaintiffs' allegations are insufficient under settled law holding that an alleged procedural right alone, without concrete injury, does not satisfy Article III. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."); *Forest Res. Coal. v. Vilsack,* 100 F.Supp.3d 21, 43 (D.D.C. 2015) ("[P]laintiffs can 'demonstrate standing

only if application of the regulations by the Government will affect *them* in the manner [described in the complaint]." (quoting *Summers,* 555 U.S. at 494)). In sum, Plaintiffs fail to demonstrate that their plans to view right whales (or any other asserted concrete interest) will be adversely affected by any alleged procedural violation.

Federal Defendants renew their arguments concerning Plaintiffs' lack of standing as set forth in Defendants' preliminary injunction memorandum, ECF No. 19 at 24-34. The Court should grant summary judgment in favor of Federal Defendants on standing grounds.

### III.    NMFS Reasonably Concluded, Based on the Best Available Science, that the CVOW Project Is Not Likely To Jeopardize Right Whales.

Turning to the merits of Plaintiffs' ESA-related claims against NMFS, the issue before the Court is whether Plaintiffs have carried their burden at summary judgment of showing NMFS was arbitrary and capricious in concluding, based on the best scientific and commercial data, that the CVOW Project is not likely to jeopardize right whales. *See Bennett v. Spear*, 520 U.S. 154, 177 (1997). Plaintiffs' assertion that NMFS failed to use the best scientific and commercial data available in support of its "no jeopardy" determination*, see* ECF No. 36-1 at 32, is contrary to Plaintiffs' own previous concession that "CFACT does not challenge NMFS's scientific judgments about the information the agency considered." ECF No. 22 at 15. Nevertheless, Plaintiffs' jeopardy-related arguments are refuted by the record before the Court.

### A.    No injury, serious injury, or mortality of any ESA-listed whales is expected to occur as a result of the CVOW Project.

NMFS reasonably concluded, based on the best available science, that the CVOW Project is not likely to jeopardize right whales. NOAA_000231.[9] In support of this determination, NMFS

---

[9] Plaintiffs erroneously refer to the applicable ESA jeopardy analysis as BOEM's jeopardy analysis. *See* ECF No. 36-1 at 26. NMFS made the applicable jeopardy analysis and determination pursuant to the ESA, 16 U.S.C. § 1536(b)(4). *See* NOAA_000231 (concluding that the CVOW Project is not likely to jeopardize right whales).

applied its expertise to conclude that temporary harassment in the form of temporary behavioral disturbance and/or temporary threshold shift[10] in hearing from exposure to pile-driving noise are the only adverse effects to right whales expected to result from the Project. NOAA_000217. NMFS determined, conservatively, that only up to six individual right whales a year, for a total of 12 individuals over the two years during which offshore pile driving would occur, could be subject to such harassment. *Id.*

The NMFS BiOp specified RPMs and terms and conditions to avoid and minimize the potential take of right whales in the form of harassment that it determined was reasonably certain to occur as a result of pile-driving construction. NOAA_000233-47. In short, pile-driving construction will only be allowed to take place between May and October, which avoids the winter and spring seasons when right whales are more likely to be present.[11] *Id.* Protected species observers ("PSOs") will visually monitor the construction area to detect right whales during pile driving. In addition, a real-time passive acoustic monitoring ("PAM") system will be used to supplement visual monitoring. *Id.* The PSOs and PAM will be used for pre-clearance monitoring and shutdown procedures to ensure that right whales are not present during pile-driving construction. *Id.* If a right whale is present but was somehow not detected by PSOs or PAM, the mandatory soft-start procedures for pile-driving with lower intensity sound will create an opportunity for the whale to move away from the source before more intense sound is emitted. *Id.* And, all pile-driving work must be mitigated by noise attenuation systems, such as two concentric bubble curtains used to muffle sound emitted from construction. *Id.* NMFS reasonably concluded that, taken together, these

---

[10] Temporary threshold shift is a temporary loss of hearing sensitivity at certain frequency ranges that recovers to pre-exposure levels over time. NOAA_000139.
[11] Federal Defendants do not dispute that right whales have the potential to occur in the Project area year-round. As described in the biological opinion, however, monopiles will be installed between May 1 and October 31, the months of the year during which migration does not typically occur and right whale density is expected to be much lower. NOAA_000019; NOAA_000194.

measures are expected to reduce the occurrence and intensity of noise exposure to right whales from pile-driving operations. NOAA_000217.

On substantially similar claims challenging the merits of a BiOp for the Vineyard Wind project—an offshore wind project off the coast of Massachusetts—the U.S. District Court for the District of Massachusetts and the U.S. Court of Appeals for the First Circuit recently upheld a BiOp with similar terms and conditions for pile-driving construction. *Nantucket Residents Against Turbines v. BOEM*, 675 F. Supp. 3d 28, 43 (D. Mass. 2023) ("[N]umerous mitigation measures are designed not only to protect right whales from harassment, but also to protect other species."), *aff'd Nantucket Residents Against Turbines v. BOEM,* 100 F.4th 1, 20 (1st Cir. Apr. 24, 2024) ("*Nantucket Residents*") (cert petition filed Sept. 23, 2024) ("And as discussed, the Residents have not demonstrated that the agency's proposed mitigation measures are inadequate, or that reliance on those measures was arbitrary and capricious."). Indeed, the First Circuit rejected the plaintiffs' claim in that case that "the biological opinion ignored the best available data about the right whale's current status and environmental baseline." *Id.* at 13.

Plaintiffs are flat-out wrong in repeatedly asserting that the ITS allows for "take" involving the mortality of .7 right whales per year. *See* ECF No. 36-1 at 41 n.155 (citing BOEMCVOW_417). Contrary to Plaintiffs' characterization of the ITS, "[n]o mortality or permanent injury (auditory or other) is expected from exposure to any aspect of the proposed action during the construction, operations, or decommissioning phases of the project." NOAA_000217. Plaintiffs are also incorrect in asserting that BOEM has concluded that the cumulative effect of the other Atlantic Coast offshore wind projects that it has approved or is likely to approve in the future threaten at least one right whale death a year. ECF No. 36-1 at 41 n.153 (citing BOEMCVOW_417). The cited document in both instances, BOEM's FEIS (BOEMCVOW_417), discusses the Potential Biological

Removal ("PBR") threshold for the right whale and references average human-caused mortality and serious injury of right whales due to causes *other than* offshore wind development. *See id.*

PBR is an MMPA term of art. *See* 16 U.S.C. § 1362(20).[12] Plaintiffs have not brought any claims under the MMPA, *see* ECF No. 11, so their reference to PBR is misguided. Moreover, the PBR is not otherwise relevant to NMFS's jeopardy analysis. As described in detail in the BiOp, zero right whales will be removed from the population as a result of the CVOW Project. Again, only six "takes" involving behavioral harassment are anticipated and authorized to occur in 2024 and again in 2025. NOAA_000217. *See also Melone v. Coit,* 100 F.4th 21, 31 (1st Cir. 2024) ("However, the [incidental harassment authorization] does not authorize the lethal take of any right whales—it only authorizes temporary, non-lethal harassment. . . ."). Nor must these non-lethal takes, in fact, occur; fewer takes are possible in real world conditions considering the extensive mitigation and monitoring measures imposed on the action. Nothing in the BOEM FEIS or any other record document discussing PBR contradicts NMFS's conclusion in the BiOp that the CVOW Project is unlikely to result in injury or mortality to right whales. NOAA_000152 ("Therefore, no injury, serious injury, or mortality of any ESA-listed whales is expected to occur as a result of exposure to pile driving noise."). Plaintiffs' arguments concerning PBR do not support their argument that the CVOW Project will jeopardize right whales.

