## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| COMMITTEE FOR A CONSTRUCTIVE TOMORROW, et al., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al., | ) ) ) |
| Defendants. | ) ) ) |

Case No. 24-cv-00774 (LLA)

Hon. Loren L. AliKhan

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR SUMMARY JUDGMENT MOTION AND OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Roger J. Marzulla, Bar No. 394907
Nancie G. Marzulla, Bar No. 400985
Mollie A. Jackowski, Bar No. 1780535
Marzulla Law, LLC
1150 Connecticut Ave., NW, Suite 1050
Washington, D.C. 20036
(202) 822-6760
nancie@marzulla.com
roger@marzulla.com
mollie@marzulla.com

Paul D. Kamenar, Bar No. 914200
1629 K. Street, N.W.
Suite 300
Washington, D.C. 20006
(301) 257-9435
paul.kamenar@gmail.com

Dated: March 24, 2025

Counsel for Plaintiffs

# Table of Contents

Table of Authorities.................................................................................................................. ii

Table of Abbreviations ........................................................................................................... iv

Argument ................................................................................................................................. 2

1.   Defendants Intentionally Failed to Analyze the Adverse Effects of Other Federal Offshore Wind Projects That Were on the Brink of Being Approved..................................................... 2

    1.1    The Cumulative Impacts of Projects Near Completion Were Not Speculative ......... 4

    1.2    The Statute Prevails Over an Inconsistent Regulation................................................. 5

    1.3    Other Courts Have Required Consideration of Known Impacts of Future Projects Under Section 7.................................................................................................................. 8

2.   Defendants Admit That, Without Excuse, They Failed to Consider the Best Scientific and Commercial Information Available, Including Their Own North Atlantic Right Whale and Offshore Wind Strategy ......................................................................................................... 10

    2.1    The North Atlantic Right Whale and Offshore Wind Strategy Jointly Prepared by NMFS and BOEM Is the Best Available Scientific Information on the Adverse Effects of Offshore Wind Projects on the Endangered North Atlantic Right Whale............................ 13

    2.2    References to the Hayes Letter and Other Government-Created Documents Relating to the Number of Takes and Deaths of North Atlantic Right Whales Demonstrate that NMFS Failed to Consider All Relevant Issues ................................................................................. 15

    2.3    Evidence Showing the Ecological Dangers of Turbine Debris and Malfunction on Marine Life Demonstrates that NMFS Should Have Considered Such Risks When Making the No Jeopardy Determination and NMFS Admits That It Did Not Review or Consider the Possibility of Turbine Failure................................................................................................. 18

    2.4    A Motion to Supplement the Administrative Record Would Have Been Futile, Since These Documents Were Not Considered and Therefore Not Part of the Administrative Record. ....................................................................................................................................... 20

3.   This Court's Ruling That at Least One Plaintiff Has Standing Is Law of the Case and Should Not Be Reconsidered ................................................................................................... 22

    3.1    Plaintiff, Craig Rucker, Has Established Standing for Himself, and Plaintiff, CFACT ……………………………………………………………………………………24

    3.2    Peter Flaherty and the National Legal and Policy Center Have Also Established Standing .................................................................................................................................. 27

    3.3    This Court Has Already Determined that CFACT Has Established Causation ........ 28

    3.4    This Court Has Authority to Redress CFACT's Injuries ......................................... 29

4.   The Court Should Vacate the Biological Opinion.............................................................. 30

Conclusion ............................................................................................................................. 33

**Table of Authorities**

## Cases

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993) ................... 31

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014) ................................................ 30

*Am. Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008). ..................................................... 11

*Animal Welfare Inst. v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540 (D. Md. 2009) ............. 24

*Appalachian Voices v. United States Dep't of Interior*, 25 F.4th 259 (4th Cir. 2022) ................... 7

*Bennett v. Spear*, 520 U.S. 154 (1997). ................................................................................... 27, 30

*Carlton v. Babbitt*, 26 F. Supp. 2d 102 (D.D.C. 1998) .......................................................... 12, 17

*Carpenters Indus. Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017) ........................................... 24, 27

*Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 243 F. Supp. 3d 91 (D.D.C.
    2017). .................................................................................................................................... 7

*City of Dania Beach v. F.A.A.*, 628 F.3d 581 (D.C. Cir. 2010). .................................................... 21

*Conservation L. Found. v. Pritzker*, 37 F. Supp. 3d 254 (D.D.C. 2014) ...................................... 31

*Ctr. for Biological Diversity v. Env't Prot. Agency*, 861 F.3d 174 (D.C. Cir. 2017). ............. 28, 30

*Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1 (D.D.C. 2024). ................................... 31

*Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236 (D.D.C. 2020) ............................ 30, 31

*Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670 (D.D.C. 1997). .................................................... 11

*Defs. of Wildlife v. Norton*, No. CIV.A.99-927(ESH), 2003 WL 24122459 (D.D.C. Jan. 7, 2003).
    ............................................................................................................................................ 8, 9

*Dixon v. United States*, 381 U.S. 68 (1965). ........................................................................... 5, 6

*EB5 Holdings, Inc. v. Jaddou*, No. CV 23-1180 (RC), 2024 WL 4431258 (D.D.C. Sept. 30,
    2024). ................................................................................................................................... 23

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371 (D.C.
    Cir. 2017) ............................................................................................................................ 22

*Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989) ............................................................. 11, 12, 15, 21

*Est. of Gaither ex rel. Gaither v. D.C.*, 771 F. Supp. 2d 5 (D.D.C. 2011) ................................... 23

*Fund For Animals v. Hall*, 448 F. Supp. 2d 127 (D.D.C. 2006). ..................................................... 8

*Humane Soc'y of the United States v. Jewell*, 76 F. Supp. 3d 69 (D.D.C. 2014). ......................... 31

*Isse v. Am. Univ.*, 544 F. Supp. 2d 25 (D.D.C. 2008) ................................................................... 23

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ........................................................ 1

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992). ................................................................... 24, 25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983). .. 11,
    15

*Mountain States Legal Found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996). .............................. 27

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1 (1st
    Cir. 2024). ............................................................................................................................ 9

*Nat. Res. Def. Council v. E.P.A.*, 489 F.3d 1250 (D.C. Cir. 2007) ............................................... 31

*Nat'l Min. Ass'n v. Jackson*, 856 F. Supp. 2d 150 (D.D.C. 2012). ............................................. 13

*Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92 (D.D.C. 2019). ...................... 31

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008)...................... 8

*Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203 (D.D.C. 2005). ........................................... 12, 20

*Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232 (D.D.C. 2015). ............................................. 31

*Orion Rsrvs. Ltd. P'ship v. Salazar*, 553 F.3d 697 (D.C. Cir. 2009). ....................................... 6

*Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028 (9th
Cir. 2001). ........................................................................................... 9, 10

*Pac. Shores Subdivision, California Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1
(D.D.C. 2006). .............................................................................. 12, 15, 20, 21

*Pub. Emps. for Env't Resp. v. United States Fish & Wildlife Serv.*, 189 F. Supp. 3d 1 (D.D.C.
2016) ..................................................................................................... 32

*S.E.C. v. Bilzerian*, 729 F. Supp. 2d 9 (D.D.C. 2010) ..................................................... 23

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071 (D.C. Cir. 2021)...11

*Sierra Club v. Nat'l Marine Fisheries Serv.*, No. CV DLB-20-3060, 2024 WL 3860211, (D. Md.
Aug. 19, 2024) .......................................................................................... 7

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978)................................................ 1, 4, 7

*Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685 (D.C. Cir. 1991). ................... 21

*Troy Corp. v. Browner*, 120 F.3d 277 (D.C. Cir. 1997)................................................... 11

*United States v. All Assets Held at Bank Julius, Baer & Co., Ltd.*, 308 F. Supp. 3d 186 (D.D.C.
2018) ..................................................................................................... 23

*United States v. Mayendia-Blanco*, 905 F.3d 26 (1st Cir. 2018)........................................ 29