---

[12] Stock Assessments are required by the MMPA to include an estimate of PBR. 16 U.S.C. § 1386(a)(6) ("Each draft stock assessment, based on the best scientific information available, shall...(6) estimate the potential biological removal level for the stock, describing the information used to calculate it, including the recovery factor."). PBR is also an MMPA standard reference point for commercial fishery take reduction plans. *See, e.g.,* 16 U.S.C. § 1387(f)(2) (describing the immediate goal of a take reduction plan is to reduce incidental mortality or serious injury of marine mammals "to levels less than the potential biological removal level established for that stock under section 1386"). And relevant to the ITA issued to DEV pursuant to the MMPA, "PBR and annual serious injury and mortality from anthropogenic sources [were considered] as gross indicators of the status of the species and other threats" even though no mortality was anticipated or proposed for authorization. NOAA_000641; NOAA_000768.

The record before the Court refutes Plaintiffs' improper arguments (based on unauthorized extra-record information, as described above) that right whales will be harmed by marine debris in the event of blade failure. The NMFS BiOp incorporates an analysis of the effects of marine debris on threatened and endangered marine wildlife. NOAA_000135-36. The BiOp also discusses procedures for waste management and mitigation of marine debris. NOAA_000183. The literature cited portion of the BiOp includes at least nine references involving marine debris. *See* NOAA_000250-95. The BiOp also references mitigation, monitoring, and reporting measures proposed by BOEM regarding marine debris. NOAA_000313, 314. "In the event of a fault or failure of an Offshore Project component, Dominion Energy would repair and replace it in a timely manner." BOEMCVOW_57. To protect right whales and other marine mammals, Dominion Energy would also require all offshore personnel to implement appropriate practices and protocols to avoid and minimize the release of marine debris. BOEMCVOW_1116. Therefore, contrary to Plaintiffs' erroneous characterizations of the facts, the record before the Court confirms that NMFS and BOEM accounted for the possibility of Project-related marine debris and included mitigation, monitoring, and reporting measures to minimize the potential effects of any marine debris on threatened and endangered species.[13]

---

[13] To the extent any further discussion of the Vineyard Wind blade failure incident is appropriate, Federal Defendants dispute Plaintiffs' assertion that "thousands of tons" of debris washed ashore. ECF No. 36-1 at 15. Contrary to Plaintiffs' assertion, the failed Vineyard Wind blade weighed approximately 57 tons. *See* https://nantucket-ma.gov/DocumentCenter/View/48366/Vineyard-Wind-CSM---7-23-2024-FINAL-for-Distribution-PDF (last visited Dec. 2, 2024). On information and belief, only a portion of the blade fell into the ocean. With respect to the effects of this incident on threatened and endangered species, NMFS stated in its most recent BiOp regarding the Vineyard Wind Project that "[a]t this time we are not aware of any take of any ESA listed species that has occurred as a result of the blade failure or any associated emergency response activities." *See* Vineyard Wind BiOp dated August 23, 2024 at p. 126, *available at* https://www.fisheries.noaa.gov/s3/2024-09/GARFO-2024-01318.pdf (last visited Dec. 2, 2024). Furthermore, NMFS stated that "at this time, we consider that a future, similar blade failure is extremely unlikely to occur." *Id.* at p. 321. *See also* MMPA final rule regarding Atlantic Shores Offshore Wind Project, 89 Fed. Reg. 77972, 77999 (September 24, 2024) ("[W]ind turbine failure is

The record before the Court confirms that NMFS considered the "best scientific and commercial data available" concerning potential effects of the CVOW Project on right whales, including the most recent information about the status of the species and potential effects of offshore wind projects. NOAA_000231. Therefore, NMFS reasonably concluded in its BiOp, in accordance with ESA Section 7, 16 U.S.C. § 1536(a)(2), that the CVOW Project is not likely to jeopardize the continued existence of right whales. NOAA_000231. The Court should grant summary judgment in favor of Federal Defendants with respect to Plaintiffs' claims concerning the merits of NMFS's "no jeopardy" biological opinion.

**B.    NMFS properly considered the effects of the CVOW Project in relation to other offshore wind projects as part of the environmental baseline.**

Plaintiffs' summary judgment memorandum focuses largely on their unsupported claim that NMFS failed to use the "best scientific and commercial data available" in accordance with the ESA, 16 U.S.C. § 1536, because NMFS allegedly did not adequately consider the effects of the CVOW Project in relation to other offshore wind projects. *See* ECF No. 36-1 at 24-25, 33-36. Contrary to Plaintiffs' characterizations, the record before the Court confirms that NMFS properly assessed the effects of other wind projects consistent with all requirements of the ESA.

NMFS properly considered effects on listed species, including right whales, of other offshore wind projects under construction or completed as part of the "environmental baseline" in accordance with the ESA regulations, 50 C.F.R. § 402.02. The ESA consultation regulations define "environmental baseline" to include

> the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects

---

considered rare, and NMFS still considers the likelihood that blade failure would occur pursuant to Project Company 1's specified activity during the effective period of the ITA so low as to be discountable."). Should blade failure or any other rare, emergency situation occur, an appropriate response is an emergency Section 7 consultation on the event and incident response, as was performed in the Vineyard Wind context in accordance with the ESA consultation regulations, 50 C.F.R. § 402.05.

in the action area that have already undergone formal or early [S]ection 7
consultation, and the impact of State or private actions which are contemporaneous
with the consultation in process.