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1 (D.D.C.
2020) ..................................................................................................... 24

## Statutes

16 U.S.C. § 1536(a)(2)..................................................................................... 5, 6, 14

16 U.S.C. § 1536.............................................................................................. 1, 11

## Other Authorities

51 Fed. Reg. 19,933 ............................................................................................ 4

90 Fed. Reg. 8363. .................................................................................... 2, 32, 33

## Regulations

50 C.F.R. § 402.02. ............................................................................................ 4

50 C.F.R. § 402.14(g)(8). .................................................................................... 11

50 C.F.R. § 402.16. ........................................................................................... 15

**Table of Abbreviations**

| Abbreviation | Definition |
|:---:|:---:|
| APA | Administrative Procedure Act |
| BOEM | Bureau of Ocean Energy Management |
| CFACT | Committee for a Constructive Tomorrow |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| NEPA | National Environmental Policy Act |
| NLPC | National Legal and Policy Center |
| NMFS | National Marine Fisheries Service |

Plaintiffs, Committee for a Constructive Tomorrow et al. (collectively "CFACT"), ask this Court to grant their motion for summary judgment and deny Defendants' cross-motions for summary judgment:

- Defendants do not explain how the federal agencies charged with the responsibility of protecting the highly endangered North Atlantic Right Whale, consistent with the plain language of the Endangered Species Act ("ESA")[1] and Supreme Court precedent construing the Act,[2] could have ignored the legal requirement to consider cumulative impacts of all planned wind turbine projects in the North Atlantic Right Whale's feeding and breeding grounds, along its migration route and within its designated critical habitat, to deem that "best available science" was used to determine the Project's impacts on the whale.

- The National Marine Fisheries Service ("NMFS") fails to explain how its interpretation of the ESA, which allows the agency to examine only a narrow slice of available information about the impacts of known and planned offshore wind projects that "may affect" the species, passes muster under *Loper Bright Enterprises v. Raimondo*.[3]

- Defendants offer no good reason as to why this Court should reconsider, under the same standard applicable here, its earlier ruling that Craig Rucker, President and Founder of CFACT, has standing to bring these claims.

---

[1] 16 U.S.C. § 1536.
[2] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184–85 (1978) ("The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute.").
[3] *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) (requiring courts to determine for themselves what a statute requires and to not automatically defer to an agency's interpretation of what a statute requires).

- The Government offers no plausible support for its argument that CFACT should have to supplement the administrative record with documents it relies on in its motion for summary judgment. CFACT does not seek to supplement the administrative record: CFACT instead brings to the Court's attention highly relevant post-decision events that will assist this Court's review of the issues before it.

CFACT further notes that the Government should be complying with the Executive Order issued on January 20, 2025, which prohibits Defendant, the Secretary of the Interior, from issuing any "new or renewed approvals, rights of way, permits, leases, or loans" for offshore wind projects "pending the completion" of a "comprehensive assessment and review" of the federal "wind leasing and permitting practices."[4] This review requires the agency to consider the same environmental impacts at issue in this case: "The assessment shall consider the environmental impact of onshore and offshore wind projects upon wildlife, including, but not limited to, birds and marine mammals."[5] The Government and the Company should advise the Court of remaining permits and approvals subject to this order and whether the Government has begun its comprehensive review of the Dominion Wind Project.

**Argument**

**1.    Defendants Intentionally Failed to Analyze the Adverse Effects of Other Federal Offshore Wind Projects That Were on the Brink of Being Approved**

The Government admits that, in approving the Dominion Wind Project, the Bureau of Ocean Energy Management ("BOEM") and NMFS intentionally excluded from their statutorily required jeopardy determination the adverse effects of all other Atlantic Coast offshore wind

---

[4] Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, 90 Fed. Reg. 8363.
[5] *Id.*

2

projects that were then in the approval process—and for which NMFS itself was then preparing
Biological Opinions. This includes the Biological Opinion for Sunrise Wind, an offshore wind
project off the coast of New York, issued on September 28, 2023,[6] just ten days after NMFS
issued the Dominion Wind Biological Opinion.[7] NMFS also issued the Atlantic Shores South
Biological Opinion three months later,[8] the New England 1 & 2 Projects Biological Opinion five
months later,[9] and the Maryland Offshore Wind Biological Opinion nine months later.[10]
Combined, these projects add 522 more turbines throughout the Right Whale's migration route.

NMFS and BOEM ignored in the Dominion Wind Section 7 consultation the following
projects:

| Project Name | Biological Opinion Issuance | # of Turbines |
| --- | --- | --- |
| Dominion Wind | Sept. 18, 2023 | 176 Turbines |
| Sunrise Wind | Sept. 28, 2023 | 84 Turbines |
| Atlantic Shores South | Dec. 18, 2023 | 195 Turbines |
| New England Wind 1 & 2 | Feb. 16, 2024 | 129 Turbines |
| Maryland Offshore Wind | June 18, 2024 | 114 Turbines |

---

[6] NMFS, *Sunrise Wind Biological Opinion* (Sept. 28, 2023),
https://www.fisheries.noaa.gov/s3/2023-10/Sunrise-Wind-Biological-Opinion-092823-508-
Compliant10172023.pdf.
[7] NMFS, *Dominion Wind Biological Opinion* (Sept. 18, 2023),
https://coastalvawind.com/resources/pdf/20230918_cvow-c_nmfs_biological_opinion.pdf.
[8] NMFS, *Atlantic Shores South Biological Opinion* (Dec. 18, 2023),
https://repository.library.noaa.gov/view/noaa/66052.
[9] BOEM, *New England Wind 1 & 2 Biological Opinion* (Feb. 16, 2024),
https://repository.library.noaa.gov/view/noaa/60610.
[10] NMFS, *Maryland Offshore Wind Biological Opinion* (June 18, 2024),
https://repository.library.noaa.gov/view/noaa/61632.

## 1.1    The Cumulative Impacts of Projects Near Completion Were Not Speculative

The Government argues that it excluded consideration of these pending projects because federal approvals are "'speculative.'"[11] The Government's argument is specious because the Biological Opinion for Sunrise Wind was issued just 10 days after Dominion Wind's and was doubtless in the final stage of issuance at that time Dominion Wind's Biological Opinion was issued. The combined effect on the migrating Right Whale that must now swim through both the Dominion Wind and Sunrise Wind areas—let alone the five projects NMFS and BOEM had approved before Dominion Wind, and the four projects they approved soon afterward—should not have been ignored (consistent with its obligations under Section 7) by NMFS and BOEM in approving this Project.

The Government does not consider state or private projects "speculative"—even though it has no direct control over them. As the Government admits, it considers "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation,"[12] but does not consider the identical adverse effects on endangered species from the same kind of federal activities.[13] The Government's interpretation of its obligations under Section 7 defeats the very purpose of the ESA, which is to "use . . . all methods and procedures which are necessary" to prevent a listed species from becoming extinct.[14]

The Government does not argue that information about the adverse effects of these ongoing project approvals on the Right Whale was unreliable or irrelevant. Rather, the

---

[11] Gov't Memo. in Supp. of S.J. at 35, ECF No. 38-1 (Dec. 3, 2024) (quoting 51 Fed. Reg. 19,933).
[12] 50 C.F.R. § 402.02.
[13] Gov't Memo. in Supp. of S.J. at 25, ECF No. 38-1 (Dec. 3, 2024).
[14] *Tennessee Valley Authority*, 437 U.S. at 185.

Government believes that it may ignore the adverse effects of unapproved federal (but not state or private) activities because it chooses to do so. And what if the synergistic impacts of the Dominion and Sunrise Projects, issued ten days apart, do jeopardize the species? The Government offers no legitimate reason as to why it can, under the ESA, ignore that jeopardy to the species just because one biological opinion was issued ten days earlier than the other.