*Id.* Consistent with this approach, NMFS properly considered information about the approved South

Fork, Vineyard Wind, Ocean Wind 1, Revolution Wind, and Empire Wind projects as part of the

"environmental baseline" for its analysis of the CVOW Project. NOAA_000215. As explained in

the "Integration and Synthesis of Effects" section of the BiOp, NMFS added together

the Effects of the Action (Section 7) with the Status of the Species (Section 5), the
Environmental Baseline (Section 6), and the Cumulative Effects (Section 8), to
formulate the agency's biological opinion as to whether the proposed action
"reasonably would be expected, directly or indirectly, to reduce appreciably the
likelihood of both the survival and recovery of an ESA-listed species in the wild by
reducing its numbers, reproduction, or distribution. . . ."

NOAA_000216. Because no reductions in reproduction or overall number of right whales are

expected, NMFS does not expect an appreciable reduction in the survival of right whales or a

reduction in the likelihood of recovery of the species. NOAA_000217-18.

   In affirming the district court's decision on ESA-related claims concerning the Vineyard

Wind project, the U.S. Court of Appeals for the First Circuit held that "NMFS and BOEM followed

the law in analyzing the right whale's current status and environmental baseline, the likely effects of

the Vineyard Wind project on the right whale, and the efficacy of measures to mitigate those

effects." *Nantucket Residents,* 100 F.4th at 8. As in *Nantucket Residents,* Plaintiffs here fail to show

that NMFS erred in its assessment of the potential effects of the CVOW Project in relation to other

offshore wind projects.

   Plaintiffs' repeated arguments about the potential effects of some 30 offshore wind projects

are misleading. *See* ECF No. 36-11 at 33. "Take" of right whales due to offshore wind

development, by behavioral harassment only, is anticipated to occur only during CVOW

construction due to noise from pile-driving hammer strikes. NOAA_000232. While it is possible

that 30 projects will eventually be built, their construction is not simultaneous, and only a small

portion of the projects have received final approval. Even assuming, *arguendo*, that all 30 proposed

offshore wind projects identified by Plaintiffs will eventually be built, Plaintiffs incorrectly assert

that the NMFS BiOp should have analyzed all such proposed projects as part of its "cumulative

effects" analysis pursuant to the ESA.

"Cumulative effects are those effects of future State or private activities, *not involving*

*Federal activities*, that are reasonably certain to occur within the action area of the Federal action

subject to consultation." 50 C.F.R. § 402.02 (emphasis added). Each federal action requires its own

ESA consultation process; in each successive consultation, the effects of each previously approved

federal project will be considered to the extent the project impacts the status of the species and the

environmental baseline. 51 Fed. Reg. 19926, 19933 (June 3, 1986); *see also* 50 C.F.R. § 402.02

(excluding federal activities from the definition of cumulative effects). Stated differently, the

collective impacts of federal projects are accordingly considered *before* approving any subsequent

project. *Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1269 (11th Cir. 2009)

("Future Federal actions proposed for the same area would have to be separately evaluated under

[S]ection 7 and could not occur unless they were able, in their own right, to avoid jeopardizing the

continued existence of the affected species or destroying or adversely modifying critical habitat.").

*See also Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 907 (5th Cir. 2021) (holding that a

project was "properly excluded from the cumulative effects analysis because, at the time of the

[BiOp], the [excluded] project was a federal action subject to its own consultation." (citations

omitted)).

In the preamble to the ESA consultation regulations published nearly 40 years ago, NMFS

further explained why future Federal activities are not considered part of "cumulative effects." 51

Fed. Reg. at 19926. Some commenters had recommended including proposed future federal actions

as part of cumulative effects (consistent with the definition that Plaintiffs would apply here) stating

that "this scope would be more in line with that mandated under NEPA and argu[ing] that any lesser review could detrimentally affect endangered species." *Id.* at 19932. In response, the Services explained that

> Section 7 consultation will analyze whether the "effects of the action" on listed species, plus any additional, cumulative effects of State and private actions which are reasonably certain to occur in the action area, are likely to jeopardize the continued existence of that species. Based on this analysis, the Federal agency determines whether it can proceed without exceeding the jeopardy standard. If the jeopardy standard is exceeded, the proposed Federal action cannot proceed without an exemption. This is a substantive prohibition that applies to the Federal action involved in the consultation. In contrast, NEPA is procedural in nature, rather than substantive, which would warrant a more expanded review of cumulative effects. Otherwise, in a particular situation, the jeopardy prohibition could operate to block "nonjeopardy" actions because future, speculative effects occurring after the Federal action is over might, on a cumulative basis, jeopardize a listed species. Congress did not intend that Federal actions be precluded by such speculative actions.

*Id.* at 19932-33; *see also Fund for Animals v. Hall*, 448 F.Supp.2d 127, 136 (D.D.C. 2006) ("[T]he ESA only requires agencies to consider the cumulative impacts of non-federal actions, while NEPA requires agencies to consider the cumulative impacts of all actions."). Consistent with this approach, this court has confirmed that the ESA consultation process does not "impos[e] a requirement that each [BiOp] include a collective jeopardy finding." *Mayo v. Jarvis,* 177 F.Supp.3d 91 (D.D.C. 2016) (quoting *Defs. of Wildlife v. Norton*, No. 99–927, 2003 WL 24122459, at *5 (D.D.C. Jan. 7, 2003)).

Consistent with the approach described in the preamble to the ESA consultation regulations, NMFS reasonably concluded in the BiOp here that future wind projects do not fit within the definition of "cumulative effects" because they will involve Federal activities requiring their own Section 7 consultation. NOAA_000215. "[I]n each successive consultation, the effects on listed species of other offshore wind projects under construction or completed would be considered to the extent they influence the status of the species and environmental baseline in the action area for each consultation according to the best available scientific and commercial information." *Id.* NMFS'

analysis with respect to the effects of other offshore wind projects should be upheld where, as here, it "takes the environmental baseline seriously and makes a concerted effort to evaluate the impact of [the agency's] proposed action against that backdrop." *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 230 (D.D.C. 2005) (citation omitted).

The Court should reject Plaintiffs' arguments about any alleged failure to consider the effects of other future, unpermitted offshore wind projects. NMFS performed the requisite analysis of Project effects, appropriately incorporating cumulative effects—including those of other already-permitted offshore wind projects—into the environmental baseline. Given the copious and stringent measures the agencies are imposing to protect the right whale by avoiding exposure of right whales to Project construction and minimizing the risks of any exposures, NMFS reasonably concluded the CVOW Project is not likely to jeopardize the species. *See* NOAA_000231.