The ESA gives the agency no statutory discretion to ignore important and relevant information in making a jeopardy determination; to the contrary, Section 7 states that "each Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species"[15] and specifically tasks NMFS with the statutory duty to make its jeopardy determination using "the best scientific and commercial data available."[16]

## 1.2    The Statute Prevails Over an Inconsistent Regulation

Defendants argue that, regardless of what the ESA provides, "[c]ourts cannot ignore the existence or plain terms of a regulation."[17] But if a regulation conflicts with the statute or "operates to create a rule out of harmony with the statute," that regulation "is a mere nullity."[18]

As the Government concedes, CFACT's claim is not a facial challenge to the regulation,[19] but a response to the Government's and the Company argument that they were not required to consider the soon-to-be-approved projects like Sunrise Wind because their regulation says so. CFACT's sole point here is that, where the regulation is inconsistent with the statute, it is the

---

[15] 16 U.S.C. § 1536(a)(2).
[16] *Id.*
[17] Dominion Energy Memo. in Supp. of S.J. at 19, ECF No. 40-1 (Dec. 17, 2024).
[18] *Dixon v. United States*, 381 U.S. 68, 74 (1965) (internal citations omitted).
[19] Gov't Memo. in Supp. of S.J. at 34, ECF No. 38-1 (Dec. 3, 2024).

statute and not the regulation that defines the agency's legal obligation.[20] Here, NMFS's obligation was to determine whether proposed federal actions—e.g., Dominion Wind, Sunrise Wind, Atlantic Shores South, New England Wind 1 & 2, and the Maryland Offshore Wind Project—jeopardize the continued existence of the Right Whale and to prepare a written Biological Opinion stating the reasons for its conclusion.[21] So, even if the agencies published a regulation exempting themselves from considering relevant information about the effects of other pending government approvals, that regulation does not exempt NMFS and BOEM from their statutory obligation to determine jeopardy using "the best scientific and commercial data available."[22]

The Government cannot hide behind NMFS's regulation to excuse its failure to consider the best scientific and commercial information available, and the Company is wrong in arguing that, because this regulation is duly promulgated, the Court must accept the Government's failure because NMFS was simply following the regulation as written. The power of agencies "to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law . . . but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute[,]" and when a regulation does not carry out the will of Congress expressed by the statute, "but operates to create a rule out of harmony with the statute," that regulation "is a mere nullity."[23] Authority to "issue regulations is not the power to make law, and a regulation contrary to a statute is void."[24] And in cases where an agency applies a regulation

---

[20] *Dixon*, 381 U.S. at 74.
[21] 16 U.S.C. § 1536(a)(2).
[22] *Id.*
[23] *Dixon*, 381 U.S. at 74 (internal citations and quotations omitted).
[24] *Orion Rsrvs. Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009).

that conflicts with the statute from which its authority derives, affected parties may challenge the application of the regulation on those grounds.[25]

NMFS's regulation excluding federal actions from the cumulative effects analysis directly conflicts with the plain meaning and intent of Congress in passing the Endangered Species Act, which was to

> halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute. . . . Agencies in particular are directed . . . to "use . . . all methods and procedures which are necessary" to preserve endangered species.[26]

Refusing to look at the cumulative effects of a major federal program that impacts the North Atlantic Right Whale along its entire migration route contradicts the directive to "use . . . all methods and procedures which are necessary" to preserve endangered species. Refusing to consider how North Atlantic Right Whales are impacted by other offshore wind projects when considering whether this Project will jeopardize an already weakened and susceptible species fails to look at the full picture of how this endangered species will really be impacted.

Other circuits have recognized that under the ESA, "'[w]hen it comes to protecting listed species, environmental context is critical.'"[27] Here, using its regulations as a defense, NMFS has refused to evaluate and consider the cumulative effects of the offshore wind program and evaluated this Project in a vacuum. Other circuits have warned that this type of review does the exact opposite of what the ESA was intended to do:

> If the Fish and Wildlife Service conducted its 'jeopardy analysis in a vacuum,' focusing only on the individual agency action at issue, then 'a listed species could

---

[25] *See generally Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 243 F. Supp. 3d 91 (D.D.C. 2017).

[26] *Tennessee Valley Authority*, 437 U.S. at 184–85.

[27] *Sierra Club v. Nat'l Marine Fisheries Serv.*, No. CV DLB-20-3060, 2024 WL 3860211, at *14 (D. Md. Aug. 19, 2024) (quoting *Appalachian Voices v. United States Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022)).

be gradually destroyed, so long as each step on the path to destruction [wa]s sufficiently modest.' . . . But this 'slow slide into oblivion is one of the very ills the [Endangered Species Act] seeks to prevent.'"[28]

This Project does not exist in a vacuum; it is part of a massive-scale, "coordinated" plan to develop in rapid succession numerous projects, which will consist of thousands of turbines all along the Atlantic coast of the United States.[29] Because NMFS's regulation allowed it to ignore cumulative impacts from future offshore wind projects and the best scientific and commercial data available on how 30-plus projects along the North Atlantic Right Whale's migratory route jeopardizes the species' continued existence, NMFS's final agency action directly conflicts with the ESA and is reviewable under the Administrative Procedure Acts ("APA").

### 1.3    Other Courts Have Required Consideration of Known Impacts of Future Projects Under Section 7

The Company is wrong when it asserts that this Court and others have rejected obligations to consider future projects in an ESA consultation. *Fund for Animals v. Hall*[30] involved challenges under the National Environmental Policy Act ("NEPA") and the APA, not the ESA, and the Court's decision reflected that a Section 7 consultation and Biological Opinion could not replace NEPA's review requirements.[31] In *Defenders of Wildlife v. Norton*,[32] the plaintiffs argued that all federal actions must be considered in a Biological Opinion. CFACT does not make this argument; instead, CFACT argues that NMFS must look at the cumulative

---

[28] *Appalachian Voices*, 25 F.4th at 269 (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 929–30 (9th Cir. 2008)).
[29] Biden Administration, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (Mar. 29, 2021), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.
[30] *Fund For Animals v. Hall*, 448 F. Supp. 2d 127, 136 (D.D.C. 2006).
[31] *Id.* at 135–37.
[32] *Defs. of Wildlife v. Norton*, No. CIV.A.99-927(ESH), 2003 WL 24122459, at *5 (D.D.C. Jan. 7, 2003).

effects of the other offshore wind projects in making a jeopardy determination. But the *Norton* court also concluded that a Biological Opinion "must consider other agencies' projects in determining the likely effect of that single agency's action on the endangered species,"[33] signaling that other federal projects must also be considered in a Biological Opinion, not just the single action under review. And in *Nantucket Residents*,[34] the plaintiffs relied on general statements from a scientific article regarding failure to consider cumulative effects—not the failure to consider Government-made documents and Government decisions regarding the number of takes from offshore wind projects and other offshore wind projects' impacts on the North Atlantic Right Whale.

*Pacific Coast*,[35] is not inapposite, as the Company argues. In *Pacific Coast*, plaintiffs challenged several individual biological opinions and argued that NMFS's "disregard of projects with a relatively small area of impact but that carried a high risk of degradation when multiplied by many projects and continued over a long time period" was a major flaw in the Section 7 analysis.[36] The Ninth Circuit went on to explain that other federal projects, whether future or already approved, must be considered, or else individual project impacts would become diluted:

> Unless the effects of individual projects are aggregated to ensure that their cumulative effects are perceived and measured in future ESA consultations, it is difficult to have any confidence in a wide regional no-jeopardy opinion. Failure to account adequately for the cumulative effects of the various projects undermines the assumptions that the district court authorized NMFS to make in PCFFA I. If the effects of individual projects are diluted to insignificance and not aggregated, then Pacific Coast is correct in asserting that NMFS's assessment of ACS consistency at

---

[33] *Id.*
[34] *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1 (1st Cir. 2024).
[35] *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028 (9th Cir. 2001).
[36] *Id.* at 1036.

the watershed level is tantamount to assuming that no project will ever lead to jeopardy of a listed species.[37]

What happened in *Pacific Coast* is happening here: NMFS is reviewing each of these offshore wind projects in a vacuum, failing to look at how, once aggregated, all the projects will jeopardize the North Atlantic Right Whale. While six "harassment" takes here might not seem like anything to NMFS, when all projects are combined, NMFS has approved the take, by harassment, of more Right Whales than are currently in existence. While NMFS's authorized takes of Right Whales have not authorized the killing of any whale, NMFS has stated that less than one Right Whale can die annually.[38]

Combined, the offshore wind program surely jeopardizes the continued existence of the North Atlantic Right Whale. Right Whales will be harassed as they migrate along the coast, making them more vulnerable with each harassment, leading to increased likelihoods of death,[39] but individually, under NMFS's truncated analysis, none of the projects alone will ever jeopardize the species. Without looking at future offshore wind projects, NMFS is diluting the impact on the North Atlantic Right Whale and shirking its duties under the ESA to preserve the continued existence of the species.