Although the NMFS BiOp appropriately focused on the effects of the CVOW Project in relation to past and ongoing wind projects as part of the environmental baseline pursuant to the ESA consultation regulations, NMFS and BOEM did consider the effects of future offshore wind development through the NEPA process. The FEIS took into account the past, present, and reasonably foreseeable future impacts of climate change and those of past and future offshore wind projects, as well as those of much larger industries than offshore wind, including fishing and marine transportation. FEIS § 1.6; BOEMCVOW_42. NMFS and BOEM considered the potential cumulative effects of wind development including the selected "Alternative B" on right whales in Section 3.15 of the FEIS. FEIS § 3.15; BOEMCVOW_410-64.[14] The FEIS incorporated a

---

[14] The FEIS's "No Action Alternative," which assumes a scenario in which no construction of the subject project occurs, found that impacts to right whales from all unrelated past, present, and reasonably foreseeable future actions are major "due to the current stock status for which serious injury or loss of an individual from vessel strike or entanglement, and the continued stressor of climate change reducing the health and resilience of the population, would result in population-level impacts that threaten the viability of the species." BOEMCVOW_445 (FEIS § 3.15.3.3). The FEIS

Geographic Analysis Area for marine mammals that spans the entire eastern seaboard.

BOEMCVOW_411 (Figure 3.15-1). *See also* BOEMCVOW_944-49 (Table F2-1 describing

existing, ongoing, and planned offshore wind projects broken down into regions).

The BiOp's conclusion that no mortality or permanent injury is expected to result from any

aspect of the CVOW Project, NOAA_000217, is consistent with the FEIS's conclusion that the

CVOW Project's incremental impact on right whales is minor. [15] As explained above, NMFS

reasonably came to this conclusion in part because of the extensive mitigation and monitoring

measures that BOEM has adopted as conditions of COP approval. *Id.* Nor is any mortality or

serious injury authorized pursuant to the MMPA. NOAA_000948. Any take involving mortality or

serious injury resulting from the CVOW Project would be unauthorized and would result in

immediate reinitiation of the Section 7 consultation. 50 C.F.R. § 402.14(i)(5) ("If during the course

of the action the amount or extent of incidental taking . . . is exceeded, the Federal agency must

reinitiate consultation immediately."); *see also Defs. of Wildlife v. U.S. Dep't. of Navy,* 733 F.3d

1106, 1124 (11th Cir. 2013) (no authorized take is a reinitiation trigger set to its strictest setting).

NMFS also addressed impacts of other wind projects on right whales in the ITA for the

CVOW Project through its analysis of past and ongoing activities as part of the environmental

---

properly concludes, however, that the CVOW Project's incremental impact on right whales is
*minor*, because individuals are not expected to abandon their migratory behavior but may modify
their behavior in ways that do not rise to population-level impacts due to mitigation and monitoring
measures. BOEMCVOW_460 (FEIS § 3.15-51).
[15] Plaintiffs incorrectly suggest that NMFS erred in its jeopardy analysis (and/or that BOEM erred
in relying on NMFS's jeopardy analysis), because there have been two observed right whale deaths
this year. *See* ECF No. 36-1 at 26-27. Because the referenced whale deaths occurred *after* the
challenged agency actions, it follows that such information about these whale deaths cannot inform
the Court's determinations as to the validity of agency actions. *Camp v. Pitts,* 411 U.S. 138, 142
(1973) (per curiam) ("[T]he focal point for judicial review [of an agency decision] should be the
administrative record already in existence, not some new record made initially in the reviewing
court.").

baseline, which is factored into the MMPA's "negligible impact" analysis, as explained in response to Comment 28 concerning the ITA. *See* 89 Fed. Reg. at 4384-85; NOAA_000761-62. Regarding cumulative effects from future wind projects, such effects are not required to be considered in making findings under the MMPA, 16 U.S.C. § 1371(a)(5); instead, such future effects are considered in the NEPA analysis, as described above. The U.S. District Court for the District of Massachusetts and the U.S. Court of Appeals for the First Circuit recently upheld NMFS's approach to assessing effects of future wind projects pursuant to the MMPA in *Melone v. Coit*, a case challenging the Vineyard Wind Project. No. 1:22-cv-10921-IT, 2023 WL 5002764, *24 (D. Mass. Aug. 4, 2023) ("Plaintiff has offered no evidence, in the Record or otherwise, that reflects that NMFS failed to consider the impact of other ongoing activities entirely."), *aff'd* 100 F.4th 21 (1st Cir. 2024) ("As NMFS notes, it did consider the effects of ongoing and past anthropogenic activities aside from Vineyard Wind's project as part of its 'negligible impact' analysis, which analyzes the species' density, distribution, population size, growth rate, and other relevant stressors."). Indeed, the U.S. Court of Appeals for the First Circuit recognized that, with respect to the Vineyard Wind project, NMFS had considered the effects of other wind projects not only pursuant to the MMPA but also pursuant to the ESA and NEPA:

> As NMFS notes, it did consider the effects of ongoing and past anthropogenic activities aside from Vineyard Wind's project as part of its 'negligible impact' analysis, which analyzes the species' density, distribution, population size, growth rate, and other relevant stressors. Additionally, NMFS. . . 'evaluate[d] the direct, indirect, and cumulative effects of the [IHA],' . . . by participating as a cooperative agency in BOEM's development of the project's EIS. It also considered such factors when preparing its biological opinion for BOEM in compliance with the ESA.

*Melone,* 100 F.4th at 33. *See also Seafreeze Shoreside Inc. v. United States Department of the Interior and Responsible Offshore Development Alliance v. United States Department of the Interior,* Nos. 1:22-cv-11091-IT & 1:22-cv-11172IT, 2023 WL 6691015, *18 (D. Mass. Oct. 12, 2023) (appeal pending) ("Defendants detail that the Corps both relied on cumulative impacts

analysis performed as part of the NEPA review and independently considered cumulative impacts that other wind projects in the area would cause."). Here, as in *Melone*, the record shows that the agencies considered effects of other wind projects as necessary and in the appropriate manner under the relevant statute when required pursuant to the MMPA, NEPA, and the ESA, respectively.

None of the cases cited by Plaintiffs support their assertion that NMFS's consideration of other offshore wind Projects resulted in an unlawful "incremental step" BiOp. *See* First Amended Complaint, ECF No. 11 ¶¶ 1, 16, 91. Plaintiffs' citation to *Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir. 1985), does not support their ESA claims here. *See* ECF No. 36-1 at 38. In that case, the U.S. Forest Service had failed to complete a "biological assessment" to determine whether ESA consultation was necessary. *Thomas,* 753 F.2d at 763. And, in assessing whether a project should be enjoined pending the preparation of formal analysis under the ESA, the Ninth Circuit noted that the procedural requirements of the ESA should be stringently enforced to ensure compliance with the ESA's substantive provisions. *Id.* at 764. The question whether an injunction should issue pending completion of ESA analysis has little bearing on whether the agencies should consider other future federal activities in the cumulative effects analysis. Moreover, here, BOEM submitted a biological assessment, NOAA_000359, and NMFS properly concluded ESA consultation when it provided its biological opinion, NOAA_000001.

*Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010), cited by Plaintiffs, is also inapposite because it does not address the appropriate scope of cumulative effects analysis in a biological opinion. *See* ECF No. 36-1 at 38. In that case, the Ninth Circuit held that it was impermissible for FWS to define the scope of the agency action under review as the operations and management of a hatchery for a period of only five years. 628 F.3d at 521. The hatchery had been operating for seventy years and was expected to continue operating into the future; limiting the analysis of impacts to a shorter time frame could therefore undermine the agency's ability to assess

the hatchery's impacts. *Id.* at 522-23. Thus, the issue in *Wild Fish Conservancy* addressed the proper scope of the agency action for purposes of ESA consultation. *See id.* Here, by contrast, Plaintiffs assert that NMFS should have considered *other* wind projects that might be developed later by *other* companies on *other* off-shore leases as part of the cumulative effects analysis for the CVOW project.

Plaintiffs' reliance on *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988), is similarly misplaced because it does not address the appropriate scope of cumulative effects analysis. ECF No. 36-1 at 37-38. The Ninth Circuit in *Conner* held that when considering the effects of a potential oil and gas lease, FWS could not postpone consideration of the impacts of subsequent oil and gas well drilling that would occur within the leased area on the basis that there was inadequate information about subsequent drilling. *Conner*, 848 F.2d at 1453-58. The court noted that the ESA requires the agency to evaluate the "*entire* agency action." *Id.* at 1453. Subsequent drilling would inevitably follow the issuance of the oil and gas leases under review and should therefore be considered part of the "agency action" that was analyzed in the 2021 BiOp for the leases. *Id.* at 1453. Here, by contrast, the NMFS BiOp considered all project phases including construction, operation, and decommissioning. *See* NOAA_000217 ("No mortality or permanent injury (auditory or other) is expected from exposure to any aspect of the proposed action during the construction, operations, or decommissioning phases of the project.").

Plaintiffs' citation to *Pacific Coast Federation of Fishermen's Associations, Inc. v. NMFS*, 265 F.3d 1028 (9th Cir. 2001), also does not support Plaintiffs' claims here. *See* ECF No. 36-1 at 17-18. In that case, the court considered a consolidated challenge to four separate BiOps concerning the impact of 23 proposed timber sales on the Umpqua River cutthroat trout and the Oregon Coast coho salmon and concluded that NMFS's "no jeopardy" determinations in those BiOps were inadequately supported by the best available science. *Pacific Coast* said nothing about whether

other future projects, which will undergo their own Section 7 analysis, should have been part of the "cumulative impacts" analysis pursuant to 50 C.F.R. § 402.02.

In contrast to the cases cited by Plaintiffs, the facts here are more like *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980), a case construing agency actions under OCSLA. In *North Slope Borough,* the plaintiffs challenged the adequacy of ESA analysis associated with lease sales for oil and gas development. *Id.* at 609. The court concluded that environmental review procedures under OCSLA provided "checks and balances" to ensure that environmental effects could be fully assessed at later stages. *Id.* Under OCSLA, any lease entered into by the Secretary of the Interior requiring future approval of plans contained as an implied term a condition that the Secretary will not violate the ESA. *Id.* The *North Slope* court reasoned that, under the OCSLA procedures,

> it becomes clear that the Secretary of Interior retains strict control of an [O]uter [C]ontinental [S]helf project for its duration, from lease sale to depleted, run-dry well. And, as information and experience is collected, the Secretary is in better shape to respond sensitively to environmental needs and wisely to oil-strikes.

*Id.* As in *North Slope Borough*, here there are "checks and balances." BOEM may periodically review the activities conducted under an approved COP pursuant to 30 C.F.R. § 585.634(b) and therefore retains discretion to ensure ESA compliance through further consultations with NMFS, if necessary. *See also* 30 C.F.R. § 585.701(a). Moreover, one of BOEM's conditions of approval of the COP incorporates the terms and conditions and RPMs of a future BiOp that might result from such consultation. *See* BOEMCVOW_2313-4 (COP Approval Conditions General Provision 1.4).

In sum, NMFS appropriately evaluated effects in its BiOp and Plaintiffs have failed to demonstrate otherwise.

**C.    NMFS's analysis of cumulative effects of the offshore wind projects on the NARW is consistent with the ESA and supported by the record.**

For the first time in this litigation, Plaintiffs appear to challenge the regulatory definition of "cumulative effects" as set forth in the ESA consultation regulations jointly promulgated by NMFS

and FWS in 1986, 50 C.F.R. Pt. 402. *See* ECF No. 36-1 at 36 ("NMFS has erroneously adopted a regulatory interpretation of Section 7 that allows it to carve out or exclude from its Section 7 cumulative analysis a subset of the government's coordinated plan to develop wind turbine projects. . . ."). As explained below, such a claim is not properly before the Court because Plaintiffs failed to include it in their First Amended Complaint. In any event, such a claim is untimely and lacks merit.

Under Section 7 of the ESA, Federal agencies must consult with NMFS and/or the FWS to ensure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species. 16 U.S.C. § 1536(a)(2). NMFS must provide a written statement setting forth its "opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species." 16 § U.S.C. 1536(a)(3). The ESA does not provide instruction on how the agency is to consider how an action affects the species; nor does it reference or define cumulative effects. It provides only that "[i]n fulfilling the requirements of" Section 7(a)(2), "each agency shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

In 1986, NMFS and FWS promulgated a definition of "cumulative effects" to be considered during the consultation process. 51 Fed. Reg. 19926, 19932 (June 3, 1986). "Cumulative effects" are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area." *Id.* The Services revised portions of the ESA consultation regulations in a 2019 final rule, 84 Fed. Reg. 4976 (Aug. 27, 2019).[16] However, the

---

[16] On November 14, 2022, the U.S. District Court for the Northern District of California issued an order granting the government's request for a voluntary remand without vacating the 2019 regulations. *Ctr. for Biological Diversity v. Haaland*, No. 19-cv-05206, (N.D. Cal. November 16, 2022).