**2.      Defendants Admit That, Without Excuse, They Failed to Consider the Best Scientific and Commercial Information Available, Including Their Own North Atlantic Right Whale and Offshore Wind Strategy**

Section 7 of the Endangered Species Act imposes an explicit, affirmative duty on all federal agencies to ensure that their actions are not likely to jeopardize the continued existence of

---

[37] *Id.* at 1036–37.
[38] Bureau of Ocean Energy Management, BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy (Jan. 2024) at 7, https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW_0.pdf (Right Whale Strategy).
[39] *Id.*

a species, using "the best scientific and commercial data available."[40] This provision "prohibits the Secretary from disregarding available scientific evidence that is in some way better than the evidence he relie[d] on."[41] This standard requires agencies to "consider the scientific information presently available."[42] In its review, the court holds "'agencies to certain minimal standards of rationality.'"[43]

The Government unapologetically admits that it failed to consider several critical Government documents, including the *North Atlantic Right Whale and Offshore Wind Strategy*,[44] which provide critical evidence concerning the precarious existence of the North Atlantic Right Whale[45]—rendering its Biological Opinion arbitrary and capricious for failing to consider an "important aspect of the problem[.]"[46] Adding insult to injury, the Government now seeks to bar the Court from even seeing those agency-ignored documents to determine whether, as CFACT asserts, they should have been considered during the ESA consultation.

But evidence that is not part of an Administrative Record is reviewable by the Court when, as here, it proves that the Government failed to consider important factors relevant to that final agency action.[47] Courts have broad discretion to review extra record evidence in instances where, as here, the "agency failed to consider factors which are relevant to its final decision[.]"[48]

---

[40] *See* 16 U.S.C. § 1536; *see also* 50 C.F.R. § 402.14(g)(8).
[41] *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 998 (D.C. Cir. 2008) (internal citations and quotations omitted).
[42] *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 680 (D.D.C. 1997).
[43] *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1090 (D.C. Cir. 2021) (quoting *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997)).
[44] *See* Right Whale Strategy *supra* note 38.
[45] Gov't Memo. in Supp. of S.J. at 12, 14, ECF No. 38-1 (Dec. 3, 2024).
[46] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).
[47] *See Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (a court can review extra-record documents "when the agency failed to consider factors which are relevant to its final decision.").
[48] *Id.*

And courts review extra-record documents to help them "understand the issues clearly,"[49] or in instances where "simply reviewing the administrative record is not enough to resolve the case."[50] The D.C. Circuit has held that "when the substantive soundness of the agency's decision is under scrutiny . . . it may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective,"[51] and the Court has enumerated eight exceptions that, if found, trigger the need for extra-record review:

> (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.[52]

In *Oceana, Inc. v. Evans*,[53] for example, the court allowed the use of extra-record review to evaluate a letter written by a scientist who developed the model used by NMFS to determine whether NMFS's use of that model was inappropriate.[54] In *Carlton v. Babbit*,[55] NMFS relied on a scientific article in its decision-making process, and the Court implemented an extra-record review to evaluate a letter from the scientist explaining why NMFS's use of the article was improper. Specifically, the Court found that the author's "understanding of his own article [was] particularly relevant and should have been considered in connection with this matter."[56] And in

---

[49] *Id.*

[50] *See Pac. Shores Subdivision, California Water Dist. V. U.S. Army Corps of Eng'rs,* 448 F. Supp. 2d 1, 6 (D.D.C. 2006).

[51] *Esch*, 876 F.2d at 991.

[52] *Id.*

[53] *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 213–14 (D.D.C. 2005).

[54] *Id.* at 217 n.17.

[55] *Carlton v. Babbitt*, 26 F. Supp. 2d 102 (D.D.C. 1998).

[56] *Id.* at 108.

*National Mining Association v. Jackson*,[57] this Court utilized extra-record review because "while the administrative record [was] not so bare as to frustrate judicial review as to all of the plaintiffs' claims, it [was] entirely bare as to how the EPA has applied the Final Guidance."[58]

### 2.1 The North Atlantic Right Whale and Offshore Wind Strategy Jointly Prepared by NMFS and BOEM Is the Best Available Scientific Information on the Adverse Effects of Offshore Wind Projects on the Endangered North Atlantic Right Whale

NMFS and BOEM jointly prepared the North Atlantic Right Whale and Offshore Wind Strategy to "focus and coordinate efforts related to" North Atlantic Right Whales and offshore wind development.[59] Inexplicably, however, NMFS failed to consider this critically important study in preparing its Biological Opinion for the Dominion Wind Project. Had it done so, NMFS would have realized that the conclusions in that Strategy confirm the adverse impacts this Project will have on the whale:

- The North Atlantic Right Whale has a "range [that] overlaps with the area proposed for [offshore wind] development. . . ."[60]

- "The activities associated with [offshore wind] development would introduce or further contribute to existing stressors in the environment that affect [North Atlantic Right Whales],"[61] including "exposure to noise and/or pressure (particularly from construction activities),"[62] resulting in "hearing impairment, masking of [North Atlantic Right Whale]

---

[57] *Nat'l Min. Ass'n v. Jackson*, 856 F. Supp. 2d 150 (D.D.C. 2012).
[58] *Id.* at 158.
[59] Right Whale Strategy *supra* note 38 at 1.
[60] *Id.* at 5.
[61] *Id.* at 12.
[62] *Id.*

vocal communication, physiological impacts (e.g., stress), and/or behavioral disturbance, as well as mortality and injury. . . ."[63]

- "The extent to which OSW development may increase or alter entanglement risk and how changes in habitat may affect [North Atlantic Right Whales], particularly through sublethal effects that do not result in mortality or serious injury, are not as well understood. Sublethal effects can be direct or indirect, and often scientific quantification of indirect effects is challenging, though some can be modeled."[64]

- "Whales that are in compromised condition (e.g., injured, entangled, malnourished) and exposed to stressors are likely to experience more severe consequences than healthy animals."[65]

Defendants argue that the Strategy is "nonbinding."[66] But they cannot and do not contend that it does not contain crucially important scientific information about the North Atlantic Right Whale, including that impacts on Right Whales "could result from stressors generated from a single project," and "there is the potential for these effects to be compounded by exposure to multiple projects" because migrating whales "have the potential to travel near or through many" offshore wind developments.[67] And nothing in the ESA allows the agencies to ignore the "best scientific information available"[68] because it is found in a nonbinding document (as, for example, a scientific study of the adverse effects of offshore wind projects on the Right Whale).

---

[63] *Id.*
[64] *Id.*
[65] *Id.* at 14.
[66] Gov't Memo. in Supp. of S.J. at 14, ECF No. 38-1 (Dec. 3, 2024).
[67] Right Whale Strategy *supra* note 38 at 14.
[68] 16 U.S.C. § 1536(a)(2).