2019 final rule did not modify the definition of "cumulative effects" as established pursuant to the 1986 final rule. *Compare* 51 Fed. Reg. 19926 and 84 Fed. Reg. 4976.[17]

Assuming Plaintiffs seek to mount a challenge to any iteration of the ESA regulations, Plaintiffs' First Amended Complaint does not include such a claim. *See generally* ECF No. 11. As the Supreme Court has made clear, "[j]urisdiction may not be sustained on a theory that the plaintiff has not advanced." *Merrell Dow Pharms. v. Thompson*, 478 U.S. 804, 809 n.6 (1986) (first citing *Healy v. Sea Gull Specialty Co.*, 237 U.S. 479, 480 (1915) ("[T]he Plaintiff is absolute master of what jurisdiction he will appeal to."), and then citing *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) ("[T]he party who brings a suit is master to decide what law he will rely upon. . . .") (Holmes, J.)). By failing to plead this unique theory in their First Amended Complaint, Plaintiffs have forfeited the claim. As a baseline rule, "a plaintiff may not assert new claims in a motion for summary judgment." *McKinney v. U.S. Postal Serv.*, 75 F. Supp. 3d 266, 279 (D.D.C. 2014); *see also Hudson v. Am. Fed'n of Gov. Employees*, 630 F. Supp. 3d 214, 232 (D.D.C. 2022); *Taylor v. Mills*, 892 F. Supp. 2d 124, 137–38 (D.D.C. 2012) (collecting cases); *accord Earth Island Institute v. U.S. Forest Serv.*, 87 F.4th 1054, 1071 (9th Cir. 2023) ("Rule 8's pleading standard is 'liberal,' but still requires that the defendant receives notice as to what is at issue in the case."); *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings.").

---

[17] NMFS applied the 2019 regulations for its analysis in the CVOW Project BiOp. NOAA_000013. NMFS also considered whether the substantive analysis and conclusions articulated in the Opinion and ITS would be any different under the pre-2019 regulations, and concluded they would not be. NOAA_000013-14. While the regulations were updated again in 2024, *see* 89 Fed. Reg. 24268 (Apr. 5, 2024), those amendments did not alter the definition of "cumulative effects," and the decision at issue in this litigation was appropriately made under the 2019 regulations. There are currently two pending facial challenges to the ESA regulations as issued by the Services in 2024. *Ctr. for Biological Diversity et al. v. U.S. Dep't of the Interior et al*., Case No. 3:24-cv-04651-JST (N.D. Cal. 2024); *Nat'l Hydropower Ass'n v. Fish & Wildlife Serv*., Case No. 24-2285-CRC (D.D.C. 2024).

Plaintiffs' summary judgment memorandum does not appear to assert a facial challenge to the regulatory definition of "cumulative effects." However, to the extent Plaintiffs nevertheless seek to mount such a facial challenge it would be untimely. The statute of limitations for such a facial challenge is 28 U.S.C. § 2401(a), which provides that, unless a separate limitations period is prescribed, "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). "A right of action 'accrues' when the plaintiff has a 'complete and present cause of action'—*i.e.*, when she has the right to 'file suit and obtain relief.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2450 (2024) (citation omitted). In an APA case, the statute of limitations begins to run when the plaintiff "suffers an injury from final agency action." *Id.* Because a facial challenge to the regulatory definition of "cumulative effects" by Plaintiffs or their members accrued over six years ago[18], a facial challenge is time barred pursuant to 28 U.S.C. § 2401(a).

Even if Plaintiffs had asserted a timely facial challenge to the regulatory definition of "cumulative effects," Plaintiffs would fail to meet their burden under the law of this Circuit to demonstrate that there is no circumstance under which the regulatory definition of "cumulative effects" may be lawfully applied. *Reno v. Flores*, 507 U.S. 292, 300-01 (1993); *Amfac Resorts, LLC v. Dep't of Interior*, 282 F.3d 818 (D.C. Cir 2002), *vacated on other grounds sub nom Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003) (citing *Flores*, 507 U.S. at 301). Plaintiffs fail to allege facts concerning agency decisions that applied the regulatory definition of "cumulative effects" other than has occurred with respect to the CVOW Project and, in any event,

---

[18] Plaintiff Committee for a Constructive Tomorrow was founded in 1985. *See* https://www.cfact.org/about/ (last visited Dec. 2, 2024). Plaintiff Heartland Institute was founded in 1984. *See* https://heartland.org/about-us/ (last visited Dec. 2, 2024). Plaintiff National Legal and Policy Center was founded in 1991*, see* https://nlpc.org/our-story/ (last visited Dec. 2, 2024). NMFS has applied its cumulative effects definition in every BiOp it has issued during the intervening period, including all BiOps affecting the NARW.

Plaintiffs have not adduced factual evidence to demonstrate that they were injured by such agency decisions.

Assuming *arguendo* that Plaintiffs allege an as-applied challenge to NMFS's application of its consultation regulations to reach its statutorily-required BiOp detailing how the agency action affects listed species and/or critical habitat pursuant to 16 U.S.C. § 1536(b)(3)(A), the Court should reject Plaintiffs' challenge. To determine how an agency action affects listed species under 16 U.S.C. § 1536(b)(3)(A), NMFS promulgated regulations specifying the scope of analysis for evaluating such effects (including the appropriate scope of "cumulative effects"). 50 C.F.R. §§ 402.02, 402.14. NMFS reasonably applied that regulation here to reach its opinion, and the record fully supports that determination.

"When it enacted the ESA, Congress delegated broad administrative and interpretive power to the Secretary." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,* 515 U.S. 687, 708 (1995). Even absent any delegation of discretion, the ESA's command to ensure that federal action will not jeopardize species is best read not to require consideration of future federal actions. If the agency included other future federal action in the cumulative effects analysis, "the jeopardy prohibition could operate to block 'nonjeopardy' actions because future, speculative effects occurring after the Federal action is over might, on a cumulative basis, jeopardize a listed species." 51 Fed. Reg. at 19933. This result is not contemplated by ESA Section 7, which directs an agency to make a particular assessment with respect to the specific "agency action" subject to consultation. *See* 16 U.S.C. § 1536(a)(2), (b)(1).

The ESA's mandate that the agency use the "best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), does not counsel otherwise. This language creates a "reasonable information standard" to be followed by the agencies during the consultation process. 51 Fed. Reg. at 19926. The provision speaks only to what type of data the agency must consider when conducting

its jeopardy analysis, *not* the scope of that analysis, and Plaintiffs err in suggesting otherwise. *See* ECF No. 36-1 at 24. In any event, the question of "what constitutes the best scientific and commercial data available is itself a scientific determination deserving of deference" under the APA. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014). *See also Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) ("Section 706 [of the APA] *does* mandate that judicial review of agency policymaking and factfinding be deferential.").