Nor can this document be found in the administrative record, which contains the information the agencies relied on in making their decisions.[69] The whole point is that they ignored and did not consider the document—thus failing to consider "important aspect[s] of the problem."[70]

Defendants argue that the Court is not allowed to see the Strategy because the final version (but not the draft version) was published after BOEM published the Dominion Wind Record of Decision. The plain fact is that at least the Draft Strategy, with its critically valuable scientific information regarding the Right Whale, was available at the time the agencies published the Biological Opinion and the Record of Decision.[71] But even documents that post-date the agency action can be reviewed when evidence arising after the agency action shows whether the decision was correct or not.[72] In addition, Section 7 requires NMFS to reinitiate consultation when "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."[73]

### 2.2    References to the Hayes Letter and Other Government-Created Documents Relating to the Number of Takes and Deaths of North Atlantic Right Whales Demonstrate that NMFS Failed to Consider All Relevant Issues

The Government objects to the May 2022 Hayes Letter, written by Dr. Sean A. Hayes, NMFS's Director of Protected Species, to BOEM regarding the "population-level effects" offshore wind poses to North Atlantic Right Whales. This letter completely undermines the

---

[69] *See Pac. Shores Subdivision, California Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 7 (D.D.C. 2006).

[70] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[71] The Draft Strategy was published in October 2022. *See* National Marine Fisheries Service and Bureau of Ocean Energy Management, Draft North Atlantic Right Whale and Offshore Wind Strategy (Oct. 2022), https://www.regulations.gov/document/BOEM-2022-0066-0003.

[72] *Esch*, 876 F.2d at 991.

[73] 50 C.F.R. § 402.16.

Government's repeated assertions that this Project poses no significant risk to the North Atlantic Right Whale. The letter highlights that offshore wind development poses risks to the Right Whale,

> at varying stages, including construction and development, and include increased noise, vessel traffic, habitat modifications, water withdrawals associated with certain substations and resultant impingement/entrainment of zooplankton, changes in fishing effort and related potential increased entanglement risk, and oceanographic changes that may disrupt the distribution, abundance, and availability of typical right whale food. . . . [U]nlike vessel traffic and noise, which can be mitigated to some extent, oceanographic impacts from installed and operating turbines cannot be mitigated for the 30-year lifespan of the project, unless they are decommissioned.[74]

To defend against CFACT's claims, the Government attempts to undermine the Hayes letter and his opinions. But Dr. Sean Hayes is not some random scientist with unsolicited opinions on these projects. Dr. Hayes is NMFS's current Director of Protected Species and at the time he wrote the letter, he was the Protected Species Branch Chief, where he oversaw the teams managing ESA and Marine Mammal Protection Act research for marine mammals.[75] His research and findings as a lead scientist at NMFS were important enough to be cited throughout the Dominion Wind Biological Opinion, including a NMFS technical report evaluating North Atlantic Right Whale recovery challenges and several U.S. Atlantic and Gulf of Mexico marine mammal stock assessments.[76]

In cases like this, where a scientist whose work has been used to formulate a biological opinion is brought in to challenge an agency decision, courts have allowed extra-record review.

---

[74] Dr. Sean A. Hayes Letter, Ex. 1 to CFACT's Memo. in Supp. of S.J. at 1, ECF No. 36-3 (Oct. 4, 2024).
[75] NOAA Fisheries, *Sean Hayes, Ph.D.*, https://www.fisheries.noaa.gov/contact/sean-hayes-phd (last visited Mar. 21, 2025).
[76] NOAA_000265-000266 (seven sources written by Sean A. Hayes).

In *Carlton v. Babbit*,[77] a case reviewing a biological opinion, this Court allowed extra-record review of a letter written by a scientist who had written an article heavily relied upon by NMFS in making its decision because the author's "understanding of his own article was particularly relevant and should have been considered in connection with this matter."[78] Here, Dr. Hayes's understanding of his research—research that was used by NMFS in the Biological Opinion—is relevant to how NMFS ultimately made its final decision and is reviewable.

The Government also objects to CFACT's citations to other Government documents evidencing the number of takes that have been approved by NMFS for offshore wind projects and NMFS's own reports regarding the death and serious injuries of North Atlantic Right Whales, several of which have occurred near offshore wind leases and one of which occurred last year offshore Virginia, near the Dominion Wind Project. In making these objections, NMFS confirms that it failed to consider how its approvals in other projects, and future approvals, would impact the species as a whole when making its determination here. Without seeing the opinions of other NMFS scientists who reviewed other offshore wind projects, the staggering number of takes approved under Marine Mammal Protection Act permits, and the increasing number of Right Whale deaths in and around offshore wind leases, this Court will not be able to determine whether NMFS failed to consider issues relevant to its final decision.

---

[77] *Carlton*, 26 F. Supp. 2d 102.
[78] *Id.* at 108.

**2.3  Evidence Showing the Ecological Dangers of Turbine Debris and Malfunction on Marine Life Demonstrates that NMFS Should Have Considered Such Risks When Making the No Jeopardy Determination and NMFS Admits That It Did Not Review or Consider the Possibility of Turbine Failure**

NMFS had the statutory duty to consider available scientific information on how the Project would impact North Atlantic Right Whales. This includes information on how blade and turbine failures would impact endangered species swimming in and traveling through the area. But, not only does the Biological Opinion fail to discuss or mention such impacts from turbine and blade failures, it also fails to discuss how turbine blade debris from multiple projects— already approved projects and future planned projects—will degrade the ocean environment, alter food sources, and change North Atlantic Right Whale migration routes—issues which CFACT raised in its Amended Complaint, its 60-Day Notice Letter, and has consistently argued in its briefing.

Because of the deficiencies with NMFS's review, and by extension the Administrative Record, CFACT referenced those documents to advise the Court of the likelihood of a turbine blade failure and how dangerous such a failure can be to endangered species and their environments. The Government continues to push its baseless narrative that the record does not support any danger from turbine blade failure and debris in the water, but that evidence does not exist because NMFS intentionally chose not to review it. Just because NMFS did not analyze or consider the issue does not mean that there is no threat.

The Government, in arguing that the Court should not consider evidence of turbine blade failure at other offshore wind projects, erroneously asserts that CFACT's claims are limited to claims "concerning potential effects of the [Coastal Virginia Offshore Wind] Project on right

18

whales."[79] Not so. CFACT's claims have always been centered around how NMFS "failed to address the cumulative, connected, and synergistic impacts of implementing the [Offshore Wind] projects slated for the Atlantic Coast, including but not limited to the [Coastal Virginia Offshore Wind] facility," and "failed to consult and use the best available scientific and commercial information in its analyses."[80] Because these creatures travel through the lease areas for more than 30 offshore wind projects, turbine and blade failures at other projects should have been considered. The whales were exposed to debris and chemicals from the Vineyard Wind 1 Project turbine blade failure in July 2024 and would also likely be exposed to other debris and chemicals from turbine or blade failure as they migrate back through the other lease areas.

These turbine generators are more than 800-feet tall, with blades made of fiberglass and other chemicals that are more than 350-feet long. Each turbine contains tens of thousands of gallons of coolants, oils, and lubricants.[81] How these materials impact endangered species, should material from one of the 168 turbines (plus the thousands of other turbines along the east coast) end up leaking or falling into the water, is something NMFS should have considered in its Biological Opinion. The evidence cited by CFACT demonstrates the dangers of these scenarios and establishes for the Court just one of the many issues that NMFS failed to consider that were relevant to its decision.