The record here confirms that NMFS acted consistently with the ESA and the regulatory definition of "cumulative effects" as part of its analysis in the BiOp of the effects of the CVOW Project on listed species, including the right whale. As explained in detail above, NMFS reasonably excluded future federal wind projects from consideration as "cumulative effects" within the meaning of the regulations, 50 C.F.R. § 402.02, because such future projects may or may not occur. NOAA_000215. If such future wind projects do occur, they will be subject to their own consultation. And when considering each subsequent project, the agency will consider previously-approved projects (including the CVOW Project) in the baseline. *Id.* If the additive effects of past projects will exceed the jeopardy standard for the species, the project under consideration cannot go forward as proposed without an exemption. Again, the ESA directs NMFS to take into account a project's effects on a species, but it does not direct how NMFS should account for such effects. 16 U.S.C. § 1536(a)(3). The Court should uphold NMFS's application of the regulatory definition of cumulative effects, because it is consistent with the "best reading" of the ESA, which requires NMFS to make a jeopardy determination for this specific "agency action" and not future ones. 16 U.S.C. § 1536(a)(2), (b)(1). Moreover, NMFS's application of the regulatory definition of cumulative effects achieves Section 7's mandate to determine the effects this specific "agency action" is expected to have on listed species and critical habitat. *Loper Bright*, 144 S. Ct. at 2263 ("When the best reading of a statute is that it delegates discretionary authority to an agency, the role

of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits."); *see also Kisor v. Wilkie,* 139 S.Ct. 2400, 2416 (2019) ("[T]he agency's reading must fall within the bounds of reasonable interpretation.") (cleaned up).

*Maine Lobstermen's Association v. NMFS,* 70 F.4th 582 (D.C. Cir. 2023), cited by Plaintiffs at ECF No. 36-1 at 28, does not support Plaintiffs' argument that NMFS's analysis falls outside statutory bounds. The *Maine Lobstermen's* decision had nothing to do with how NMFS should consider a project's cumulative effects in a biological opinion. The *Maine Lobstermen's* court determined that the agency had erred in applying a "precautionary principle" that the Court concluded resulted in overestimating the effects of lobster fishing on the right whale population. *Id.* at 598. There is no corresponding legal error here, and for the reasons stated above, NMFS's approach is consistent with the best reading of the ESA.

Having demonstrated that NMFS's reading of the ESA falls within the bounds of its delegated discretion and is in fact the best way to read the statute, the Court should review and uphold the BiOp and ITS for the CVOW Project, based on the administrative record, applying ordinary deference to the science-based determinations of NMFS pursuant to 5 U.S.C. § 706(2)(A). As explained in detail above, the record before the Court confirms as a factual matter that NMFS considered the effects of the CVOW Project in relation to the existing South Fork, Vineyard Wind, Ocean Wind 1, Revolution Wind, and Empire Wind projects as part of the "environmental baseline." NOAA_000215. NMFS explained that other, future offshore wind projects would be subject to at least one Federal authorization or permit triggering the ESA Section 7 consultation requirements and therefore do not constitute "cumulative effects" subject to analysis as part of the BiOp for the CVOW Project. *Id.* NMFS has explained the factual basis for its determinations as to which other wind projects are subject to analysis in its BiOp, and the Court should defer to the

agency's determinations not only as to what constitutes the best scientific information available but also the appropriate scope of analysis for "cumulative effects" in accordance with the ESA consultation regulations. *See Conservancy of Sw. Fla., Inc. v. Williams,* No. 13-14477-CIV-Martinez-Goodman, 2018 WL 11422990, at *16 (S.D. Fla. Dec. 21, 2018) (Assessment of cumulative effects "is an area clearly within the technical expertise of the agency to which this Court should defer."); *cf. Selkirk Conservation All. v. Forsgren,* 336 F.3d 944, 959 (9th Cir. 2003) (Under NEPA, courts "defer to an agency's determination of the scope of its cumulative effects review.") (*quoting Neighbors of Cuddy Mountain, v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002)).

Contrary to Plaintiffs' suggestion that NMFS is not owed deference with respect to its determinations concerning the appropriate scope of the BiOp's cumulative effects analysis or other determinations within the BiOp, *see* ECF No. 36-1 at 24, reviewing courts are at their "most deferential" when, as here, the agency is "making predictions, within its area of special expertise, at the frontiers of science." *Balt. Gas & Elec. Co v. Nat. Res. Def. Council*, *Inc.,* 462 U.S. 87, 103 (1983); *see also Marsh v. Or. Def. Res. Council*, 490 U.S. 360, 377 (1989). As the D.C. Circuit has noted, the court "must look at the decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc). Thus, the Court should defer to the NMFS BiOp's cumulative effects analysis and "no jeopardy" conclusion in accordance with D.C. Circuit precedent applying the "arbitrary and capricious" standard of review in ESA cases in accordance with the APA, 5 U.S.C. § 706(2)(A). *E.g.*, *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 686 (D.C. Cir. 1982) ("We conclude therefore that the appropriate standard of review under the ESA is the arbitrary and capricious standard provided by the APA.").

*See also Loper Bright,* 144 S.Ct. at 2261 ("Section 706 [of the APA] *does* mandate that judicial review of agency policymaking and factfinding be deferential.").

**IV.    BOEM Reasonably Relied on the NMFS BiOp.**

In addition to challenging the merits of NMFS's decision to issue its BiOp for the CVOW Project, *see* First Amended Complaint, ECF No. 11, Second and Fourth Causes of Action, ¶¶ 86-97 and 103-110, Plaintiffs also challenge BOEM's decision to rely on the NMFS BiOp to satisfy the ESA's substantive requirement to avoid jeopardizing right whales in connection with its decision to approve the CVOW COP. *Id.* ¶¶ 98-102 (Third Cause of Action against BOEM). *See also id.* ¶¶ *103-110* (Fourth Cause of Action)*.* BOEM's January 28, 2024 decision to approve the CVOW COP is expressly conditioned on the applicant's compliance with all terms and conditions of the NMFS BiOp. *See* BOEMCVOW_2313-14. In light of the BiOp's determination that the CVOW Project is not likely to jeopardize right whales, *see* NOAA_000231, to succeed on their claim Plaintiffs must demonstrate that: 1) NMFS's "no jeopardy" determination is arbitrary and capricious; and 2) BOEM unreasonably relied on this finding in approving the COP. *City of Tacoma, Washington v. F.E.R.C.*, 460 F.3d 53, 76 (D.C. Cir. 2006) (the "critical question" when reviewing the decision of an action agency to rely on a biological opinion is "whether the action agency's *reliance* was arbitrary and capricious. . . ."). An agency's reliance on a BiOp will satisfy its ESA obligations "if a challenging party can point to no 'new' information—i.e., information the [consultant agency] did not take into account—which challenges the opinion's conclusions." *Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir.1990), *quoted in City of Tacoma*, 460 F.3d at 76. Plaintiffs cite no such "new information" here. As explained in detail above, proposed offshore wind projects will be subject to their own ESA consultations, in turn, and therefore are not part of the requisite "cumulative effects" analysis for the CVOW Project. Plaintiffs do not assert any new information that calls into question the factual conclusions of the NMFS BiOp. Moreover, for the

reasons set forth above, the NMFS BiOp is fully supported by the record. Therefore, BOEM reasonably relied on the NMFS BiOp when it issued its ROD adopting the CVOW COP and the Court should grant summary judgment to Federal Defendants on Plaintiffs' Third and Fourth Causes of Action. *See* BOEMCVOW_2165 ("The incremental impacts of all action alternatives to NARWs would be minor due to implementation of several mitigation measures, e.g., clearance and shutdown zones, use of sound attenuation measures, numerous vessel strike avoidance measures, and use of Protected Species Observers (PSO) and Passive Acoustic Monitoring (PAM)."); *see also* BOEMCVOW_2313-4 (COP Approval provision incorporating terms of NMFS BiOp).