The Government misses the mark by arguing that CFACT never commented on this during the Environmental Impact Statement ("EIS") process. However, CFACT's claim relates to the ESA and NMFS's Section 7 consultation and review, which does not allow for public

---

[79] Gov't Memo. in Supp. of S.J. at 11, ECF No. 38-1 (Dec. 3, 2024).
[80] Amend. Compl. ¶ 31, ECF No. 11 (Apr. 16, 2024).
[81] BOEMCVOW_951.

comment.[82] The Government made this same unsuccessful argument in *Oceana, Inc. v. Evans*,[83] where the Court allowed extra-record evidence because "there was no public comment period for" the Biological Opinion and the scientist only "became aware of the [Biological Opinion's] use of [her] model," after the Biological Opinion was published.[84]

### 2.4    A Motion to Supplement the Administrative Record Would Have Been Futile, Since These Documents Were Not Considered and Therefore Not Part of the Administrative Record

The Government confuses supplementation of the record with extra-record review and incorrectly argues that because CFACT did not attempt to supplement the record with these documents, these documents should not be considered. As this Court explained in *Pacific Shores*,[85] supplementing the record, which is "adding to the volume of the administrative record with documents the agency considered,"[86] should not be confused with extra-record evidence, which allows the court to view "evidence outside of or in addition to the administrative record that was not necessarily considered by the agency."[87] Only documents that "were directly or indirectly considered by the [agency] decisionmaker(s) should be included in the administrative record."[88] Whereas, extra-record documents could include any other type of relevant evidence. Just as the Government conflates these two separate processes, it also conflates the standard that must be met for extra-record review. CFACT does not, as the Government erroneously contends, have to "rebut the presumption of administrative regularity," rather, CFACT must show that "one

---

[82] *See Oceana, Inc.*, 384 F. Supp. 2d at 217 n.17.
[83] *Oceana, Inc.*, 384 F. Supp. 2d 203.
[84] *Id.* at 217 n.17.
[85] *See Pac. Shores Subdivision, California Water Dist.*, 448 F. Supp. 2d at 5–6.
[86] *Id.* at 5.
[87] *Id.*
[88] *Id.* at 7.

of the eight recognized exceptions to the general prohibition against extra-record review"[89] has

been met.

The Government relies on cases that involve only record supplementation, not review of documents that were never part of the evidence the agency reviewed in making its decision. Contrary to the Government's assertion, in *Pacific Shores*, the court never analyzed whether extra-record review was available because the plaintiffs in that case did not ask for that type of review.[90] Likewise, *City of Dania Beach v. FAA*,[91] is inapplicable because it dealt with the issue of record supplementation, not whether the Court could review evidence that was not in the record because the agency failed to consider it. *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.,*[92] is also not applicable because it involved a discovery request, not evidence that the agency should have considered but did not. Here, none of the documents cited by CFACT were reviewed or in front of the agency at the time the decision was made, making record supplementation improper. As already discussed, however, these documents call into question the "substantive soundness" of NMFS's decision, and CFACT has established two of the eight exceptions to extra-record review apply: "[W]hen the agency failed to consider factors which are relevant to its final decision" and "where evidence arising after the agency action shows whether the decision was correct or not."[93]

---

[89] *See id.* at 5–6.
[90] *Id.* at 6.
[91] *City of Dania Beach v. F.A.A.*, 628 F.3d 581, 590 (D.C. Cir. 2010).
[92] *Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991).
[93] *Esch*, 876 F.2d at 991.

**3.    This Court's Ruling That at Least One Plaintiff Has Standing Is Law of the Case and Should Not Be Reconsidered**

In ruling on CFACT's motion for an administrative stay or preliminary injunction, the Court determined that Plaintiff, Craig Rucker, has standing to bring this case. That ruling is the law of this case, and Defendants offer no good reason why the Court should reconsider that ruling.

Defendants are wrong when they argue that the Court's finding that Rucker has standing (and therefore the Court has jurisdiction) was based on a lesser showing than required at the summary judgment stage. As the D.C. Circuit has held, the same showing to establish standing applies at both the preliminary injunction and the summary judgment stage: "In the context of a preliminary injunction motion, we require the plaintiff to 'show a substantial likelihood of standing' 'under the heightened standard for evaluating a motion for summary judgment.'"[94]

In ruling on the preliminary injunction, this Court concluded, applying this "heightened standard,"[95] "that Plaintiffs have shown a substantial likelihood that at least one plaintiff, Mr. Rucker, has standing. . . ."[96] The Court found that Rucker had shown injury-in-fact through his "abiding interest in the Right Whale," his "concrete plans to observe the Right Whale in the near future," and his belief, "that the Project will interfere with" his concrete plans.[97] The Court also found that Rucker had established causation by contending that NMFS "failed to consider cumulative effects" in the Biological Opinion "leading to approval of a project that will hinder his ability to observe the Right Whale."[98] And the Court found that Rucker's injuries were

---

[94] *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (citations omitted).
[95] *Id.*
[96] Memo. Op. and Order Denying Mot. for Stay at 8, ECF No. 28 (May 24, 2024).
[97] *Id.* at 6.
[98] *Id.* at 7.

redressable because "requiring NMFS to consider cumulative effects in its Biological Opinion could cause NMFS to reach a different conclusion regarding the Project's effects on the Right Whale."[99]

Defendants are, in effect, asking the Court to reconsider its prior ruling that Rucker has standing. But, motions for reconsideration—whether actual or de facto—"cannot be used as 'an opportunity to reargue facts and theories upon which a court has already ruled[.]'"[100] Efficient administration of justice requires that there be good reason for a court to reconsider an issue already litigated by the parties.[101] Yet Defendants offer no good reason (or any reason at all) why the Court should undertake reconsideration of its existing, heightened-standard ruling that Rucker has standing. And Defendants have failed to identify any extraordinary circumstances, such as change in controlling law, new evidence, or the need to correct clear errors or prevent manifest injustice, to justify the Court reconsidering its previous determination.[102]

To have jurisdiction of this case, this Court need only find that one plaintiff has standing.[103] As the D.C. Circuit and Supreme Court have held, if "constitutional standing 'can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise

---

[99] *Id.*

[100] *Est. of Gaither ex rel. Gaither v. D.C.*, 771 F. Supp. 2d 5, 10 (D.D.C. 2011) (quoting *S.E.C. v. Bilzerian*, 729 F. Supp. 2d 9, 14 (D.D.C. 2010)) (the court noted that defendants' motion was not a bona fide motion for reconsideration but rather an attempt to relitigate matters already decided).

[101] *See United States v. All Assets Held at Bank Julius, Baer & Co., Ltd.*, 308 F. Supp. 3d 186, 193 (D.D.C. 2018); *Isse v. Am. Univ.*, 544 F. Supp. 2d 25, 30 (D.D.C. 2008) ("[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.") (internal citations and quotations omitted).

[102] *EB5 Holdings, Inc. v. Jaddou*, No. CV 23-1180 (RC), 2024 WL 4431258, at *2 (D.D.C. Sept. 30, 2024).

[103] Memo. Op. and Order Denying Mot. for Stay at 6, ECF No. 28 (May 24, 2024).

that claim.'"[104] Because this Court has already found that Rucker has standing, it need not

evaluate the standing of the other Plaintiffs. Regardless, however, both Craig Rucker and Peter

Flaherty have submitted declarations on behalf of themselves and Plaintiffs, CFACT, and the

National Legal and Policy Center, establishing their standing to pursue these claims.[105]

### 3.1    Plaintiff, Craig Rucker, Has Established Standing for Himself, and Plaintiff, CFACT

This Court has already determined that Plaintiff, Craig Rucker, who is the founder and

President of Plaintiff, CFACT, and has dedicated his career to protecting "the most

environmentally sensitive and endangered species on the planet, including the North Atlantic

Right Whale,"[106] has a cognizable, recreational, and aesthetic "abiding interest in the Right

Whale" through his "concrete plans to observe the Right Whale in the near future" and his belief

"that the Project will interfere with these plans."[107] Such interests are enough to confer standing

for ESA claims, for, as the Supreme Court has held, "[t]he desire to use or observe an animal

species, even for purely esthetic [sic] purposes, is undeniably a cognizable interest for purpose of

standing."[108]

CFACT and its members, which includes Plaintiff, Craig Rucker, have a legally protected

interest in the endangered North Atlantic Right Whale, granting them standing under the

ESA.[109] As a nonprofit organization, CFACT is "dedicated to protecting the earth through wise