**V.    Plaintiffs Have Waived Their NEPA Claim.**

While Plaintiffs' Amended Complaint alleges that BOEM failed to comply with NEPA, ECF No. 11 at ¶¶ 81-85, Plaintiffs make no NEPA argument in their motion for summary judgment. Because in an APA case "the district court sits as an appellate tribunal and disposes of the case on cross-motions for summary judgment . . . a plaintiff's failure to raise arguments or theories in its motion for summary judgment results in waiver of those arguments." *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 72 (D.D.C. 2014) (citing *EMILY's List v. Fed. Election Comm'n*, 569 F. Supp. 2d 18, 25 n.6 (D.D.C. 2008)); *see also Marinette Marine v. Coast Guard*, 973 F. Supp. 1, 4 n.7 (D.D.C. 1997). Plaintiffs' motion for summary judgment only makes passing mention of NEPA in describing the background of the agencies' review processes, ECF No. 36-1 at 5, in describing the *ESA*'s requirements regarding cumulative effects, *id.* at 18-19, 31, 34, and in arguing they have standing as a general matter, *id.* at 20, 40. Their motion makes no substantive argument that BOEM violated NEPA, and the conclusion of their brief does not ask the Court to find that BOEM violated NEPA.[19] *See generally id.* Having offered no reason to find that BOEM's thorough environmental

_____

[19] Plaintiffs' First Amended Complaint does not allege that NMFS violated NEPA.

review of the Project violated NEPA, Plaintiffs waived their NEPA claim. *See Oceana*, 24 F. Supp. 3d at 72.

## VI.    Plaintiffs Are Not Entitled to Any Remedy, but Certainly Not the Requested Remedies.

Finally, Federal Defendants do not concede that there has been any legal error necessitating any remedy whatsoever. Even if the Court were to disagree, Plaintiffs' respective remedy requests, *see* ECF No. 36-2 (requesting an order vacating the NMFS BiOp and enjoining Project construction) go beyond the appropriate role of the Court under the APA, 5 U.S.C. § 706(2). The appropriate remedy in a case where an agency's decision is not supported by the record is a remand to the agency for additional investigation and explanation. *Fla. Power & Light Co.*, 470 U.S. at 744 (APA specifically contemplates judicial review on basis of agency record compiled in course of informal agency action in which a hearing has not occurred).

Plaintiffs' request, ECF No. 36-2, to enjoin Project construction "until [BOEM] and [NMFS] comply with the Endangered Species Act" is contrary to the APA, which provides that a court shall "set aside"—not "correct"—agency action that it finds to have been "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Thus, the Supreme Court has long held that a reviewing court, if it disapproves of agency action on review, ought not to order the agency to take specific action on remand. *See NLRB v. Food Store Emps. Union*, 417 U.S. 1, 10 (1974) ("when a reviewing court concludes that an agency invested with broad discretion . . . has apparently abused that discretion . . . , remand to the agency for reconsideration, and not enlargement of the agency order, is ordinarily the reviewing court's proper course"); *see also Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 525, 549 (1978) (courts should avoid engrafting their own notions of what the proper course of action is upon agencies entrusted with substantive functions by Congress); *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952) ("[T]he guiding principle [of APA review], violated here, is that

the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the [agency] for reconsideration." (citations omitted)).

If the Court concludes that there was some legal error with respect to the NMFS BiOp or BOEM's reliance on the NMFS BiOp, the Court should exercise its discretion to remand this matter without enjoining the CVOW Project. *See, e.g.*, *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) ("[W]hen equity demands, an unlawfully promulgated regulation can be left in place while the agency provides the proper procedural remedy." (citations omitted)); *Int'l United Mine Workers v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 966 (D.C. Cir. 1990) (The Court has "commonly remanded without vacating an agency's rule or order where the failure lay in lack of reasoned decisionmaking, . . . but also where the order was otherwise arbitrary and capricious" (citations omitted)); *Chemical Mfrs. Ass'n v. EPA*, 870 F.2d 177, 236 (5th Cir. 1989) (remanding without vacating).

As to Plaintiffs' request for injunctive relief, the standards for a permanent injunction require a plaintiff to demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Plaintiffs here have not addressed these factors in support of their request for injunctive relief. Although DEV is in the best position to articulate how its interests would be compromised if the Court granted Plaintiffs' requested relief, the Court should certainly balance the harm to the parties and "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-*

42

*Barcelo*, 456 U.S. 305, 312 (1982). Federal Defendants request the opportunity to submit further

briefing on the subject of remedy if the Court determines that any remedy is warranted.

## CONCLUSION

NMFS's and BOEM's determinations and analyses concerning the CVOW Project were

rational and are fully supported by the respective administrative records. Plaintiffs fail to carry their

burden to show that the agencies' actions were arbitrary, capricious, or contrary to law. Therefore,

Federal Defendants respectfully request that this Court grant their cross-motion for summary

judgment as to all claims asserted in Plaintiffs' First Amended Complaint, ECF No. 11.

Date:  December 3, 2024                          Respectfully submitted,

*Of Counsel:*                                    TODD KIM
                                                 Assistant Attorney General
                                                 Environment & Natural Resources Division
Stephen R. Vorkoper
Lori R. Monroe
Office of the Solicitor                          */s/ Mark Arthur Brown*
U.S. Department of the Interior                  MARK ARTHUR BROWN
1849 C Street, NW                                D.C. Bar No. 470050
Washington, D.C. 20240                           Wildlife and Marine Resources Section
                                                 P.O. Box 7611
Brandon Sousa                                    Washington, D.C. 20044-7611
Attorney-Advisor                                 (202) 305-0204
National Oceanic and Atmospheric                 mark.brown@usdoj.gov
Administration
Office of General Counsel, Fisheries and         AMANDA K. RUDAT
Protected Resources Section                      Trial Attorney
1315 East-West Highway                           Natural Resources Section
Silver Spring, MD 20910                          U.S. Department of Justice
(240) 621-1302                                   P.O. Box 7611
brandon.sousa@noaa.gov                           Washington, D.C. 20044-7611
                                                 (202) 532-3201
                                                 amanda.rudat@usdoj.gov

                                                 *Counsel for the United States*

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on December 3, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

<em><u>/s/ Mark Arthur Brown</u></em>

                                         Mark Arthur Brown