---

[104] *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 18 (D.D.C. 2020) (quoting *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017)).
[105] *See* Decl. of C. Rucker, ECF No. 36-4 (Oct. 4, 2024); *see also* Decl. of P. Flaherty, ECF No. 36-5 (Oct. 4, 2024).
[106] Decl. of C. Rucker ¶ 3, ECF No. 36-4 (Oct. 4, 2024).
[107] Memo. Op. and Order Denying Mot. for Stay at 6, ECF No. 28 (May 24, 2024).
[108] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992).
[109] *Animal Welfare Inst. v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540, 559 (D. Md. 2009) (holding that "a nonprofit animal protection organization" with members "whom enjoyed observing" endangered species and a "nonprofit community organization" with goals to assess

stewardship of the land and its wildlife,"[110] and CFACT and its members work to protect the critically endangered Right Whale through their active stewardship program that seeks to protect animals, empower entrepreneurs, and promote a healthy environment.[111] CFACT members live in "Virginia Beach, VA where onshore construction activities for the Dominion Wind Project have already begun,"[112] and CFACT member, Craig Rucker, has taken several trips to observe the "[North Atlantic] Right Whale" and has scheduled several tours in Virginia Beach, VA, where North Atlantic Right Whales are known to be present in the hopes of seeing a whale.[113] Dominion Wind's "impacts to the [North Atlantic Right Whale] will adversely affect CFACT members and degrade their ability to observe the species and enjoy the aesthetic experience of being in their presence."[114] Injury to their member's ability to aesthetically and recreationally enjoy endangered species is a cognizable, injury in fact under the ESA and constitutes an injury to CFACT.[115]

The Government mischaracterizes Rucker's declaration, arguing that Rucker did not plainly state that he intended to go whale watching in the areas affected by Dominion Wind's construction activities.[116] But, that critique is incorrect, as Dominion Wind is actively being constructed offshore of Virginia Beach, VA, and Rucker scheduled his whale watching trip with a Virginia Beach company that travels offshore Virginia Beach.[117]

---

impacts of wind energy whose members lived near area where endangered species lived had standing under the ESA).

[110] Decl. of C. Rucker ¶ 1, ECF No. 15-2 (Apr. 29, 2024).

[111] *Id.* ¶ 2–3.

[112] *Id.* ¶ 9.

[113] *Id.* ¶ 4-5.

[114] *Id.* ¶ 7.

[115] *See Lujan*, 504 U.S. at 562–63.

[116] Decl. of C. Rucker ¶ 5, ECF No. 15-2 (Apr. 29, 2024).

[117] Rudee Tours, *Tour Information*, https://www.rudeetours.com/ (last visited Mar. 21, 2025).

The Government also inaccurately asserts that Rucker's ability to view North Atlantic Right Whales was not actually injured because no construction activities were occurring during his planned whale-watching trip.[118] But Dominion Energy's December 2024 Monthly Mariner's report confirms that construction activities—installation of rock scour protection and installation of cables—that affect whales were actively occurring throughout December when Rucker's whale watching tour was scheduled.[119] And in any event, Rucker's injury arises from his inability to continue to observe, appreciate, and study the North Atlantic Right Whale as its numbers steadily decline due, in part, to the adverse impacts of offshore wind projects, including Dominion Wind.

Dominion Wind also attempts to dismiss Rucker's injuries by claiming that "because the alleged source of harm—purportedly unconsidered cumulative effects of other offshore wind projects—will occur regardless," Rucker has not established injury.[120] But Rucker's alleged injury-in-fact is that the Government's approval of this Dominion Wind Project, in combination with all the other projects being approved and constructed, will injure this species of whale, causing there to be fewer whales available to view or will cause the whales to migrate away from the areas offshore of Virginia where they can currently be found, or both.

---

[118] Gov't Memo. in Supp. of S.J. at 15, ECF No. 38-1 (Dec. 3, 2024).
[119] Dominion Energy, *December 2024 Monthly Mariner's Update for Coastal Virginia Offshore Wind* (Dec. 4, 2024) at 3, https://coastalvawind.com/resources/pdf/mariner/20241201_december_mariner_update.pdf ("The installation of rock scour protection at the base of the monopile foundations will continue in December 2024 with the M/V FLINTSTONE and M/V YELLOWSTONE. Through the remainder of 2024 and into 2025, OEC cable installation will continue with the Cable Lay Vessel (CLV) LIVINGSTONE operating from a position beginning ~12-nautical miles from shore and working towards the Lease Area. Pre-Lay Grapnel Runs (PLGR) along the IAC routes within the Lease Area will begin in December using the tug WASHINGTON.").
[120] Dominion Energy's Memo. in Supp. of S.J. at 27, ECF No. 40-1 (Dec. 17, 2024).

### 3.2    Peter Flaherty and the National Legal and Policy Center Have Also Established Standing

Contrary to Defendants' erroneous assertions, the economic harm to Flaherty and the National Legal and Policy Center from an increase in electricity rates and the monthly surcharge resulting from the construction and installation of this offshore wind Project does constitute injury-in-fact under the ESA. Persons or organizations with economic interests that directly relate to endangered species also have standing to sue under the ESA.[121] And the Supreme Court has interpreted the ESA to protect purely economic interests: "[W]e think it readily apparent that another objective [of the best available science requirement of the ESA] . . . is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives."[122]

The D.C. Circuit came to a similar conclusion in *Mountain States Legal Foundation v. Glickman*,[123] finding that even with a solely economic claim "plaintiffs have shown an eminently plausible relationship between their interests and policy values that play an important constraining role in the statute[, the ESA,] at issue."[124]

Plaintiff, Peter Flaherty, is Chairman of Plaintiff, National Legal and Policy Center, which is a non-profit organization that promotes good government, including decisions relating to clean energy, and corporate decision-making.[125] The Project economically injures Flaherty and National Legal and Policy Center ("NLPC") by increasing their monthly energy bills, which help to subsidize the Dominion Wind Project:

---

[121] *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017).
[122] *Bennett v. Spear*, 520 U.S. 154, 176–77 (1997).
[123] *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1237 (D.C. Cir. 1996).
[124] *Id.*
[125] Decl. of P. Flaherty ¶ 1, ECF No. 36-5 (Oct. 4, 2024).

Approval of the Dominion Wind Project has economically injured Virginia ratepayers, including NLPC and me, through these monthly energy bill increases to subsidize the offshore development. The Dominion Wind [P]roject approvals and decisions, including the Biological Opinion, have caused, and continue to cause economic injury to NLPC and me, while also failing to ensure the continued viability of the North Atlantic Right Whale.[126]

### 3.3     This Court Has Already Determined that CFACT Has Established Causation

Using the heightened preliminary injunction/summary judgment standard, this Court has already found that Rucker has established causation, which "'requires a showing of two causal links: 'one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement] and one connecting that substantive decision to the plaintiff's particularized injury.'"'[127] This Court found that for Rucker, "[b]oth links are present here: Mr. Rucker contends that NMFS' failure to consider cumulative effects resulted in a deficient Biological Opinion . . . leading to approval of a project that will hinder his ability to observe the Right Whale."[128]

The causation here is evident, direct, and palpable: NMFS's failure to consider cumulative effects in the Biological Opinion led to its No Jeopardy Determination, which resulted in BOEM's approval of the Project, which threatens the continued existence of the Endangered North Atlantic Right Whale, which, in turn, injures Rucker's and CFACT's aesthetic and recreational, and Flaherty and National Legal and Policy Center's economic interests. Plaintiffs' declarations establish the causation between the Project's approvals and their injuries:

---

[126] *Id.*

[127] Memo. Op. and Order Denying Mot. for Stay at 7, ECF No. 28 (May 24, 2024) (quoting *Ctr. for Biological Diversity v. Env't Prot. Agency*, 861 F.3d 174, 184 (D.C. Cir. 2017)).

[128] *Id.*

- "[T]he Dominion Wind Project as planned and approved will have a significant, adverse impact on the Right Whale Species . . . ."[129]

- "Project-related impacts to the [North Atlantic Right Whale] will adversely affect CFACT members and degrade their ability to observe the species and enjoy the aesthetic experience of being in their presence."[130]

- "Approval of the Dominion Wind Project has economically injured Virginia ratepayers, including NLPC and me, through these monthly energy bill increases to subsidize the offshore development. The Dominion Wind [P]roject approvals and decisions, including the Biological Opinion, have caused, and continue to cause economic injury to NLPC and me, while also failing to ensure the continued viability of the North Atlantic Right Whale."[131]

### 3.4    This Court Has Authority to Redress CFACT's Injuries

Only Dominion Wind asserts that Plaintiffs' injuries are not redressable; the Government has waived this argument.[132] Specifically, Dominion Wind argues that "any alleged harm to Mr. Rucker is not redressable here because the alleged source of harm—purportedly unconsidered cumulative effects of other offshore wind projects—will occur regardless."[133] The Government made this same argument in its Opposition to CFACT's Motion for Preliminary Injunction—an argument that did not persuade the Court. Here, CFACT is seeking a ruling that the Biological Opinion violates the ESA because it excludes the best scientific information available, including

---

[129] Decl. of C. Rucker ¶ 6, ECF No. 15-2 (Apr. 29, 2024).

[130] *Id.* ¶ 7.

[131] Decl. of P. Flaherty ¶ 3, ECF No. 36-5 (Oct. 4, 2024).

[132] *See United States v. Mayendia-Blanco*, 905 F.3d 26, 32 (1st Cir. 2018) ("[I]t is a well-settled principle that arguments not raised by a party in its opening brief are waived.").

[133] Dominion Energy's Memo. in Supp. of S.J. at 27, ECF No. 40-1 (Dec. 17, 2024).

cumulative impacts from other projects. CFACT is only asking for this Biological Opinion to be vacated so that NMFS can analyze the best available scientific information and determine whether that information changes its analysis and opinions in the Biological Opinion. Such a violation is redressable by an order from this Court.[134]

This Court has already determined that Plaintiffs must only show "that a 'revisitation' would redress the injury 'because [the agency] *could* reach a different conclusion.'"[135] CFACT's injuries are redressable because it has established that "an order requiring NMFS to consider cumulative effects in its Biological Opinion could cause NMFS to reach a different conclusion regarding the Project's effects on the Right Whale."[136]

**4.    The Court Should Vacate the Biological Opinion**

Defendants argue that, even if Plaintiffs are successful in their summary judgment motion, the requested remedies, vacatur of the Biological Opinion and a stay of construction, are not available here. The Company also argues that if the Biological Opinion were vacated, "any alleged 'deficiency' with the [Biological Opinion] and BOEM's reliance on it is not significant."[137] Defendants are wrong on the law.

In the D.C. Circuit, "vacatur is the normal remedy" under the APA.[138] And this ordinary practice "holds when the law rendering the agency action unlawful is the Endangered Species Act."[139] This Court has invalidated and vacated biological opinions for failing to comply with the

---

[134] *See, e.g., Bennett*, 520 U.S. at 171.
[135] Memo. Op. and Order Denying Mot. for Stay at 7, ECF No. 28 (May 24, 2024) (quoting *Center for Biological Diversity*, 861 F.3d at 185).
[136] *Id.*
[137] Dominion Energy's Memo. in Supp. of S.J. at 28, ECF No. 40-1 (Dec. 17, 2024).
[138] *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).
[139] *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 244 (D.D.C. 2020) (internal citations and quotations omitted).

ESA.[140] For example, in *Oceana, Inc. v. Pritzker*,[141] this Court found that "vacating the [biological opinion] and directing NMFS to reinitiate consultation would redress" injuries where plaintiffs maintained that the biological opinion permitted "an unlawfully excessive amount of harm to loggerheads, which threatened [plaintiff's] enjoyment and study of those animals."[142]

In *Allied-Signal*, the D.C. Circuit set forth two factors for courts to consider when deciding on whether to vacate: "(1) the 'seriousness of the order's deficiencies' and (2) the likely 'disruptive consequences' of vacatur."[143] But the Company is incorrect in asserting that the burden of proving vacatur is necessary falls on CFACT. It does not. Rather, "because vacatur is the default remedy[,]" "defendants bear the burden to prove that vacatur is unnecessary."[144]

"Straightforward" "violations of the ESA," are not the sort of "deficiencies that can be redressed on remand"[145] because "the defects in the challenged [Biological Opinion] go far beyond a mere failure in explanation."[146] Failing to consider the best scientific and commercial data available, which is a statutory directive, is a straightforward violation of the ESA. "In such circumstances — where there is no question that the agency has violated the law and absolutely no possibility of the [agency action's] survival on remand — the D.C. Circuit has suggested that the rule ought to be vacated."[147]

---

[140] *See id.* at 245; *see also Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 60 (D.D.C. 2024).

[141] *Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232 (D.D.C. 2015).

[142] *Id.* at 241.

[143] *Ctr. for Biological Diversity*, 734 F. Supp. 3d at 60 (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993)).

[144] *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019).

[145] *Ctr. for Biological Diversity*, 480 F.Supp.3d at 245.

[146] *Humane Soc'y of the United States v. Jewell*, 76 F. Supp. 3d 69, 137 (D.D.C. 2014).

[147] *Conservation L. Found. v. Pritzker*, 37 F. Supp. 3d 254, 271 (D.D.C. 2014) (citing *Nat. Res. Def. Council v. E.P.A.*, 489 F.3d 1250, 1261 (D.C. Cir. 2007)).

As for any disruptive consequences, absent a strong showing by Defendants that "vacatur will unduly harm economic interests like aquaculture or recreational fishing," this Court "is reluctant to rely on economic disruption as the basis for denying" the normal remedy of vacatur.[148]

Neither Defendant has met its burden of proving that vacatur is unnecessary here. The Company writes off any alleged deficiency in the Biological Opinion, arguing that even if those deficiencies exist—they do—the Biological Opinion should remain valid, and construction should be allowed to continue because the agency could explain its deficiencies and BOEM would reasonably rely on the Biological Opinion and the analysis in the Final EIS. But the Final EIS does not make a jeopardy determination; only a Biological Opinion by the consulting agency can do that.

The Presidential Memorandum issued on January 20, 2025 supports vacating the Biological Opinion in this case. The Memorandum states that for existing leases the Secretary of the Interior, "shall conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases," and that no new or renewed "approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects" shall be issued "pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices."[149] This Memorandum also requires the

---

[148] *Pub. Emps. for Env't Resp. v. United States Fish & Wildlife Serv.*, 189 F. Supp. 3d 1, 3 (D.D.C. 2016).

[149] Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, 90 Fed. Reg. 8363.

Secretary of Interior to consult with the National Marine Fisheries Service regarding impacts to wildlife.[150]

In any event, the Company's argument that the Court lacks the authority to grant Plaintiffs the requested remedy is wrong and not a ground for denying summary judgment.

**Conclusion**

For all of these reasons, and those set forth in its earlier briefings, CFACT asks this Court to grant its motion for summary judgment and deny Defendants' cross-motions for summary judgment.

Respectfully submitted,

/s/ Roger J. Marzulla
Roger J. Marzulla, Bar No. 394907
Nancie G. Marzulla, Bar No. 400985
Mollie A. Jackowski, Bar No. 1780535
Marzulla Law, LLC
1150 Connecticut Ave., NW, Suite 1050
Washington, D.C. 20036
(202) 822-6760
nancie@marzulla.com
roger@marzulla.com
mollie@marzulla.com

Paul D. Kamenar, Bar No. 914200
1629 K. Street, N.W.
Suite 300
Washington, D.C. 20006
(301) 257-9435
paul.kamenar@gmail.com

Dated: March 24, 2025                    Counsel for Plaintiffs

---

[150] *Id.*